LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543
475 14th Street, Suite 500
Oakland, CA 94612
Telephone: (510) 329-2140
Facsimile:  (510) 580-9410

DENNIS CUNNINGHAM, SBN 112910
115A Bartlett St.
San Francisco, CA 94110
Telephone: 415-285-8091
Facsimile:  415-285-8092

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ALAMEDA COUNTY MALE PRISONERS** And Former Prisoners, DANIEL GONZALEZ, ROCCI GARRETT, LAWRENCE GERRANS and MICHAEL LUCAS, MARTIN GALLARDO, and SERGIO MORALES-SERVIN And JOHN DOEs Nos. 1-- X, on behalf of themselves and others similarly situated, <u>as a Class, and Subclass</u> **PLAINTIFFS,** vs. **ALAMEDA COUNTY SHERIFF'S OFFICE**, GREGORY J. AHERN, THOMAS F. MADIGAN, D. HOUGHTELLING, CAPTAIN DERRICK C. HESSELEIN, DEPUTY IGNONT (sp), DEPUTY JOE (sp), TECHNICIAN KAISER, ALAMEDA COUNTY and John & Jane DOEs, Nos. 1 - 50. **and,** The **CALIFORNIA FORENSIC MEDICAL GROUP**, a corporation; aka WELLSPRING, INC. its Employees and Sub-Contractors, and Rick & Ruth ROEs Nos. 1-50, **and,** **ARAMARK CORRECTIONAL SERVICES, LLC**, a Delaware Limited Liability Company; its Employees and Sub-Contractors, and Rick and Ruth ROES Nos. 51-100. | No. _____<br><br><br>**COMPLAINT** for INJUNCTIVE RELIEF, DECLARATORY RELIEF AND DAMAGES FOR VIOLATION OF CIVIL RIGHTS and OTHER WRONGS<br><br><br><br>**JURY TRIAL DEMANDED** |

1

**DEFENDANTS.**

1.      Plaintiffs DANIEL GONZALEZ, ROCCI GARRETT, LAWRENCE GERRANS and MICHAEL LUCAS, MARTIN GALLARDO, and SERGIO MORALES-SERVIN on behalf of themselves and those they speak for and seek to represent herein, for themselves and others make this complaint, based on the knowledge of the Plaintiffs as to themselves and as to conditions and acts which they have personally observed, and on information and belief, including the investigation of counsel, as to all other matters.

**PRELIMINARY STATEMENT**

2.      This is a civil rights action in which the Plaintiffs, on behalf of themselves and a class of similarly situated individuals, seek relief for Defendants' violations of Plaintiffs' rights and privileges secured by the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

3.      This civil rights lawsuit arises out of the unlawful, unconstitutional and inhumane manner in which defendant ALAMEDA COUNTY SHERIFF'S OFFICE, its staff and employees and multiple for-profit contractors, operate the largest county jail in the San Francisco Bay Area. Although 85 percent or more of inmates at Santa Rita Jail are pretrial detainees, both state and federal, Defendants operates this county jail as a penal institution which has as its primary purpose, the lock down of inmates.  Inmates are treated as the inventory in defendants' business of incarceration.  Defendants expend a minimum effort to meet state and federal standards. Although defendants assert that they fully comply with statutory and regulatory standards, in reality, defendants have implemented policies and procedures and a system, which deliberately avoids and then obfuscates their refusal to comply with these state and federal statutes and regulations, which are directed at setting a constitutional standard for conditions of confinement.

4.      Unable to tolerate these unsanitary and inhumane conditions, plaintiffs and other inmates after failing to obtain a response through defendants' purported grievance process, then engaged in a multi-prong strike, including a hunger strike, a work strike, and a strike against participating in jail activities such as going to court.

5.      The conditions plaintiffs and class members seek to address are:

      a.   Excessive lock down, and inadequate time out of cell;

      b.   Inadequate outdoor recreation;

      c.   Unsanitary conditions of confinement;

      d.   Food that is infested with rodents, insects and bird droppings;

      e.   Food that is inedible due to excessive cooking and overheating;

      f.   Lack of medical care for newly booked detainees who are detoxing from drugs;

      g.   Requiring inmates to provide the medical care for  newly booked, detoxing detainees;

      h.   Group punishment: punishing entire units for the perceived infraction of individuals;

      i.   Retaliation and discipline against inmates for speaking out against problems;

      j.   Deliberate conduct by defendants to prevent plaintiffs and class members from filing grievances or raising complaints over conditions of confinement;

      k.   Intimidation and retaliation by defendants when plaintiffs and class members attempt to file grievances or articulate complaints over conditions of confinement;

      l.   Defendants wrongful denials of attorney visits, family visits, phone calls and mail.

      m.   Defendants' price gouging and profiteering from charges for commissary; phone calls and video visits.

6.      Many if not most of these are long standing conditions, many of which were first raised by the women inmates at Santa Rita Jail in *Mohrbacher et al v. Alameda County Sheriff's Office*, et al. 3:18-cv-00050-JD.

7.      Defendants actions deprive plaintiffs and class members of their constitutional rights to free speech and free association; to the right as pretrial detainees with the presumption of innocence, to be free from punishment; to the right to be free from cruel and unusual punishment; to the right of equal protection and due process under the law; all of which are guaranteed by the United States constitution.

**JURISDICTION**

8.     This action is brought pursuant to the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United State Constitution, by way of the Civil Rights Acts, 42 U.S.C. §§1981, 1983 et seq. and 1988.

9.     Jurisdiction is conferred upon this Court by 28 U.S.C. §1331 (claims arising under the United States Constitution) and §1343 (claims brought to address deprivations, under color of state authority, of rights privileges, and immunities secured by the United States Constitution).

**VENUE AND INTRADISTRICT ASSIGNMENT**

10.     The claims alleged herein arose in the County of Alameda, State of California. Therefore, venue and assignment, under 28 U.S.C. § 1391(b), lies in the United States District Court for the Northern District of California, San Francisco Division or Oakland Division.

**JURY DEMAND**

11.     Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

**PARTIES**

**Plaintiffs**

12.     Plaintiffs are all former or current prisoners incarcerated at the Santa Rita Jail.  All Plaintiffs seek to represent a class of male imprisoned at the Santa Rita Jail at any time since November 12, 2017, two years prior to the date of filing of the Original Complaint in this action.

13.     Plaintiffs DANIEL GONZALEZ, ROCCI GARRETT, are currently incarcerated prisoners in Santa Rita Jail.

14.     Plaintiffs LAWRENCE GERRANS and MICHAEL LUCAS were formerly imprisoned at Santa Rita jail.

15.     MARTIN GALLARDO and SERGIO MORALES-SERVIN are currently incarcerated prisoners in Santa Rita Jail, who were kitchen workers, and who received a disciplinary citation, with loss of privileges and punishment in the form of additional days added to their sentence.

**Defendants**

    a.   Alameda County Defendants

16.     Defendant ALAMEDA COUNTY SHERIFF'S OFFICE (hereinafter referred to as "ACSO") is a "public entity" within the definition of Cal. Govt. Code § 811.2.

17.     Defendant ALAMEDA COUNTY is a county in the State of California.

18.     Defendant GREGORY J. AHERN is, and at all times relevant to this Complaint was, the Sheriff of Alameda County.  As Sheriff of Alameda County, Defendant Ahern has at times relevant to this Complaint held a command and policy making position with regard to County Jails, including Santa Rita Jail.  Defendant Sheriff AHERN has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at Santa Rita Jail, as described fully below.  Sherriff AHERN has, wholly or in part, directly and proximately caused and, in the absence of the injunctive relief which Plaintiffs seek in this Complaint, will continue in the future to proximately cause, the injuries and violations of rights set forth fully below. Defendant Sheriff AHERN is sued in his official capacity only.

19.     Defendant D. HOUGHTELLING is, and at all times relevant to this Complaint was, the Assistant Sheriff of Alameda County in charge of the Detentions and Corrections Unit ("DCU"), which includes the Santa Rita Jail. As Assistant Sheriff of Alameda County in charge of DCU, Defendant HOUGHTELLING has at times relevant to this Complaint held a command and policy making position with regard to County Jails, including Santa Rita Jail.  Defendant Assistant Sheriff HOUGHTELLING has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at Santa Rita Jail, as described fully below.  Assistant Sheriff HOUGHTELLING has, wholly or in part, directly and proximately caused and, in the absence of the injunctive relief which Plaintiffs seek in this Complaint, will continue in the future to proximately cause, the injuries and violations of rights set forth fully below. Assistant Sheriff HOUGHTELLING is sued in his official capacity only.

20.     Defendant TOM MADIGAN is, and at all times relevant to this Complaint was, the Commander in Charge of DCU, which includes the Santa Rita Jail. As the Commander in Charge of DCU, Defendant MADIGAN has at times relevant to this Complaint held a command and

1   policy making position with regard to County Jails, including Santa Rita Jail.  Defendant

2   MADIGAN has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced

3   in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices

4   that prevail at Santa Rita Jail, as described fully below.  Defendant MADIGAN directly supervises

5   defendant HESSELEIN and has, wholly or in part, directly and proximately caused and, in the

6   absence of the injunctive relief which Plaintiffs seek in this Complaint, will continue in the future

7   to proximately cause, the injuries and violations of rights set forth fully below. Defendant

8   MADIGAN is sued in his official capacity only.

9   21.      Defendant D. HESSELEIN is, and at all times relevant to this Complaint was, the

10  Detention and Corrections Commander of ACSO.  As the Detention and Corrections Commander

11  of ACSO, Defendant HESSELEIN has at times relevant to this Complaint held a command and

12  policy making position with regard to County Jails, including Santa Rita Jail.  Defendant

13  HESSELEIN has caused, created, authorized, condoned, ratified, approved or knowingly

14  acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and

15  practices that prevail at Santa Rita Jail, as described fully below.  Defendant HESSELEIN has

16  direct supervision and control over the staff of Santa Rita Jail.  Defendant HESSELEIN is the

17  responsible individual for enforcing defendant ACSO's policies and procedures, for setting

18  standards, for holding all other employees, including all sheriff deputies and technicians

19  accountable for the proper enforcement of ACSO's policies and procedures and insuring that

20  conditions of confinement are lawful and constitutional.    Defendant HESSELEIN is responsible

21  for investigating and being personally knowledgeable about the goings on inside the jail.

22  Defendant HESSELEIN, wholly or in part, directly and proximately caused and, in the absence of

23  the injunctive relief which Plaintiffs seek in this Complaint, will continue in the future to

24  proximately cause, the injuries and violations of rights set forth fully below. Defendant

25  HESSELEIN is sued in his personal and official capacity.

26  22.      Defendants Deputies JOE, and IGNOT,  DEPUTY 'A', and DEPUTY "S", were guards

27  and deputies on duty at Santa Rita Jail with direct control over plaintiffs and class members.

28  Defendant Technician KAISER is an ACSO employee assigned to work at Housing Unit 34.

Defendants JOE, and IGNOT,  DEPUTY 'John Doe', and DEPUTY "Jane Doe", and Technician KAISER are sued in their individual capacities.

