LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543
528 Grand Avenue
Oakland, CA 94610
Telephone: (510) 329-2140
Facsimile: (510) 580-9410
Email: yhuang.law@gmail.com

DENNIS CUNNINGHAM, SBN 112910
115A Bartlett
San Francisco, CA 94110
Telephone: (415) 285-8091
Facsimile: (415) 285-8092
Email: denniscunninghamlaw@gmail.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| **ALAMEDA COUNTY MALE PRISONERS** And Former Prisoners, DANIEL GONZALEZ, et al. on behalf of themselves and others similarly situated, as a Class, and Subclass **PLAINTIFFS,** vs. **ALAMEDA COUNTY SHERIFF'S OFFICE**, et al. **DEFENDANTS.** | Case No. 3:19-cv-07423 JSC **EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND REQUEST FOR BRIEFING SCHEDULE FOR PRELIMINARY INJUNCTION** |

I.     INTRODUCTION ....................................................................................................1

II.    STATEMENT OF FACTS ......................................................................................2

       A.    COVID-19 IS A GLOBAL PUBLIC HEALTH CRISIS. ................................4

       B.    SRJ, AS A CORRECTIONAL FACILITY, HOUSES HIGHER THAN
             AVERAGE CONCENTRATIONS OF PEOPLE ESPECIALLY VULNERABLE
             TO COVID-19 ............................................................................................6

       C.    PROFIT AS A PRIORITY CREATES PENNY PINCHING ON INMATE
             SERVICES ..................................................................................................7

       D.    JAIL'S PRACTICE OF PREMATURELY RELEASE COVID-19 POSITIVE
             PRISONERS ................................................................................................9

       E.    JAIL'S PRACTICE OF NOT PROVIDING MEDICAL CARE FOR COVID-19
             POSITIVE PRISONERS ................................................................................9

       F.    JAIL'S PRACTICE OF NOT PROVIDING FOR COVID-19 PRISONER'S
             PERSONAL NEEDS ....................................................................................9

       G.    THE JAIL MAINTAINS POOR SANITATION PRACTICES ........................10

III.   ARGUMENT .........................................................................................................11

       A.    IMMINENT HARM CAN RESULT FROM THE CORONA VIRUS INFECTION
             WHICH IF IMMEDIATE RELIEF IS NOT GRANTED. ..............................12

       B.    THE PLAINTIFFS MEET THE LEGAL STANDARD FOR ISSUANCE OF A
             TEMPORARY RESTRAINING ORDER ..........................................................13

       C.    PROTECTING CONSTITUTIONAL RIGHTS UNDER THE 8TH AND 14TH
             AMENDMENTS IS A COMPELLING PUBLIC INTEREST. ......................13

             1.    A Temporary Restraining Order Is Allowed within the Court's
                   Discretionary. ..................................................................................14

             2.    Plaintiffs Provide Ample Basis on Affidavits to Merit Issue of a Temporary
                   Restraining Order. ............................................................................14

             3.    Pretrial Injunctive Relief Can Be Decided on Hearsay Evidence or Even
                   Inadmissible Evidence. ....................................................................14

             4.    Waiver of A Bond or a Minimal Bond Is Appropriate. ......................15

**Table of Authorities**

**Federal Cases**

*Babu v. Alameda County*, 4:18-cv-07677, ND. Cal. ...............................................................11

*Beacon Theatres, Inc. v. Westover,* 359 U.S. 500 (1959) ......................................................13

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ..............................................................12

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc*. 924 F.Supp. 1559 (S.D. Cal. 1996) ...............15

*Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389 (9th Cir.1984) ..........................................15

*Hamilton Watch Co. v. Benrus Watch Co.* 206 F.2d 738 (2d Cir. 1953)........................................14

*Hamilton Watch Co. v. Benrus Watch Co*., 206 F.2d 738 (C.A.2 1953) ........................................14

*In re Pacific Far East Line, Inc.*, 43 F.R.D. 283 (N.D. Cal. 1967). .......................................14

*Industrial Bank of Washington v. Tobriner*, 405 F.2d 1321 (1968) ..........................................14

*Int'l Society for Krishna Consciousness v. Kearnes,* 454 F.Supp. 116 (E.D. Cal. 1978) .....................14

*Moltan Co. v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171 (6th Cir. 1995) ................................15

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co*., 434 U.S. 1345, 1347 n. 2 (1977) .......................13

*Nw. Airlines, Inc. v. Bauer* 467 F. Supp. 2d 957 (D.N.D. 2006) ............................................12

*People v. Tahoe Regional Planning Agency*, 766 F.2d 1319 (9th Cir. 1985)...................................15

*Progress Development Corp. v. Mitchell*, 286 F.2d 222 (C.A.7 1961) ........................................14

*Ross-Whitney Corp. v. Smith Kline & French Laboratories,* 207 F.2d 190 (9th Cir.1953) ....................15

*Sierra On-Line, Inc. v. Phoenix Software, Inc*., 739 F.2d 1415 (9th Cir. 1984)..............................13

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co*., 240 F.3d 832 (9th Cir. 2001) ...................13

*U.S. v. Raines*, 362 U.S. 17 (1960) .......................................................................13

*University of Texas v. Camenisch*, 451 U.S. 390 (1981) ....................................................14

*Winter v. Nat. Res. Def. Council, Inc.* 555 U.S. 7 (2008) .............................................12, 13

**Federal Rules**

Federal Rule of Civil Procedure 56 ........................................................................15

Federal Rule of Civil Procedure 65 ....................................................................12, 13

**Treatises**

Moore's Federal Practice.............................................................................14

**Other**

Alameda County Sheriff's Office, *COVID-19 Update, Alameda County Sheriff's Office*, (May 7, 2020) https://www.alamedacountysheriff.org/admin_covid19.php ................................................7

Cal. Dept. Pub. Health, *COVID-19 Updates* (last accessed May 4, 2020) https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx.....................4

Center for Disease Control and Prevention, *Cases in the U.S., CDC* (last accessed May 4, 2020) ..........4