23.    Each and every individual Defendant named herein was at all times relevant to this Complaint an officer or employee of the Alameda County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of ASCO and within the scope of their employment with ASCO.

       b.    The Private Contractor Defendants

24.    Defendant CALIFORNIA FORENSIC MEDICAL GROUP (hereinafter referred to as "CFMG"; also known as CFMG, Inc.) is an active, domestic, for-profit corporation incorporated in the State of California with its principal place of business in San Diego, California.   Defendant CFMG contracts with ASCO to provide general medical, dental, prenatal and opioid treatment services at Santa Rita Jail.  Defendants RICK and RUTH ROEs 1-50 are CFMG employees who work at Santa Rita Jail.  At all times relevant to this Complaint, Defendants CFMG and RICK and RUTH ROEs 1-50 were agents of the Alameda County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of ASCO and within the scope of their agency with ASCO.

25.    Defendant ARAMARK CORRECTIONAL SERVICES LLC ("ARAMARK") is an active, foreign, for-profit Limited Liability Company registered in the State of Delaware and licensed to do business in the State of California.  Defendant ARAMARK contracts with ASCO to operate the kitchens at Santa Rita Jail for the purpose of feeding Santa Rita prisoners, and for the purpose of preparing food to feed prisoners at least six other Bay Area county jails.  Defendants RICK and RUTH ROEs 51-100 are ARAMARK employees who work at Santa Rita Jail.  At all times relevant to this Complaint, Defendants ARAMARK and RICK and RUTH ROEs 51-100 were agents of the Alameda County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of ASCO and within the scope of their agency with ASCO.

## CLASS ALLEGATIONS

26.     Pursuant to Rules 23(a), (b2) and (b)(3) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a Plaintiff class consisting of all men incarcerated at Santa Rita Jail ("SRJ")from November 12, 2017 through to the present, and the subclass of sentenced men incarcerated at Santa Rita Jail ("SRJ")from November 12, 2017 through to the present. All such inmates were denied access to food that is adequate to maintain health in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution, denied conditions of confinement that met the minimal requirements of the Eighth and Fourteenth Amendments to the U.S. Constitution, and all faced denial of due process in defendants' retaliatory actions and the manner in which grievances were handled.  All plaintiffs and class members had their First Amendment and Due Process rights, under the United States Constitution violated.

27.     The members of the class are so numerous as to render joinder impracticable.  In the Fourth Quarter of 2018, Santa Rita Jail had an average daily population of 2,573 inmates, of which 85% or 2,175 were pretrial.   Approximately 2,239  or 87% of all inmates are male.

28.     In addition, joinder is impracticable because, upon information and belief, many members of the class are not aware of the fact that their constitutional rights were violated and that they have the right to seek redress in court.  Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.  There is no appropriate avenue for the protection of the class members' constitutional rights other than a class action.

29.     The class members share a number of questions of law and fact in common, including, but not limited to:

        a.   whether the lack of sanitation in inmate housing, in holding cells, and in jail food preparation facilities is inadequate and violations of inmates eight and 14th amendment rights;

        b.   whether the members of the class were denied access to food that is adequate to maintain health;

        c.   whether ACSO and ARAMARK jointly established and implemented policies specifically designed and intended to deny access to food, and reduce necessary

expenditures on food preparation and basic food that is adequate to maintain health, and reduce expenditures on costs of food storage and the proper sanitation of food handling facilities, in order to reduce ACSO's costs to increase the profits of ACSO and ARAMARK;

d.  whether ACSO, in concert with its goals to increase profits to ACSO, established and implemented policies specifically designed and intended to increase profits to ACSO by providing the lowest quality food provided to inmates, forces inmates to purchase food from the commissary.  This has the double benefit to defendant ACSO of maintaining lower costs output for food and simultaneously increasing profits from sale of commissary items.  On information and belief, plaintiffs assert that the Sheriff has sole approval authority over recent significant prices increases where simple, common food stuffs such as ramen return profit margins of 400% and the Sheriff's contract with the commissary concessionaire provides that the Sheriff receives 40% of all profits earned.   Commissary prices also recently increased.

e.  whether ACSO, in concert with its goals to impede and create barriers to plaintiffs and class members' abilities to communicate with family and friends, and increase profits to ACSO, established and implemented policies specifically designed and intended to increase profits to ACSO by maintaining high prices for inmate phone and family video contacts;

f.  whether ACSO established and implemented policies in violation of the First, Eighth and Fourteenth Amendment, by wrongfully limiting the ability of inmates to phone and visit with family and community, unreasonable denial and limits of in person and video visits, with these unreasonable denials and limits partially imposed through high and excessive costs of telephone calls and video visits, imposed through making phones inaccessible and unavailable, and lockdowns so that inmates are prevented from participating in in person and video visits;

g.  whether ACSO established and implemented policies in violation of the Fourteenth Amendment. which inflicted unconstitutional punishment against the male pretrial

9

population of SRJ by long periods of enforced idleness, excessively locking them into cells and denying them necessary out of cell time, and outdoor recreation time;

h.  whether ACSO established and implemented policies in violation of the First, Eighth and Fourteenth Amendment, by wrongfully delaying mail or not delivering mail;

i.  whether ACSO established and implemented policies in violation of the Fourth, Eighth and Fourteenth Amendment by subjecting all inmate workers to daily, naked, full body searches which are dehumanizing and degrading;

j.  whether ACSO established and implemented policies in violation of the Eighth and Fourteenth Amendment by subjecting laundry inmate workers to exposure to linens and materials contaminated with human biohazardous materials from the coroners' office,  including failing to provide adequate training; failing to provide any protective clothing or gear.

k.  whether the manner in which jail laundry was performed is inadequate and violates plaintiffs and class members' Eight and 14th amendment rights;

l.  whether ACSO, as part of its to objective maximize profits from the inmates to the jail, in concert with CFMG policies and practices creating barriers to medical care including excessive co-pay charges;

m.  whether ACSO established and implemented policies in violation of the First, Eighth and Fourteenth Amendments, to intimidate and prevent plaintiffs and class members from filing grievances against wrongful and unlawful practices at SRJ;

n.  whether the members of the class were prevented by fear of retaliation from engaging in the right to file grievances against unlawful practices at SRJ.

o.  whether at all times relevant to this Complaint Defendants ACSO, CFMG and ARAMARK acted under color of State law;

30.  The Plaintiffs' claims are typical of those of the class.  Like the other members of the class, the Plaintiffs were victims of the Defendants' policy, practice, and/or custom of preventing access to appropriate and necessary health sustaining food; communications with family and community,

COMPLAINT; DEMAND FOR JURY TRIAL

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No._____

necessary sanitation including sufficient supplies provided with sufficient frequency for maintaining personal sanitation; access to medical care; sufficient clean laundry; and the right to be free of infliction of frequent and repeated strip and body cavity searches that are conducted outside prisoners' cells, for no valid penological reason, and as a form of deliberate dehumanizing, degradation.

31.     The legal theories under which the Plaintiffs seek relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the Plaintiffs are typical of the harms suffered by the class members.

32.     The Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interests with members of the class, and will fairly and adequately protect the interests of the class.  The Plaintiffs have all been subject to conditions of confinement that violate the First, Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution.

33.     The Plaintiffs are represented by experienced civil rights and class action counsel. Plaintiffs' Counsel have the resources, expertise, and experience to prosecute this action. Plaintiffs' Counsel know of no conflicts among members of the class or between the attorneys and members of the class.

34.     The Plaintiff class should be certified pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to class members, the interests of the Plaintiffs and potential class members are aligned, and a class action is superior to other available methods for fairly and efficiently adjudicating the case.

## STATEMENT OF FACTS

*35.*     On October 30, 2019, for the first time ever, inmates at Santa Rita Jail, unable to tolerate the conditions of confinement, commenced a hunger strike, and a strike against the jail.  The strike against the jail included refusal to go to Court, refusal to eat the Jail's food, and refusal to perform work.

General Conditions For MALE Inmates At SRJ

36.     Santa Rita Jail was completed in 1989, and designed with the concept of locking up inmates.  Santa Rita Jail was not designed to provide inmates with classes or programs, but primarily to keep inmates, even those who are pretrial, locked in cells.

37.     Defendant ACSO, despite California State policy that the "dramatic spending in corrections" have resulted in worse or unchanged recidivism rates, and mandated that "California must reinvest its criminal justice resources to support community-based corrections programs and evidence-based practices that will achieve improved public safety returns on this state's substantial investment in its criminal justice system,"  Penal Code §17.5, and despite Defendant Alameda County Sheriff's Office's receipt of a significant portion of Alameda County's funding from the state for evidence based practices, through realignment funding, defendant ACSO has not changed its emphasis on locking up inmates locked in cells and its policy of enforced idleness.  Santa Rita Jail, severely limits out of cell time, outdoor exercise time, and has maintained its administrative rigidity.

Lack Of Sanitation

38.     Santa Rita Jail's men minimum security housing consists of large cells with 28 to 30 men in each cell. Men are housed in bunk beds, and there are 6 cells in each housing unit.  In the minimum-security housing units, each cell has 2 toilets, one urinal and one shower, which all 30 inmates share.  The jail does not provide soap in the bathrooms.   Inmates are required to clean their own housing and bathrooms.  But the jail only permits access to cleaning supplies once a week for 15 minutes.  In addition, the cleaning supplies is limited to only a few utensils, and one bottle of cleanser.  As a result, it is impossible for the plaintiffs and class members to actually clean the bathrooms, or their cells, and must live in squalor and filth.  One of plaintiffs' complaints is that the inmate bathrooms have become infested with swarms of small flies or biting gnats who are attracted by the filth.   The men have requested better and more frequent access to cleaning supplies.

39.     Furthermore, the jail has a policy of housing people who are detoxing from drugs with the general population in a housing unit rather than in a medical unit where these people receive care

from medical staff.  People who are detoxing from drugs are very ill, vomiting or with severe loss of bowel control.  These people end up vomiting or losing bowel control on their beds, on the floors, all over the bathrooms.   Because getting a lower bunk often requires a medical slip, these inmates who are detoxing are placed in the upper bunk and the vomit and feces gets on the person below.  In addition, these individuals are disoriented, weak, and when they have to vomit or have loose bowels, they have difficulty getting down in a hurry from the top bunk, leading to frequent falls and injuries.  Sometimes, these severely weakened and impaired individuals are unable to reach the bathroom and the resulting human bio waste is over the floors and in the general cell living area.

40.     Because everyone is required to live together, the smell, biohazards, and filth negatively affects everyone.  Because inmates have no access to cleaning supplies, this frequent situation contributes to the squalor, filth and unsanitary conditions inmates are forced to live in.  Almost all of the minimum-security cells have someone at least once a week, who is detoxing, so this is a constant, chronic condition. This results in the spread of contagious bugs such as lice and scabies, staph infections, e-coli, pseudomonas, hepatitis, C-difficile, and even possibility the Aids virus.

41.     Due to the policy of arresting indigent and homeless people, defendant ACSO regularly places these people into the cells with other prisoners, without affording these people an opportunity to shower and wash.  Theoretically, there is a shower available at booking/intake.  However, the holding cells and the booking/intake facilities are routinely filthy, rendering the showers unavailable, and unusable, and certainly not suitable for assisting in cleaning people to avoid the spread of contagion.