Center for Disease Control, *Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission* (last accessed May 7, 2020) https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf ..........................6

Center for Disease Control, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC, (last accessed May 7, 2020) https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ....................................................7

Center for Systems Sciences and Engineering (CSSE) at Johns Hopkins, *COVID-19 Dashboard*, Johns Hopkins University & Medicine, (last accessed May 4, 2020) https://coronavirus.jhu.edu ..............4

*Chronicle Digital Team*, Coronavirus Tracker, SF Chronicle (May 7, 2020) https://projects.sfchronicle.com/2020/coronavirus-map/....................................................7

Donald J. Trump *et al., Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefings*, Whitehouse, (Apr. 1, 2020) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-15/. ...................................................5

Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease*, Whitehouse, (Mar. 13, 2020) https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ ....................................................5

F.A Klok, M.J.H.A. Kruip, N.J.M can der Meer, *et al.*, Incidence of Thrombotic Complications in Critically Ill ICU Patients with COVID-19, Elsevier, (Apr. 13, 2020) https://www.thrombosisresearch.com/article/S0049-3848(20)30120-1/pdf ..............................6

International Society of Nephrology, *Recommendations for the Novel Coronavirus 2019 Epidemic* (last accessed May 7, 2020) https://www.theisn.org/covid19/recommendations.......................................5

Office of Governor Gavin Newsom, *Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19*, CA.gov, (Mar. 4, 2020) https://www.gov.ca.gov/2020/03/04/ governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/.............................................5

Office of the Federal Public Defender, *Covid-19 Update*, Office of the Federal Public Defender, (last accessed May 7, 2020) https://www.ndcalfpd.org .........................................................2, 7

Panagis Galiatsatos, M.D., M.H.S, *What Coronavirus Does to the Lungs*, Johns Hopkins Medicine, (Apr. 13, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/what-coronavirus-does-to-the-lungs ........................................................5

Tedros Adhanom, *WHO Director-General's Opening Remarks at the Mission Briefing on COVID-19 -9 April 2020*, World Health Organization, (Apr. 9, 2020) https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-mission-briefing-on-covid-19---9-april-2020 ................. 5

The Novel Coronavirus Pneumonia Emergency Response Epidemiology Team, *Vital Surveillances: The Epidemiological Characteristics of an Outbreak of 2019 Novel Coronavirus Diseases (COVID-19) – China, 2020*, China CDC Weekly, (Feb. 21, 2020), http://weekly.chinacdc.cn/en/article/id/e53946e2-c6c4-41e9-9a9b-fea8db1a8f51 ................................................................................ 6

World Health Organization Regional Office For Europe, *Preparedness, Prevention and Control of COVID-19 in Prisons and Other Places of Detention,* World Health Organization Regional Office For Europe, (Mar. 15, 2020) http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf ........................................................................ 7

World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 16-24, 2020) https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf ...................................... 6

Zhou, F et al., *Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19 in Wuhan, China: a Retrospective Cohort Study* (abstract), PubMed, (Mar. 28, 2020) https://www.ncbi.nlm.nih.gov/pubmed/32171076 ............................................................ 5

v

## Table of Declarations in Support

| Title of Declaration | Date Signed | Short Cite |
|---|---|---|
| Declaration of Adam Nelson | April 19, 2020 | Adam Decl. |
| Declaration of Dwight Adams | April 20, 2020 | Adams Decl. |
| Declaration of Marla Armstrong | May 6, 2020 | Armstrong Decl. |
| Dr. Christina Bourne | May 6, 2020 | Bourne Decl. |
| Declaration of Saul Espinoza | May 6, 2020 | Espinoza Decl. |
| Declaration of Darryl Geyer | May 7, 2020 | Geyer Decl. |
| Declaration of Cedric Henry | April 29, 2020 | Henry Decl. |
| Declaration of Jose Alonzo Herrera | April 21, 2020 | Herrera Decl. |
| Declaration of Yolanda Huang | May 7, 2020 | Huang Decl. |
| Declaration of Ocie Johnson | April 29, 2020 | Johnson Decl. |
| Declaration of Jimmie Jones | April 17, 2020 | Jones Decl,. |
| Tyronne Alexander Jones | May 6, 2020 | Jones Decl. |
| Declaration of Maria Moore | April 21, 2020 | Moore Dec. |
| Declaration of Troy Powell | April 20, 2020 | Powell Decl. |
| Tikisha Upshaw | May 6, 2020 | Upshaw Decl. |
| Declaration of Angelo Valdez | April 29, 2020 | Valdez Decl. |
| Declaration of Leonard Wakefield | May 7, 2020 | Wakefield Decl. |
| Declaration of Eric Wayne | April 17, 2020 | Wayne Decl. |
| Declaration of Lamont Williams | April 20, 2020 | Williams Decl. |

# I.    INTRODUCTION

The Alameda County Male Prisoner-Plaintiffs in these actions, for themselves and the other prisoners at Santa Rita Jail ("SRJ"), as a class, seek relief on an emergency basis in the form of an order or orders by this honorable Court which will concretely require the defendant Sheriff, his underlings, and relevant personnel from SRJ's contracted, for-profit medical care provider, defendant Wellpath (formerly known as CFMG, California Forensic Medical Group) to protect the prisoners at SRJ from defendants' continuing failure to provide reasonable COVID-19 prevention, care, and treatment.

The prisoners remaining at SRJ are left with little defense against COVID-19. Under the total control of the defendant SHERIFF, there is little testing, tragically poor implementation of distancing, ineffective isolation of quarantined inmates, improper sanitation, a severe lack of soap, sanitizer, and personal protective equipment ("PPE"). Under ordinary circumstances, there is effectively no clean-up or disinfecting, and the place is filthy. Grievously, during the COVID-19 pandemic, poor practices and disregard for sanitation continues, with tragic implications for prisoners, as well as anyone who enters SRJ or comes into contact with anyone who has entered SRJ. Specifically, most SRJ staff members do not wear masks or other PPE such as gloves at work and staff move freely between quarantined and non-quarantined housing units ("HU"). Inmates report various body fluids on nearly every surface with rare and ineffective cleanings by SRJ and completely inadequate provision of cleaning supplies which would allow inmates to take steps to clean and protect themselves. All of these practices serve to spread COVID-19 within the SRJ and to those in contact with SRJ staff and inmates.