42.     These problems are exacerbated by the jail's policy of not providing soap for inmates in the bathrooms.   Although there is a "free" toiletry kit given out to all newly booked inmates and for indigent inmates, the products are of limited quantity so that it is inadequate for maintaining personal hygiene beyond one or two uses.  Therefore, while the soap in the "free" kit is supposed to last a whole week, those who are reliant  on the indigent kit do not provide enough supplies to maintain personal cleanliness for  an entire week.  In addition, although the "free" kit for indigent inmates is supposed to be provided once a week, often is provided less frequently.  The inability of

COMPLAINT; DEMAND FOR JURY TRIAL

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No._____

1    inmates to maintain personal hygiene negatively impacts all of the inmates who share the same cell

2    with indigent inmates.

3    43.    The problems extend beyond the housing unit cells and booking/intake.  Whenever people

4    are booked, or go to and from the jail to court, they are held in the multi-purpose rooms, and

5    various holding cells.   A recurring problem is unsanitary conditions in the bathrooms and the

6    holding cells.  Due to the large number of people who transit through these rooms, these cells

7    quickly become dirty, and filled with trash.  The multi-purpose room, holding cells and dress out

8    rooms are rarely cleaned.  The bathrooms available are filthy with feces and biohazards all around.

9    44.    Even inmates do not have access to soap outside the housing unit cells because they are not

10   permitted to carry this soap on their person.  Because the jail does not provide soap in any of the

11   bathrooms available to inmates, when inmates are required to go to court or other parts of the jail,

12   they have no means to wash their hands after using the bathroom.   While there is a policy on the

13   books for Defendant ACSO's books permitting inmates to bring a sanitary kit to court, whether an

14   inmate actually gets to bring a "sanitary kit" depends on the arbitrary whim of the deputies in

15   charge at the various stations along the way.  Most inmates do not chance bringing their soap with

16   them because meeting up with the wrong deputy resulted in having that soap confiscated and

17   therefore resulting in having no soap at all.  As a result, inmates going to court are not afforded the

18   ability to wash their hands after using the bathroom.

19        Laundry

20   45.    Every male inmate, by regulation is limited to only one set of clean clothes per week.

21   Having extra clean clothing is subject to disciplinary punishment.  Laundry exchange requires that

22   each inmate strip down to underwear, or wrap in a sheet or towel, because laundry is a one to one

23   exchange.  Being permitted only one change of clothes per week is another means whereby, the jail

24   makes it difficult, if not impossible to maintain personal cleanliness.  Furthermore, laundry

25   exchange is on Thursday or Friday, but bathroom cleaning is done in Saturdays.  Given the filth of

26   the bathroom, any of the inmates who "volunteers" to clean the bathrooms are then placed in the

27   situation that their clothes become soiled due to cleaning human feces and urine in the bathroom,

28   and then, as a reward for their volunteer efforts, they have to live in these soiled clothes for 5-6

days.  Inmates have requested that if they either be provided two sets of clean clothing or if they are to be limited to one set of clean clothes, it would make more sense for clean laundry to be provided, after cell cleaning, so that inmates can clean the bathroom, and then have clean laundry to wear for the rest of the week.

46.     Even with "clean" laundry, the "clean" clothing is frequently not very clean, having been improperly laundered.  This is due to the insufficient washing machines at the jail.  Jail laundry workers, in order to meet their work loads, have to overstuff the washing machines, which results in insufficient water and soap, and laundry which is not properly laundered.  Furthermore, jail laundry workers are required to do the sheets and towels and other linens from the coroners' office, which are often soaked in human bodily fluids.  At times these linens even have body parts wrapped within.  While these linens are transported in bags clearly marked as "biohazard", these linens are given to jail laundry workers, who have no protective clothing, no training in handling biohazardous human wastes, and are washed in the same jail washing machines.

Defendant ACSO's Substantial Salary Increases

47.     Since 2013,  Sheriff Ahearn has overseen an unprecedented increase in the salaries of defendant ACSO personnel at Santa Rita Jail.  Salaries and benefits at SRJ have increased by $12.44 million dollars since 2013.  As a result, being a jail guard at SRJ is one of – if not the most – remunerative jobs in the entire county that a high school graduate with no college education can get.  A starting jail guards make approximately $100,000 per year in salary and benefits.  This is not counting overtime payments available.

48.     That $12.4 million-dollar salary increase, and the $1.7 million increase in overtime between 2013 and 2018 amounted to almost 50% of the Sheriff's office SRJ budget increases over that period.  It is reported that in 2017, Defendant Sheriff Ahern received $632,332 in total compensation, Defendant Houghtelling received $449,144.96 in total compensation and Defendant Captain Hesselein received $394,437.[1]

---

[1]   https://transparentcalifornia.com/salaries/2017/alameda-county/

49.     Over the same period, while remuneration for Sheriff's office deputies and personnel at SRJ increased substantially, the SRJ jail population for whom the Sheriff is responsible, *declined* by almost 30%.

50.     According to ACSO, the average daily population at SRJ was 3,431 inmates in June 2013 and had fallen to 2,825 by June 2015.  Upon information and belief, the average daily population is now between 2,200 and 2,500.  Thus, the population at SRJ has declined by about 30% at the same time that remuneration for Sheriff's office deputies and personnel at SRJ increased by over 18%.

51.     During this period, ACSO also entered into contracts with private, for-profit companies to provide basic and crucial services to SRJ inmates.

<u>ACSO's Contract with For Profit CFMG (also known as Wellpoint, Inc.)</u>

52.     ACSO contracts with Defendant CFMG to provide all health care services of any type needed by any inmate at SRJ.  CFMG's contract specifies a set price based on average daily inmate population ("ADP").

53.     Crucially, the CFMG contract specifies that CFMG itself is solely responsible for all costs incurred in connection with any health care services provided to inmates outside the jail and that CFMG is not entitled to and will not receive any reimbursement from ACSO for the cost of services provided to inmates by hospitals or by any non-CFMG personnel. The cost for all such services is borne solely by CFMG.

54.     ACSO's contract with CFMG explicitly states that CFMG will pay for any and all "inpatient hospitalization costs, emergency room visits, ambulance transportation expenses, outpatient surgeries, outpatient physician consultations, outside specialist fees, off-site diagnostic procedures."  If an inmate receives such medical services, CFMG must pay the total cost of the medical care provided, "regardless of the level of cost incurred."

55.     The contract specifies that CFMG alone will determine "the necessity and appropriateness of inpatient hospital care and other outside medical services."

56.     Incredibly, the contract also specifies that in the event a third-party payor such as an insurer pays for part or all of any medical service provided to an inmate outside the walls of SRJ, CFMG must turn over half of that third-party payment to the Sheriff's office.  In other words, even if

1   CFMG is reimbursed for its costs for outside medical care provided to inmates, the Sheriff's office

2   takes half of the reimbursement even though it paid nothing for the outside medical care.

3   57.     By requiring CFMG to pay for any and all medical care provided outside of SRJ to any SRJ

4   inmate, and by limiting CFMG's ability to recover any amount CFMG pays for such care, ACSO's

5   contract with CFMG creates a financial incentive and imperative for CFMG to refuse and withhold

6   needed and appropriate outside medical services to all inmates, including pregnant inmates, when

7   the needed and appropriate medical services consist of "inpatient hospitalization costs . . .

8   outpatient physician consultations, outside specialist[s, or] off-site diagnostic procedures," among

9   other services.

10   58.     By specifying that CFMG alone will determine "the necessity and appropriateness of

11   inpatient hospital care and other outside medical services," ACSO's contract with CFMG enables

12   CFMG to refuse and withhold needed and appropriate outside medical services to SRJ inmates,

13   including pregnant inmates, when the needed and appropriate medical services consist of "inpatient

14   hospitalization costs . . . outpatient physician consultations, outside specialist[s, or] off-site

15   diagnostic procedures," among other services.

16   59.     "[O]utpatient physician consultations, outside specialist[s and] off-site diagnostic

17   procedures" within the meaning of the CFMG contract include any outside or off-site OBGYN

18   services, including prenatal care, provided to pregnant SRJ inmates.

19   60.     The medical provider in the San Francisco County jail is not a for-profit correctional

20   healthcare company such as CFMG.  It is the County Department of Public Health, which has no

21   financial incentive to deny care.

22   61.     The medical provider in the Contra Costa County jail is not a for-profit correctional

23   healthcare company such as CFMG.  It is the County Department of Public Health, which has no

24   financial incentive to deny care.

25   62.     The price provisions of the CFMG contract which create a financial incentive to deny care

26   have had a devastating impact on the provision of medical services to inmates at SRJ, including

27   pregnant inmates.  That impact is detailed below at Paragraphs 93-98; 114-125.

28   _ACSO's Contract with ARAMARK_

17

63.     ACSO contracts with ARAMARK to prepare food for inmates at SRJ and to prepare food which is used to feed inmates at other adult jail facilities in Colusa, Solano, San Benito, San Joaquin, Amador and Lake counties, and a juvenile facility in San Joaquin County.  ARAMARK prepares 16,000 meals a day, with the labor of inmate workers who are not paid but receive food treats.

64.     Through its contract with ARAMARK, ACSO instituted a 25% cut in the inmate food budget at SRJ.

65.     ARAMARK implemented the reduction in the inmate food budget at SRJ in the amount of $1.65 million.

66.     The cost reductions which ACSO instituted in the ARAMARK contract and implemented by ARAMARK have had a devastating impact on the quantity and quality of food provided to inmates at SRJ.  That impact is detailed below.

        Vermin and Animal Invested Food/Poor Sanitation in the Jail Kitchen

67.     The kitchen at SRJ is staffed by inmate workers under the supervision of Defendant ARAMARK.  Inmates are not consistently tested for communicable diseases before being assigned to work in the kitchen.

68.     Santa Rita's kitchen prepares food not just for prisoners in the Santa Rita Jail, but also for at least six (6) other county jails within the region.  Both Aramark and the Alameda County Sheriff's Office receive financial benefit from this food service to other county jails.

69.     According to inmate kitchen workers at SRJ, the kitchen at SRJ is filthy.  Birds roost at night in the kitchen.  Kitchen workers report seeing rats and mice daily in the kitchen.  Night time workers report that cockroaches are in the kitchen every night.   Animal droppings fall all on counter surfaces, including food preparation surfaces.  Rats run across the kitchen floor and there are frequently rat droppings in the food.  Santa Rita Jail has attracted a variety of animals and bugs by providing abundant food and suitable habitat.

70.     Inmates have complained that the food they receive is infested by rat and mice feces, bird droppings, and on occasion, the dead mouse in the beans.

71.     The cake and bread trays, loaded with baked goods, are left out over-night, uncovered, and the birds feast.  Food in the kitchen is kept in such a manner that rats can access it.  Bread is kept in plastic bags in open plastic crates, providing for easy access for rats.  Rats climb over the bread and chew open packages.  When bread bags are chewed by rats, a few pieces are thrown away but the rest of the bread is served to prisoners.

72.     Used food trays are collected and delivered to the kitchen, where they are stacked against one wall, and left in the open, available and accessible to mice and rats, again providing an easily accessible, bounty of food and therefore, continually attracts mice and rats.

73.     Sandwich meat, primarily bologna, often is spoiled, with raised white spots of unknown origin and type on it.  That spoiled meat is given to prisoners to eat.