Defendants' response when a prisoner becomes ill with COVID-19 is a transfer to solitary confinement (the "Hole"), where he is locked without treatment and denied basic care. Meal trays are slid through the door slot until, some days later, the prisoner--declared to be "recovered", despite being symptomatic--is transferred back to the general jail population. While in the Hole, infected inmates, including men complaining of significant symptoms such as breathing difficulty and chest pain, are treated punitively. They are denied medicine and information about their illness. They are denied appropriate food (and sometimes denied even compliance with established dietary needs), appropriate bedding, basic personal hygiene accommodations such as showers, working sinks, and sop. They are deprived of family contact, including phone access. They are made to endure conditions even more filthy than usual, kept in freezing cold cells without sufficient blankets (even when requested), and kept indoors away from natural light and open air for extended periods. A lucky few receive a couple of cough drops.

1

**COMPLAINT**

*Alameda County Male Prisoners v. Alameda County Sheriff's Office*, United States District Court, No. District of California, Case No. 3:19-cv-07423 JSC

There is no laundry service and men report wearing the same clothes for weeks. Deprived of information and basic medical attention, many of these prisoners are terrified, believing they being left to die in a cold concrete box.

Withal we must consider defendant Wellpath's contract obligation to bear all out of jail medical costs, including hospital visits by prisoners, and how that conflict of interest may bear upon the prisoners' COVID-19 experience at Santa Rita.

All in all, as shown with particularity in the accumulated statements of the prisoners appended hereto, COVID-19 was well-established at SRJ by March, and the SRJ as operated by defendants and under their control is not responding to it in a constitutionally reasonable and adequate way. Plaintiffs, on the strength of the information from upwards of a 100 prisoners since March 15, 2020, are asking the Court to issue a temporary restraining order and then set a briefing schedule with regard to a preliminary injunction, to determine what defendants have and have not been doing, and are doing in light of what is generally known to be needed---distancing, quarantine, PPE, disinfectant, soap and sanitizer, and appropriate medical care for the caseload of COVID-19 infections which have arisen in SRJ, and to make such remedial orders as may be called for.

## II.    STATEMENT OF FACTS

Alameda County's Santa Rita Jail ("SRJ" or the "Jail"), is the largest county jail in the Bay Area. SRJ has a higher COVID-19 infection rate than anywhere else in the Bay Area, and a higher infection rate than the State of California.[1] SRJ has obscured this fact by refusing to test inmates, and prematurely deeming infected prisoners "recovered" and moving them back into general population. Johnson Decl. ¶ 27, Espinoza Decl. ¶ 4, Geyer Decl. ¶ 11, Henry Decl. ¶ 3, Wayne Decl. ¶¶ 14, 18, Valdez Decl. ¶¶ 1, 4. Prisoners who are exhibiting symptoms but do not have a fever, some due to inaccurate thermometers, continue to be denied tests. *See, e.g.*, Jones Decl. ¶ 3. Fewer than one percent of inmates have been tested. These policies have caused additional prisoners to be infected and are turning the Jail into a source of infection to the larger community. Wayne Decl. ¶ 20, Geyer Decl. ¶¶ 7-10, Wakefield Decl. ¶¶ 1, 2.

SRJ's medical care—if it can be called that--of prisoners sick with COVID-19 mirrors its general fiscal tightfisted penny-pinching attitude toward prisoner services. The Jail treated and continues to treat

---

[1] Office of the Federal Public Defender, *Covid-19 Update*, Office of the Federal Public Defender, ("*Covid-19 Update*")(last accessed May 7, 2020) https://www.ndcalfpd.org (showing an infection rate of over twenty per 1,000 people in the Santa Rita Jail compared to under five per 1,000 for California and San Francisco).

infected prisoners in an unconstitutional manner, by placing prisoners sick with COVID-19 in solitary confinement, without adequate medical care and miniscule ministrations for COVID-19 symptoms of hacking cough, severe body and head pains, difficulty breathing, the chills and shivers of fever. Johnson Decl. ¶ 22, Espinoza Decl. ¶ 3, Moore Decl. ¶ 5, Geyer Decl. ¶ 4, Henry Decl. ¶¶ 6, 11, Jones Decl. ¶¶ 4, 6, Valdez Decl. ¶¶ 2, 6-8, Armstrong Decl. ¶¶ 2, 3, 4, Adams Decl. ¶¶ 4-6, 9, and Wakefield Decl. ¶¶ 6, 7,11. The totality of palliative care consists of cough drops for a COVID-19-infected prisoner, and then only on request. Valdez Decl. ¶ 7.

These solitary confinement cells used for housing infected inmates are not cleaned after the prior prisoner occupant is moved out before a new prisoner is moved in. These sick and unwell prisoners are then required to sit in dirty cells for hours until some meager set of cleaning materials are provided, and then clean the cells themselves, if they have the energy to do so. Espinoza Decl. ¶¶ 3, 5, Adams Decl. ¶ 4, Jones Decl. ¶ 4, Johnson Decl. ¶ 4.

Calories are provided but not nutritious food to assist in lowering inflammation. Valdez Decl. ¶ 9, Wakefield Decl. ¶ 9. Prisoners are not provided with assistance to reduce inflammation or boost native health. Bourne Decl. ¶ 10. Food trays are dirty, with unwashed leftovers beneath the new food. COVID-19 position prisoners are not provided their special medical or religious diets. Ocie Johnson was not provided, for two days, his prescribed cardiac diet while testing positive for COVID-19 which is especially taxing on those with cardiac disease. Johnson Decl. ¶¶ 7, 9. Prisoners are not provided antipyretics or pain medication for the shooting headaches and body pains. *See, e.g.,* Adams Decl. ¶ 6. They are expected to share inhalers. Armstrong Decl. ¶¶ 3-5.