74.     Cooked beans are not properly stored, and not labeled, so that old, leftover beans are frequently reheated and served, or combined with newer cooked beans.  As a result, the beans decompose, and frequently become slimy and start to bubble as part of its bacterial decomposition. Decomposing spoilt beans are regularly served to prisoners.

75.     The kitchen bathroom is not adequately maintained and frequently by the middle of the first day shift, the bathroom has run out of soap and paper towels, so that inmate workers, required by health code to wash their hands after using the bathroom, are unable to do so.

76.     Commercial kitchens normally have a daily clean-up crew which comes in and cleans all ovens, stoves, vent hoods, floors, and other surfaces and equipment in the kitchen.  Commercial clean-up crews normally come in the early morning, before a commercial kitchen opens.

77.     In 2017, the women prisoners at Santa Rita Jail filed a class action lawsuit against the jail for similar issues.  For a period of time, women prisoners, who work the graveyard shift at the kitchen, were organized into cleaning crews, and crews were assigned to clean the various parts of the jail.  For the past two months, this situation has reverted.  The cleaning crews have been disbanded.  The new Aramark staff person no longer has access to the cleaning supplies.  There is only one woman prisoner assigned to cleaning, and she given only dishwashing liquid and a squeegee to clean the kitchen floor.

Dirty Food Trays

78.     The Santa Rita Jail has a tray washing system that does not consistently remove old food and clean the food trays.  Used food trays are collected and sent back to the kitchen, and stacked along the walls in open stacks overnight.  These trays are not rinsed.  By the time the next day's kitchen shift starts, this food has dried and hardened, particularly into the corners of the tray's indented pockets.   The Aramark cleaning procedure is for these trays to be dumped into a large, wash basin, approximately 100 to 150 gallons in size, which is filled with soapy water.  There is a circulating pump which moves the soapy water, and these trays swish around.  The inmate worker has a paddle to move these trays After a few minutes the inmate worker takes a milk crate style plastic crate and scoops up these trays out of the wash basin and dumps these trays onto a counter. A second worker then stacks these trays into a conveyor belt, where these trays are processed through a machine that  to sanitize the trays.  The sanitization process takes less than 5 minutes. After this sanitization, the trays are then provided to other kitchen workers to refill with new food for future meals.  Often the trays have left over food encrusted, and remaining on the bottom of the tray's pockets.

79.     Inmates regularly discover that under the new food in their trays, there is dried, hardened, old food, and have regularly notified sheriff deputies of this problem.  Inmates have also notified sheriff deputies of rodent and vermin droppings and of bird excrement in their food.  Inmates have filed grievances on these issues.  These grievances are denied and these notifications have not caused either defendant ACSO nor Aramark to change its procedures, or improve their sanitization.

        Inedible Food

80.     The quality of the food provided to inmates is of the lowest quality, high in starch and sugar, with most of the protein from soy powder and plain, flavorless beans.  The food is repetitive, overcooked, and tasteless.  Defendant ACSO and Aramark's metrics is to produce this food at the minimum cost with the only goal,  a minimum calorie count.  The food is prepared using a cook chill method, whereby the food, such as oatmeal and beans are cooked in large 100-gallon containers, this food is then packed in large plastic bags, refrigerated and held for up to 30 days.  All texture is rendered  obsolete.

81.     Then the contents of these plastic bags are portioned out into plastic trays.  These trays are then plastic wrapped and refrigerated.  These trays are placed onto carts, which deliver food to the housing units.  Once at the housing unit, these trays are placed into warming ovens, sometimes for many hours.  Due to the systems with which ACSO operates its jails, meals, including dinner, are served at irregular times.    By the time food is served, this over cooked food has often been held in warming ovens for over long.  This texture less, tasteless food is what defendant ACSO and ARAMARK give inmates as food.

82.     As a result of the irregular deliveries, one of the few fresh foods prisoners receive, milk, is often soured and spoilt, rendering it inedible.  There are seldom fresh fruits and vegetables, and what there is the same, bagged mini carrots, oranges and apples.

83.     In addition, service of food is timed erratically.  Sometimes lunch is not served until after 4 pm, and then dinner is served right after that.  For plaintiffs suffering from diabetes, this creates dangers due to unregulated blood sugar swings.

<u>Lockdowns & Insufficient Out Of Cell Time And Outdoor Recreation Time</u>

84.     Despite the fact that there are 30 men living in each cell of minimum housing, in filthy and unsanitary conditions, despite the fact that most of the men are pretrial and the jail is not permitted to punish these inmates, the housing unit deputies frequently lock down the cells, not allowing the men out into the common area, and not providing outdoor recreation.  These lockdowns reinforce defendant ACSO's policy and practice of enforced isolation.  During periods of enforced isolation, deputies and technicians will increase the isolation by turning off all phones, and turning off the television.

85.     Furthermore, the jail provides very little in the way of activities for inmates, and so lockdown and cell time is enforced idleness.  At best, 25% or less of the inmate have access to classes.  2015 ACSO Grant Application to BSCC, Narrative, p. 2 of 35.  Classes and programs are at best 90 minutes once or twice week.  The out of cell time for classes do not offset the lockdowns.

86.     By having inmates, particularly low security level, minimum security inmates in frequent lockdown, these inmates are incentivized to "volunteer" for work, just to be able to get out of the

cell. For inmate workers, the coercion to work results in defacto denial of pod time and outdoor recreation time.

87.     Defendant ACSO routinely asserts that it has insufficient staffing to carry out the normal functions of the jail.  It is unclear whether there is actual insufficient staffing, or whether there are issues of poor jail management, or some other reason, including housing deputy whim.  In early 2019, defendant ACSO and defendant Ahern announced the closure of the downtown Oakland jail, Glen Dyer.  Simultaneously, these defendants announced that there would be no layoffs and that all personnel from Glen Dyer would be transferred to Santa Rita, significantly increasing the staffing at Santa Rita Jail.

88.     Despite what would appear to be a significant increase in staffing at Santa Rita Jail, inmates are constantly placed on lockdown and denied out of cell time.  The reasons frequently given is insufficient staffing.   There is often no rhyme or reason for why plaintiffs and class members are placed on lockdown.

89.     In addition, these lockdowns also result in denial of outdoor recreation time.

90.     For inmate workers, they are denied POD time and outdoor recreation time because they are at work when POD time and outdoor recreation time opportunities are available.  Inmates perform a significant amount of the work in Santa Rita Jail, from kitchen work and food preparation, to all the laundry, to all the significant cleaning in and around the jails.  Inmate workers distribute the food and laundry, and all supplies to inmates.  None of this work is compensated.  Defendant ACSO states that these workers "volunteer", and in exchange for their volunteer work they are afforded time out of the cell and some food treats.

Food Treats

91.     Defendant ACSO also assert that the compensation inmate workers men receive are "food treats".  However, these men are only provided 5 minutes or less to eat these "food treats", they are not permitted to carry these treats back to their cells, so they can eat them at a leisurely pace.  For those with medical issues, such as ulcers, so that wolfing food creates health issues, these inmates are then denied "food treats".

Medical Care Is Grossly Inadequate At Santa Rita Jail

22

92.     As a result of the cost provisions of ACSO's contract with CFMG, medical care provided to SRJ inmates at SRJ is grossly inadequate.   In addition, SRJ inmates are regularly denied necessary and appropriate outside medical care by CFMG because the provision of such care comes directly out of SFMG's bottom line profits. The following example of grossly inadequate and entirely withheld medical care are given by way of illustration only and not by way of limitation.

        a.   Lawrence Gerrans

93.     Plaintiff LAWRENCE GERRANS arrived at Santa Rita Jail, with a number of medical conditions, including hypertension, for which he was under the care of a physician and prescribed _daily_ medication.  This information was transmitted multiple times to both defendant ACSO, and WellPoint.  Defendant ACSO refused to accept or permit plaintiff GERRANS to bring into jail, his own prescription medication.  For over 2 weeks, defendants failed to provide plaintiff with any of his needed, daily prescription medication.  Plaintiff started suffering from dangerous symptoms of hypertension.  Then defendant CFMG provided plaintiff with some other medication, which had not been prescribed, and for three days afterwards, plaintiff had excruciating headaches, difficulty seeing, pressure in his cranium and eye.  Not until after this incident, did defendant CFMG finally provide plaintiff GERRANS with the medication for which he had been prescribed.  Plaintiff GERRANS still  suffers from inability to proper focus his eyes, and difficulty seeing.

94.     Defendant CFMG on a regular, and constant basis clears newly booked individuals with addiction issues and withdrawal issues, to be placed into general housing with other inmate, and refuse to provide these newly booked individuals with medical treatment for their withdrawal.  When these inmates become violently ill, vomiting, seizing, uncontrollable diarrhea, defendant deputies Doe 1-25, refuse to summon medical assistance, refuse to remove these inmates, telling the other inmates in the housing unit, "This is your problem.  If you don't like it, don't come to jail."

95.     These detoxing inmates introduce biohazards in the housing cells.  As a result, there are chronic issues of staph infections hepatitis, pseudomonas, E.coli, C-difficile infections, , which defendants do nothing to prevent, and are slow and sluggish to address when these infections and

23

**COMPLAINT; DEMAND FOR JURY TRIAL**
*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No_____

1  communicable diseases are present.  As a result of the ongoing presence of biohazardous human

2  waste in the cell Plaintiff GERRANS developed a severe staph infection on his foot from the

3  spread of biohazardous human waste in the bathroom and cell floor.

4      <u>Kyle Murphy</u>

5  96.    Kyle Murphy was incarcerated at Santa Rita Jail.  At the time of the incident, he was

6  pretrial and in minimum security.  One day Kyle started having seizures.  Men in his cell pushed

7  the emergency button.  Defendant Technician Kaiser was on duty, and said, "Don't hit the button"

8  and then apparently turned the button off.   Men in Kyle's cell started yelling "man down", and

9  soon all of the six cells started yelling "man down".  It took 30-40 minutes for a Sheriff deputy to

10  appear.  After visually examining Kyle, the Sheriff Deputy left, and it took another 15 -20 minutes

11  before a male nurse arrived.  The nurse came, assessed the situation and gave Kyle a dose of

12  Narcan.  That had no effect, so the nurse then left to get oxygen.  The nurse returned with an

13  oxygen mask and can, and proceeded to try and apply oxygen to Kyle.  The male nurse was not

14  well trained and did not know how to use the oxygen tank and mask.  The mask apparently was

15  cutting off all outside oxygen to Kyle, but oxygen was not flowing from the tank.  Kyle started to

16  turn blue.  Men in the cell started getting upset, and many of them were screaming "he's dying".

17  After some time with Kyle turning blue, a female nurse appeared.  She took the oxygen tube and

18  plugged it into the tank and then oxygen started to flow.  They had to carry Kyle out.  He was gone

19  to the hospital for a week, and upon his return, neurological damage was obvious.  His eyes could

20  no longer track in tandem, and one of his eyes wanders.

21      <u>Upper Bunks</u>

22  97.    The upper bunk of the bunk beds has no ladder, and the only way to access it is to clamber

23  on the horizontal railings of the lower bunk and to hoist one-self up.  To get a lower bunk, requires

24  a medical slip, called a "chrono".  For people who are detoxing, getting off the upper bunk quickly

25  is important, otherwise they end up vomiting or defecating on themselves in bed, or the floor,

26  rather than making it to the bathroom.  While detoxing, these people are in a severely weakened

27  and disoriented state, and getting off that top bunk is difficult.  Yet, these people are medically

28  cleared to be in housing units, and never given a chrono for a lower bunk.