Prisoners are not provided basic necessary information, including whether they have in fact tested positive for COVID -19, or possible outcomes for the illness. Johnson Decl. ¶¶ 14, 17, Adams Decl. ¶¶ 3, 4, 6, Espinoza Decl. ¶¶ 3, 4,5, Herrera Decl. ¶¶ 2-6, Henry Decl. ¶ 6. Prisoners have to deduce their health and infection status depending on the housing unit they find themselves in. Adams Decl. ¶¶ 2-3, Jones Decl. ¶¶ 3, 5, 6, 8, Moore Decl. ¶ 3, Powell Decl. ¶ 4, Valdez Decl. ¶¶2,4, Johnson Decl. ¶ 2, Herrera Decl. ¶¶ 3-5, Wyne Decl. ¶¶ 13, 14. Prisoners have no recourse to independently obtain information. Access to a telephone is extremely limited. Infected prisoners are unable to call family or their lawyers to inform them of their plight or to get information on the corona virus. *See, e.g.,* Johnson Decl. ¶¶ 5, 6, 10, 11. Locked and isolated in cells designed for disciplinary actions, many of these prisoners are exceedingly frightened and believe that they will die, alone, in a cold, concrete cell. *See, e.g.*, Johnson Decl. ¶ 11, Jones Decl. ¶ 6.

3

As a result of this lack of care, prisoners who have COVID-19 symptoms are hiding their symptoms and avoiding reporting these symptoms to jail deputies in order avoid the privations of solitary confinement, and the punishment those with COVID-19 are enduring. *See* Jones Decl. ¶2.

Prisoners who have tested positive for COVID -19 are released back into general population while still symptomatic, and without a follow-up testing to confirm that they are in fact free of the corona virus. This failure to do follow-up testing has caused secondary transmissions. *See* Wayne Decl. ¶ 14.

SRJ is a qualified Alameda County referral agency for referrals of former inmates for emergency housing, but refuses to make referrals so that COVID -19 infected prisoners who are released can obtain emergency housing to shelter in place. *See* Geyer Decl. ¶¶ 10-11.

The majority of the prisoners in SRJ, some 85%, are pretrial detainees, protected under the 14th Amendment, and constitutionally protected against punishment. And even for those convicted, the treatment--namely locking prisoners ill with COVID-19 into solitary confinement, disciplinary cells--is cruel and unusual punishment.

## A. COVID-19 IS A GLOBAL PUBLIC HEALTH CRISIS.

We are in the midst of the most significant global pandemic in generations. As of May 5, 2020, there were more than 3.67 million global confirmed cases of COVID-19.[2] The United States accounts for more such cases than the next four countries on the list combined, with more than 1.17 million confirmed cases of infection and 68,279 deaths as of May 5, 2020.[3] The CDC's forecast has COVID -19 deaths reaching 100,000 by the end of May. Without effective public health intervention, more than 200 million people in the United States could be infected with COVID-19, with as many as 1.5 million deaths in the most severe projections.

California has not been spared the pandemic. By May 5, 2020, California accounted for over 56,000 confirmed COVID-19 cases, and 2,317 deaths.[4] On March 4, 2020, Governor Gavin Newsom

---

[2] Center for Systems Sciences and Engineering (CSSE) at Johns Hopkins, *COVID-19 Dashboard,* Johns Hopkins University & Medicine, (last accessed May 4, 2020) https://coronavirus.jhu.edu

[3] CSSE , *Supra* note 2; Center for Disease Control and Prevention ("CDC"), *Cases in the U.S., CDC* (last accessed May 4, 2020) https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[4] CDC, *Supra* n. 3; Cal. Dept. Pub. Health, *COVID-19 Updates*, (last accessed May 4, 2020) https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx.

declared a state of emergency concerning the COVID-19 outbreak.[5] On March 13, 2020, the President declared a national state of emergency.[6] In a subsequent letter to President Trump, Governor Newsom projected "that roughly 56 percent of our population--25.5 million people--will be infected with the virus over an eight week period." The White House has projected that, even taking into account existing interventions by federal and state authorities, the total number of COVID-19 deaths in the United States may be as high as 240,000 people.[7]

COVID-19 is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects. Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity, and it can damage tissues in other vital organs, such as the heart and kidneys.[8] According to recent estimates, the fatality rate for people with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems. [9]

Certain medical conditions increase the risk of serious complications from COVID-19, including asthma and other lung diseases, heart disease, chronic liver or kidney disease, diabetes, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle

[5] Office of Governor Gavin Newsom, *Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19*, CA.gov, (Mar. 4, 2020) https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/
[6] Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease,* Whitehouse, (Mar. 13, 2020) https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.
[7] Donald J. Trump *et al.*, *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefings,* Whitehouse, (Apr. 1, 2020) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-15/.
[8] Panagis Galiatsatos, M.D., M.H.S, *What Coronavirus Does to the Lungs*, Johns Hopkins Medicine, (Apr. 13, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/what-coronavirus-does-to-the-lungs; International Society of Nephrology, *Recommendations for the Novel Coronavirus 2019 Epidemic* (last accessed May 7, 2020) https://www.theisn.org/covid19/recommendations (kidney abnormalities); Zhou, F et al., *Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19 in Wuhan, China: a Retrospective Cohort Study* (abstract), PubMed, (Mar. 28, 2020) https://www.ncbi.nlm.nih.gov/pubmed/32171076 (heart failure in ~12% of early patients).
[9] Tedros Adhanom, *WHO Director-General's Opening Remarks at the Mission Briefing on COVID-19 -9 April 2020*, World Health Organization, (Apr. 9, 2020) https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-mission-briefing-on-covid-19---9-april-2020.

cell disease), metabolic disorders, stroke, current or recent pregnancy, and developmental delay.[10] People with these underlying conditions are at an increased risk of developing serious symptoms from COVID-19, regardless of age.[11] Since COVID-19 is a new or "novel" corona virus within humans, research is just beginning, and new complications are being realized almost daily. New physical symptoms include loss of smell, strokes, and frost bite appearances on toes. All the health implications of contracting COVID-19 are not yet known. And while, scientists presume that contracting and surviving COVID -19 imparts *some* immunity, it is unclear the length of that immunity, so it is very possible that individuals can become infected with COVID -19 more than once.