98.     On the weekend before the strike, a young man, who was not well, was in 31 West, and was assigned to an upper bunk.  A few days prior to his serious injury, he was having seizures.  On or about October 26, 2019, this young man, had a seizure and fell off and fell on his head.  Deputies were slow in responding, and medical staff took almost half an hour before coming to the cell. Inmates in the cell observed that it appeared that this young man stopped breathing.  Paramedics were called and all the inmates of that housing unit was required to leave and stay in the little yard while he was removed.  Inmates believe that this young man died.

Phone/Visiting/Video Visits

99.     Recognizing that maintaining family contact and contact with friends and community is an important ingredient to the mental health and well-being of inmates, and that inmates with stronger ties to family and community have a lower recidivism rate, 15 CFR 1062 states that "as many visits and visitors as facility schedules, space, and number of personnel will allow." Cal. Code Regs., tit. 15, § 1062

100.     Santa Rita Jail and defendant ACSO do not follow this state regulation.  Instead, on a frequent basis, visitors many who have traveled long distances, are denied visits, often with little notice.

101.     Santa Rita Jail and defendant ACSO have implemented a video visit procedure.  However, the equipment frequently malfunctions, and more important, defendant ACSO and sheriff deputies frequently take actions to deny and prevent inmates from participating video visits because prior to the video visits, they will force inmates into lockdown.  Then at the time of the video visit, the deputy is conveniently unavailable to escort the inmate to the video kiosk in order to participate in the visit.  All of these video visits require money, and when the deputies fail and or refuse to allow a plaintiff out of the cell to access the video call, the inmate is still charged for these calls.   The minimum charge is $6.00.   The net result is to deny inmates video visits, and still charge for the video call the inmate was prevented by defendants from having.

102.     Other times, plaintiffs have family members schedule visits, and travel from great distances for these visits, only to be told that the jail is unable to move the plaintiff from the cell to the visiting room and so the visit is canceled, often just before the visit is scheduled.

Profiteering and Excessive Charges

103.   Commissary prices charged by defendant ACSO have mark-ups in excess of 400%.  For example, Maruchan Ramen retails for 20 cents, yet defendant ACSO sells single Maruchan ramen packets for $1.13.  Assuming these are purchased wholesale, the profit margin is even higher. Commissary prices at Santa Rita Jail, which are higher than prices at other jails, just had a price increase.  Forty percent of the profit goes to defendant ACSO.

104.   Phone charges at Santa Rita Jail are also higher when compared to prices in surrounding county jails, such as San Mateo and San Francisco.  Defendant ACSO charges inmates 23 cents per minute for collect calls.  San Francisco charges 8 cents.

Strike

105.   On or about October 17, 2019, Santa Rita Jail's Watch Commander, late in the afternoon, defendant Hesselein, entered the common area of Housing Unit 31.  Defendant Hesselein was dressed, not in uniform, but a suit with a red tie.  He was in the company of other older, white, men and women, likewise dressed in business attire.

106.   At that time, the men in HU 31 had been on lockdown all day, and there had been no lunch, so the men had not had any food for almost 12 hours.  Sua sponte, the men started to yell, " Stop feeding us rat shit."  "Jail clothes stink"  "The food sucks"  "There's shit all over the place."

107.   Defendant Hesselein walked over and verbally confronted the inmates, demanding respect and yelled, "I'll shut this place down."  "I'll make you guys' life hell."  The inmates did not stop yelling out and defendant Hesselein walked out.

108.   Shortly thereafter, despite the fact that during this past week, the men had been on lockdown, with the excuse that there were not enough deputies to allow the men out of their cell for POD time;  a squad of about a dozen sheriff deputies dressed in tactical outfits and armed with rifles and weapons stormed the housing unit.  One deputy stood on a table with a rifle pointing it at the inmates and someone barked out an order, "Get down on the ground" and the inmates were instructed to lay down, face down on the floor of their cell.

109.   Someone yelled out, "I'm not getting down on the ground, the ground is filthy", and as a result, no one in the cell laid down.   The sheriff deputies threatened to shoot the inmates, and a

tense standoff resulted.  Finally, the inmates were instructed to put their hands over their heads, and then all inmates were all walked out of their cells into the multi-purpose room.

110.    Once the inmates were removed, the deputies, conducted a "raid" where everything in the cell was turned inside out and searched.  All the personal belongings, food and other items of the inmates were all tossed helter skelter into a pile in the center of the room.

111.    By the time, the deputies were finished "raiding" all of the three lower tier cells, it was close to 11 p.m., and so the deputies yelled out at the upper tier that the inmates were required to throw outside the bars into the landing, anything extra, meaning extra food, extra towels, extra bedding and extra food.  The guards yelled out that if the upper tier inmates complied, they would not be "raided" in the morning.  Otherwise, the upper tier inmates threw out some stuff, and the deputies left.  There was no raid in the morning.

112.    The next day, October 18, 2019, the men were again placed on lock down, and the meal schedule was again chaotic.  When the afternoon meal finally arrived, late in the afternoon, the men of Housing Unit 31, spontaneously refused to leave their cells, and refused the meal, thereby engaging in a hunger strike.  The deputies, alarmed, called in officers, first a sergeant and then a lieutenant, who offered to discuss with the inmates, their grievances, and asked the men to select a spokesperson.  They selected Lawrence Gerrans.

113.    The men of HU 31 then spent the next two hours writing down their grievances and giving them to Lawrence Gerrans.  These grievances were copied, a statement was written, and these were given to the lieutenant, who promised to review these documents and respond.  These grievances, later called the Strike Demands are attached as Exhibit A, and the documented later called the Strike Statement is attached as Exhibit B.

114.    That evening, around 10 p.m., the deputy Charondo placed into HU31, upper D, a young, white, emaciated man, who was in drug withdrawal.  He was place on an upper bunk.  Within an hour, this young man lost control of his bowels and defecated all over himself.  The inmates pressed the emergency buzzer and said there was a man who was ill and needed to leave.  As he was walking, everyone could see the diarrhea on the back of his pants, having gone through his pants and was now pooling in the cuffs of his sweats.

**COMPLAINT; DEMAND FOR JURY TRIAL**
*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No_____

115.    Deputy Ignont (sp?) walked in and stated that the infirmary had cleared him to be in the housing unit.  Deputy Ignont (sp?) said, "He's your problem." "You guys take care of him".

116.    By this time, the diarrhea had dripped into this young man's shoes and he was now tracking this all over the floor.  This young man appeared to be in extremely poor health, and could easily have been ill with a number of infectious diseases including pseudomonas, hepatitis, aids, C-dip.

117.    But there was nothing the inmates could do, so the young man and the inmate helping him, slowly walked him back to his mattress.

118.    By six a.m., when everyone woke up, the stink in the cell from this young man's diarrhea was like a green, disgusting fog coating the entire room.  The diarrhea had smeared all over the bed and all over his clothes.   The inmates again rang the buzzer yelling "Sick man coming out".  Eddie took a sheet and wrapped it like a diaper around this young man and walked him out of the cell.  The technician buzzed open the cell door, and one inmate rolled up this young man's mattress, and with an arm around this young man's shoulders, proceeded to walk him down the landing and down the stairs.  As they reached the bottom Deputy Joe walked in, and he signaled to Eddie to drop the mattress, and he proceeded to handcuff Eddie and take him away.  Deputy Joe tells the young many to walk back to the cell.  The young man was barely able to walk and when he reached the cell door, he collapsed, prone on the floor.

119.    Deputy Joe brings Eddie back into the room and announces that "This is your fucking problem.  I don't care how many times he shit himself."  Then Deputy Joe orders the kid to stand up and move.  The kid doesn't move.  Deputy Joe walked over, and grabbed this kid by the hair and pulled him up by the hair onto a sitting position and yells into his face, "don't make me do this."  At this time, Lawrence Gerrans, afraid that this kid would not be able to tolerate any physical violence, and intervened.  "Whoa, whoa, it doesn't need to be like this." Then Deputy Joe released the kid, whose head drops like a ball back onto the floor.  Lawrence Gerrans said, "I'll take care of him", and requested a hazmat bag, and clean clothing, clean sheets and towel. Lawrence Gerrans said to Deputy Joe, "You seem like a nice guy, but doing this to this kid is indefensible."  Deputy Joe responded,  "Don't come to jail" and walked off.

28

120.    The inmates then took the kid back into the cell, showered him, and while he was showering had another episode of diarrhea.  Inmates cleaned his mattress, put the mattress on the floor, and put the kid on the floor.

121.    By noon, the kid had another episode of diarrhea.  Plaintiff Gerrans pushed the emergency button and said that at the very minimum, this kid was now severely dehydrated and this was a medical emergency.

122.    Only after the 4th or 5th incident of diarrhea, and over 15 hours of all the men in the cell enduring this unsanitary, exposure to human feces, were the inmates finally able to get defendant ACSO to remove this kid from the cell and place him under appropriate medical supervision.

123.    That afternoon, another inmate in HU 31, fell off the top bunk, landing on his head.  Soon thereafter, this inmate went into seizure, flapping like a fish.  Men in the cell heard the crack, as his head hit the ground.  They immediately hit the emergency button and requested medical response. The medical response was also slow in coming.  The deputies were slow in responding.

124.    This cell was a kitchen workers cell, and they were not permitted to return after their shift for over two hours.  During this time, some of these plaintiffs and class members could see a paramedic van drive up into the parking lot.  However, when the paramedics arrived, the paramedics were in no hurry.  This led these plaintiffs and class members to conclude that the young man in HU 31 had died, and so there was no longer a medical emergency.  They concluded that if the kid was alive, they would have been hustling to get him to the hospital.

125.    After being held for two hours extra in the kitchen, these men were moved into small yard. By the time they got back to the cell, the kid was gone.

126.    That evening, after inmates returned to their cells, the mood was "Enough is enough", and there was a call for a vote.  The majority and all the races and majority voted for a strike that would be a hunger strike, a work strike and a strike against participating in jail activities such as going to class or court.

        Excessive Searches

127.    Not only are plaintiffs and members of the plaintiff class required to work for no compensation, to lose out free time in the form of POD time, to miss out on outdoor recreation,

because they are at work when outdoor recreation is available, and then face threats and discipline of additional days on their sentence without a hearing, these class members are subjected to a full body search, each and every day after their work shift.  These workers have to strip naked, stand before a deputy, and be searched.  They often have to open their mouths, and let the deputy view their anus.  It is a dehumanizing and degrading procedure, all for the ability to work for free.

Grievances And Retaliation

128.    Multiple members of the class have filed grievances in this case, and exhausted the grievance process.  In addition, plaintiffs may seek consolidation with *Mohrbacher, et al. v. Alameda County Sheriffs Office, et al.*  3:18-cv-00050-JD on related and intersecting issues.  Many of the plaintiffs of the present case and class members in Mohrbacher, et al, have also tried to file grievances but defendants refuse to accept those grievances, refuse to assign numbers to the grievances, and have failed and refused to respond to these grievances.  In addition, plaintiffs submitted the strike demands to ACSO on October 18, 2019, at the request of a jail Lieutenant, who asked for their grievances.  A copy of these grievances is attached as Exhibit A.