For people in the highest risk populations, the fatality rate of COVID-19 is about 15 percent—or one in seven infected individuals.[12] Patients in high-risk categories who do not die from COVID-19 can nevertheless expect a prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurologic damage, and the loss of respiratory capacity.[13]

**B.    SRJ, AS A CORRECTIONAL FACILITY, HOUSES HIGHER THAN AVERAGE CONCENTRATIONS OF PEOPLE ESPECIALLY VULNERABLE TO COVID-19**

The World Health Organization ("WHO") has recognized that incarcerated people "are likely to be more vulnerable to the [COVID-19] outbreak than the general population because of the confined conditions in which they live." The CDC has explained that correctional facilities "present unique challenges for control of COVID 19 transmission among incarcerated persons, detention center staff, and

---

[10] CDC, *Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission* (last accessed May 7, 2020) https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

[11] *Id.*

[12] The Novel Coronavirus Pneumonia Emergency Response Epidemiology Team, *Vital Surveillances: The Epidemiological Characteristics of an Outbreak of 2019 Novel Coronavirus Diseases (COVID-19) – China, 2020*, China CDC Weekly, (Feb. 21, 2020), http://weekly.chinacdc.cn/en/article/id/e53946e2-c6c4-41e9-9a9b-fea8db1a8f51

[13] Gautam Rewal, Sankalp Yadac, and Raj Kumar, *Post-Intensive Care Syndrome: an Overview, J. Transl. Int. Med.*, 90-92, (Jun. 2017) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5506407/; World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* (Feb. 16-24, 2020) https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf; F.A Klok, M.J.H.A. Kruip, N.J.M can der Meer, *et al.*, *Incidence of Thrombotic Complications in Critically Ill ICU Patients with COVID-19*, Elsevier (Apr. 13, 2020) https://www.thrombosisresearch.com/article/S0049-3848(20)30120-1/pdf

visitors."[14] (CDC Guidance). Conditions in correctional facilities pose very significant risks for transmitting COVID-19 not only to the people incarcerated there, but also to employees and volunteers—and from them to the community as a whole.[15]

Alameda County has the second highest tally of COVID-19 infections in the Bay Area, with 1,533 cases and 55 deaths as of April 28, 2020.[16] SRJ's infection rate, or 20 persons per thousand, is higher than the rate for California, or the Bay Area or Alameda County, and doubles the 11 per 1,000 persons rate of the Federal Bureau of Prisons.[17]

## C.    PROFIT AS A PRIORITY CREATES PENNY PINCHING ON INMATE SERVICES

Defendant WELLPATH is a for profit medical provider, with a built-in incentive through its for profit structure and contract with defendant SHERIFF, to minimize costs in order to maximize returns. Examples of these efforts to minimize costs are reflected in the provision of two cough drops per day to infected inmates, one in the morning and one in the afternoon, for the serious and severe cough that is a hallmark of COVID-19. Defendant Wellpath does not offer cough drops—two of the declarations submitted, Cedric Henry and Dwight Adams, received cough drops only after interview of counsel. Huang Decl., Ex. 1, p. 2 The other prisoners who were infected with COVID did not even get cough drops. Valdez Decl. ¶ 7, Espinoza Decl. ¶5, Wakefield Decl. ¶7, Henry ¶ 6.

Medical examinations and treatment consists of having sick and infected prisoners kneel on the floor inside their cells, and thrust their forehead through the opened food tray slot in the cell's metal door. The Jail's medical staff then takes the prisoner's temperature. Adams Decl. ¶ 9, Espinoza Decl. ¶4. The prisoner then sticks a finger through the food tray slot and the prisoner's oxygen level is monitored. Requests for an analgesic or antipyretics for the body pain and headache are rebuffed, and prisoners are

---

[14] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC, (last accessed May 7, 2020) https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[15] WHO Regional Office For Europe, *Preparedness, Prevention and Control of COVID-19 in Prisons and Other Places of Detention,* World Health Organization Regional Office For Europe, (Mar. 15, 2020) http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf.

[16] Alameda County Sheriff's Office, *COVID-19 Update, Alameda County Sheriff's Office*, (May 7, 2020) https://www.alamedacountysheriff.org/admin_covid19.php.; *Chronicle Digital Team,* Coronavirus Tracker, SF Chronicle (May 7, 2020) https://projects.sfchronicle.com/2020/coronavirus-map/.

[17] *See, supra,* n. 1, Covid-19 Update.

told it is better for their body to fight it off themselves. *See, e.g.*, Valdez Decl. ¶ 6.The penny pinching extends to having prisoners share an asthma inhaler, which is used in the mouth and an excellent means of spreading the corona virus. *See* Armstrong Decl. ¶¶ 3-5, Bourne Decl. ¶ 2.

Defendant ARAMARK is another for profit corporation within the Jail, also with a built in incentive through its for-profit structure and contract with defendant SHERIFF, to minimize costs in order to maximize returns. And the costs are reflected in ARAMARK's efforts to reduce services and supplies to the minimum possible, rendering poorly cooked, tasteless food. Food consists primarily of soy powder protein, white starches, and cooked beans which are generally hard and difficult to chew. Vegetables consist of two spoonfuls of old carrot nibs and wilted or dried lettuce. Trays are not properly washed. Food trays are left out overnight so residue food dries. Then food trays are swirled in a soapy bath for a few minutes before being sanitized for 30 seconds. Food residue is often left on the bottom and corners of the tray resulting in new food being placed on top of old caked on, food residue. Valdez Decl. ¶ 9. A recent dinner consisted of unflavored, watery over cooked and mushy macaroni and undercooked hard white beans, with two spoonsful of carrots, a dry biscuit and a white flour "cake." For men who are ill and have a poor appetite due to COVID-19, the dinner was inedible. Henry Decl. ¶13.