129.    While defendant ACSO purports to have a grievance process, defendant and its employees actively dissuade and prevent plaintiffs and members of the class from filing grievances.   The system on paper appears reasonable.  The housing unit deputy is supposed to try and resolve the grievance.  However, the result is that housing unit deputies refuse to accept grievances because clearly, receiving grievances reflect negatively on the housing unit deputies, so the goal is to reduce the number of grievances inmates submit.  To keep the number of grievances low, housing unit deputies often refuse or fail to provide blank grievances; refuse to accept completed grievances from plaintiffs and members of the class, stating that the complaint is "not grievable"; or refuse to accept completed grievances from plaintiffs and members of the class, stating that the grievance, for example, the complaints on the food or the lack of tray sanitation, is directed at defendant Aramark, which is a separate business and not subject to a grievance.  The first level of ACSO grievance procedure is for the housing unit deputy to exercise discretion to resolve the grievance, and housing unit deputies often respond by stating "This is jail.  If you don't like it, don't come to jail."

30

130.    Even when a grievance is submitted, the responses are formulaic and do not address the inmate's concerns.  Lavert Branner filed a grievance complaining of an invasion of gnats, and that the gnats were getting into his food.  Defendant ACSO's denied the grievance, stating "If you have any discrepancy with any of your meals, you need to contact a housing unit deputy immediately.  Not only is a deputy a great resource to verify your claim, the deputy will be able to contact the Kitchen and possibly issue a remedy."

131.    In one situation, an inmate brought to deputy Wong's attention of a meal that had been contaminated.  Deputy Wong took a grievance and brought it down to the kitchen.  Apparently, the grievance was not well received.  The next time, a problem with a meal was brought to Deputy Wong's attention, he refused the grievance although he did bring in another food tray.

132.    Defendant ACSO gives reports to the Alameda County Board of Supervisors on grievances, touting how few grievances are filed, as proof of the quality of the conditions of confinement at Santa Rita Jail.  This is an added reason why deputies are instructed to refuse and deflect grievances in order to reduce the total number of grievances.  Some inmates have asked deputies, "Don't you want to improve this place?"  And the response has been "Not my job."  This strategy does not change the root cause of the problem, which is why problems escalate and the inmates were forced to hold a strike.

133.    Plaintiff Rocci Garrett had been personally threatened by Technician Kaiser.  Kaiser told Plaintiff Garrett to "suck my dick".  Thereafter, plaintiff attempted to file a PREA complaint, alleging sexual harassment and sexual threat.  In retaliation, Technician turned off the phones in the housing unit, so plaintiff Garrett could not complete the call.  Finally, plaintiff Garrett phoned his wife, informed her of the situation, and asked her to call PREA the next morning and report the sex harassment and sex assault.

134.    Later that night, after 11 pm, when it was lights out, Technician Kaiser came on over the public address system and said that plaintiff Garrett was ordered to leave the cell, and meet with sheriff deputies in the back hallway.  Technician Kaiser also popped open the cell door.  Plaintiff Garrett refused, and closed the cell door.  Thereafter, Technician Kaiser again came over the intercom stating that Plaintiff Garrett was "ordered" to go to the back hallway and again popped

open the cell door. Plaintiff Garrett again refused.  Then three sheriff deputies came to the cell, asking to speak with Plaintiff Garrett.  Plaintiff Garrett again refused and stated that they would have to do an extraction, but that he was refusing to willingly leave the cell.

135.    These deputies then proceeded to question Plaintiff Garrett about the incident with Technician Kaiser, asserting that there had been no sex harassment, that the statement "Suck My Dick" was a common, ordinary statement, and that Plaintiff Garrett had not felt "sexually threatened."  They asked him to withdraw his complaint.  These deputies stated, "We have to protect our own."  Plaintiff Garrett asked if the deputies' body cams were on, when they said the body cams were not on, Plaintiff Garrett then asked for a lawyer and the questioning stopped.

136.    Following this incident, Technician Kaiser asked two different inmates to relay to Plaintiff GARRETT that he, Technician Kaiser was going to "follow the book" when it came to Garrett. Plaintiff GARRETT interpreted this to be a direct threat, that whenever Technician Kaiser, could, he would write up Plaintiff GARRETT for every possible disciplinary violation, and that if plaintiff GARRETT submits anything on Technician Kaiser, nothing will be filed.

137.    Since then, plaintiff Garrett has submitted two grievances.  Neither grievance was filed or assigned a number.  One grievance is in fact taped to a white board in the deputies' office with a big note taped on the board, "Not grievable".  This is visible to the plaintiffs and class members through the glass window of the deputies' office.

138.    Since this time, Plaintiff GARRETT has not been permitted to have any visits, nor any video visits, nor has any of his mail been allowed through.

139.    Since plaintiff GARRETT's filing of the PREA complaint against Technician Kaiser, Technician Kaiser has been engaged in retaliation against inmates in HU 34.  For example, when on lock down, defendant Kaiser has turned off the phones inside the cell.  When plaintiffs and members of the class raise the issue, defendant Kaiser said, take it up with the deputies, but then never calls a deputy to come to the housing unit.

140.    On another occasion, defendant Kaiser turned off the television and the phones.  This was also during lockdown, when everyone in the cells was watching a football game.  When plaintiffs and class members against queried why, defendant Kaiser said it was because two inmates were in

the POD using the phone. These two inmates had been let outside the cell by the deputy to use the phone in the POD because the phones inside the cell were not functioning. Nonetheless, defendant Kaiser chose to punish the entire housing unit by turning off the television, when all the inmates were locked down it their cells.

141.  Plaintiff LAWRENCE GERRANS was the individual who the other inmates requested to be their spokesperson. LAWRENCE GERRANS collected everyone's comments and requests and wrote up what became, both the Strike Demands and the Strike Statement. Plaintiff LAWRENCE GERRANS has taken this action at the suggestion of a defendant ACSO lieutenant who came into the Housing Unit when plaintiffs and class members were refusing food in protest on October 18, 2019. On Thursday, October 31, 2019, defendant ACSO had him removed from Santa Rita Jail, and transferred to Marin County jail. In Marin County Jail, plaintiff LAWRENCE GERRANS has been placed into administrative segregation.

142.  Defendant ACSO also began issuing disciplinary citations only to sentenced inmates who had been workers. None of the workers had been informed that they lacked the right to not work. They all believed that working was a "voluntary" activity, especially since the only compensation they received was "food treats". 15 CCR 1080 requires that the disciplinary process be posted or handed out to inmates. There is nothing posted nor is there anything in the ACSO handbook that workers are prohibited from refusing work, and that if an inmate worker refuses to work, that they would be subject to discipline.

143.  Plaintiff MARTIN GALLARDO, and class members have been issued disciplinary notices stating that they were losing privileges and that additional time would be added to their sentence. Plaintiff GALLARDO and other plaintiffs have requested a due process hearing, and none has been held.

144.  Following the strike deputies have told plaintiffs and members of the class, not to speak with plaintiffs' counsel. On three days, despite significant efforts by plaintiffs' counsel to have interviews with plaintiffs and members of the class, and despite confirmed appointments, after plaintiff's counsel and staff drove from Oakland to Santa Rita Jail, they were told that over half of

the visits could not take place due to the "unavailability" of deputies to move inmates.  On Friday, November 8, 2019, counsel's paralegal was only able to have one of the 5 visits scheduled.

PRIOR KNOWLEDGE OF THESE CONDITIONS

CONSCIOUS DISREGARD OF HARM TO INMATES

145.    None of these complaints are new, or a surprise.  Many of these exact same issues, as listed in the Strike Demands have been made by women prisoners in the Mohrbacher case, filed in January, 2018, now pending in this court.  3:18-cv-00050-JD.

146.    Defendants were well aware of the issues and have chosen to not address or fix the problem.  Defendants Ahern, Madigan, and Hesselein, encouraged, authorized, ratified, and condoned the unconstitutional and wrongful conducts complained of herein.

147.    Said customs, policies and practices include the maintenance of inhumane and unsanitary conditions of confinement, the interference, disruption of plaintiffs' First Amendment protective activities, and the right to family visits and communications with family and attorneys; the failure to maintain adequate policies and failure to adequately train, supervise and control jail employees including jail deputies and technicians; failure to insure that for profit contractors provide adequate services including medical care, and health, nutritious and edible food.

**Applicable Community Standards**

148.    SRJ's treatment of prisoners falls far short of acceptable conditions under the United States Constitution. The Eighth Amendment to the U.S. Constitution requires that correctional facilities "must ensure that inmates receive adequate food, clothing, shelter, and medical care." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)

149.    California Regulations provide a ready benchmark for what constitutes "adequate food, clothing, . . . and medical care."  All references will be to Title 15.

150.    Santa Rita Jail is primarily a Type II facility, defined as "a local detention facility used for the detention of persons pending arraignment, during trial, and upon a sentence of commitment."

151.    California Code of Regulations (hereinafter "CCR") 15, § 1006.

34

COMPLAINT; DEMAND FOR JURY TRIAL

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No._____

152.    CCR §1051 requires appropriate segregation of inmates until a medical evaluation is completed.

153.    CCR §1061 requires an "voluntary academic and/or vocational education of housed inmates."

154.    CCR §1062 requires that ACSO "provide for as many visits and visitors" for inmates as the facility allows.

155.    CCR § 1073 requires a grievance procedure where inmates "may appeal and have resolved grievances relating to any conditions of confinement.

156.    CCR§ 1080 requires that rules and disciplinary penalties be posted or issued to each inmate.

157.    CCR §1200 requires "emergency and basic health care".

158.    CCR § 1206 requires health screening, and a "written plan to provide care" for any inmate at the time of booking who requests or needs medical, mental health care.

159.    CCR §1210(b) specifies that "[f]or each inmate treated for health conditions for which additional treatment, special accommodations and/or a schedule of follow-up care is/are needed during the period of incarceration, responsible health care staff shall develop a written treatment plan."

160.    CCR § 1248 specifies that, "The medical diets utilized by a facility shall be planned, prepared and served with consultation from a registered dietitian. The facility manager shall comply with any medical diet prescribed for an inmate.

161.    CCR § 1248 further specifies that, "[t]he facility manager and responsible physician shall ensure that the medical diet manual, which includes sample menus of medical diets, shall be available in both the medical unit and the food service office for reference and information. A registered dietitian shall review, and the responsible physician shall approve, the diet manual on an annual basis.

162.    CCR § 1240 specifies that, "[p]rovisions shall be made for inmates who may miss a regularly scheduled facility meal. They shall be provided with a substitute meal and beverage, and inmates on medical diets shall be provided with their prescribed meal."

35

163.    CCR § 1242 specifies that "Menus shall be planned to provide a variety of foods, thus preventing repetitive meals."

164.    CCR § 1241 specifies that "A wide variety of food should be served."

165.    CCR § 1241(c) specifies that "The daily requirement of fruits and vegetables shall be five servings. At least one serving shall be from each of the following three categories:

166.    CCR § 1241(c)(1) specifies that "One serving of a fresh fruit or vegetable per day, or seven (7) servings per week."

167.    CCR § 1241(c)(2) specifies that "One serving of a Vitamin C source containing 30 mg. or more per day or seven (7) servings per week."