Defendant SHERIFF instituted a Jail policy which dictates that each prisoner only receive one bedroll and each bedroom has a thin mattress, one blanket and one sheet. The Jail does not give Prisoners sick with COVID-19 locked up in cold concrete solitary confinement cells are not provided extra blankets. *See* Henry Decl. ¶ 6, Adams Decl. ¶5, Valdez ¶8, Johnson ¶ 12.

Prisoners also have difficulty obtaining basics such as soap, towels, and personal toiletries. Prisoners sick with COVID-19 symptoms are removed from general housing into solitary confinement, leaving their property behind. Prisoners arrive in solitary confinement with only the clothes they are wearing, and lacking all personal toiletries including a towel, soap, or a toothbrush. SRJ normally requires prisoners to purchase these items. Prisoners have also reported difficulty getting basics such as clean clothes, soap. Espinosa Decl. ¶5, Wayne Decl. ¶¶ 5, 8, 12, 20; Adams Decl. ¶¶4, 8; Powell Decl. ¶3; Moore Decl. ¶4; Geyer Decl. ¶6, Wakefield Decl. ¶ 6, Nelson Decl ¶5, Johnson Decl. ¶15. Prisoners sick with COVID-19 are allowed access to showers only once every 48 to 72 hours, and often, even when a shower is available, cannot take a shower because they lack soap and a towel. Prisoners sick with COVID-19 report that during their entire time in solitary confinement, they are not provided a single change of clean clothing. *See* Adams Decl. ¶8, Espinosa Decl. ¶5, Geyer Decl. ¶ 4.

For COVID-19 infected prisoners who become sicker yet and have to be moved into the Out

8

Patient Housing Unit ("OPHU"), the conditions are somewhat worse than being in solitary confinement. In the OPHU, showers are permitted only once a week or once every two weeks. *See* Adams Decl. ¶ 8, Geyer Decl. ¶ 7.

**D. JAIL'S PRACTICE OF PREMATURELY RELEASE COVID-19 POSITIVE PRISONERS**

A number of prisoners have reported that they tested positive for COVID-19 and then, within 7-8 days, are prematurely returned to general population although they are still symptomatic. *See* Henry Decl. ¶ 4, 6,9; Huang Decl. ¶ 14 ;Valdez Decl. ¶¶1,4;Adams Decl. ¶¶ 3,4, 6; Herrerz Decl.¶ 2, 3, 4, 6; Johnson Decl. ¶¶ 6, 14, 17. The COVID-19 pandemic has generated significant public scrutiny onto all sectors of society, including jails. Moving COVID-19 positive prisoners back to general population as soon as they no longer present with fever for 2 days allows the Jail to list these individuals as "recovered" in their website.

As a result of these premature releases of symptomatic prisoners, other prisoners have contracted COVID-19. Huang Decl. ¶ 14, Valdez Decl. ¶ 4 , Espinoza Decl. ¶ 2.  These transfers have allowed the Jail to post on its website that the numbers of prisoners who recovered increased and that the COVID-19 positive numbers are lower.

**E. JAIL'S PRACTICE OF NOT PROVIDING MEDICAL CARE FOR COVID-19 POSITIVE PRISONERS**

As a general practice, the jail provides no medical treatment for those suffering from COVID-19. Infected prisoners are denied requests for an extra blanket, denied requests for an antipyretic or pain killer for headaches, body aches, provided nothing for the hacking cough. *See* Valdez Decl. ¶¶ 2, 6 7; Espinoza Decl ¶5, Jones Decl. ¶6; Wakefield Decl. ¶ 7, 10, 12; Henry Decl.¶ 6. In fact, even after outside advocates raise the issue of lack of comfort, the only medication provided by defendants for the hacking cough is two (2) cough drops per day.  *See* Huang Decl. Ex. 1, p. 2. The jail also denies all painkillers or antipyretics such as Tylenol on the grounds that it is medically preferable to provide COVID-19 positive prisoners with nothing. *See*, e.g., Valdez Decl ¶ 6.

**F. JAIL'S PRACTICE OF NOT PROVIDING FOR COVID-19 PRISONER'S PERSONAL NEEDS**

When prisoners are removed from general housing to the solitary confinement unit, they are instructed to bring nothing. Therefore, they arrive in Housing Unit 8 without any of their property, and no personal toiletries. Many of the prisoners who test positive for COVID-19 are then stranded without a towel, no soap, no toothbrush. *See* Espinoza Decl. ¶5. These prisoners are locked into a solitary

9

confinement cell, completely isolated and can't take a shower, and have no access to a phone to call family. The entire time, without outside intervention or advocacy, COVID-19 positive prisoners received nothing for their extreme body pains or headaches and some not even two (2) cough drops per day for their dry, hacking coughs. *See* Jones Decl. ¶ 4; Espinoza Decl. ¶ 6; Armstrong Decl. ¶ 2, 3, 4; Adams Decl. ¶¶ 4, 6, 9; Valdez Decl. ¶¶ 6, 7; Henry Decl. ¶¶ 4, 11; Wakefield Decl. ¶¶ 7, 12.

## G. THE JAIL MAINTAINS POOR SANITATION PRACTICES

The poor sanitation practices in the jail for areas occupied by prisoners include the widespread use of the same map and broom for multiple housing units, bathrooms, showers and sleep quarters, without sanitization or other cleaning, leading to the spread of bacteria and pathogens. Former prisoner Darryl Geyer contracted fecal bacteria in his knee through this poor sanitation practice. While housed in the Medical Housing Unit ("OPHU"), he was repeatedly exposed to areas used by COVID-19 patients, without masks or gloves. Upon his release, he requested emergency housing, which the jail refused. Four days after his released, he tested positive for COVID-19, which he believes could only have come through contact with COVID-19 patients in the jails' OPHU. *See* Geyer Decl. ¶¶ 9, 11. Contact tracing would be appropriate and it is unknown if the Jail has done so.