168.    CCR § 1241(c)(3) specifies that "One serving of a Vitamin A source, fruit or vegetable, containing 200 micrograms Retional Equivalents (RE) or more per day, or seven servings per week."

169.    CCR § 1241 further specifies that "Providing only the minimum servings outlined in this regulation is not sufficient to meet the inmates' caloric requirements. Additional servings from the dairy, vegetable-fruit, and bread-cereal groups must be provided in amounts to meet caloric requirements."

170.    CCR § 1230 specifies that, "[t]he responsible physician, in cooperation with the food services manager and the facility administrator, shall develop written procedures for medical screening of inmate food service workers prior to working in the facility kitchen"

171.    In addition, CCR § 1243 specifies that, "Facilities shall have a written food service plan that shall comply with the applicable California Retail Food Code."

172.    Among other things, the California  Retail Food Code § 113980 requires that "All food shall be manufactured, produced, prepared . . . stored . . . and served so as to be pure and free from . . . spoilage; . . . shall be protected from dirt, vermin, . . . droplet contamination, overhead leakage, or other environmental sources of contamination; shall otherwise be fully fit for human consumption."

173.    As alleged above in Paragraphs 89-118, ACSO and ARAMARK comply with none of the standards cited above which clearly define what constitutes the provision of adequate foods to inmates.

174.    CCR § 1260 specifies that, "The standard issue of climatically suitable clothing to inmates held after arraignment . . . shall include (c) clean undergarments . . . (2) for females - bra and two pairs of panties."  Further, CCR § 1262 specifies that, "Undergarments and socks shall be exchanged twice each week."

175.    CCR § 1248 also provides that "The inmates' personal undergarments and footwear may be substituted for the institutional undergarments and footwear specified in this regulation. This option notwithstanding, the facility has the primary responsibility to provide the personal undergarments and footwear."

176.    CCR § 1263 specifies that "Written policy and procedures shall specify handling of laundry that is known or suspected to be contaminated with infectious material."

177.    As alleged above in Paragraphs 63-83, ACSO and Aramark complies with none of the standards cited above which clearly define what constitutes the provision of adequate foods to inmates.

### FIRST CLAIM FOR RELIEF
### DEPRIVATION OF FEDERAL CIVIL RIGHTS
### UNDER 42 U.S.C. § 1983

178.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

179.    This first claim is asserted against Defendants Alameda County Sheriff's Office, Alameda County, Defendants Gregory Ahern, D. Houghtelling, Thomas Madigan, Captain Derrick C. Hesselein, Deputy Ignont, Deputy Joe and Technician Kaiser, and Does 1 through 25.

180.    At all relevant times herein, ACSO has been responsible for operating the Santa Rita Jail.

181.    At all relevant times herein, Defendants Hesselein was the individual directly in charge of Santa Rita Jail, with direct supervisory powers, and the duty to properly supervise, train and insure that there are appropriate and necessary policies, procedures, customs, and or practices, and that

those policies, procedures, customs and/or practices were followed and properly applied.  Instead, while Santa Rita Jail has a plethora of written policies, many of these policies were routinely either not applied, or applied in a manner that corrupted or perverted the intent and purpose of those policies, and then caused violations of the Plaintiffs' and the class members' constitutional rights granted pursuant to 42 U.S.C. § 1983, including those under the First, Fourth, Fifth,  Eighth and Fourteenth Amendments.

182.    As a direct and proximate result of the conduct of defendants described herein the named individual plaintiffs have been denied their constitutional and legal rights as stated, and have suffered physical injuries and bodily harm, mental and emotional distress,  and other damages in an amount according to proof.

183.    Defendants' policies, practices customs, conduct and acts all alleged herein have resulted and will continue to result in irreparable injury to plaintiffs, including but not limited to violations of their constitutional and statutory rights.  Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein.  Plaintiffs and members of the class remain in the custody and under the control of Defendants.  Plaintiffs therefore see injunctive relief from this court, to ensure that plaintiffs and persons similarly situated will not suffer violations of their rights from defendants' illegal and unconstitutional policies, customs and practices as described herein.

184.    An actual controversy exists between plaintiffs and defendants in that

185.    Plaintiffs contend that the policies, practices and conduct of defendants alleged herein are unlawful and unconstitutional, whereas plaintiffs are informed and believe that defendants contend that said policies, practices and conduct are lawful and constitutional. Plaintiffs seek a declaration of rights with respect to this controversy

185.  Defendants' above-described conduct violated plaintiffs and all class members rights under the First, Fourth, Fifth, Eighth and Fourteen Amendment.

## SECOND CLAIM FOR RELIEF

## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AGAINST ACSO AND THE CALIFORNIA FORENSIC MEDICAL GROUP

186.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

187.     At all relevant times herein, Defendant CALIFORNIA FORENSIC MEDICAL GROUP acted under color of State law.

188.     At all relevant times herein, Defendant CFMG established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the Plaintiffs' and the class members' constitutional rights granted pursuant to 42 U.S.C. § 1983, including those under the Eighth and Fourteenth Amendments.  All of the aforementioned acts of the Defendant CFMG, their agents, servants and employees, were carried out jointly with ACSO under the color of state law.

189.     At all relevant times herein, Defendant ALAMDEA COUNTY SHERIFF'S OFFICE delegated to Defendant CFMG the traditional public function of determining and controlling the provision of medical services to inmates, including inmates, in such a way as deliberately calculated to deny such inmates access to adequate medical care.  The denial of necessary and appropriate medical services was imposed in order to reduce CFMG's costs under its contract with ASCO, specifically pursuant to the pricing provisions of that contract which penalized CFMG for allowing the provision of any outside medical care, regardless of the medical necessity of such care.

190.     At all relevant times herein, Defendant CFMG acted jointly and intentionally with Defendant ACSO, pursuant to a customary plan to restrict Plaintiffs and class members from obtaining medically necessary and appropriate medical care.

191.     At all relevant times herein, Defendant CFMG intentionally participated with the Defendant ACSO in a customary plan to restrict Plaintiffs and class members from obtaining medically necessary and appropriate medical care.

192.     At all relevant times herein, an inmate's right to necessary and appropriate medical services was clearly established.  The contours of the right to necessary and appropriate medical services was made sufficiently clear by, among other things, the California Regulations cited herein.

COMPLAINT; DEMAND FOR JURY TRIAL

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No._____

193.    At all relevant times herein, Defendants CFMG and ACSO acted with deliberate indifference to the violation of Plaintiff's class members' rights.  As shown above, CFMG and ACSO were aware of the substantial risk of serious harm to an inmate's health and safety created by the denial of necessary and appropriate medical services and CFMG and ACSO deliberately disregarded that risk.  At all relevant times, the California Regulations cited herein put CFMG and ACSO on actual notice that such substantial risk of serious harm is not one that today's society chooses to tolerate.

194.    At all relevant times herein, there existed a pervasive entwinement between Defendant CFMG and Defendant ACSO, in that CFMG was at all relevant times delegated by ACSO the traditional public function of determining and providing medical care to inmates.

195.    The deprivation of Plaintiffs' and class members' constitutional rights was caused by the close nexus between Defendant CFMG and Defendant ACSO that was created by the direct role of Defendant ACSO in enforcing CFMG's determination to deny and withhold necessary and appropriate medical care to SRJ inmates.

196.    The close nexus between Defendants CFMG and ACSO is the legal cause of injuries to Plaintiffs and the class as alleged herein and, as a result, Plaintiffs and the class have sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

 Wherefore, plaintiffs and the prisoner class they represent request relief as outlined below.

## THIRD CLAIM FOR RELIEF

## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AGAINST ACSO AND ARAMARK CORRECTIONAL SERVICES LLC

197.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

198.    At all relevant times herein, Defendant ARAMARK CORRECTIONAL SERVICES LLC acted under color of State law.

199.    At all relevant times herein, Defendant ARAMARK established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the

Plaintiffs' and the class members' constitutional rights granted pursuant to 42 U.S.C. § 1983, including those under the Eighth and Fourteenth Amendments.  All of the aforementioned acts of the Defendant ARAMARK, their agents, servants and employees, were carried out under the color of state law.

200.    At all relevant times herein, Defendant ALAMDEA COUNTY SHERIFF'S OFFICE delegated to Defendant ARAMARK the traditional public function of feeding municipal inmates and allowed and enabled Defendant ARAMARK to cause constitutionally inadequate food to be provided to SRJ inmates and to deny SRJ food that is adequate to sustain health.  The denial of food that is adequate to sustain health was imposed in order to reduce ARAMARK's costs under its contract with ASCO.

201.    At all relevant times herein, Defendant ARAMARK acted jointly and intentionally with Defendant ACSO, pursuant to a customary plan to prevent Plaintiffs and class members from having access to food that is adequate to maintain health.

202.    At all relevant times herein, Defendant ARAMARK intentionally participated with the Defendant ACSO in a customary plan to prevent Plaintiffs and class members from having access to food that is adequate to maintain health.

203.    On information and belief, plaintiffs allege that deplorable, inedible jail food benefited said defendants by lowering the cost of providing this food, and at the same time encouraging inmates at Santa Rita Jail to purchase the over-priced commissary food, from which defendant ACSO also benefited.

204.    At all relevant times herein, an inmate's right to food that is adequate to maintain health was clearly established.  The contours of the right to food that is adequate to maintain health was made sufficiently clear by, among other things, the California Regulations cited herein.

205.    At all relevant times herein, Defendants ARAMARK and ACSO acted with deliberate indifference to the violation of Plaintiff's class members' rights.  As shown above, ARAMARK and ACSO were aware of the substantial risk of serious harm to an inmate's health created by the denial of food that is adequate to maintain health and ARAMARK and ACSO deliberately disregarded that risk.  At all relevant times, the California Regulations cited herein put ARAMARK and ACSO

41

on actual notice that such substantial risk of serious harm is not one that today's society chooses to tolerate.

206.    At all relevant times herein, there existed a pervasive entwinement between Defendant CFMG and Defendant ACSO, in that ARAMARK was at all relevant times delegated by ACSO the traditional State function of feeding inmates.

207.    The deprivation of Plaintiffs' and class members' constitutional rights was caused by the close nexus between Defendant CFMG and Defendant ACSO that was created by the direct role of Defendant ACSO in enforcing ARAMARK's determination to prevent Plaintiffs and class members from having access to food that is adequate to sustain health.

208.    The close nexus between Defendants ARAMARK and ACSO is the legal cause of injuries to Plaintiffs and the class as alleged herein and, as a result, Plaintiffs and the class have sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request the Court to:

1.      Certify the Class of male prisoners at Santa Rita under Rule 23, F.R. Civ P., and also the Subclass of male prisoners who have been sentenced.

2.      Make findings of fact reflecting the general and specific failings and inadequacies of both groups of defendants' approaches to and practice in the care of male prisoners, the pattern and practice of defendants' non-feasance and maltreatment of male prisoners, and defendants' violations of statutory, regulatory and constitutional requirements in dealing with male prisoners.

3.      Initiate a serious effort, perhaps with a Rule to Show Cause, to require defendants to provide medical care for all  prisoners who are in withdrawal from addiction to drugs, particularly opiates and fentanyl.