On April 7, 2020, plaintiff MARIA MOORE, a pretrial detainee, was housed in Housing Unit 21 in Santa Rita Jail has submitted a declaration that when she was transported to the OPHU because her cell mate  tested positive for COVID-19, the OPHU cell had not been cleaned. The cell was very dirty, with biological material smeared on the wall, wet splotches that smelled like urine on the floor, and dirt everywhere. Despite requests for cleaning supplies, she was provided with none and ended up using a menstrual pad to wipe the mattress and the cot. *See* Moore Decl. ¶4.

And while the Jail has publicly stated that it is engaged in regular sanitation of common surfaces in the jail, the jail's sanitization methods leaves much to be desired.  Surfaces are not first wiped clean and then disinfected, with the disinfectant wiped to insure even coating and disinfecting of the surface. Instead, in the jail, surfaces are not wiped, and sanitization consists of spray once or twice a surface with a dilute bleach solution. Surfaces are never wiped. *See* Valdez Decl. ¶¶ 2, 3.

During this period of time, defendant SHERIFF has and continues to inform the public and the Alameda County Board of Supervisors that they had complete compliance with all of the Center for Disease Control's recommendations, and that all of their procedures for handling potential exposure to COVID-19 had been reviewed and approved by the Alameda County Public Health Department

10

**COMPLAINT**

*Alameda County Male Prisoners v. Alameda County Sheriff's Office*, United States District Court, No. District of California, Case No. 3:19-cv-07423 JSC

("Alameda Public Health"). Public Production compliance with Dkt 85 p. 32-34, *Babu v. Alameda County*, 4:18-cv-07677, ND. Cal.

Defendant SHERIFF has also inconsistently enforced requirements that all sheriff deputies mask up with gloves when entering or transiting prisoner housing units. *See* Upshaw Decl. ¶¶ 2-4. In addition, Defendant SHERIFF has failed to develop adequate procedures to prevent the internal spread of COVID-19 whereby sheriff deputies in fact change masks and gloves when transiting from one housing unit to the next, particularly when transiting from a housing unit known to be exposed or suspected to have been exposed to COVID-19 and another prisoner housing unit; and cross-contamination by changing masks and gloves when physically searching an inmates or an inmates' bed and belongings, before moving to search a second inmate or the second inmates' belongings. *See* Upshaw Decl. ¶¶ 2-4.

Defendant SHERIFF and defendant WELLPATH have publicly-stated that they are receiving 100 test COVID-19 test kits per week, and yet as of May 3, 2020, they have publicly stated that they have only conducted 121 tests. Of these tests, defendant SHERIFF reports that there have been 31 positives.[18]

Defendant ARAMARK produced a public menu which purported to state that every breakfast contains either fresh fruit or juice, and that every lunch contains fresh fruit and two out of three lunches contain a half cup of vegetable. Public Production compliance with Dkt 85, p. 87 *Babu v. Alameda County*, 4:18-cv-07677, ND. Cal. In reality, prisoners receive very little in the way of edible fruits and vegetables. The meals served do not support good health, are not anti-inflammatory, and is often, inedible. *See* Henry Decl. ¶13, Bourne Decl. ¶10.

### III.   ARGUMENT

Plaintiffs will likely suffer imminent and irreparable injury if defendant is not immediately restrained and required to perform:

1. Adequate testing within Santa Rita Jail for the corona virus;
   a. Universal testing for those pending incarceration and those currently incarcerated
   b. Universal testing for those who work in the jail setting
   c. Testing all prisoners who have tested positive for COVID-19 to confirm that they are in fact not infectious before returning them to the general population;
2. Adequate Prevention Measures:

---

[18] https://www.alamedacountysheriff.org/admin_COVID19.php

a. Mandate physical distancing and masking

b. Allow and facilitate frequent hand-washing and adequate hygiene materials

c. maintain and apply appropriate cleaning and sanitation techniques to all surfaces in prisoner housing units;

d. immediately cease all sharing of personal equipment and medical appliances such as asthma inhalers

e. No transport into or cleaning of coroner's laundry in Santa Rita Jail.

3. Adequate Medical Services

a. Mandate a thorough examination by a qualified health professional to evaluate risk of severe disease and need for hospitalization;

b. Monitor vital signs at least two times per day to detect and intervene upon fatal respiratory complications early;

c. Appropriate accommodations for people with disabilities;

d. Ensure access to medications including antipyretics and pain relievers;

e. Ensure optimal management of any underlying chronic conditions;

f. Ensure access to comfort measures, including warm blankets, cool wash cloths, hot beverages, sports drinks, cough drops, and other similar amenities to address the viral symptoms;

g. Ensure frequent and ready access to hygiene facilities;

h. Be given information about prognosis and disease status; and

i. Facilitate family and community support and contact.

j. provide meals that actually comport with their public menus that include daily servings of fresh fruit and vegetables;

Fed. R. Civ. P. 65(B)(1); *Nw. Airlines, Inc. v. Bauer* 467 F. Supp. 2d 957, 963-64 (D.N.D. 2006) *See Winter v. Nat. Res. Def. Council, Inc.* 555 U.S. 7, 22 (2008).

## A. IMMINENT HARM CAN RESULT FROM THE CORONA VIRUS INFECTION WHICH IF IMMEDIATE RELIEF IS NOT GRANTED.

The key issue in demonstrating irreparable harm is whether a plaintiff can show that he "has sustained or is immediately in danger of sustaining some direct injury…" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983). COVID -19 is a highly contagious disease with a high mortality rate,

particularly among individuals with comorbidity. Many of the plaintiffs suffer from comorbidity, including heart disease, and asthma. Because the Sheriff is also the Coroner, and reporting has been limited to the Sheriff's website, it is unknown whether there have been any resulting deaths or whether there were required hospitalization due to the corona virus if the death did not take place inside the Jail.

The health risks of COVID -19 are still being uncovered, with the recent new information that children infected with COVID -19 sometimes suffer serious coronary side effects, and that individuals can develop frost bite like symptoms in their toes, and even young patients can experience debilitating strokes. The most dangerous and imminent harm from the corona virus is the high rate of death. Given the extraordinary steps all branches of government in California have taken, including closing public facilities to the public, and the broad shelter-in-place health emergency orders, there is no question COVID-19 produces imminent harm. The Plaintiffs and even more so, the members of plaintiff class, have no adequate remedy at law for the injuries they have suffered and will suffer in the immediate future. *See Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506-07 (1959).