4.      Make findings of fact that lockdown and continued denial of out of cell time and denial of outdoor recreation constitutes punishment of pretrial detainees;

A. **Prohibit defendants from**:

1.       punishing or threatening to punish prisoners for exercising their right to free speech, particularly regarding problems in Santa Rita Jail;

2.      coercing or pressuring prisoners to not file a grievance or to withdraw a grievance;

3.      requiring inmate workers to do coroners' laundry;

4.      24-hour lockdowns without a justifiable exigent circumstance, not merely staff scheduling and ease;

5.      interfering with prisoners' mail;

6.      preventing or interfering with attorney client communications;

7.      charging for video visits when defendants have not permitted the prisoner to participate in the video visit;

8.      interfering with, preventing or cancel duly scheduled visits, whether video or in person. **And**,

B. **Affirmatively <u>Order and direct</u> defendants to**:

1.      Fully comply with all applicable state statutes and regulations, and develop a legitimate individual treatment plan for each detoxing prisoner, *and carry it out completely*!

2.      Fully comply with all applicable state statutes and regulations for a sufficient, healthy, balanced, nutritious diet approved by a doctor;

3.      Develop, implement and maintain a systematic program for sanitation throughout the jail, including housing units, holding cells, kitchen and all bathrooms.

4.      Immediately provide no less 12 to 16 hours out of cell time daily for all pretrial detainees with no less than the minimum outdoor exercise prescribed by state regulations;

5.      Stop the profiteering from phone calls, video calls and the commissary;

6.      Permit confidential legal contact visits between plaintiffs, class members and their attorneys;

7.      Enter a preliminary and permanent injunction on behalf of the broad Class of male prisoners which will counter and remedy the County defendants' broader unconstitutional practice(s) as complained of and to be shown further;

8.      Award compensatory and punitive damages to plaintiffs against defendants in amounts to be determined at trial;

9.      Award costs and fees for this action, including attorneys' fees;

10.     Grant such other and further relief as this Court deems appropriate.

DATED: November 12, 2019             **LAW OFFICE OF YOLANDA HUANG**


 __ */s/ Yolanda Huang*_____
Yolanda Huang

**DENNIS CUNNINGHAM**


 _*/s/ Dennis Cunningham*_____
*Counsel for Plaintiffs*

44

**JURY TRIAL DEMAND**

A JURY TRIAL IS DEMANDED on behalf of Plaintiffs.

DATED: November 12, 2019         **LAW OFFICE OF YOLANDA HUANG**


___/s/ Yolanda Huang_____
Yolanda Huang



**DENNIS CUNNINGHAM**


_/s/ Dennis Cunningham_____
Dennis Cunningham


**DENNIS CUNNINGHAM**


_/s/ Dennis Cunningham_____
Dennis Cunningham



*Counsel for Plaintiffs*

45

EXHIBIT A

## Requests

* A copy of this Document sent Rita Administration after the Hunger Strike on October 18, 2019
* Lawrence Gerrans provided 1 Hour Video Testimony as well.

1.) Food - Improve palatably. more Diversity. See List.
   (See List of Food requests)

2.) Costs of Commissary Too High - meet Federal Rates
   • Aramark Needs To Lower Costs or Find New Supplier.

3.) Cost of Telephone Too High - availability + Access is Too Low. We Want our own Personal electronics with access to email, Texting + Phone as well as Internet for Netflix, etc.
   • Cost of Communication + Access is Punitive + Usury.

4.) Clothing - 2 Sets of Blues
                 4 Sets of Shirts, Underwear, Socks
                 2 Pair Work Out Shorts
                 * exchange Availability Twice a week.

5.) Law Library - We Need Access (Federal Law)
                 - Internet Access could be Solution.
                 * This is Federal requirement for fed inmates

6.) Cell Cleaning - Twice a week.
   • Clean mops + Clean mop water
   • Clean Brushes + Clean Towels
   • More Disinfects
   • Better Floor + Shower Cleaning Agents
   • Insecticides To Kill Blood Sucking gnats
   • Honor requests for Additional Supplies day Today

7.) Mail - more reliable + on-time delivery
                 (especially Newspapers)
                 - Faster Sending of mail out

8.) <u>Bedding</u> - Exchange Blankets monthly
- Improve Mattresses - too thin, too old, too dirty
- Provide Pillows for goodness sake !

9.) <u>Personal Disinfectants</u> - Triple Antibiotics, Bandaids
* Add to commissary        Athlete's foot Spray
* make more easily       - Hydrogen Peroxide/disinfectants
   available from Nurse     Personal Sanitation Supplies
                          - Barbicide for Clippers

10.) <u>Family + Attorney Visits</u>
   - Not subject to lockdown within 6 hours of visit.
   - Notification System for Video visits
   - Allow video visits to commence in lock down
      - Tower should be able to easily monitor.

11.) <u>Upgrade T.V.'s + Speakers</u> - Hard to see
                                    - Hard to Hear

12.) <u>Stop turning phones off</u> - costing Attorney fee's

13.) <u>Mandatory Pod Times</u> - <u>morning</u>/<u>Afternoon</u>/<u>Evening</u>
                              9 to 11    2 to 4    7 to 10

14.) <u>Mandatory yard access</u> - 4 times a week
        irregular

15.) <u>Adhere to Title 15 minimum Standards</u>

16.) <u>Stop recording Personal + Legal Phone calls for</u>
   <u>Pre-Trial detainees, Civil rights violation.</u>
      • Can't mount defense. Perform investigations.

17.) <u>Mandatory Meal Times</u>

- Breakfast  5:30 Am To 7:30 Am
- Lunch     11:00 Am To 1:00 pm
- Dinner     5:00 pm To 7:00 pm

18.) Policy For Inmate Intake Sanitation

- Inmates must shower and They must clean Their Finger nails + Toe nails before receiving issuance of clothing and Assignment To Housing. We must control Bed Bugs, STAPH, infectious diseases due To creek dwellers + Homeless indigents being co-mingled with General population

19.) Clean The Holding TAnks with Hot mops, Bleaching and disinfecting agents at Least once a day ! They are Filthy + Health Hazards

20.) Clean The multi-purpose rooms daily with Hot mops + disinfectents.

21.) Coordinating clothing + Bedding exchange immediately after Pod cleanings.

22.) Get Body Scanners + Stop The strip searches

- They are Not yielding Seizures
- They are uncomfortable + Demoralizing

23. Stop Shackling minimum security prisoners during Federal Transport. Unnecessary + Demoralizing.

24. Provide Signage + Intake paper relating mutual Terms + Conditions of respect, Conduct + Privileges between detainees + deputies

25. Assign Key Holders by ethnicity / Affiliation to Maintain order + rules. Self police to reduce manpower burden on Deputies in minimum security environments.

26. Santa Rita Needs to evolve its Systems + methods away from This Punitive Justice System and demoralizing, inhumane Treatment of citizens and Drug addicts to a modernized System + method of Restorative Justice! Right Now we Have Garbage In + even worse Garbage going out! This does Not make our Communities any Safer! To The Contrary, it makes Them Less Safe! We Need to Build people up, mAke Them Productive and restore Their Health and Vitality!

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

COMPLAINT; DEMAND FOR JURY TRIAL

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No_____

Cell Sanitation is at a crisis point. Detainees are only provided Cleaning Supplies once a week. The Supplies provided are insufficient as is The time allotted To effectively clean Their cells, sinks, Showers, Toilets and Floors. Blood Sucking gnats Swarm The Showers and cells. Detainees are Contracting Lice, Bed Bugs, and Flesh eating Staph infections From The MRSA virus.

The protocols For Sanitation are illogical. Detainees are only given one Set of cloThes For The week, To include one Shower Towel. This Policy is in Stark ContrasT To most oTher Jails That Provide Four (4) Sets or more of cloThes per week.

New cloThes are exchanged every Friday. Cell Cleaning is scheduled every Saturday. Forcing Citizen detainees To clean Their cells, Floors, BaThrooms and Showers in clean cloThes and Then SiT in Their Now DirTy cloThes for The remaining Six (6) days of The week. This is indignant and punitive Treatment.

Homeless detainees are exchanged ouT of Their FilThy cloThes and inTo clean Jail issued cloThes wiThouT being Showered or Sanitized. They are Then SenT To FilThy Holding cells To SiT and Lay down in vomiT, urine, Feces, Semen, Food and dirT Stained

Floors until They are Transported To Their new
Housing unit. They are Then introduced To a
Dormitory cell Shared by as many as 30 other
detainees, Comprised of regular citizens Serving
Terms for Drunk Driving, Drug possession, Domestic
Violence or awaiting Their court dates, etc. Upon
arrival To The Dorm unit, Known as a 'POD',
They are mandated to Shower in The singular
Shower Stall Shared by all Dorm mAtes. This
Spreads Lice, Bed Bugs, and infectious diseases
like MRSA; Creating an obvious Health Hazard
and Public Safety problem.

In The worst case detainees are exposed To
Heroin addicts introduced To The Dorm without
any medication. The Heroin addicts involuntarily
defecate on Themselves, The Floors, Toilets and
Shower creating an enormous Bio Hazard. RATHer
THen caring For The Heroin addict in The Infirmary,
The Detainees are made To Tend To The addict,
clean up The addict and His messes, and Suffer
The indignity, Smell and infectious disease risks
associated WiTH These intravenous drug users.
The risk of exposure To Hepatitis, C-Difficil,
Pseudomonis, E-Coli and other infectious disease
introduced To Their Shower and Living environment
is an illogical risk To The detainees and public
Health, in general.

The Jail is Suffering continuous lockdowns due to insufficient resources, manpower, and apparent Funding. Consequently, citizen detainees are being 'locked down' in their cells in excess of 22 hours a day. Family and Attorney visits are being cancelled due to lack of manpower to walk detainees to their visits. In many cases, families and Attorneys who are traveling in excess of two (2) hours and/or flying in are being denied their visits upon arriving to the Jail. They are given no notice and are having to return home. This is creating frustrations and costs that are unnecessary.

Detainees are being gouged by commissary prices, for personal Food and Supplies, that exceed 800% mark up over retail store prices. For example, a single pack of Top Ramen noodle soup costs thirteen cents ($.13) at Safeway. It's commissary price is one dollar and thirteen cents ($1.13).

Detainees are being gouged by excessive calling costs. The cost to place a cell is twenty three cents ($.23) per minute with a 15 minute limit, and phones are limited. This is costly and punitive to detainees, their families, and lawyers. All calls are also recorded and monitored, precluding detainees from mounting their defense with counsel or speaking candidly or intimately to their

Loved ones.

For Federal Detainees The Jail is required To Have a Law Library. IT does NoT! This precludes Federal Detainees From being able To mount Their Defense, creating a Liability For The Government, in That iT gives Those convicted an immediate appeal.

Detainees are being deprived of access To Personal electronics commonly available at other Jails. They are Suffering The ability To remain connected and engaged To Their Families, Jobs and The World, in general. For an, otherwise, innocent Detainee This exacerbates Their Personal and professional Hardship. costing many Their relationships, Jobs and income and precludes Them From accessing The Legal resources and intelligence To defend Themselves. Detainees are requesting reinstatement of Their ability To call, Text, email and use The internet. To carry on Their Lives.

For more information on The Hunger Strike and/or if you Suffered under The conditions at Santa Rita and wish To Bear witness please call The Law Offices of _____.