There is no adequate remedy at law, as damages would not suffice to compensate neither the potential serious physical injury resulting from COVID-19, nor an untimely death.

**B.      THE PLAINTIFFS MEET THE LEGAL STANDARD FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER.**

Federal Rule of Civil Procedure 65 provides for the issuance of restraining orders and preliminary injunctions. The standard for issuing a temporary restraining order is identical to the standard for a preliminary injunction. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co*., 434 U.S. 1345, 1347 n. 2 (1977), *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co*., 240 F.3d 832, 839 n. 7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 20 (2008). In deciding a motion for a preliminary injunction, "[t]he district court is not required to make any binding findings of fact; it need only find probabilities that the necessary facts can be proved." *Sierra On-Line, Inc. v. Phoenix Software, Inc*., 739 F.2d 1415, 1423 (9th Cir. 1984).

**C.      PROTECTING CONSTITUTIONAL RIGHTS UNDER THE 8TH AND 14TH AMENDMENTS IS A COMPELLING PUBLIC INTEREST.**

Protection of constitutional rights such as the Plaintiffs' under the Eighth and Fourteenth Amendments is a recognized compelling public interest (*see U.S. v. Raines,* 362 U.S. 17, 27 (1960))

which "weighs heavily in the balancing of harms, for the protection of those rights is not merely a benefit to plaintiff but to all citizens." *Int'l Society for Krishna Consciousness v. Kearnes,* 454 F.Supp. 116, 125 (E.D. Cal. 1978). The public also has interests in (1) avoiding accelerating the spread of the corona virus both in the Jail and to others in contact with inmates or staff at the Jail, (2) preventing overburdening hospitals, and (3) preventing future societal burden caused by the loss of inmate health or life, including income for minor children and the ability of prisoners to work after their release. A jail sentence should not be a death sentence or punishment with a poorly understood but debilitating disease, much less so should an arrest result in a death sentence.

1. A Temporary Restraining Order Is Allowed within the Court's Discretionary.

"[P]reliminary injunctions and temporary restraining orders are by nature discretionary with the court." *In re Pacific Far East Line, Inc.*, 43 F.R.D. 283, 285 (N.D. Cal. 1967)) (quoting (Moore's Federal Practice, Vol. 7, Sec. 65.04[2]). Plaintiffs request that this court issue a temporary restraining order and set a further briefing schedule for a preliminary injunction.

2. Plaintiffs Provide Ample Basis on Affidavits to Merit Issue of a Temporary Restraining Order.

Declarations of prisoners, public health experts, and physicians were filed with the Complaint in this action. A preliminary injunction or a temporary restraining order "serves as an equitable policing measure to prevent the parties from harming one another during the litigation." *Hamilton Watch Co. v. Benrus Watch Co.* 206 F.2d 738, 742 (2d Cir. 1953). Therefore, a more informal procedure and less stringent evidentiary standards apply for the pre-trial injunctive relief applications. Given Plaintiffs' limited purpose, and given the haste that is necessary to preserve inmates' lives and health, a preliminary injunction should be granted on the basis that procedures for preliminary relief are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). *See also Progress Development Corp. v. Mitchell*, 286 F.2d 222 (C.A.7 1961), and the findings of fact and conclusions of law **made** by a court granting a preliminary injunction are not binding at trial on the merits, *Industrial Bank of Washington v. Tobriner*, 405 F.2d 1321, 1324 (1968); *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 742 (C.A.2 1953).

3. Pretrial Injunctive Relief Can Be Decided on Hearsay Evidence or Even Inadmissible Evidence.

Pre-trial injunctive relief can be decided on hearsay evidence. *Ross-Whitney Corp. v. Smith Kline*

14

*& French Laboratories,* 207 F.2d 190, 198 (9th Cir.1953) (preliminary injunction may be granted on affidavits). It was within the discretion of the district court to accept this hearsay for purposes of deciding whether to issue the preliminary injunction. *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.") "The exigencies of preliminary relief often prevent the movant from procuring supporting evidence in a form that would meet Rule 56(e)'s requirement of evidence admissible at trial. Such evidence may yet be considered by the court, which has discretion to weight the evidence as required to reflect its reliability." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc*. 924 F.Supp. 1559, 1562 (S.D. Cal. 1996) (internal citation omitted).

In these difficult and uncertain times, the jail has barred direct legal visits. Plaintiffs have no direct access to counsel, and cannot with any great speed, receive, review, revise and return wet-ink signed declarations. Visits are now all conducted by video or phone. To require, under these challenging times, that wet-ink signatures be submitted would defeat the availability of speedy relief. Plaintiffs' compromise of having the language read and approved over either telephone or video, is the best, and actually, the only accommodation available short of snail mail, and as such should be received and duly considered by the Court.

                4.   <u>Waiver of A Bond or a Minimal Bond Is Appropriate.</u>

This is an action in the public interest, and as such, bond may be waived. *Moltan Co. v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). The public interest has been defined as seeking a public benefit rather than a personal benefit. *Id*. The Ninth Circuit has held that the district court has discretion to waive a bond or "or to request mere nominal security, where requiring security would effectively deny access to judicial review." *People v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985).

Plaintiffs request the relief sought, to protect plaintiffs and class members from the ravages and imminent harm of the corona virus.

///

///

///

15

**COMPLAINT**

*Alameda County Male Prisoners v. Alameda County Sheriff's Office*, United States District Court, No. District of California, Case No. 3:19-cv-07423 JSC

Respectfully submitted,

DATED: May 7, 2020                    LAW OFFICE OF YOLANDA HUANG

                                      By:__/s/ Yolanda Huang_____
                                      Yolanda Huang

                                      DENNIS CUNNINGHAM, ESQ.

                                      By:__/s/ Dennis Cunningham
                                      Dennis Cunningham

                                      *Counsel for Plaintiffs*