LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543
528 Grand Avenue
Oakland, CA 94610
Telephone: (510) 329-2140
Facsimile: (510) 580-9410
Email: yhuang.law@gmail.com

DENNIS CUNNINGHAM, SBN 112910
115A Bartlett St.
San Francisco, CA 94110
Telephone: 415-285-8091
Facsimile: 415-285-8092
Email: denniscunninghamlaw@gmail.com
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| **ALAMEDA COUNTY MALE PRISONERS** And Former Prisoners, DANIEL GONZALEZ, ROCCI GARRETT, LAWRENCE GERRANS and MICHAEL LUCAS, MARTIN GALLARDO, SERGIO MORALES-SERVIN, SAUL ESPINOSA, CEDRIC HENRY, TROY POWELL, DANIEL TORRES, ARTEMIO GONZALEZ JOHN DOEs Nos. 1-- X, on behalf of themselves and others similarly situated, ~~as a Class, and Subclass~~ **PLAINTIFFS,** vs. **ALAMEDA COUNTY SHERIFF'S OFFICE**, GREGORY J. AHEARN, THOMAS F. MADIGAN, CAPTAIN DERRICK C. HESSELEIN, DEPUTY IGNONT (sp), DEPUTY JOE (sp), ALAMEDA COUNTY and John & Jane ROEs, Nos. 1 – 25; CAPTAIN LUCKETT-FAHIMA as Jane Roe 1. **WELL-PATH MANAGEMENT, INC.,** a Delaware Corporation, (formerly known as California Forensic Medical Group) a corporation; its Employees and Sub- | No. 3:19-cv-07423 JSC<br><br><br>**SECOND AMENDED COMPLAINT** for INJUNCTIVE RELIEF, DECLARATORY RELIEF AND DAMAGES FOR VIOLATION OF CIVIL RIGHTS and OTHER WRONGS<br><br><br>**JURY TRIAL DEMANDED** |

1

Contractors, and Rick & Ruth ROEs Nos. 26-50,

**and,**

**ARAMARK CORRECTIONAL SERVICES, LLC**, a Delaware Limited Liability Company; its Employees and Sub-Contractors, and Rick and Ruth ROES Nos. 51-75.

**DEFENDANTS.**

Plaintiffs, ALAMEDA COUNTY JAIL MALE PRISONERS, DANIEL GONZALEZ, ROCCI GARRETT, LAWRENCE GERRANS and MICHAEL LUCAS, MARTIN GALLARDO, SERGIO MORALES-SERVIN, SAUL ESPINOSA, CEDRIC HENRY, TROY POWELL, DANIEL TORRES and ARTEMIO GONZALEZ, on behalf of themselves and those they speak for and seek to represent herein, for themselves and others make this complaint, based on the knowledge of the Plaintiffs as to themselves and as to conditions and acts which they have personally observed, and on information and belief, including the investigation of counsel, as to all other matters.

## PRELIMINARY STATEMENT

1. This is a civil rights action in which the Plaintiffs, on behalf of themselves and a class of similarly situated individuals, seek relief for Defendants' violations of Plaintiffs' rights and privileges secured by the First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution.

2. This civil rights lawsuit arises out of the unlawful, unconstitutional and inhumane manner in which defendant ALAMEDA COUNTY SHERIFF'S OFFICE (hereinafter Defendant "SHERIFF"), its staff and employees and multiple for-profit contractors, operate the largest county jail in the San Francisco Bay Area. Eighty-five percent or more of prisoners at Santa Rita Jail are pretrial detainees, both state and federal.

3. Defendant GREGORY AHEARN has promulgated policies and practices for Santa Rita Jail's handling of prisoners under its custody and control. There are two basic policies toward its prisoners. The first policy, as publicly articulated by Sheriff Gregory AHEARN, is that Santa Rita Jail's prisoners, including all pretrial prisoners, who are 85% of the prisoner population, are violent criminals, who have lied their entire lives, and not to be believed and despite the

2

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

constitutional presumption of innocence, all prisoners, including pretrial detainees in its custody, are deserving of punishment and deprivations. The second policy is a fiscal tightfisted, penny pinching attitude toward prisoner services, which results in greatly limited and reduced prisoner services provided by the jail and the flourishing and emphasis by the jail of fee based prisoner services. As a consequence, Santa Rita Jail regularly takes actions without considering the impact of these actions on prisoners.

4. Defendants operate this county jail as a penal institution which has as its primary purpose, the lock down of prisoners. Prisoners are treated as the inventory in defendants' business of incarceration, and not as sentient human beings. Defendant Sheriff Ahern has developed policies, practices and deputy trainings which minimize benefits to prisoners, promote jail staff conduct which focus on deprivation and punishment and at best, disregard the prisoners' needs and rights and at worst promote and execute routine violations of prisoners' constitutional and statutory rights.

5. Unable to tolerate these unsanitary and inhumane conditions, plaintiffs and other prisoners after failing to obtain a response through defendants' labyrinthine and difficult grievance process, then engaged in a multi-prong strike, including a hunger strike, a work strike, and a strike against participating in jail activities such as going to court, and then initiated this lawsuit.

6. Regardless of whether a prisoner is pretrial or convicted, Santa Rita jail and Sheriff Ahern treat all prisoners to the same conditions of confinement, The everyday conditions of confinement defendant Santa Rita County Jail and defendant Sheriff Ahern's policies which plaintiffs and class members seek to address and redress for are:

**6.1. JAIL POLICY PLACING PROFIT OVER PEOPLE RESULTING IN POOR QUALITY AND UNCONSTITUTIONAL DEPRIVATION OF BASIC SERVICES AND PROFITEERING OPERATIONS.**

**6.1.1. <u>Food</u>**

a. Food that is infested with rodents, rodent droppings, and bird droppings;

b. Food that is inedible due to age, poor storage, spoilage, excessive cooking and baking;

3

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

c. Food that lacks nutritional value and consists primarily of soy powder, white flour and sugar;

**6.1.2  For Profit Operations**

a. Commissary

b. Tablets

c. Visitation – video & telephone.

**6.1.3  Insufficient and Inadequate Sanitation for Jail and Personal Hygiene**

a. Insufficient cleaning supplies, towels, gloves, and tools to do effective and actual cleaning;

b. Insufficient frequency of availability of cleaning supplies and cleaning of common areas;

c. Inadequate and often unclean laundry.

**6.1.4  Medical Care**

a. Cost cutting, requiring prisoners to share medications including asthma inhalers;

b. Lack of medical care for newly booked detainees who are detoxing from drugs;

c. Requiring prisoners to provide the medical care for newly booked, detoxing detainees;

d. Cost based medical care for less effective and cost as the primary driver on medical treatment;

e. Denial of comfort care in medical treatment;

f. Routine delay and denial of basic medical care;

g. Refusal and failure to provide prisoners with basic information about their health conditions and health care; and,

h. failure to provide Spanish translation to non-English speakers.

**6.2.        PUNISHMENT AND DEPRIVATION**

a.   Enforced idleness:

      i. Excessive lock down, and inadequate time out of cell;

      ii. Inadequate outdoor recreation;

4

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

iii. Arbitrary Rules regarding attire making it difficult to exercise; and,

iv. lack of and inadequate programming.

b. Group punishment: punishing entire units for the perceived infraction of individuals;

c. Deliberate policies and practices by defendants to prevent plaintiffs and class members from filing grievances or raising complaints over conditions of confinement, including retaliation for efforts to file grievances;

d. Lack of language services, including translation so that non-English speakers, and those prisoners who are not literate, are unable to understand jail procedures, do not receive necessary information, and cannot file grievances or request needed services; and,

f. Defendants' wrongful denials of attorney visits, family visits, phone calls and mail.

### 6.3       DISREARD FOR THE WELFARE AND SAFETY OF PRISONERS

Defendant Sheriff failed to take necessary and appropriate adequate steps, and did not properly execute the necessary and appropriate adequate steps to keep prisoners from becoming infected with covid-19. Defendant Sheriff and defendant WELLPATH failed to provide adequate or necessary medical care for those prisoners while they were infected with covid-19 and for those prisoners who continue to experience health problems after they were deemed recovered or negative after suffering from covid-19.

### JURISDICTION

7. This action is brought pursuant to the First, Fourth, Eighth, and Fourteenth Amendments to the United State Constitution, by way of the Civil Rights Acts, 42 U.S.C. §§1981, 1983 et seq. and 1988.

8. Jurisdiction is conferred upon this Court by 28 U.S.C. §1331 (claims arising under the United States Constitution) and §1343 (claims brought to address deprivations, under color of state authority, of rights privileges, and immunities secured by the United States Constitution).

### VENUE AND INTRADISTRICT ASSIGNMENT

9. The claims alleged herein arose in the County of Alameda, State of California. Therefore, venue and assignment, under 28 U.S.C. § 1391(b), lies in the United States District Court for the Northern District of California, San Francisco Division or Oakland Division.

5

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

**JURY DEMAND**

10. Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

**PARTIES**

**Plaintiffs**

11. Plaintiffs are all former or current prisoners incarcerated at the Santa Rita Jail. Plaintiffs seek to represent a class of male imprisoned at the Santa Rita Jail at any time since November 12, 2017, two years prior to the date of filing of the Original Complaint in this action, and a sub-class of prisoners who became infected with covid-19 while incarcerated in Santa Rita Jail. Eighty-five percent of plaintiffs and class members are pretrial detainees. JOHN DOES 1-250 Due to the somewhat transient nature of county jail, prisoners come and go. Added to this the current Covid-19 crisis and the release and transfer of some 500 additional prisoners, the original named plaintiffs are all no longer in custody. Of the current, newly added named plaintiffs, SAUL ESPINOSA, CEDRIC HENRY, DANIEL TORRES, ARTEMIO GONZALEZ, and represent the sub-class of prisoners who contracted covid-19, while in the custody at Santa Rita jail, and ARTEMIO GONZALEZ and LAWRENCE GERRANS represent the sub-class of pretrial prisoners.

**Alameda County Defendants**

12. Defendant ALAMEDA COUNTY SHERIFF'S OFFICE (hereinafter referred to as "SHERIFF") is a "public entity" within the definition of Cal. Govt. Code § 811.2.

13. Defendant ALAMEDA COUNTY is a county in the State of California.

14. Defendant GREGORY J. AHEARN (hereinafter referred to as "AHEARN") is, and at all times relevant to this Complaint was, the Sheriff of Alameda County. As Sheriff of Alameda County, Defendant AHEARN has at times relevant to this Complaint held a command and policy making position with regard to County Jails, including Santa Rita Jail. Defendant Sheriff AHEARN has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs

6

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

1  and practices that prevail at Santa Rita Jail, as described fully below.  Sherriff AHEARN has,

2  wholly or in part, directly and proximately caused and, in the absence of the injunctive relief

3  which Plaintiffs seek in this Complaint, will continue in the future to proximately cause, the

4  injuries and violations of rights set forth fully below. Defendant Sheriff AHEARN is sued in

5  his official capacity.

6  15. Defendant TOM MADIGAN (hereinafter referred to as "MADIGAN") is, and at all times

7  relevant to this Complaint was, the Commander in Charge of Detention and Corrections

8  (hereinafter "DCU"), which includes the Santa Rita Jail. As the Commander in Charge of

9  DCU, Defendant MADIGAN has at times relevant to this Complaint held a command and

10  policy making position with regard to County Jails, including Santa Rita Jail.  Defendant

11  MADIGAN has caused, created, authorized, condoned, ratified, approved or knowingly

12  acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs

13  and practices that prevail at Santa Rita Jail, as described fully below.  Defendant MADIGAN

14  directly supervises defendant HESSELEIN and has, wholly or in part, directly and proximately

15  caused and, in the absence of the injunctive relief which Plaintiffs seek in this Complaint, will

16  continue in the future to proximately cause, the injuries and violations of rights set forth fully

17  below. Defendant MADIGAN is sued in his official capacity.

18  16. Santa Rita Jail is run by a Santa Rita Jail Facility Commander.  The Santa Rita Jail Facility

19  Commander holds a command and policy making position with regard to Santa Rita Jail.  The

20  Santa Rita Jail Facility Commander was Captain D. HESSELEIN at the time the Complaint

21  was first filed, and is currently LUCKETT-FAHIMA, has and continues to cause, create,

22  authorize, condone, ratify, approve or knowingly acquiesce in the illegal, unconstitutional, and

23  inhumane conditions, actions, policies, customs and practices that prevail at Santa Rita Jail, as

24  described fully below.

25  17. The Detention and Corrections Captain, first Defendant D. HESSELEIN and now Defendant

26  LUCKETT-FAHIMA had and has  direct supervision and control over the staff of Santa Rita

27  Jail; is the responsible individual for enforcing defendant SHERIFF's policies and procedures,

28  for setting standards, for holding all other employees, including all sheriff deputies and

technicians accountable for the proper enforcement of SHERIFF's policies and procedures and insuring that conditions of confinement are lawful and constitutional; is responsible for investigating and being personally knowledgeable about the goings on inside the jail. Defendant LUCKETT-FAHIM, as the current Sant Rita Jail Facility Commanders, wholly or in part, directly and proximately caused and, in the absence of the injunctive relief which Plaintiffs seek in this Complaint, will continue in the future to proximately cause, the injuries and violations of rights set forth fully below. DEFENDANT LUCKETT-FAHIMA, prior to her promotion to captain and to the position of Santa Rita Jail Facility Commander at Santa Rita Jail was a lieutenant assigned to Santa Rita Jail, and prior to her promotion as lieutenant, was a Sergeant assigned to Santa Rita Jail. Defendant Santa Rita Jail Facility Commander is sued in her official capacity. Defendant D. HESSELEIN is sued in his official and personal capacity.

18. Defendants DEPUTY IGNONT (sp), DEPUTY JOE (sp), DEPUTY 'John Roe', and DEPUTY "Jane Roe were and are guards and deputies on duty at Santa Rita Jail with direct control over plaintiffs and class members. Defendants DEPUTY IGNONT (sp), DEPUTY JOE (sp), DEPUTY 'John Roe', and DEPUTY "Jane Roe", are sued in their individual capacities.

19. Each and every individual Defendant named herein was at all times relevant to this Complaint an officer or employee of the Alameda County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of Defendant SHERIFF and within the scope of their employment with ASCO.

**The Private For Profit Contractor Defendants**

20. Defendant **WELL-PATH MANAGEMENT, INC** (hereinafter referred to as "WELL-PATH") is an active, for-profit corporation incorporated in the State of Delaware with its principal place of business in California, located at San Diego, California. Defendant WELL-PATH has entered into a written contract with defendant Sheriff to provide and is currently engaged in providing general medical, dental, prenatal and opioid treatment services at Santa Rita Jail. Defendant JESSICA WALDURA is the chief medical officer in charge of defendant WELLPATH's medical operations, and she is sued in her official capacity. Defendant

8

JENNIFER DIAZ is the Health Services Administrator, and she is the administrator responsible for defendant WELLPATH's provision of medical services at Santa Rita Jail. She is sued in her official capacity. Defendants RICK and RUTH ROEs 1-50 are WELL-PATH employees who work at Santa Rita Jail. At all times relevant to this Complaint, Defendants WELL-PATH and RICK and RUTH ROEs 1-25 were agents of the Alameda County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of ASCO and within the scope of their agency with ASCO.

21. Defendant **ARAMARK CORRECTIONAL SERVICES LLC** ("ARAMARK") is an active, foreign, for-profit Limited Liability Company registered in the State of Delaware and licensed to do business in the State of California. Defendant ARAMARK entered into a written contract with defendant Sheriff to operate the kitchens at Santa Rita Jail for the purpose of feeding Santa Rita prisoners, and for the purpose of preparing food to feed prisoners at least six other Bay Area county jails. Defendants RICK and RUTH ROEs 51-100 are ARAMARK employees who work at Santa Rita Jail. At all times relevant to this Complaint, Defendants ARAMARK and RICK and RUTH ROEs 26-50 were agents of the Defendant SHERIFF, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of Defendant SHERIFF and within the scope of their agency with Defendant SHERIFF.

## CLASS ALLEGATIONS

22. Pursuant to Rules 23(a), (b2) and (b)(3) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a Plaintiff class consisting of all men incarcerated at Santa Rita Jail ("SRJ") from November 12, 2017 through to the present, the subclass ("A")of prisoners who are pretrial and the subclass ("B")of men incarcerated at Santa Rita Jail ("SRJ") who contracted the corona virus while under the custody of defendants. All such prisoners were denied access to food that is adequate to maintain health in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution, denied conditions of confinement that met the minimal requirements of the Eighth and Fourteenth Amendments to the U.S. Constitution, and all faced denial of due process and their First Amendment rights violated

9

by defendants' retaliatory actions and the manner in which defendants procedures for prisoner grievances.

23. The members of the class are so numerous as to render joinder impracticable.  In the Fourth Quarter of 2018, Santa Rita Jail had an average daily population of 2,573 prisoners, of which 85% or 2,175 were pretrial.   Approximately 2,239  or 87% of all prisoners are male.

24. On May 5, 2020, due to the covid-19 pandemic, the population of Santa Rita Jail has been reduced to 1,773.  On information and belief, Plaintiffs assert that over 1,500 of the current prisoners are men.  The sub-class of prisoners who contracted covid-19 while in custody at Santa Rita Jail number over 230 men.

25. In addition, joinder is impracticable because, upon information and belief, many members of the class are not aware of the fact that their constitutional rights were violated and that they have the right to seek redress in court.  Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.  There is no appropriate avenue for the protection of the class members' constitutional rights other than a class action.

26. The class members share a number of questions of law and fact in common, including, but not limited to:

27. whether the lack of sanitation in prisoner housing, in holding cells, and in jail food preparation facilities is inadequate and violations of prisoners eight and 14th amendment rights;

28. whether SHERIFF and WELL-PATH established and implemented policies specifically designed and intended to place the reduction of costs as the primary objective in the provision of medical care for Plaintiffs and class members which resulted in the detriment and injury of Plaintiffs and class members;

29. whether this denial of medical care violated Plaintiffs and Class members rights under the 8th and 14th Amendment;

30. whether the members of the class were denied access to food that is adequate to maintain health;

SECOND AMENDED COMPLAINT

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

31.    whether SHERIFF and ARAMARK jointly established and implemented written policies
and unwritten customs and practices specifically designed and intended to deny access to
clean, unspoiled and sanitary food adequate to maintain health, and reduce necessary
expenditures on food purchase, food preparation, food storage and the proper food handling
and service, in order to reduce SHERIFF's costs to increase the profits of SHERIFF and
ARAMARK;

32.    whether SHERIFF, pursuant to written policies established and adopted by defendants
AHERN and SHERIFF to increase profits, implemented these policies in part by providing
the low quality and limited quantity of food provided to prisoners, which then forces
prisoners who can afford it, to purchase food from the commissary.  This has the double
benefit to defendant SHERIFF of maintaining lower costs output for food and
simultaneously increasing profits from sale of commissary items.  On information and
belief, plaintiffs assert that defendant Ahern has sole approval authority over recent
significant prices increases where simple, common food stuffs such as ramen return profit
margins of 400% and the written contract with the commissary concessionaire provides that
defendant Sheriff  40% of all profits earned.    Commissary prices were significantly raised
in Fall, 2019 and again in Spring, 2020.

33.    whether SHERIFF, in concert with its goals to impede and create barriers to plaintiffs and
class members' abilities to communicate with family and friends, and increase profits to
SHERIFF, established and implemented written policies specifically designed set and
maintain high prices for prisoner phone and family video contacts;

34.    whether SHERIFF established and implemented written policies and culture and practices in
violation of the First,  Eighth and Fourteenth Amendment, by wrongfully limiting the ability
of prisoners to phone and visit with family and community, unreasonable denial and limits
of in person and video visits, with these unreasonable denials and limits partially imposed
through high and excessive costs of telephone calls and video visits, imposed through
making phones inaccessible and unavailable, and lockdowns so that prisoners are prevented
from participating in in-person and video visits;

11

35. whether SHERIFF established and implemented policies and culture and practices in violation of the Fourteenth Amendment which inflicted unconstitutional punishment against the male pretrial population of SRJ by long periods of enforced idleness, excessively locking them into cells and denying them necessary out of cell time, outdoor recreation time, and programming;

36. whether the manner in which jail laundry was performed and distributed is inadequate and violates plaintiffs and class members' Eight and 14th amendment rights;

37. whether SHERIFF, as part of its objective to maximize profits from the prisoners to the jail, in concert with WELL-PATH policies and practices, created practical barriers to medical care by requiring prisoners to request each and every medical service, by implementing procedural barriers for prisoners to making the Jail required requests for medical assistance, including limiting the availability of medical request slips, or the ability to submit these slips electronically; barriers for prisoners requesting medical assistance including language barriers; and long delays in responses to submitted medical request slips; and punishment and retaliation by the jail for prisoners requesting medical attention, including emergency medical attention. Inasmuch as discovery has not commenced, plaintiffs allege that some of these are written practices and that these written practices are implemented through custom and practice.

38. whether SHERIFF established and implemented policies in violation of the First, Eighth and Fourteenth Amendments, to intimidate and prevent plaintiffs and class members from filing grievances against wrongful and unlawful practices at SRJ;

39. whether the members of the class were prevented by fear of retaliation from engaging in the right to file grievances against unlawful practices and from communicating medical needs and requesting medical attention at SRJ.

40. whether at all times relevant to this Complaint Defendants SHERIFF, WELL-PATH and ARAMARK acted under color of State law;

41. The Plaintiffs' claims are typical of those of the class. Like the other members of the class, the Plaintiffs were victims of the Defendants' policy, practice, and/or custom of preventing

SECOND AMENDED COMPLAINT

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

access to: appropriate and necessary health sustaining food; communications with family and community, necessary sanitation including sufficient supplies provided with sufficient frequency for maintaining personal sanitation; access to medical care; sufficient clean laundry; and the right to be free of retaliation for voicing criticisms or observations of short comings at the jail and for voicing conditions of medical needs;

42. The legal theories under which the Plaintiffs seek relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the Plaintiffs are typical of the harms suffered by the class members.

43. The Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interests with members of the class, and will fairly and adequately protect the interests of the class. The Plaintiffs have all been subject to conditions of confinement that violate the First, Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution.

44. The Plaintiffs are represented by experienced civil rights and class action counsel. Plaintiffs' Counsel have the resources, expertise, and experience to prosecute this action. Plaintiffs' Counsel know of no conflicts among members of the class or between the attorneys and members of the class.

45. The Plaintiff class should be certified pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to class members, the interests of the Plaintiffs and potential class members are aligned, and a class action is superior to other available methods for fairly and efficiently adjudicating the case.

**STATEMENT OF FACTS**

46. On October 30, 2019, prisoners at Santa Rita Jail, unable to tolerate the conditions of confinement, commenced a hunger strike, and a strike against the jail. The strike against the jail included refusal to go to Court, refusal to eat the Jail's food, and refusal to perform work.

# GENERAL CONDITIONS FOR MALE PRISONERS AT SRJ

47. Santa Rita Jail was completed in 1989, and designed with the concept of locking up prisoners. Santa Rita Jail was not designed to provide prisoners with classes or programs, but primarily to keep prisoners, even those who are pretrial, locked in cells, with enforced idleness.

48. Defendant SHERIFF, despite California State policy that the "dramatic spending in corrections" have resulted in worse or unchanged recidivism rates, and mandated that "California must reinvest its criminal justice resources to support community-based corrections programs and evidence-based practices that will achieve improved public safety returns on this state's substantial investment in its criminal justice system," Penal Code §17.5, and despite Defendant Alameda County Sheriff's Office's receipt of a significant portion of Alameda County's funding from the state for evidence based practices, through realignment funding, defendant SHERIFF has not changed its emphasis on its premier policy of enforced idleness and his disregard for the "presumption of innocence status" of pretrial detainees, and focus on punishment and deprivation.

## PROFITEERING: JAIL POLICY PLACING PROFIT OVER PEOPLE

49. Since 2013, Defendant AHEARN has overseen an unprecedented increase in the salaries of defendant SHERIFF personnel at Santa Rita Jail. Salaries and benefits at SRJ have increased by $12.44 million dollars since 2013. As a result, being a jail guard at SRJ is one of – if not the most – remunerative jobs in the entire county that a high school graduate with no college education can get. A starting jail guards make approximately $100,000 per year in salary and benefits. This is not counting overtime payments available.

50. That $12.4 million-dollar salary increase, and the $1.7 million increase in overtime between 2013 and 2018 amounted to almost 50% of the Sheriff's office SRJ budget increases over that period. It is reported that in 2017, Defendant AHEARN received $632,332 in total compensation, then Detentions and Corrections Commander Houghtelling received $449,144.96 in total compensation and Defendant Captain Hesselein received $394,437.[1]

[1] https://transparentcalifornia.com/salaries/2017/alameda-county/

14

51. Over the same period, while remuneration for Sheriff's office deputies and personnel at SRJ increased substantially, the SRJ jail population for whom the Sheriff is responsible, *declined* by almost 30%.

52. According to Defendant SHERIFF, the average daily population at SRJ was 3,431 prisoners in June 2013 and had fallen to 2,825 by June 2015. On March 1, 2020, the Jail population was 2,597. On May 6, 2020, the population had declined to 1,746. Thus, the population at SRJ has declined by about 30% at the same time that remuneration for Sheriff's office deputies and personnel at SRJ increased by over 18%.

53. On March 20, 2020 defendant SHERIFF submitted a budget increase request to the Alameda County Board of Supervisors, of an additional $106 million to hire 456 new staff for the jail, which the Board of Supervisors for defendant Alameda County approved at the urging of defendant SHERIFF and defendant MADIGAN.

54. During this period, SHERIFF also entered into written contracts with private, for-profit companies to provide basic and necessary services to SRJ prisoners.

**SHERIFF'S CONTRACT WITH FOR-PROFIT DEFENDANT ARAMARK**

55. SHERIFF contracts with ARAMARK to prepare food for prisoners at SRJ and prisoners at other adult jail facilities in Colusa, Solano, San Benito, San Joaquin, Amador and Lake counties, and a juvenile facility in San Joaquin County. ARAMARK prepares 16,000 meals a day, with the labor of prisoner workers who are not paid but receive food treats. On information and belief, Plaintiffs plead that this contract between defendant Sheriff and defendant ARAMARK to provide food to other adult and juvenile facilities produces profits for both defendants.

56. Defendants ARAMARK, Sheriff and AHERN implemented a reduction in the prisoner food budget at SRJ in the amount of $1.65 million, which was an almost 25% reduction.

57. The cost reductions instituted by Defendants ARAMARK, Sheriff and AHERN in the food budget contract had a devastating impact on the quantity and quality of food provided to prisoners at SRJ, creating a situation where the food served is high in white flour and sugar

1    to reach minimum caloric requirements, with little in the way of fresh fruits and vegetables,

2    and protein is primarily soy powder.

3    **Poor Sanitation in the Jail Kitchen, Vermin and Animal Infested Food**

4    58.    Title 15 of Calif. Code Regs has a number of regulations which set the standards for Santa

5       Rita Jail and defendant Sheriff. These provisions include §1245 which requires that Santa

6       Rita Jail meet the standards set in California's Health and Safety Code §§113700 et seq.,

7       which is the Retail Food Code.

8    59.    The California Retail Food Code § 113980 requires that "All food shall be manufactured,

9       produced, prepared . . . stored . . . and served so as to be pure and free from . . . spoilage; . . .

10      shall be protected from dirt, vermin, . . . droplet contamination, overhead leakage, or other

11      environmental sources of contamination; shall otherwise be fully fit for human

12      consumption."

13    60.    The kitchen at SRJ is staffed by prisoner workers under the supervision and direction of

14      Defendant ARAMARK. Prisoners are not consistently tested for communicable diseases

15      before being assigned to work in the kitchen. Willie Dudley, a former kitchen worker was

16      not tested for tuberculosis until two months after he stopped working.

17    61.    According to prisoner kitchen workers at SRJ, the kitchen at SRJ is filthy. Birds roost at

18      night in the kitchen. Kitchen workers report seeing rats and mice daily in the kitchen. Night

19      time workers report that cockroaches are in the kitchen every night. Animal droppings fall

20      all on counter surfaces, including food preparation surfaces. Rats run across the kitchen

21      floor. Santa Rita Jail has attracted a variety of animals and bugs by providing abundant food

22      and suitable habitat.

23    62.    The cake and bread trays, loaded with baked goods, are left out over-night, uncovered, and

24      the birds feast. Bird feces are left on the cakes and breads. Food in the kitchen is kept in

25      such a manner that enable rats and mice easy access. Bread is kept in plastic bags in open

26      plastic crates. Rats climb over the bread and chew open packages. When bread bags are

27      chewed by rats, a few pieces are thrown away but the rest of the bread is served to prisoners.

28

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

63. Plaintiff Daniel Gonzalez has seen rats inside the cook pots and birds pecking on baked goods in cake pans. Baked goods are left uncovered in open racks in the kitchen.

64. Used food trays are collected and delivered to the kitchen, where they are stacked against one wall, and left in the open, available and accessible to mice and rats, again providing an easily accessible, bounty of food and therefore, continually attracts mice and rats. Daniel Gonzalez reports that he would be called to pressure wash the kitchen only in preparation for inspections.

65. In 2017, the women prisoners at Santa Rita Jail filed a class action lawsuit against the jail for similar issues. *Mohrbacher et al. v. Alameda County Sheriff's Office* et al. 4:18-00050 JD.

**Dirty Food Trays**

66. Food at Santa Rita Jail is served on plastic, reusable trays. The Santa Rita Jail has a tray washing system that does not consistently or reliably remove old food and clean the food trays. This is a chronic, long standing problem, but defendants ARAMARK, SHERIFF, HESSELEIN and LUCKETT-FAHIMA have failed and refuse to change the manner and means of washing these trays.

67. In Santa Rita Jail, used food trays are collected and sent back to the kitchen, and stacked along the walls in open stacks overnight. These trays are not rinsed. By the time the next day's kitchen shift starts, this food has dried and hardened, particularly into the corners of the tray's indented pockets.

68. The Aramark cleaning procedure is for these trays to be dumped into a large, wash basin, approximately 100 to 150 gallons in size, which is filled with soapy water. There is a circulating pump which agitates the soapy water, and these trays swish around. The soapy water is infrequently changed, often only once a day. A prisoner worker has a paddle to move these trays After a few minutes the prisoner worker takes a milk crate style plastic crate and scoops up these trays out of the wash basin and dumps these trays onto a counter. A second worker then stacks these trays into a conveyor belt, where these trays are processed through a machine that to sanitize the trays. The sanitization process takes less than 5 minutes. After this sanitization, the trays are then provided to other kitchen workers

17

to refill with new food for future meals. Often the trays have left over food encrusted, and remaining on the bottom of the tray's pockets.

69. The tray washing system is controlled and governed by the installation of physical tray washing basin, and the sanitizing machines, and defendant Aramark and Sheriff's failure to make any physical proviso for overnight storage for food encrusted trays except on the floor. This is evolved into a long standing custom and practice which results in dried, hardened, old food, being left on food trays so that prisoners regularly discover that under the new food in their trays, remains dried, hardened, old food.

70. Prisoners have also notified sheriff deputies of rodent and vermin droppings and of bird excrement in their food. And on occasion, boiled mice are found in the beans. Prisoners have filed grievances on these issues. These grievances are denied and these notifications have not caused either defendant SHERIFF nor Aramark to change its procedures, or improve their sanitization. Class member Scanvinski Hymes reported on July 4, 2019 that dried up food was on his tray and filed a grievance. As recently as August 14, 2020, class member Darnell Ellis filed a grievance regarding this problem after he received a dirty tray and multiple other prisoners in his housing unit received meal trays that were dirty with old food.

**Repetitive, Inedible Food**

71. A number of regulations in Title 15 sets standards for jail food. §1242 specifies that "Menus shall be planned to provide a variety of foods, thus preventing repetitive meals."

    a.  §1241 specifies that "A wide variety of food should be served."

    b.  §1241(c) specifies that "The daily requirement of fruits and vegetables shall be five servings. At least one serving shall be from each of the following three categories:

    c.  §1241(c)(1) specifies that "One serving of a fresh fruit or vegetable per day, or seven (7) servings per week."

    d.  §1241(c)(2) specifies that "One serving of a Vitamin C source containing 30 mg. or more per day or seven (7) servings per week."

e.     §1241(c)(3) specifies that "One serving of a Vitamin A source, fruit or vegetable, containing 200 micrograms Retional Equivalents (RE) or more per day, or seven servings per week."

f.     § 1242 specifies that "Menus shall be planned to provide a variety of foods, thus preventing repetitive meals."

72.   The quality of the food provided to prisoners is of the lowest quality, high in starch and sugar, with most of the protein from soy powder and plain, flavorless beans.  The food is repetitive, overcooked, and tasteless.  Defendant SHERIFF and Aramark's metrics is to produce this food at the minimum cost with the of meeting the required calorie count.  The food is prepared using a cook chill method, whereby the food, such as oatmeal and beans are cooked in large 100-gallon containers, this food is then packed in large plastic bags, refrigerated and held for up to 30 days.  All texture and taste is rendered obsolete.  Plaintiff Larry Gerrans reports that the oatmeal for breakfast is basically a mush without a single identifiable oat in it.

73.   Then the contents of these plastic bags are portioned out into plastic trays.  These trays are then plastic wrapped and refrigerated.  These trays are placed onto carts, which deliver food to the housing units.  Once at the housing unit, these trays are placed into warming ovens, sometimes for many hours.  Due to the systems with which SHERIFF operates its jails, meals, including dinner, are served at irregular times.    By the time food is served, this over cooked food, chilled and then reheated food has often been held in warming ovens for hours.  Sometimes breakfast is placed into the warming oven the night before.  This tasteless, textureless and now dried material is what defendant SHERIFF and ARAMARK give prisoners as food.

74.   As a result of the irregular deliveries, one of the few fresh foods prisoners receive, milk, is often soured and spoilt, rendering it inedible.  There are seldom fresh fruits and vegetables, and what there is the same, bagged mini carrots, oranges and apples.  Often what fresh vegetables are served are wilted, or slimy and otherwise inedible because of the way the Jail handles food.

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

75. In addition, service of food is timed erratically. Sometimes lunch is not served until after 4 pm, and then dinner is served right after that. For plaintiffs suffering from diabetes, this creates dangers due to unregulated blood sugar swings.

76. Many class members, including Dillon Costello reports late and highly overcooked dinners on November 24, 2019, saying when the food is not served on time and left to cook in the oven sometimes till 8-8:30 PM when dinner is supposed to be at 4 PM, it leaves the food overcooked, burnt, and no longer edible." Plaintiff Daniel Gonzalez reports on February 24, 2020 that "Today my breakfast was burnt completely into a hard patty. I've never seen oatmeal which last I check was a liquid, burned so bad it turned into a solid patty."

**Food Contamination**

77. Plaintiff Larry Gerrans, during his incarceration at Santa Rita Jail, was a federal pretrial detainee. He was initially incarcerated in August of 2019. When he arrived at SRJ, the other prisoners warned him that the food was frequently contaminated with rodents, rodent droppings and other forms of adulteration. At his first meal he was instructed that he should never scrape the sides or the bottom of his tray because the Jail doesn't clean the trays well, and often there are uncleaned food leftovers from previous meals left stuck to the tray's bottom and sides. He was also warned to always observe the color of any liquid on top of the plastic covering over the food tray, and to refuse any tray in which the liquid was yellow or brown, indicating rat urine.

78. Sometime in late September, early October, 2019, after unwrapping his dinner tray, he opened the two slices of bread, and saw rat feces between the bread. He immediately called the housing unit deputy, deputy Wong. Deputy Wong turned on his body worn camera and recorded Larry Gerrans' request that he document the rat droppings between the bread on his dinner tray. Larry Gerrans was concerned because he knew that rats carry the Hanta virus, which is passed through their feces, and Hanta virus can be deadly. Larry Gerrans requested that Deputy Wong document and report this so that this issue could be fixed. He also completed a Grievance Report No. 19-2431. Plaintiff Gerrans later learned that the rat feces were destroyed by Deputy Wong and never submitted along with his grievance.

SECOND AMENDED COMPLAINT

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

79. Deputy Wong was harassed and ridiculed by fellow deputies for accepting the grievance, and the next time there was a problem with food, he refused to accept the grievance but brought a replacement food tray.

80. Plaintiff Daniel Gonzalez, in November, 2019, observed a dead mouse in a sandwich bag, plastic cooked with the beans at one time, and a razor in the beans another time in the meals served in his housing unit.

81. In Fall, 2019, Chad Arrington, a class member had pieces of metal in his food, which he believed to be broken pieces of razors. He accidentally swallowed a piece of the razor, creating a medical emergency.

82. On January 22, 2020, class member Eric Rivera filed grievance stating that he and two other inmates in his housing unit found rat droppings in the food tray. In July, 2020, David Mellion, a class member, found rodent droppings in the drink cup that came with his meal. Alameda County Vector Control confirmed that these droppings are indeed "mouse fecal pellets".

83. On June 15, 2020. Robert Manning, a class member along with multiple other class members saw a dead mouse on a food tray in housing unit 31 West.

84. Food contamination is a regular occurrence. Class members try to file grievances and are told by housing unit deputies that these issues are not grievable because the food is not jail responsibility and is the responsibility of an outside company. Housing unit deputies refuse to accept grievances, throw the grievances away, refuse to turn on their body worn camera to document these incidents and throw destroy the evidence including dead rodents, by throwing them away.

85. Class member Darnell Ellis reported that after the dirty tray incident, he requested and had trouble receiving a paper grievance in order to file a grievance. And after he was finally able to obtain and submit a paper grievance, the housing unit deputies refused to process is, and assign a number, that his grievance sat unattended on the deputies' desk for over five (5) days and was only processed after his insistence. Even after weeks, there was no response by the jail to this grievance.

SECOND AMENDED COMPLAINT

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

86. Both defendant Sheriff and defendant Aramark were placed on notice that rodent infestation is a significant issue in the jail kitchen and that contamination of food served is also a significant issue, in the litigation Mohrbacher et al. v Alameda County Sheriff's Office, et al. 3:18-00050 JD, filed January 4, 2018. On information and belief, Plaintiffs assert that despite the knowledge of rodent infestation, neither defendant Sheriff nor defendant Aramark have tested the rodents in the kitchen for Hantavirus and have failed to fix, correct or take affirmative action to remedy the problem of animals in the kitchen. Used trays encrusted with food are still left stacked on the ground overnight, providing an irresistible lure to mice and rats.

87. On or around August 26, 2020, there was an inspection of the kitchen and kitchen functions at Santa Rita Jail. The Jail deputies deliberately steered the inspectors away from the scullery, where the trays are washed, so that the dirty trays would not be inspected, nor would the inadequate washing system be viewed.

**Food Lacking Nutritional Value**

88. Many class members, including David Misch, Courtney Smith, and Anthony Lopez report food that lacks nutritional value and consists primarily of soy powder, white flour and sugar. Misch reports having to eat extra bread due to his breakfast missing its source of protein on March 14, 2020. Smith reports that there's "never any meat that is real for breakfast only soybean patty" and cites "some type of potato meal they call White Death".

89. Lopez reports "a boiled egg with toast and two taco shells" for breakfast and a common lunch of "4 slices of toast with one boiled egg" on January 29, 2020, and says, "we should get enough egg for the bread y'all feed us," citing the disproportionate low ratio of protein to carbs.

90. Classmember Davey Hudson filed grievances in 2018 and 2019, and surveyed 40 fellow prisoners in HU 23, and found that every single prisoner experienced some problem with the food, on a daily basis. Davey Hudson's survey summary is as follows:

Dietary Issues _____ Frequency  Daily    Weekly

22

| | | |
|---|---|---|
| a. Overcooked, inedible food | 29 | 38 |
| b. Portions less than 2/3 normal size | 18 | 39 |
| c. spoilt food | 13 | 31 |
| d. contaminated, unsafe food | 7 | 15 |

## FOR PROFIT OPERATIONS; TABLET, PHONES, COMMISSARY

91. The Defendant Sheriff runs a number of profit making operations including the prisoners' phone, tablet and commissary system in Sana Rita Jail. In contrast, San Francisco Mayor London Breed has announced that in San Francisco all telephone calls will be free and there will be no profit from commissary sales.

92. By creating a high profit margin commissary, phone and tablet system, Defendant Sheriff has provided defendants, through this insidious policy, a disincentive to rectify problems, improve, or augment any of the basic human services the jail is required to provide, such as food or programming.

### Commissary

93. Defendant Sheriff has a written contract with Keefe Commissary Network to sell products through the prisoner commissary and vending machines. For the Commissary, the Jail receives a 40% of the net sales with a guarantee of $500,000 per year. Some commissary items have over a 400% mark-up. Maruchan Ramen sells for $0.24, retail, on Amazon; Defendant Sheriff charges the prisoners, $1.13 for the same ramen. Assuming jail ramen is purchased wholesale, the profit margin to defendant Sheriff and the commissary vendor is even higher. Per Sheriff Ahern's July 11, 2018 report to the Alameda County Board of Supervisors, defendant Sheriff earned $1,742,062 in 2017. Commissary prices were raised in early Fall, 2019 and again during the covid-19 pandemic, in late Spring, 2020. Per the written contract with the commissary provider, Defendant Sheriff controls these price increases.

94. Not only is there the exorbitant mark-up on the commissary items, but when families deposit money on their loved one's "books" so the prisoners can order commissary, or purchase

23

commissary for family in jail, defendant Sheriff charges up to $7 for deposits up to $49, and $9 for deposits over $50. The only time, there is no charge is if the family member delivers cash to the jail, and deposits the cash in person, at the jail.

95. Profits from Commissary sales are a strong disincentive for Defendants Sheriff, Ahern and Luckett-Fahima to improve the food served. The small portions, poor quality and unsanitary jail food increases the demand for high priced commissary food items, because at least the Commissary food is highly salted, sealed and sanitary.

96. The jail also does not provide basic necessities such as soap, shampoo, toothpaste, and requires prisoners to purchase these items. Although the jail states that a free kit is available, it is not readily available, nor regularly provided, and the quantities provided of soap, tooth paste in the free kit are small and do not last. Nathaniel Avila reports that from March through August, his family it cost his family almost $250 a month to provide him with basic soap, toothpaste, personal hygiene, and supplemental food.

97. One of the reasons prisoners hate moving from one housing unit to another, is that frequently in the move, one's commissary is lost or destroyed. Class member Thomas McHale, when he tested positive for covid-19, was moved twice, and during the move, lost 30-40 dollars' worth of commissary, which for him, was a significant loss. Despite filing a grievance, there has been no response, no return of his commissary, and no refund or compensation for the loss of his commissary. Saul Espinosa also lost commissary items when he tested positive for covid-19 and was moved to "the hole".

98. Prisoners hate the cell searches by deputies, is that deputies trash their cells, and searches include opening and searching commissary, where sheriff deputies stick their hands into the prisoners' food under the aegis of a search, and afterwards the food is no longer edible. Loss of commissary is a significant loss for each prisoners.

**Tablets**

99. The jail justifies the denial of POD time and the lack of family visits by providing tablets to each prisoner. The tablets are Wi-Fi connected and capable of phone calls, and accessing various applications, for news, movies and music. A few of the applications are free, but

24

most cost money.  Calls on the tablet are $7 for 25 minutes.  To hear music costs $150 a month, with an additional $10 charge if the prisoner wants to choose which songs to hear.  Pod casts cost $8.99 per month, $5.99 for 14 days, $3.99 per day.  Movies cost $3.99 for 180 minutes.  The problem is that tablets do not have reliable Wi-Fi access in cells and are only useful in the common area.  And pursuant to the current covid-19 lockdowns, most prisoners have greatly reduced common area access, so there is just limited hours that the tablets are available.

100. Angelo Valdez, a class member reports that although, the tablet charge is $8.99, a prisoner can only use funds from his books in $5 increments, so to pay for $8.99 on the tablet, the prisoner has to use $10 of value from his books, and ultimately forfeit some of those funds.

101. Angelo Valdez reports that although the tablet is technically available to prisoners only from 7 a.m. to 10 p.m., the battery on the tablets usually only last for 3-3.5 hours of continuous use.  So, while a prisoner may have paid for 30 days of music at the cost of $150 a month, the tablet is really only available for 3.5 hours per day since prisoners cannot recharge the battery and the guards do not permit prisoners to exchange tablets for fresh batteries.

102. Angelo Valdez reports that the jail says that Wi-Fi is in the common area, which is where the jail says tablets should be used, but during pod time, if many people try to use the tablet simultaneously, all tablets crash with error messages "14004" and the user is kicked off the system.  Apparently, there is insufficient band-width in the jail Wi-Fi system to support these tablets.  So, the programming is not accessible, and even when programming is paid for.  Class member Eric Wayne filed a grievance that prisoners are "kicked off the Wi-Fi network 20 times a day" .

103.  Furthermore, although prisoners are charged money and pay for "24 hours" of access, the clock keeps running even if when the tablets are taken away, or unavailable due to poor Wi-Fi connections, or some other technical issues.  Regardless, the clock keeps running.  So, defendants Sheriff, Ahern and Luckett-Fahima overcharge prisoners and then short change them at each turn in the curve.

104. Now the Jail has instituted a new waiver stating: ""By accepting this notification, Wi-Fi coverage for this Wi-Fi tablet is for day room only. No refunds for dropped connections or spotty service." Defendants Sheriff and Luckett-Fahima justify the significant increased amount of time prisoners are locked inside their cell, and the total lack of family visits, with the compensation of the tablet and video visits. But now, the one free video visit per week has been rescinded, and there will be no refunds.

105. Having tablets provides defendants SHERIFF, AHERN, MADIGAN, and LUCKETT-FAHIMA with the disincentive to provide additional programming, out of cell opportunities and exercise options, and outdoor recreation. When plaintiffs and class members are locked in the cells, or in lock down, that provides greater incentive to use the tablets and to spend money on the tablets.

**Telephone Calls And Video Visits**

106. Being able to maintain connection to family and community is extremely important to all prisoners, including plaintiffs and all class members. Defendant Sheriff charges high fees for phone calls and video visits cost. Defendants ACSO, Sheriff, Ahern and Luckett-Fahima set the costs for prisoner telephone calls at one of the most expensive rates in the Bay Area, $0.23 and $0.38 per minute. These are collect calls, and the person receiving the call has to set up an account with GTL, a for profit corporation, selected by Defendants Ahern and Sheriff, for these collect calls. To set up a collect call account requires a credit card, and GTL, charges each person for the privilege of putting money into the account. One can only deposit up to $50 at a time, and each deposit costs from $3 to $4.50 for the ability to make the deposit. Phone charges at Santa Rita Jail are also higher when compared to prices in surrounding county jails, such as San Mateo and San Francisco. Whereas Defendant SHERIFF charges prisoners 23 cents per minute for collect calls San Francisco Mayor London Breed has made phone calls free for prisoners.

107. Charging pretrial defendants' high prices for phone calls punishes people who are legally innocent, and makes it harder for them to contact family members and others who provide emotional and mental support.

26

108. Plaintiff Larry Gerrans was housed in one of the minimum security, dormitory housing units. Three cages on top and three cages on the bottom, with a capacity for 180 men in one POD. In the common area are 8 video phones, which are video screens with a phone receive attached. The phone receiver has a 12 inch chord. There are no chairs in front of the phones, so individuals using the video phones have to kneel, or bend over, or find a trash can to turn over to sit on. Although there are 8 phones, the jail only permits 2 of these video phones to be used at any one time. And these video phones can only be accessed during common area time or "POD Time". Prisoners cannot call out on the video phones. Family members have to reserve and pay for video phone visits in advance. However, if for some reason the prisoners are locked down in their cells, that reserved video phone visit is then forfeited because during lock-downs prisoners cannot access these video phones.

109. On numerous occasions, the jail had scheduled his family for pre-paid video visits during times when the prisoners were locked in their cell, and Larry Gerrans was unable to get out of the cell to access the video phone, the video visit was forfeited, and his family was unable to get a refund of their prepaid money.

110. Class member, Dillon Costello filed a grievance on 12.7.2019 that he has been denied multiple video visits with his family because there was no deputy available to allow him to have the visit, and his family is not refunded the lost funds.

111. In the month of July, 2020, Nathaniel Avila's family had to spend $335 for phone calls and video calls with Nathaniel. And during this week, of the three video calls, one was "no good" because the signal kept dropping. His family considers these phone calls exceedingly important because in the time of covid, there are no in person visits, and as of the filing of this amended complaint, no in person family visits for six months. Children have not been able to visit with their parents, and the only way to have a visual contact is through these video calls. Although the video visits have crummy reception, the family feels that is the only way they can see each other, and so they suffer the costs and the bad reception.

112. Having such high costs for phone calls and out of jail communications prevents, deters and operates as a blockade to Plaintiffs and class members, not only being to reach family and friends, and seek legal assistance, but also in phoning counsel.

## LACK OF SANITATION

### Sanitation (Pre-Covid)

113. Defendants Sheriff, Ahern, Hesselein and Luckett-Fahima instituted and enforce rules that require Prisoners to clean their cells and common areas. Prisoners complain that it is impossible for the plaintiffs and class members to actually clean the bathrooms, or their cells, and must live in squalor and filth. Santa Rita Jail's men minimum security housing consists of large cells with 28 to 30 men in each cell. Men are housed in bunk beds, and there are 6 cells in each housing unit. In the minimum-security housing units, each cell has 2 toilets, one urinal and one shower, which all 30 prisoners share. The jail does not provide soap in the bathrooms. Pre-Covid, the jail only permitted access to cleaning supplies at most, once a week for 15 minutes. Many times, cleaning supplies are denied for weeks. In addition, the cleaning supplies on the minimum side is limited to one broom, one mop, a short handled toilet brush and one bottle of cleanser. There is a mop bucket which is filled once with some cleanser and water and used for three housing PODS. The broom and mops are the same set, used in all areas of the prisoners' cells, the bathrooms, the common areas, the sleeping areas, and the brooms and mops are never cleaned, the bacteria and filth from the bathrooms are actually just spread around, making everything coated with dangerous bacteria and dirt, rather than actually improving the cleanliness and the sanitation of prisoners' cells. One of plaintiffs' complaints is that the prisoner bathrooms were infested with swarms of small flies or biting gnats who are attracted by the filth. The men have regularly requested better and more frequent access to cleaning supplies.

114. There is no security justification in providing three PODS with one mop bucket of cleaning solution, for 6 showers, countless toilets and cells. The only policy rationale for not permitting more than one mop bucket and for not providing a greater number of cleaning tools and cleaning supplies is defendants SHERIFF and Ahern's fiscal penny pinching.

115. Furthermore, the jail has a policy of housing people who are detoxing from drugs with the general population in a housing unit rather than in a medical unit where these people receive care from medical staff. People who are detoxing from drugs are very ill, vomiting or with severe loss of bowel control. These people end up vomiting or losing bowel control on their beds, on the floors, all over the bathrooms. Because getting a lower bunk often requires a medical slip, these prisoners who are detoxing are placed in the upper bunk and the vomit and feces gets on the person below. In addition, these individuals are disoriented, weak, and when they have to vomit or have loose bowels, they have difficulty getting down in a hurry from the top bunk, leading to frequent falls and injuries. Sometimes, these severely weakened and impaired individuals are unable to reach the bathroom and the resulting human bio-waste is over the floors and in the general cell living area.

116. Because everyone is required to live together, the smell, biohazards, and filth negatively affects everyone. Because prisoners have no access to cleaning supplies, this frequent situation contributes to the squalor, filth and unsanitary conditions prisoners are forced to live in. Almost all of the minimum-security cells have someone at least once a week, who is detoxing, so this is a constant, chronic condition.

117. Due to the policy of arresting indigent and homeless people, defendant SHERIFF regularly places these people into the cells with other prisoners, without affording these people an opportunity to shower and wash before being placed into housing. Theoretically, there is a shower available at booking/intake. However, the holding cells and the booking/intake facilities are routinely filthy, rendering the showers unavailable, and unusable, and certainly not suitable for assisting in cleaning people to avoid the spread of contagion. This results in the spread of contagious bugs such as lice and scabies, staph infections, e-coli, pseudomonas, hepatitis, C-difficile, and even possibility the Aids virus.

118. These problems are exacerbated by the jail's policy pre-covid of not providing soap for prisoners in the bathrooms. Although there is a "free" toiletry kit given out to all newly booked prisoners and for indigent prisoners, the products are of limited quantity, does not suds well, so that it is inadequate for maintaining personal hygiene beyond one or two uses.

29

Therefore, while the soap in the "free" kit is supposed to last a whole week, those who are reliant on the indigent kit do not provide enough supplies to maintain personal cleanliness for an entire week. In addition, although the "free" kit for indigent prisoners is supposed to be provided once a week, often is provided less frequently. The inability of prisoners to maintain personal hygiene negatively impacts all of the prisoners who share the same cell with indigent prisoners.

119. The problems extend beyond the housing unit cells and booking/intake. Whenever people are booked, or go to and from the jail to court, they are held in the multi-purpose rooms, and various holding cells. A recurring problem is unsanitary conditions in the bathrooms and the holding cells. Due to the large number of people who transit through these rooms, these cells quickly become dirty, and filled with trash. The multi-purpose room, holding cells and dress out rooms are rarely cleaned. The bathrooms available are filthy with feces and biohazards all around.

120. Prisoners do not have access to soap outside the housing unit cells because they are not permitted to carry this soap on their person. Because the jail does not provide soap in any of the bathrooms available to prisoners, when prisoners are required to go to court or other parts of the jail, they have no means to wash their hands after using the bathroom. While there is a policy on the books for Defendant SHERIFF's books permitting prisoners to bring a sanitary kit to court, whether a prisoner actually gets to bring a "sanitary kit" depends on the arbitrary whim of the deputies in charge at the various stations along the way. Most prisoners do not chance bringing their soap with them because meeting up with the wrong deputy results in having that soap confiscated and therefore in having no soap at all. As a result, prisoners going to court are not afforded the ability to clean their hands.

121. On the maximum side, the prisoners do not even get a mop bucket. Instead all they receive for cleaning is a broom with no handle, just the bristles, and a squirt bottle of some cleaning solution. No rags, no sponges, and no means to wipe is provided. Prisoners on the maximum side have to use their own tee shirts, or one prisoner said, that he would watch the

1  pod workers, and if one of them happened to leave a used rag around, he would take that

2  used, dirty rag, to wipe down his cell and toilet.

3  122. On the maximum side, each cell can hold at most 2 prisoners. Each cell has a bunk bed, and

4  a toilet and sink. The showers located in the common areas. During POD time, the

5  doors to the cells are locked. There is no toilet in the POD area, so anyone who has to use

6  the bathroom is forced to go in the shower, or if they have a plastic bottle, urinate in a plastic

7  bottle. This creates an unsanitary situation for everyone. The jail claims that cell doors can

8  be opened once an hour for prisoners to use the bathroom. However, the technicians

9  routinely shut off the television when cell doors are open. Those men who require to use the

10  bathroom are then holding up access to news and programs for the entire pod, when they

11  have to use the bathroom. Therefore, to avoid conflict, which can lead to physical conflict,

12  most men do not require that the cell doors be opened, and use the showers or plastic bottles

13  instead. For men who cannot time their needs for a toilet, they have no option except to use

14  the showers or plastic bottles instead. The jail, despite grievances, have refused to remedy

15  this situation. As a result, the POD showers are regularly are contaminated with urine and

16  feces, are filthy and biohazards.

17  123. Many prisoners have stated that they have caught various skin infections as a result of the

18  dirty and unsanitary conditions in their cells. Plaintiff Larry Gerrans, after the first time he

19  volunteered to clean the bathroom in his dormitory type cell, developed a severe bacterial

20  infection in his right foot, which cause the skin to become inflamed, puss and bleed. The

21  bacteria was a form of flesh eating bacterial so that despite anti-biotics and antiseptic

22  betadine, the wounds did not heal. The inflammation became so bad that Larry Gerrans had

23  difficulty walking. As Larry Gerrans foot infection developed, other prisoners shared with

24  Larry their own infections and scars, and Larry saw that these type of staph infections and

25  bacterial infections are common among prisoners at Santa Rita Jail.

26  **SANITATION (During Covid)**

27  124. The covid-19 pandemic became a national health crisis in mid-march, 2020. Over the next

28  few months, Santa Rita Jail slowly made changes to the sanitation regime. Previously,

31

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

defendants Sheriff and Hesselein prohibited prisoners from possessing bar soap, asserting that bar soap was a weapon.  But with covid-19, the jail, in order to enable and encourage prisoners to wash their hands, began to distribute bar soap, and there have been no reports that bar soap has been a security issue.  The brand currently being distributed is Bob Barker bar soap, which many of the inmates have difficulty using because it is harsh and drying on the skin.  The Center for Disease Control states that  with bar soap, "ensure that it does not irritate the skin and thereby discourage frequent hand washing."[2] And although the  jail is now distributing bar soap, it still does not allow prisoners to purchase bar soap on the commissary.  It is also unknown whether defendants will permit prisoners continued access to bar soap after the covid-19 pandemic ends.  Bar soap was not and is not available for purchase in the commissary.

125. Defendant Sheriff increased the sanitation schedule, so that the tools and supplies previously available are now available more often.  Cleaning supplies in the general population housing units became available more regularly, and in some housing units, for a period of time every day during POD time, cleaning supplies were available.  However, the sanitation procedures and the sanitation tools and supplies did not change. In the minimum section the supplies are still limited to only one mop and one mop bucket for three PODs, and so the Cells at the end of the rotation have no possibility of being cleaned.  In reality, only the first few cells, who can use the mop bucket with clean water and cleaning solution have any chance of actually achieving cleanliness.   For the maximum side, they still are not provided rags or paper towels and entire housing units share one bottle of spray cleaner.  These insufficient cleaning supplies and cleaning tools does not permit genuine cleaning.  And the issues with showers being contaminated with human waste and not being cleaned, has not changed or otherwise improved.

[2] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

126. During covid, Troy Powell, a plaintiffa on the maximum side, contracted a serious fungal infection on his hands, from the dirty shower in his housing unit when the expanded sanitation efforts were in place.

**Laundry (Pre-Covid)**

127. Every male prisoner, by regulation is limited to only one set of clean clothes per week. Having extra clean clothing is subject to disciplinary punishment. Laundry exchange requires that each prisoner strip down to underwear, or wrap in a sheet or towel, because laundry is a one to one exchange. Being permitted only one change of clothes per week is another means whereby, the jail makes it difficult, if not impossible to maintain personal cleanliness. Furthermore, laundry exchange is on Thursday or Friday, but bathroom cleaning is done in Saturdays. Given the filth of the bathroom, any of the prisoners who "volunteers" to clean the bathrooms are then placed in the situation that their clothes become soiled due to cleaning human feces and urine in the bathroom, and then, as a reward for their volunteer efforts, they have to live in these soiled clothes for 5-6 days. Prisoners have requested that if they either be provided two sets of clean clothing or if they are to be limited to one set of clean clothes, it would make more sense for clean laundry to be provided, after cell cleaning, so that prisoners can clean the bathroom, and then have clean laundry to wear for the rest of the week.

128. Even with "clean" laundry, the "clean" clothing is frequently not very clean, having been improperly laundered. At the time this complaint was initially filed jail prisoners were required to do the sheets and towels and other linens from the coroners' office, which are often soaked in human bodily fluids. At times these linens even have body parts wrapped within. While these linens are transported in bags clearly marked as "biohazard", these linens are given to jail laundry workers, who have no protective clothing, no training in handling biohazardous human wastes, and are washed in the same jail washing machines. The jail now claims that this practice has ended, but Plaintiffs have not been able to verify this.

SECOND AMENDED COMPLAINT

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

129. Laundry exchange is not regularly conducted In the Out Patient Housing Unit. Although prisoner are there because of medical needs, and one would hope would have access to better sanitation; clean laundry is not part of the program. Darryl Geyer, a class member reported that for the many months he was in the OPHU in 2019 and 2020, due to a fecal bacteria infection of his knee, he never once received a laundry exchange and was reduced to hand washing underwear and sox in a sink.

**Laundry (During Covid)**

130. Class member Louis Penny, a pretrial detainee reports that he now has lesions or rashes on his skin, and that other prisoners in his housing unit report rashes as well. He has had rashes for over a year, and believes that these result from the laundry he is provided. When he hand washed newly laundered clothing provided in a laundry exchange, he noticed a greasy residue coming off of these newly laundered clothing. Class member Penny reports that the jail has provided calamine lotion but the calamine lotion only provides temporary relief but does not get rid of the rash.

131. Class member Joey Lovato reported that in the OPHU within the last 45 days, for covid-19, there was no regular laundry exchange. If he asked for clean laundry, they would give him one clean t-shirt, or one set of boxers, and never clean outer wear.

132. Class member Jatinder Sing reported that after he returned from the hospital, to the OPHU, he was not provided with a laundry exchange, or other clean laundry.

**SHERIFF'S CONTRACT WITH FOR PROFIT DEFENDANT WELL-PATH**

133. Defendant SHERIFF has a written contract with Defendant WELL-PATH to provide all health care services of any type needed by any prisoner at SRJ. WELL-PATH's contract specifies a set price based on average daily prisoner population ("ADP").

134. A number of sections of Title 15 pertain to medical care in Santa Rita Jail. Among them is §1200 which requires "emergency and basic health care"; § 1206 which requires health screening, and a "written plan to provide care" for any prisoner at the time of booking who requests or needs medical, mental health care; and § 1210(b) which

34

135. specifies that "[f]or each prisoner treated for health conditions for which additional treatment, special accommodations and/or a schedule of follow-up care is/are needed during the period of incarceration, responsible health care staff shall develop a written treatment plan."

136. The written contract is calculated based upon the daily average prisoner population and specifies that WELL-PATH itself is solely responsible for all costs incurred in connection with any health care services provided to prisoners inside and outside the jail. WELL-PATH is not entitled to and will not receive any reimbursement from SHERIFF for the cost of services provided to prisoners by hospitals or by any non-WELL-PATH personnel. And defendant WELL-PATH is also charged with reimbursing defendant SHERIFF for the required deputy escort and transportation charges if a prisoner requires out of facility care. The cost for all such services is borne solely by WELL-PATH.

137. SHERIFF's contract with WELL-PATH explicitly states that WELL-PATH will pay for any and all "inpatient hospitalization costs, emergency room visits, ambulance transportation expenses, outpatient surgeries, outpatient physician consultations, outside specialist fees, off-site diagnostic procedures." If a prisoner receives such medical services, WELL-PATH must pay the total cost of the medical care provided, "regardless of the level of cost incurred."

138. The contract specifies that WELL-PATH alone will determine "the necessity and appropriateness of inpatient hospital care and other outside medical services."

139. Incredibly, the contract also specifies that in the event a third-party payor such as an insurer pays for part or all of any medical service provided to a prisoner outside the walls of SRJ, WELL-PATH must turn over half of that third-party payment to the Sheriff's office. In other words, even if WELL-PATH is reimbursed for its costs for outside medical care provided to prisoners, the Sheriff's office takes half of the reimbursement even though it paid nothing for the outside medical care.

140. By requiring WELL-PATH to pay for any and all medical care provided outside of SRJ to any SRJ prisoner, and by limiting WELL-PATH's ability to recover any amount WELL-PATH pays for such care, SHERIFF's contract with WELL-PATH creates a financial incentive and imperative for WELL-PATH to refuse and withhold needed and appropriate

35

outside medical services to all prisoners, including pregnant prisoners, when the needed and appropriate medical services consist of "inpatient hospitalization costs . . . outpatient physician consultations, outside specialist[s, or] off-site diagnostic procedures," among other services.

141. By specifying that WELL-PATH alone will determine "the necessity and appropriateness of inpatient hospital care and other outside medical services," SHERIFF's contract with WELL-PATH enables WELL-PATH to refuse and withhold needed and appropriate outside medical services to SRJ prisoners, including pregnant prisoners, when the needed and appropriate medical services consist of "inpatient hospitalization costs . . . outpatient physician consultations, outside specialist[s, or] off-site diagnostic procedures," among other services.

142. "[O]utpatient physician consultations, outside specialist[s and] off-site diagnostic procedures" within the meaning of the WELL-PATH contract include any outside or off-site OBGYN services, including prenatal care, provided to pregnant SRJ prisoners.

143. WELL-PATH has limited medical services on site. It does not have an infirmary, it only operates an outpatient housing unit ("OPHU") in which there are minimal medical services, but closer proximity to the one medical staff on duty.

144. The medical provider in the San Francisco County jail is not a for-profit correctional healthcare company such as WELL-PATH. It is the County Department of Public Health, which has no financial incentive to deny care.

145. The medical provider in the Contra Costa County jail is not a for-profit correctional healthcare company such as WELL-PATH. It is the County Department of Public Health, which has no financial incentive to deny care.

146. The price provisions of the WELL-PATH contract which create a financial incentive to deny care have had a devastating impact on the provision of medical services to prisoners at SRJ.

**Medical Care Is Grossly Inadequate At Santa Rita Jail**

147. As a result of the cost provisions of SHERIFF's contract with WELL-PATH, medical care provided to SRJ prisoners at SRJ is grossly inadequate. In addition, SRJ prisoners are

regularly denied necessary and appropriate outside medical care by WELL-PATH because the provision of such care comes directly out of WELL-PATH's bottom line profits. The following example of grossly inadequate and entirely withheld medical care are given by way of illustration only and not by way of limitation. One example, is that prisoners who have asthma and require an inhaler, pre-Covid, were required to share a single inhaler. During pill call, those with asthma were required to line up, and would be provided access to that single inhaler. Each prisoner had a small cardboard box to place over the mouth piece, but that single inhaler was shared between all prisoners. Not only was this unhygienic, but the procedure does not meet prisoners' medical needs; asthma attacks are not timed to pill call. Asthma sufferers were only provided with the inhaler on this schedule, and if they had breathing needs outside of this schedule, it was tough luck.

Lawrence Gerrans

148. Plaintiff LARRY GERRANS arrived at Santa Rita Jail, with a number of medical conditions, including hypertension, for which he was under the care of a physician and prescribed daily medication. This information was transmitted multiple times to both defendant SHERIFF, and WellPoint. Defendant SHERIFF refused to accept or permit prisoner LARRY GERRANS to bring into jail, his own prescription medication. For over 22, defendants failed to provide plaintiff with any of his needed, daily prescription medication, and Plaintiff GERRANS' blood pressure continued to rise during that time until Plaintiff Gerrans was started suffering from dangerous symptoms of hypertension. Then defendant WELL-PATH provided plaintiff with some other medication, which had not been prescribed, and this medication made Plaintiff Gerrans very ill. He developed a migraine, started seeing light tracers. He became nauseous and began vomiting violently. For three days afterwards these symptoms persisted, and even after the migraine and vomiting ended, his eyesight did not return to the pre-medication level.

149. Defendant WELL-PATH on a regular, and constant basis clears newly booked individuals with addiction issues and withdrawal issues, to be placed into general housing with other prisoner, and refuse to provide these newly booked individuals with medical treatment for

1   their withdrawal.  When these prisoners become violently ill, vomiting, seizing,

2   uncontrollable diarrhea, defendant deputies Doe 1-25, refuse to summon medical assistance,

3   refuse to remove these prisoners, telling the other prisoners in the housing unit, "This is your

4   problem.  If you don't like it, don't come to jail."

5   150.  These detoxing prisoners introduce biohazards in the housing cells.  As a result, there are

6   chronic issues of staph infections hepatitis, pseudomonas, E.coli, C-difficile infections, ,

7   which defendants do nothing to prevent, and are slow and sluggish to address when these

8   infections and communicable diseases are present.  As a result of the ongoing presence of

9   biohazardous human waste in the cell Plaintiff GERRANS developed a severe staph

10  infection on his foot from the spread of biohazardous human waste in the bathroom and cell

11  floor.

12       ii.    Kyle Murphy

13  151.  Class member Kyle Murphy was incarcerated at Santa Rita Jail.  At the time of the incident,

14  he was pretrial and in minimum security.  One day Kyle started having seizures.  Men in his

15  cell pushed the emergency button.  Defendant Technician Kaiser was on duty, and said,

16  "Don't hit the button" and then apparently turned the button off.   Men in Kyle's cell started

17  yelling "man down", and soon all of the six cells started yelling "man down".  It took 30-40

18  minutes for a Sheriff deputy to appear.  After visually examining Kyle, the Sheriff Deputy

19  left, and it took another 15 -20 minutes before a male medical staffer arrived.  The male

20  medical staffer came, assessed the situation and gave Kyle a dose of Narcan.  That had no

21  effect, so the male medical staffer then left to get oxygen.  This created further time delay.

22  The male medical staffer returned with an oxygen mask and can, and proceeded to try and

23  apply oxygen to Kyle.  The male medical staffer was not well trained and did not know how

24  to use the oxygen tank and mask.  The mask apparently was cutting off all outside oxygen to

25  Kyle, but oxygen was not flowing from the tank.  Kyle started to turn blue.  Men in the cell

26  started getting upset, and many of them were screaming "he's dying".  After some time with

27  Kyle turning blue, a female nurse appeared.  She took the oxygen tube and plugged it into

28  the tank and then oxygen started to flow.  They had to carry Kyle out.  He was gone to the

38

hospital for a week, and upon his return, neurological damage was obvious. His eyes could no longer track in tandem, and one of his eyes wanders.

  iii.  Darryl Geyer, Class Member

152. Class member Darryl Geyer was walking down the stairs of his housing unit, when he lost his footing and fell on his knee, cutting and injuring his knee. Later, when he asked to be assigned a lower bunk, the housing unit deputy refused, and forced Darryl to climb onto a slipper metal table to get onto his upper bunk. In doing so, Darryl Geyer fell again, and this time, split his knee completely open. The wound did not heal properly. It became infected, and defendant Well-Point merely gave him some Neosporin, a topical ointment to apply. Over the next four months, the infection spread and grew, and was visible as a red line following his veins, moving toward his groin. At that point, Darryl Geyer requested that his defense attorney file a Penal Code 4011 petition, requesting a court order that he be provided outside medical care for this increasingly serious condition.

153. It turned out that his knee was infected with fecal bacteria, most likely spread from the bathrooms into the housing unit, the stairs, and Darryl Geyer's bunk, by the unsanitized mops and the fact that housing units shared one mop bucket for cleaning.

154. Over the next 8 months, defendant Well-Point tried various oral and topical anti-biotics, and placed Darryl Geyer in the Out Patient Housing Unit, and even suggested to Darryl Geyer that he consent to having his knee removed. Finally, after forcing Darryl Geyer to endure more than 8 months of daily pain, defendant Well-Point finally transported Darryl to Highland Hospital where he had repeated surgeries on his knee. It took multiple surgeries because the infection became so extensive due to defendant Well-Points delay and refusal to take the necessary, but more costly medical steps early on

  Upper Bunks

155. The upper bunk of the bunk beds has no ladder, and the only way to access it is to clamber on the horizontal railings of the lower bunk and to hoist one-self up. To get a lower bunk, requires a medical slip, called a "chrono". For people who are detoxing, getting off the upper bunk quickly is important, otherwise they end up vomiting or defecating on themselves in

bed, or the floor, rather than making it to the bathroom.  While detoxing, these people are in a severely weakened and disoriented state, and getting off that top bunk is difficult.  Yet, these people are medically cleared to be in housing units, and never given a chrono for a lower bunk.

156. Class member  Gregory Dawson filed a grievance stating that there was no safe way to access the top bed, or upper bunk.  The response is a rote: "There is no mandate to provide additional methods of access to a upper bunk….Santa Rita Jail continually passes thorough inspections…."  Gregory Dawson was instructed to apply to defendant Wellpath and only those with a "medical condition" qualify for a lower bunk.

157. On the weekend before the strike, a young man, who was not well, was in 31 West, and was assigned to an upper bunk.  A few days prior to his serious injury, he was having seizures.  On or about October 26, 2019, this young man, had a seizure and fell off and fell on his head.  Deputies were slow in responding, and medical staff took almost half an hour before coming to the cell.  Prisoners in the cell observed that it appeared that this young man stopped breathing.  Paramedics were called and all the prisoners of that housing unit was required to leave and stay in the little yard while he was removed.  Prisoners believe that this young man died.

158. Eric Wayne.  Eric Wayne suffered for months of pain with a hole in tooth, "I have submitted several of dental request forms and endured the tooth pain for five (5) months before finally receiving medical care.

159. Daniel Gonzalez:  Plaintiff Daniel Gonzalez had a tooth pain and despite repeated medical requests, he did not receive any medical attention.  He was forced to endure the severe pain for weeks and weeks until the pain became unbearable and not until he told the guard that he was contemplating suicide because the pain was intolerable, did he finally receive dental care.

160. Keon Traylor .  Class member Keon Traylor, filed a grievance on March 5, 2020 reporting slow response to emergency call button, "On 3-4-20 around 11:50 pm [an] prisoner in D-pod press the button to let the tech and the deputy know that he need[ed] medical attention but the tech never got on the speaker or pick up the button to see what was wrong with the prisoner.

1   Us prisoners had to kick and bang to let deputies know what was going on and this has

2   happened more than one time."

3   161.  Courtney Smith.  Class member Courtney Smith grievance - reports on April 21, 2020 that

4        since his SRJ arrival on April 14, 2020, he still has not received his meds. He has asked three

5        different nurses and filled out two different sick call slips and has still not been seen or

6        prescribed his meds.

7   162.  Hung Le.  Class member Hung Le filed a grievance on January 24, 2020 - "I've filled out the

8        medical form request[ing] for dentist to pull out my broken teeth on Jan 7th 2020 but the staff

9        never call me or take me to dentist"

10  163.  Eric Rivera.  On February 1, 2020, class member Eric Rivera had a sewage overflow in his

11       cell, causing him to fall and hit his head and lose consciousness.  He has suffered headaches

12       ever since, has requested a diagnostic examination and appropriate medical treatment, and

13       received none.

14  164.  Cedric Henry.  Plaintiff Cedric Henry contracted Covid-19 while incarcerated at Santa Rita

15       Jail.  When he first developed symptoms, the only remedy defendant Wellpath provided, was

16       to tell him to "drink water".  When he was moved into the "medical quarantine" unit, Housing

17       Unit 8, The cell they moved him into was filthy.   The jail had simply sprayed bleach all over

18       the cell, but did not wipe anything down. The dirt was still on every surface. There was feces

19       on the floor. They did not give him any towels or paper towels to wipe off the cell. Instead,

20       they just handed him a new bedroll and locked him in.

21  165.  On April 6, 2020, defendant Well-path administered a nasal swab corona virus test, they did

22       not give plaintiff Cedric Henry any information.  He was running a fever and shivering.  The

23       cell, a concrete block was cold.  He requested an extra blanket, and the deputy in charge

24       refused to give him an extra blanket because jail rules only allows for one.  He was having

25       difficulty breathing, but no doctor and no nurse explained what was going on.  Plaintiff Cedric

26       Henry thought he was going to die.  While he had difficulty breathing, no one examined his

27       lungs, or administered a chest x-ray.  The only thing defendant Well-Path did was to monitor

28       his temperature and oxygen level.  To have his temperature taken, he had to kneel down and

41

stick his forehead through the tray slot of his cell door.  To have his oxygen level monitored, he had to stick his finger through the tray slot of his cell door.

166. On April 15, 2020, based upon their flawed metric, defendant Wellpath announced that Plaintiff Cedric Henry could be removed from medical isolation because he had no temperature.  Plaintiff Cedric Henry believed he was still sick and he still had difficulty breathing.  First, the deputy walked him to Housing Unit 23, and then parked him outdoors in a concrete yard for several hours.  Apparently, Housing Unit 23 was not the plan. Then plaintiff Cedric  Henry was walked to Housing Unit Six and  placed in another outdoor concrete yard, where he sat for another two hours. When the deputy came back, plaintiff Cedric Henry explained that he still had symptoms of a bad cough and breathing problems, that he had tested positive, and that placing him with other inmates was potentially jeopardizing other people. In response to plaintiff Cedric Henry trying to prevent others from being endangered, defendant Sheriff punished Cedric Henry by placing him into solitary confinement, or what prisoners call "The Hole".

167. Despite repeated requests and communications with Jail staff, Cedric Henry received no medical attention, and was not medically monitored until April 26, 2020, through the intervention of Cedric Henry's family member, who reported that Cedric had difficulty breathing and a terrible cough.  The only medication provided was Mucinex and cough drops.

168. After a month of isolation, Cedric Henry was experiencing psychological distress and requested mental health support.  He does not receive appropriate mental health support or medical assistance.  On June 6, 2020, Cedric Henry required an emergency response and continued to experience breathing distress and strong headaches that feel like "lightning" strikes.  The jail's response is to give him Tylenol.  This "take an aspirin and call me tomorrow" is a paltry, inadequate response to an ongoing, serious medical condition.

169. Even today, more than four months after first contracting covid-19, Cedric Henry has medical issues, including extreme fatigue and lack of energy.  He barely ever leaves his cell, and can't find the energy to do much.  He is depressed and frustrated, and often has difficulty breathing, and suffers from headaches, every day, all day.  The only medical attention he receives is

42

1　Tylenol, twice a day.  And the jail only gives him a prescription for Tylenol for 7 days at a

2　time.  He is not permitted to submit a medical request for more Tylenol until his 7 days are up,

3　and then when he does submit a medical request for more Tylenol, there is a two day delay.

4　So, for two days out of every seven, is has to endure debilitating headaches.  Despite requests

5　for mental health support, he has received none.

6　170. Saul Espinosa, a class member, who suffers from arthritis and has difficulty with mobility and

7　　　kneeling was moved into Housing Unit 8C on April 18, 2020 after testing positive for covid-

8　　　19.  While in Housing Unit 8, he received no shower,  he had no soap,  he had none of his

9　　　property and none of his commissary,  he did not receive any clean clothes or even one

10　　　laundry exchange.  The only medical care he received required him to kneel down and stick

11　　　his face through the tray slot of his cell door, and then the medical staff could take his

12　　　temperature.  Because he had difficulty kneeling, he on multiple times told them he could not

13　　　do so.  Defendant Wellpath did not hydrate Saul, although he had a persistent high heart rate.

14　　　Defendant Wellpath did not treat him for his muscle and bone pain, and made no effort to

15　　　make any accommodations for his mobility issues and physical pain.  Defendant Wellpath

16　　　provided and continues to provide inadequate care for plaintiff Saul Espinosa's chronic pain.

17　　　Asthma Inhalers.  After the advent of covid-19, and due to concerns raised by counsel,

18　　　defendant Wellpath stopped requiring prisoners to share inhalers.  However, defendant

19　　　Wellpath did not change its process of only making inhalers available on schedule, with pill

20　　　call.  Asthma sufferers who had breathing issues at other times had no recourse.  Class

21　　　member Jatinder Sing reported that he tested positive for covid-19, and suffers from asthma,

22　　　and as a result of breathing problems had to be transported to the hospital.  Afterwards, upon

23　　　his return to the hospital, he was not provided with access to the inhaler, and despite the

24　　　smoke which infiltrates into the cells due to the wildfires in California, he had an asthma

25　　　attack and had to request emergency assistance.  Only then was he provided access to an

26　　　inhaler, and only during pill call.  **LACK OF SPANISH LANGUAGE TRANSLATION**

27　171. Artemio Gonzalez, is a plaintiff, who is a "Limited English Proficiency" speaker, and a

28　　　pretrial detainee.  At the end of June, he was arrested and incarcerated at Santa Rita.  Within

three weeks he became infected with covid-19. However, very few of the guards speak any Spanish, and none of the medical personnel speak Spanish. There is no one who could explain what was going on, what was happening to him, what would happen to him. There was no one he could ask questions and get answers from because very few of the deputies spoke Spanish, and those who did were not fluent. This led to an extreme panic and distraught because by being celled in Housing Unit 8C, and feeling so sick, he thought he had received a death sentence. In HU 8, no one spoke Spanish, not a single medical professional spoke Spanish. Not a single deputy in HU 8 spoke Spanish. Artemio was so sick with covid, and all he could do was lousy sign language, and the few words he knew in English to describe his pain.

**DEFENDANTS COVID-19 OUTBREAK PLAN**

172. In Mid-March, covid-19 became a global pandemic, an international public health matter, affecting all aspects of institutions including Santa Rita Jail.

173. Defendant Sheriff and Defendant Well-Path have issued a document entitled the Santa Rita Covid-19 Outbreak Plan, which they state they jointly developed. On its face, the document appears appropriate and adequate. However, the actual internal workings inside the jail are at cross-purposes with preventing and isolating covid-19, and keeping prisoners safe from contacting the virus. Since the start of the covid-19 pandemic, there have been multiple waves of covid-19 infections among prisoners and as of August 28, 2020 and 241 prisoners have contracted the illness.

174. One basic policy practice articulated in the Santa Rita Covid-19 Outbreak Plan is a form of color coding to identify different sectors of the prisoner population. Orange is the color for prisoners with covid-19 risk factors, and they are to be housed in "vulnerable housing". Red are those prisoners with active covid-19 symptoms, or who have tested positive for covid-19. Yellow are those prisoners suspected of contact with someone who is positive for covid-19. Yellow tagged housing units are quarantine units, to be quarantined for 14 days. Yet, despite this policy, individuals who are orange, and designated high risk due to health risk

44

factors, have been placed in housing units and mixed with other color designated prisoners, or prisoners who had tested positive for covid-19 and were not confirmed to be covid-19 negative.

175. Joey Lovato, a class member, reported that he was categorized as orange due to his diabetes. Yet, he was placed in housing units with other people and placed in a bunk right next to an air vent. After eight (8) days sleeping under an air vent, he became sick, was moved to HU 8, tested for covid-19, and informed that he tested positive for covid-19. When he was moved into HU 8A, the cell he was filthy. The was food on the walls, toothpaste over the vent, and the toilet and sink had food, grease and garbage. The toilet did not flush properly so the stuff in the toilet would not go down. After being placed in the filthy cell, he pushed the button for cleaning supplies and was told that he had to wait until POD time to get cleaning supplies. He had to spend the night in that dirty, smelly cell, and wait until the next day, before he was given any cleaning supplies. Joey Lovato was in HU 8 for 7-8 days, and was allowed out of his cell only 3 times for half hour, 40 minutes to shower and get cleaning supplies. The only laundry exchange he received was only a t-shirt, or a boxer, never a complete set of clean clothing. After he was deemed recovered, but he was not retested and he was moved to HU 33, where people were not all orange tagged. After arriving in HU 33, the jail started filling up the housing unit, moving prisoners in from a number of other housing units and filling up cells. Then someone got sick, and the jail tested everyone in HU 33 for covid-19, and a lot of the prisoners in HU 33 tested positive for covid-19.

176. The Defendants Sheriff and Wellpath state in their Covid-19 Outbreak Plan that they use either a "test-based strategy" for determining when Covid positive patients are recovered, or a Symptom-based strategy. The Symptom-based strategy includes:

- "At least 3 days (72 hours) have passed *since recovery* defined as resolution of fever without the use of fever-reducing medications **and** improvement in respiratory symptoms (e.g., cough, shortness of breath); **and**,
- At least 10 days have passed *since symptoms first appeared* "

    p. 7;   https://alamedacountysheriff.org/files/COVIDPlan08182020.pdf

SECOND AMENDED COMPLAINT

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

177. Most covid positive prisoners in Santa Rita Jail are monitored by the jail per the symptom based strategy. Very few are retested. However, although defendants represent that they are following Center for Disease Control ("CDC") guidelines, defendants have deleted the last segment of the CDC guidelines, which states:

"For most persons with COVID-19 illness, isolation and precautions can generally be discontinued 10 days *after symptom onset [Symptom onset* is defined as the date on which symptoms first began, including non-respiratory symptoms.]and resolution of fever for at least 24 hours, without the use of fever-reducing medications, and with improvement of other symptoms. [emphasis added]" https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html

178. Because defendants have deleted and do not comply with the last segment of the guidelines, which is that the other symptoms, not just the fever, has to be improved, before a covid-19 positive prisoner can be released from isolation, Santa Rita Jail frequently and regularly move prisoners who are still symptomatic of covid-19 out of quarantine, back into general housing, thereby creating repeat waves of reinfection among the jail's prisoner population.

179. Daniel Torres, a plaintiff, stated that he arrived in Santa Rita Jail on June 18, 2020. He was held in the quarantine pod, HU 25 for 2 weeks and then moved to HU 33. He was told that he was a person at risk, and moved to HU 3, supposedly for his own protection. While in HU3 he was told he caught COVID-19. When he was moved into HU8, even if he did not have covid-19, he would have caught it in HU 8. Daniel was placed in a cell with a cell mate who was very sick. When Daniel complaint, the housing guards retaliated against him. Badge 2368 told him that Daniel would never get pod time while 2368 was on duty. Daniel was held in HU 8 until 7/31, and then moved into HU 33W. Daniel believes that he was still sick when he was moved, because although he had no fever, he was still sick and had many of the other symptoms of Covid-19. But the jail told him that he was recovered. Once in HU 33, Daniel, who is a barber, began cutting everybody's hair. And almost immediately people in 33W started getting sick.

180.   Willie Dudley, a class member stated that he was a kitchen worker, and along with all the kitchen workers, contracted covid-19.  When all the kitchen workers were deemed "recovered, they were moved into HU 34, and he was moved into HU 33, because he had a fracture in his wrist.  At the time that he was moved in HU 33, he still felt sick.  Between the end of July and mid-August, "Guys been dropping like flies", and finally between August 15th and 17th, the defendant Sheriff decided to have all the prisoners in HU 33, tested.  At that time there were 30-40 prisoners in HU 33West.  On Sunday, August 16, 2020, the jail announced over the public address system, who had tested positive.  Those positive prisoners were told to pack up and moved into HU 8.  The remainder, presumably had tested negative, stayed.  On Sunday evening, another 10-12 prisoners were told they were being moved to HU 3.  Willie Dudley believes that it is very likely that he contributed to infecting other prisoners with covid because the jail moved him into HU 33 when he was still feeling sick.   Class members Deandre Smith and Harry Flores are two prisoners of HU 33, who caught Covid-19 in HU 33.

181.   Jason Collins, a class member stated that on or about August 28, 2020, HU 31 was "yellow-tagged" which indicates the pod had been exposed to covid-19.  This was because a prisoner in 31 was removed to go to medical on August 27, 2020.  This prisoner left around August 3, 2020 to go to HU 34, to work with the other "recovered" kitchen workers who had previously been infected with Covid-19.  About two weeks ago, this prisoner returned to HU 31, and then he became sick.  Jason has requested but not received a covid-19 test.

182.  In Mid-July, HU 22 developed a mass outbreak of covid-19 infections.  A prisoner, who had tested positive for covid-19, named Campos, was moved from HU 8 back to HU 22, without being confirmed as covid-19 negative.  On the night that he was returned to HU 22, he "face planted", signaling a continuing serious medical condition and was removed by the jail.  Shortly thereafter, his named disappeared from the jail's Inmate Locator website.  Within a week of Campos' brief return to HU 22, men in HU 22 began developing covid-19 symptoms, and more than half of the prisoners in HU 22 tested positive for covid 19.  On information and belief, Plaintiffs allege that the men in HU 22 became infected with covid-19 from Campos, and that Campos was able to infect the men of HU 22 because of defendants SHERIFF,  and

47

WELLPATH's joint policy and practice of declaring covid-19 positive prisoners as "recovered" when they are still symptomatic, and not re-testing these men before placing them back into general population.

183. Defendant Sheriff downplays the significance of covid-19 by listing the vast majority as "asymptomatic" on its website, when most of the infected prisoners report that they have the full panoply of covid-19 symptoms. The categorization of the majority of prisoners who are covid-19 infected as "asymptomatic" began in Mid-July 2020, after a spike of 103 covid-19 cases within two days, and Judge Cousins convened an emergency hearing on the spread of covid-19 at Santa Rita Jail. While, as of yet, there have been no reported deaths from covid-19, many of the prisoners who contracted covid-19, describe themselves as sick and symptomatic. For example, seven (7) Class members: Angelo Valdez, Adrian Contreras, Kevin Martin, Kevin Fuqua, Adam Parker, Eddy Urbina, and Christopher Conway are all prisoners who contracted covid-19 and out of nine common symptoms of covid -19: body pain, headaches, loss of taste/smell, chills, nausea or stomach aches, coughing, difficulty breathing, sore throat and fever, five describe having all the symptoms, and two have 8 of the 9 symptoms. Everyone rates their symptoms as a severity of eight to ten (8:10); ten (10) being unbearable, and one (1) being a little/minor. Catching covid-19 was not an insignificant or minor issue. None of the prisoners who tested positive for covid-19 considered themselves asymptomatic, nor were they told by the jail that they were asymptomatic, yet defendant SHERIFF states on its public website that the vast majority of covid-19 positive inmates are "asymptomatic".

184. While the Sheriff asserts that only 2 prisoners required hospitalization, three class members have self-identified as having been transported to the hospital for covid-19: Thomas McHale, Adrian Contreras and Jahtinder Singh.

185. Defendant Sheriff's Covid-19 website posts its updates on the covid-19 situation at the jail, on a daily basis. Family, and attorneys of the prisoners in Santa Rita, rely on this information to monitor the status of the covid-19 inside the jail, and also as a means to verify information being relayed forward by the prisoners themselves. And the information on the website, is

48

often conflicting with information from other jail sources. For example, on August 26, 2020, the white board in the lobby of the jail stated that Housing Units 3-EF, 8-ABC, 21-B, 22-A and 23-AB were on quarantine. In contrast, the Sheriff's website, which is what is available to the public, on August 26, 2020 stated that only housing units 3 EF, 8ABC were on quarantine.

186. Prisoners inside Santa Rita Jail are vulnerable to covid-19 only from importation into the jail, which can only occur from staff, primarily sheriff deputies, who leave and enter the jail on a daily basis. Prisoners inside Santa Rita Jail are also vulnerable to transmission of covid-19 from the staff who move from housing unit to housing unit.

187. Defendant Sheriff reports that staff are required to wear masks, and reported in a report to Judge Cousins that they have increased discipline for violation of the requirement to wear masks. Prisoners report that sheriff deputies still remove their masks to speak, particularly when they are talking to individuals nearby, and want to speak in a more discrete volume. Sheriff deputies who remove their masks, pull their masks down off their face, or lift their masks two to three inches from their face, while taking, or just while inside prisoners' housing units include: Roes 1-20.

188. In moving from housing unit to housing unit, defendant Sheriff has not instituted any safety precautions to prevent staff and sheriff deputies from bringing any micro-organisms from one housing unit into another. Sheriff deputies are not instructed to, nor required to change personal protective equipment if they enter and then exit a quarantined housing unit. Nor are Sheriff deputies instructed to, or required to change personal protective equipment after they have come into contact with an individual who is covid-19 positive, or suspected of having contact with covid-19, before interaction with subsequent prisoners.

SYSTEMIC DISREGARD FOR THE HUMANITY AND HUMAN NEEDS OF PRISONERS: JAIL CULTURE OF "MEANNESS" AND PUNISHMENT

189. Face to face contact and connection with family is vital to prisoners, and visiting at Santa Rita Jail is exceedingly difficult and limited. Santa Rita Jail is located in a remote location in Alameda County, when many of the people incarcerated are from the more populous areas such as Oakland, Hayward. Transportation to Santa Rita Jail is inconvenient and expensive.

Face to face visits are only permitted for half an hour per visit.  There are limited visiting

booths.  And the availability of visiting hours for each scheduled visiting time slot is limited.

Therefore, to be able to have a visit requires getting to the jail early, and often long waits.

One third of the visiting times are during work days.    And when the jail decides that there

will be a lock down which cancels visiting, this information is not posted anywhere, and so

families travel long distances and long hours only for naught.

190.    Nathaniel Avila, a class member reports that on two occasions his partner, who lives in

Southern Monterey County and had to drive 2 hours with her child for the visit, came for a

visit.  When she arrived, she was told that visits were canceled, and this is after driving two

hours for the visit.

191.    On January 19, 2020, Nathaniel Avila's partner came to visit, after driving two hours and

the housing unit the technician Padilla  did not call the prisoners who had visits, instead

declaring them "refusals", meaning they had refused the visit, thereby forfeiting or canceling

the visit.   This was a callous disregard of prisoners' needs and rights.  Nathaniel filed a

grievance on this issue.

192.    During the time in 2019, when  Larry Gerrans was in Santa Rita Jail, as a pretrial detainee,

over a period of six weeks, his wife, who traveled two hours with their children came to Santa

Rita Jail for an in person visit and was denied the visit, seven times. There was never any

advanced notice that visiting would be canceled.

193.    On one occasion, a lawyer for Larry Gerrans flew in from Southern California for a legal

visit with Larry Gerrans, and was refused the visit, and when he returned the 2nd and 3rd day,

Larry Gerrans' lawyer was repeatedly refused a visit by the Jail.

194.    Larry Felder, a class member filed a grievance that on 12.3.2019, he had a legal visit

scheduled and his lawyer, after traveling for 90 minutes to Dublin, California, was told that

Larry "refused" the visit, when in fact Larry had not refused, but that the deputy just failed to

notify Larry and bring him to the attorney visit.

SECOND AMENDED COMPLAINT

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

195. Class member, Dillon Costello filed a grievance on 12.7.2019 that he has been denied multiple video visits with his family because there was no deputy available to allow him to have the visit, and his family is not refunded the lost funds.

196. Class member, David Buchanan filed a grievance that because he is in a wheelchair, he was denied his attorney visit, and this was due to the lack of ADA access within the jail for wheelchair visits.

197. Class member, Mario Robles filed a grievance that his family drove two hours for a family visit, arriving a half hour early only to be told that Santa Rita had canceled all visits. The jail refused to state why visits were canceled. He stated that his family spent four hours for nothing, and this canceled visit was emotionally demoralizing for him and for his family.

198. During Covid-19, there are no family visits, so the telephone and video contacts with family are even more important and vital, and are the only means for prisoners to communicate or interact with family and community. For a while the jail publicly stated that each prisoner was provided with one free video visit per week, that free video call was terminated in July, 2020.

Lockdowns & Insufficient Out Of Cell Time And Outdoor Recreation Time

199. Despite the fact that there are 30 men living in each cell of minimum housing, in filthy and unsanitary conditions, despite the fact that most of the men are pretrial and the jail is not permitted to punish these prisoners, the housing unit deputies frequently lock down the cells, not allowing the men out into the common area, and not providing outdoor recreation. These lockdowns reinforce defendant SHERIFF's policy and practice of enforced isolation. During periods of enforced isolation, deputies and technicians will increase the isolation by turning off all phones, and turning off the television.

200. All prisoners experience enforced idleness as a form of punishment.

201. 15 Cal. Code of Regs. § 1061 requires a "voluntary academic and/or vocational education of housed prisoners." 15 Cal. Code of Regs. § 1065 requires that defendant Sheriff provide a "a minimum of three hours of exercise distributed over a period of seven days," and that this exercise and recreation shall be "in an area designed for recreation…."

202. Defendants Sheriff and Luckett-Fahima provide very little in the way of activities for prisoners, and so lockdown and cell time is enforced idleness. Even in the best of times, 25% or less of the prisoner have access to classes. *2015 Santa Rita Grant Application to BSCC, Narrative*, p. 2 of 35. Classes and programs are at best *90* minutes once or twice week. The out of cell time for classes do not offset the lockdowns.

203. By having prisoners, particularly minimum security prisoners in frequent lockdown, these prisoners are incentivized to "volunteer" for work, just to be able to get out of the cell. For minimum security prisoner workers, the systemic coercion to work results in defacto denial of pod time and outdoor recreation time. This "volunteer pool creates profits for defendant SHERIFF and AHERN.

204. Prisoners also perform a significant amount of the work in Santa Rita Jail, from kitchen work and food preparation, to all the laundry, to all the significant cleaning in and around the jails. Prisoner workers distribute the food and laundry, and all supplies to prisoners. This volunteer pool confers significant benefit to Defendant SHERIFF, Ahern and Luckett-Fahima. None of this work is compensated. Prisoner workers, in addition to having relief from the enforced idleness, also receive "food treats".

205. Defendant SHERIFF routinely asserts that it has insufficient staffing to carry out the normal functions of the jail. It is unclear whether there is actual insufficient staffing, or whether there are issues of poor jail management, or some other reason, including housing deputy whim. In early 2019, defendant SHERIFF and defendant AHEARN announced the closure of the downtown Oakland jail, Glen Dyer. Simultaneously, these defendants announced that there would be no layoffs and that all personnel from Glen Dyer would be transferred to Santa Rita, significantly increasing the staffing at Santa Rita Jail.

206. Despite what would appear to be a significant increase in staffing at Santa Rita Jail, prisoners are constantly placed on lockdown and denied out of cell time. The reasons frequently given is insufficient staffing.

207. Adding to the punishment of enforced idleness, Defendant Sheriff, and Defendants Ahern, Hesselein, Luckett-Fahima also promulgate and enforce rules which create barriers to prisoners

52

being able to exercise, including rules regarding how prisoners are to be dressed. By promulgating rules requiring prisoners to remain fully dressed in their jail sweats, and limiting laundry exchange to once a week, and instituting punishment for violations, these rules prevent prisoners from being able to exercise, even if they are released from their cells. The full, ill-fitting jail outfit is difficult to exercise in, and being required to wear the full outfit to exercise is an impediment to actual exercise. Even if Prisoners suffer that difficulty, Prisoners who truly exercise get hot and sweat, and by requiring Prisoners to wear their full jail outfit, they are then required to sweat into the only clothes they have, and forced to wear, sweat stained and malodorous clothes for a week. Being malodorous is not just a discomfort, but an imposition on all prisoners because the entire cell is then subjected to the body sweat odor, and this frequently causes social friction and conflict. There is no rational or penological justification to create this additional barrier for prisoners who want and need to exercise.

Strike

208.    On or about October 17, 2019, Santa Rita Jail's Watch Commander, late in the afternoon, defendant Hesselein, entered the common area of Housing Unit 31. Defendant Hesselein was dressed, not in uniform, but in a suit with a red tie. He was in the company of other older, white, men and women, likewise dressed in business attire.

206.    At that time, the men in HU 31 had been on lockdown all day, and there had been no lunch, so the men had not had any food for almost 12 hours. Sua sponte, the men started to yell, ""Stop feeding us rat shit." "Jail clothes stink" "The food sucks" "There's shit all over the place."

207.    Defendant Hesselein walked over and verbally confronted the prisoners, demanding respect and yelled, "I'll shut this place down." "I'll make you guys' life hell." and defendant Hesselein walked out.

208.    True to Defendant Hesselein's word, shortly thereafter, despite the fact that during this past week, the men had been on lockdown, with the excuse that there were not enough deputies to allow the men out of their cell for POD time; a squad of about a dozen sheriff deputies dressed in tactical outfits and armed with rifles and weapons stormed the housing unit. One

53

deputy stood on a table with a rifle pointing it at the prisoners and someone barked out an order, "Get down on the ground" and the prisoners were instructed to lay down, face down on the floor of their cell.

209.     Someone yelled out, "I'm not getting down on the ground, the ground is filthy", and as a result, no one in the cell laid down.   The sheriff deputies threatened to shoot the prisoners, and a tense standoff resulted.  Finally, the prisoners were instructed to put their hands over their heads, and then all prisoners were all walked out of their cells into the multi-purpose room.

210.     Once the prisoners were removed, the deputies, conducted a "raid" where everything in the cell was turned inside out and searched.  All the personal belongings, food and other items of the prisoners were all tossed helter skelter into a pile in the center of the room.  Once tossed, many of which are opened, commissary items become inedible; handled, dumped, thrown on the ground, and mixed with all manner of things.  This was another component of Defendant Hesselein's order, to make the prisoner's "life hell".   There was no penological justification for this raid, the incident with Defendant Hesselein was not related to the contents inside the dormitory cell.  The justification for this show of force and power was as a punishment and a statement of intimidation, letting the prisoners know that the power of force was with Defendants, and any challenge would be met with a power of force, used if not directly against the bodies of the men, then against what little property they owned, to let the prisoners know that at any moment, defendant Sheriff, could stripe them, and that even if their bodies as a group, was not within their reach, defendant Sheriff could remove from them, everything else. There certainly is no penological justification for taking prisoners food and dumping it on the floor in the middle of the room.

211. By the time, the deputies were finished "raiding" all of the three lower tier cells, it was close to 11 p.m., and so the deputies yelled out at the upper tier that the prisoners were required to throw outside the bars into the landing, anything extra, meaning extra food, extra towels, extra bedding and extra food.  The guards yelled out that if the upper tier prisoners complied, they

54

would not be "raided" in the morning.  Otherwise, the upper tier prisoners threw out some stuff, and the deputies left.  There was no raid in the morning.

212. The next day, October 18, 2019, the men were again placed on lock down, and the meal schedule was again chaotic.  When the afternoon meal finally arrived, late in the afternoon, the men of Housing Unit 31, spontaneously refused to leave their cells, and refused the meal, thereby engaging in a hunger strike.  The deputies, alarmed, called in officers, first a sergeant and then a lieutenant, who offered to discuss with the prisoners, their grievances, and asked the men to select a spokesperson.  They selected Lawrence Gerrans.

213. The men of HU 31 then spent the next two hours writing down their grievances and giving them to Plaintiff Lawrence Gerrans.  These grievances were copied, a statement was written, and these were given to the lieutenant, who promised to review these documents and respond.  These grievances, later called the Strike Demands are attached as Exhibit A, and the documented later called the Strike Statement is attached as Exhibit B.

214. That evening, around 10 p.m., the deputy Charondo placed into HU31, upper D, a young, white, emaciated man, who was in drug withdrawal.  He was place on an upper bunk.  Within an hour, this young man lost control of his bowels and defecated all over himself.  The prisoners pressed the emergency buzzer and said there was a man who was ill and needed to leave.  As he was walking, everyone could see the diarrhea on the back of his pants, having gone through his pants and was now pooling in the cuffs of his sweats.

215. Deputy Ignont (sp?) walked in and stated that the infirmary had cleared him to be in the housing unit.  Deputy Ignont (sp?) said, "He's your problem." "You guys take care of him".

216.  By this time, the diarrhea had dripped into this young man's shoes and he was now tracking this all over the floor.  This young man appeared to be in extremely poor health, and could easily have been ill with a number of infectious diseases including pseudomonas, hepatitis, aids, C-dip.

217.  But there was nothing the prisoners could do, so the young man and the prisoner helping him, slowly walked him back to his mattress.

SECOND AMENDED COMPLAINT

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

218.   By six a.m., when everyone woke up, the stink in the cell from this young man's diarrhea was like a green, disgusting fog coating the entire room.  The diarrhea had smeared all over the bed and all over his clothes.   The prisoners again rang the buzzer yelling "Sick man coming out".  Eddie took a sheet and wrapped it like a diaper around this young man and walked him out of the cell.  The technician buzzed open the cell door, and one prisoner rolled up this young man's mattress, and with an arm around this young man's shoulders, proceeded to walk him down the landing and down the stairs.  As they reached the bottom Deputy Joe walked in, and he signaled to Eddie to drop the mattress, and he proceeded to handcuff Eddie and take him away.  Deputy Joe tells the young many to walk back to the cell.  The young man was barely able to walk and when he reached the cell door, he collapsed, prone on the floor.

219.   Deputy Joe brings Eddie back into the room and announces that "This is your fucking problem.  I don't care how many times he shit himself."  Then Deputy Joe orders the kid to stand up and move.  The kid doesn't move.  Deputy Joe walked over, and grabbed this kid by the hair and pulled him up by the hair onto a sitting position and yells into his face, "don't make me do this."  At this time, Lawrence Gerrans, afraid that this kid would not be able to tolerate any physical violence, and intervened.  "Whoa, whoa, it doesn't need to be like this." Then Deputy Joe released the kid, whose head drops like a ball back onto the floor.  Lawrence Gerrans said, "I'll take care of him", and requested a hazmat bag, and clean clothing, clean sheets and towel.  Lawrence Gerrans said to Deputy Joe, "You seem like a nice guy, but doing this to this kid is indefensible."  Deputy Joe responded,  "Don't come to jail" and walked off.

220.   The prisoners then took the kid back into the cell, showered him, and while he was showering had another episode of diarrhea.  Prisoners cleaned his mattress, put the mattress on the floor, and put the kid on the floor.

221.   By noon, the kid had another episode of diarrhea.  Plaintiff Gerrans pushed the emergency button and said that at the very minimum, this kid was now severely dehydrated and this was a medical emergency.

222.    Only after the 4th or 5th incident of diarrhea, and over 15 hours of all the men in the cell enduring this unsanitary, exposure to human feces, were the prisoners finally able to get defendant SHERIFF to remove this kid from the cell and place him under appropriate medical supervision.

223.    That afternoon, another prisoner in HU 31, fell off the top bunk, landing on his head.  Soon thereafter, this prisoner went into seizure, flapping like a fish.  Men in the cell heard the crack, as his head hit the ground.  They immediately hit the emergency button and requested medical response.  The medical response was also slow in coming.  The deputies were slow in responding.

224.    This cell was a kitchen workers cell, and they were not permitted to return after their shift for over two hours.  During this time, some of these plaintiffs and class members could see a paramedic van drive up into the parking lot.  However, when the paramedics arrived, the paramedics were in no hurry.  This led these plaintiffs and class members to conclude that the young man in HU 31 had died, and so there was no longer a medical emergency.  They concluded that if the kid was alive, they would have been hustling to get him to the hospital.

225.    After being held for two hours extra in the kitchen, these men were moved into the small yard.  By the time they got back to the cell, the kid was gone.

226.    That evening, after prisoners returned to their cells, the mood was "Enough is enough", and there was a call for a vote.  The majority and all the races and majority voted for a strike that would be a hunger strike, a work strike and a strike against participating in jail activities such as going to class or court.

**Grievances And Retaliation**

227. 15 Cal. Code Regs §1073 requires Santa Rita Jail to have a grievance procedure where prisoners "may appeal and have resolved grievances relating to any conditions of confinement. A prisoner has a right under the First Amendment to file grievances. While defendant Sheriff is required by state regulations to have a grievance process, defendant Sheriff has set up a tortuous and difficult system for prisoners to utilize. First, the jail makes it difficult for a prisoner to obtain a blank grievance form, and without a grievance form, grievances cannot be written. Second, even if a grievance is written, it must be submitted, requiring a deputy has to accept the grievance and assign a grievance number. So, often, deputies refuse or fail to assign a grievance number., telling prisoners that their issue is "not grievable", or taking the physical, written grievance and refusing to assign a number, or destroying or losing the grievance. Without a grievance number, a grievance cannot be submitted.

228. Lastly, although the Sheriff's own policy states that once a grievance is submitted, the "Grievance Unit" is to respond within 21 days, there are often months before a grievance is responded to. This then means that significant time passes and the problem remains and persists, or that the issue becomes buried by the increasing numbers of more pressing current problems.

229. With the advent of the tablet, defendant Sheriff asserts that grievances can be electronically filed. However, the tablets have weak Wi-Fi signals in the cells, and when everyone in the POD room uses a tablet, there is insufficient bandwidth, so people are locked out of their tablets. This lack of bandwidth or Wi-Fi access renders the tablet unavailable for grievances.

230. Secondly, not everyone is computer savvy and there is no instruction or help in using tablets. The access to the tablet to complete grievances is convoluted and difficult and requires prisoners to sign out and re-sign in, so instead of being able to go from one app to another, prisoners have to sign out and resign in to access the grievance application.

231. Lastly, even if a prisoner successfully navigates all of these steps, to be able to "submit" a grievance electronically, a prisoner still has to get a deputy to assign a grievance number, and with the limitations on a tablet's power, with the limitations on the times and access to the

tablet, the system devised by the jail in all practical means, makes it impossible for prisoners to file grievances.

232.    The housing unit deputy is supposed to try and resolve the grievance. However, the result is that housing unit deputies refuse to accept grievances because clearly, receiving grievances reflect negatively on the housing unit deputies, so the goal is to reduce the number of grievances prisoners submit. To keep the number of grievances low, housing unit deputies often refuse or fail to provide blank grievances; refuse to accept completed grievances from plaintiffs and members of the class, stating that the complaint is "not grievable"; or refuse to accept completed grievances from plaintiffs and members of the class, stating that the grievance, for example, the complaints on the food or the lack of tray sanitation, is directed at defendant Aramark, which is a separate business and not subject to a grievance. The first level of SHERIFF grievance procedure is for the housing unit deputy to exercise discretion to resolve the grievance, and housing unit deputies often respond by stating "This is jail. If you don't like it, don't come to jail."

233.    Multiple members of the class have filed grievances in this case, and exhausted the grievance process. In addition, plaintiffs may seek consolidation with *Mohrbacher, et al. v. Alameda County Sheriffs Office, et al*. 3:18-cv-00050-JD on related and intersecting issues. Many of the plaintiffs of the present case and class members in Mohrbacher, et al, have also tried to file grievances but defendants refuse to accept those grievances, refuse to assign numbers to the grievances, and have failed and refused to respond to these grievances. In addition, plaintiffs' strike demands which were submitted, were grievances to defendant SHERIFF on October 18, 2019, written and submitted at the request of a jail Lieutenant, who asked for their grievances. EXHIBIT A.

234.    Even if a grievance is successfully submitted, defendant Sheriff's policy is to always find a way to deny the grievance. After class member Eric Rivera filed a grievance that he and two other inmates found rat droppings in their food tray, defendant Sheriff's response was that the housing unit deputy "was unable to identify the objects found" and for that reason the grievance was denied. In another instance, when there was a sewage overflow in Eric Rivera's cell, causing him to slip, fall and hit his head, his grievance was denied and the denial stated that the housing unit

1  deputy did not know about the sewage overflow yet "maintenance was informed", when the only
2  line of communication would have been between the housing unit deputy and the jail's
3  maintenance.

4      235.    Defendant Sheriff's grievance process is another way in which defendants clearly
5  communicate to plaintiffs and class members that regardless of the truth of their observations,
6  regardless of the merits of their complaints, defendant SHERIFF will ignore, disparage and belittle
7  them, and subject them to conditions that, objectively are unacceptable, but which defendant Sheriff
8  has the power to subject them to, and they have no choice but to suffer and be punished.

9      236.    And of course, there is always the retaliation that occurs by the housing unit deputy
10  for the complaint.  Too often housing unit deputies are supposed to be the first line of response to
11  the grievance, and apparently, based upon housing unit deputies' responses, there is opprobrium
12  from the jail towards grievances, and so that opprobrium is redirected as retaliation against the
13  prisoner.

14      237.    Even when a grievance is submitted, and processed, the responses are formulaic and
15  do not address the prisoner's concerns.  Lavert Branner filed a grievance complaining of an
16  invasion of gnats, and that the gnats were getting into his food.  Defendant SHERIFF's denied the
17  grievance, stating "If you have any discrepancy with any of your meals, you need to contact a
18  housing unit deputy immediately.  Not only is a deputy a great resource to verify your claim, the
19  deputy will be able to contact the Kitchen and possibly issue a remedy."

20      238.    In one situation, a prisoner brought to deputy Wong's attention of a meal that had
21  been contaminated.  Deputy Wong took a grievance and brought it down to the kitchen.
22  Apparently, the grievance was not well received.  The next time, a problem with a meal was
23  brought to Deputy Wong's attention, he refused the grievance although he did bring in another
24  food tray.

25      239.    Defendant SHERIFF gives reports to the Alameda County Board of Supervisors on
26  grievances,  touting how few grievances are filed, as proof of the quality of the conditions of
27  confinement at Santa Rita Jail.  This is an added reason why deputies are instructed to refuse and
28  deflect grievances in order to reduce the total number of grievances.  Some prisoners have asked

deputies, "Don't you want to improve this place?" And the response has been "Not my job." This strategy does not change the root cause of any problem, which is why problems escalate and the prisoners were forced to hold a strike.

240. The Santa Rita Jail "Grievance Unit" and the responses are due not just to the deputy handling individual responses, but responses are reviewed by a Sergeant, and if appealed , by a Lieutenant.

241. LAWRENCE GERRANS was the individual who the other prisoners requested to be their spokesperson. LAWRENCE GERRANS collected everyone's comments and requests and wrote up what became, both the Strike Demands and the Strike Statement. Plaintiff LAWRENCE GERRANS has taken this action at the suggestion of a defendant SHERIFF lieutenant who came into the Housing Unit when plaintiffs and class members were refusing food in protest on October 18, 2019. On Thursday, October 31, 2019, because Larry Gerrans was a federal prisoner, defendant SHERIFF had him removed from Santa Rita Jail, and transferred to Marin County jail, and during the move designating him as a prisoner who should be in solitary confinement. In Marin County Jail, LAWRENCE GERRANS has been placed into administrative segregation.

242. The purpose of removing Larry Gerrans from Santa Rita was to stifle the prisoners, remove the individual who the prisoners had chosen to be their spokesperson, and intimidate and frighten the prisoners who only saw that Larry was removed and never reappeared. On information and belief, Plaintiffs plead that defendant Hesselein either directly ordered the removal of Larry Gerrans, or reviewed and approve the order to have Larry Gerrans removed.

243. As the strike progressed, Defendant SHERIFF began issuing disciplinary citations only to sentenced prisoners who had been workers. None of the workers had been informed that they lacked the right to not work. They all believed that working was a "voluntary" activity, especially since the only compensation they received was "food treats". 15 CCR 1080 requires that the disciplinary process be posted or handed out to prisoners. There is nothing posted nor is there anything in the SHERIFF handbook that workers are prohibited from refusing work, and that if a prisoner worker refuses to work, that they would be subject to discipline.

61

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

244. Due to fears and concerns that sentenced kitchen workers who participated in the strike would be summarily punished with extra time tacked onto their sentence, Plaintiffs rushed and filed the initial complaint.

Broad Jail wide Frustration With Intolerable Conditions

245. Housing Unit 31, where the strike initiated is on the minimum security section of the jail which are, on the east side of the jail. Word of the strike traveled to the maximum security housing units, which are on the west side of the jail. Various prisoners in maximum security housing units, discussed and reviewed the conditions of Santa Rita Jail, and wrote up a list of grievances. These lists were essentially identical in content to what the prisoners in Housing Unit 31 wrote. These lists were combined with the demands of Housing Unit 31 and circulated amongst the various housing units for review, comment and approval. The prisoners collected signatures indicating approval and support for these as a joint group grievance. This group grievance, signed by hundreds of prisoners, was submitted to the Alameda County Board of Supervisors and defendant SHERIFF on March 17, 2020. A true and correct copy is attached as Exhibit C.

**MONELL**

**246.** Defendants SHERIFF, AHERN, MADIGAN, HESSELEIN AND LUCKETT-FAHIMA, as officers and ultimate decision makers, have drafted, adopted implemented and executed written contracts and policies for the operation and regulation of SANTA RITA JAIL. The written contracts are the written contacts between defendant Sheriff and outside corporations, including defendant ARAMARK, and defendant WELLPATH, GTL the telephone, tablet and video provider and the commissary provider Keefe Commissary Network. These contracts are negotiated, reviewed by defendant MADIGAN and AHERN, approved and signed by defendant AHERN on behalf of defendant SHERIFF, and then approved and adopted by the Board for defendant COUNTY. These contracts are usually for terms of approximately three years and then require review and reapproval. The Commissary contract was entered into or about July, 2018, and expires in 2021. CFMG, the predecessor Corporation to Wellpath, entered into a written contract with Defendant County and Defendant Sheriff in 2016, which expired in 2019. On

information and belief, Plaintiffs allege that upon the expiration of that prior contract, the terms were reviewed, approved and ratified by defendants AHERN, MADIGAN, COUNTY, and the contract either extended or renewed. Defendant WELLPATH is the current medical provider at Santa Rita Jail. Defendant ARAMARK's initial contract expired, and was reviewed, approved and ratified and provisionally extended by defendants AHERN, MADIGAN, COUNTY for increments of one year.

247.     The internal written policies for Defendant SHERIFF are titled the Detentions and Corrections Policy and Procedures ("D&C"), and per defendant SHERIFF's policies and procedures, to be reviewed annually. On information and belief, plaintiffs allege that the D&C written policies are in fact reviewed annually or bi-annually with the review and any changes approved by the Santa Rita Jail Facility Commanders, Hesselein and LUCKETT-FAHIMA.

248.     The implementation procedures, which may or may not be written, to implement the terms of the contracts and carry out the all functions of Santa Rita Jail, including food service, medical service and commissary, phone, tablet and video visits, sanitation and other issues raised herein are done so in coordination with the D&C are reviewed and approved by the Detentions and Corrections Commander defendant MADIGAN and the Santa Rita Jail Facility Commanders, defendants HESSELEIN and LUCKETT-FAHIMA. The written contracts, policies and procedures are written, and then in concert with the culture of hostility and disdain for prisoners, resulting in the constitutional violations described of herein.

## PRIOR KNOWLEDGE OF JAIL CONDITIONS: CONSCIOUS DISREGARD OF HARM TO PRISONERS

249.     None of these complaints are new, or a surprise. Many of these exact same issues, as listed in the Strike Demands have been made by women prisoners in the Mohrbacher case, filed in January, 2018, now pending in this court. 3:18-cv-00050-JD. The fact that prisoners on the East Side of the jail, and prisoners on the West Side of the Jail, independently derived essentially the same complaints, describing the same problems, indicates these are jail-wide, system wide practices.

250.    Many of the problems are ongoing, chronic, and the subject of numerous grievances over an expanded period of time.  Defendants were well aware of the issues and have chosen to not address or fix the problem.  Defendants AHEARN, MADIGAN, HESSELEIN,  LUCKETT-FAHIMA encouraged, authorized, ratified, and condoned the unconstitutional and wrongful conditions complained of herein, have instructed and trained jail staff in ways to obstruct grievances, deny grievances and to maintain these wrongful conditions.

251.    Said customs, policies and practices include the maintenance of inhumane and unsanitary conditions of confinement, the interference, disruption of plaintiffs' First Amendment protective activities, and the right to family visits and communications with family and attorneys; the failure to maintain adequate policies and failure to adequately train, supervise and control jail employees including jail deputies and technicians; failure to insure that for profit contractors provide adequate services including medical care, and health, nutritious and edible food.

**FIRST CLAIM FOR RELIEF**

**DEPRIVATION OF FEDERAL CIVIL RIGHTS
UNDER 42 U.S.C. § 1983**

**FIRST AMENDMENT**

252.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.  Per the Court Order Dkt. 49, Plaintiffs specifically refer to Paragraphs 4, 6.1, 6.1.2, 91, 92, 106-111, 189-198, 208-213, and 227-244.

253.     By their policies and practices, Defendants Alameda County Sheriff's Office, , Alameda County, Defendants Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan, Detentions and Detentions and Corrections Captain Luckett-Fahima, and, and Does 25-50 violated Plaintiffs and members of plaintiff class rights to free speech, under the first Amendment:

> 1) by preventing  plaintiffs and members of the plaintiff class from filing grievances regarding conditions of confinement at Santa Rita Jail; as herein described;

> 2)  by retaliating and punishing plaintiffs and members of the plaintiff class for voicing concerns and complaints regarding conditions of confinement at Santa Rita Jail; as herein described;

> 3)  this retaliation often occurred as group punishment, punishing entire PODs or housing units for the statements of a few, in order to inflict greater pressure and punishment for speaking out;

> 4) by preventing, interfering with and hampering communications between plaintiffs and class members with their family and loved ones.

254.     At all relevant times herein, defendant SHERIFF and defendant AHERN have the ultimate responsibility for operating the Santa Rita Jail.

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

255.     At all relevant times herein, Defendants MADIGAN was the Detentions and Corrections Commander directly in charge of Santa Rita Jail.  Defendants Hesselein and Luckett-Fahima were or are the Santa Rita Jail Facility Captains.

256.     These policies and practices have been, and continue to be, implemented by Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and the Class Members' ongoing deprivation of rights secured by the United States Constitution under the First Amendment.

257.   The policies, practices and customs described above are the official policies, practices and customs of Defendant COUNTY OF ALAMEDA, and are the direct and proximate cause of the violations of Plaintiffs being subjected to known harms in violation of the First Amendment. The policies, practices and customs described above include Defendant COUNTY OF ALAMEDA's failure to train its staff in the face of an obvious need for training to prevent the violations described above.

258.   Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct or failed to maintain policies, customs, or practices when it was obviously that they were needed to prevent the violation of Plaintiffs and Class members First Amendment Rights granted pursuant to 42 U.S.C. § 1983, to voice complaints and file grievances regarding conditions of confinement at Santa Rita Jail.

259.   Defendant Hesselein, acting in the performance of his official duties as the Facility Commander, purposely and deliberately ordered retaliation and group punishment be inflicted on the men in HU 31 as described in paragraphs 208 to 211, for speaking out about the unconstitutional conditions of confinement, in violation of their First Amendment rights protected by the United States Constitution.

260.     As a direct and proximate result of Defendants Hesselein, Madigan, Hesselein and Luckett-Fahima, and Role 2-50's actions and inactions, Plaintiffs and class members suffered injuries

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

entitling them to receive compensatory damages against defendants SHERIFF, County of Alameda, and Hesselein.

WHEREFORE, plaintiffs pray for relief on behalf of themselves and class members as hereunder appears.

## SECOND CLAIM FOR RELIEF

## DEPRIVATION OF FEDERAL CIVIL RIGHTS
## UNDER 42 U.S.C. § 1983

## EIGHTH AMENDMENT

## MEDICAL SERVICES

261. Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein. Per the Court Order Dkt. 49, Plaintiffs specifically refer to: 4, 6.1, 6.1.4, 6.3, 133-171, 172-188, 214-226

262. This second claim is asserted against Defendants Alameda County Sheriff's Office, Alameda County, Defendants Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan, Detentions and Corrections Captain Derrick C. Hesselein, Detentions and Corrections Captain Luckett-Fahima, and, and Does 25 through 50, DEFENDANT Well-Path, Jennifer Diaz and Jessica Waldura, Roes 1-25. Defendant Deputy Ignot (sp) and Deputy Joe are sued in their individual capacity. The paragraphs Plaintiffs refer to regarding Deputy Ignont and Joe are paragraphs 214-226.

263. Defendant Ignot and Joe, acting or purporting to act in the performance of their official duties as a sheriff's deputy, wrongfully and unreasonably refused to summon medical aid, and instead forced plaintiff Gerran and members of the class to have to provide medical care for which they had no training and no experience in providing.

264. At all relevant times herein, the named defendants herein were responsible for providing for the medical care of plaintiffs and class members. Said defendants subjected Plaintiffs and the members of the Plaintiff class they represent, to a substantial risk of serious harm and injury from the harmful and inhumane effects of denial and delay of necessary and needed medical care and the inadequate medical care, when provided. These policies and

67

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Fourteenth and Eighth Amendments.

265. By their policies and practices and the inconsistent implementation and oversight of same, Defendants subject Plaintiffs and the Prisoner Class they represent, to a substantial risk of serious harm from the provision of inadequate health care and expose Plaintiffs and the Class to significant risk of harm from exposure to COVID-19, and to the sub-class of Prisoners who had or have contracted COVID-19. These policies and practices have been, and continue to be, implemented by Defendants AHERN and WALDURA, DIAZ and their agents, officials, employees and all persons acting in concert with them under, color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

266. The policies, practices and customs described above are the official policies, practices and customs of Defendants COUNTY OF ALAMEDA, SHERIFF AND WELL-PATH and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the Eighth Amendment. The policies, practices and customs described above include Defendant COUNTY OF ALAMEDA's failure to train its staff in the face of an obvious need for training to prevent the violations described above.

267. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Class they represent request relief as outlined below.

68

# THIRD CLAIM FOR RELIEF

## DEPRIVATION OF FEDERAL CIVIL RIGHTS
### UNDER 42 U.S.C. § 1983

## FOURTEENTH AMENDMENT

## MEDICAL SERVICES

268.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.  Per the Court Order Dkt. 49, Plaintiffs specifically refer to: 4, 6.1, 6.1.4, 6.3, 133-171, 172-188, 214-226

269.     This first third Cause of Action is asserted against Defendants Alameda County Sheriff's Office, Alameda County, Defendants Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan, Detentions and Corrections Captain Derrick C. Hesselein, Detentions and Corrections Captain Luckett-Fahima, and, and Does 25 through 50, DEFENDANT Well-Path, Jennifer Diaz and Jessica Waldura,  Roes 1-25.

270.    Defendant Deputy Ignot (sp) and Deputy Joe are sued in their individual capacity.  The paragaphs Plaintiffs refer to regarding Deputy Ignont and Joe are paragraphs 214-226.

271.    Defendant Ignot and Joe, acting or purporting to act in the performance of their official duties as a sheriff's deputy, wrongfully and unreasonably refused to summon medical aid, and instead forced plaintiff Gerran and members of the class to have to provide medical care for which they had no training and no experience in providing.

272.    At all relevant times herein, the named defendants herein were responsible for providing for the medical care of plaintiffs and class members.  Said defendants subjected Plaintiff and the members of the Plaintiff class they represent, to a substantial risk of serious harm and injury from the harmful and inhumane effects of denial and delay of necessary and needed medical care and the inadequate medical care, when provided.   These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members'

SECOND AMENDED COMPLAINT

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

ongoing deprivation of rights secured by the United States Constitution under the Fourteenth and Eighth Amendments.

273. By their policies and practices described above, said defendants imposed substantial hardship on pretrial plaintiffs and pretrial members of the plaintiff class, in relation to the ordinary incidents of incarcerated life, which is not justified by any penological interest, so as to create a liberty interest protected by due process. By their policies and practices described above, Defendants subject Plaintiffs and the Class Members they represent, to a substantial risk of harm due to the denial and delay in necessary and appropriate medical care, and the inadequate care due to the serious health consequences of exposure to covid-19. These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Prisoner Class's ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

274. The policies, practices and customs described above are the official policies, practices and customs of Defendants COUNTY OF ALAMEDA, SHERIFF AND WELL-PATH and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the FOURTEENTH Amendment. The policies, practices and customs described above include Defendant COUNTY OF ALAMEDA's failure to train its staff in the face of an obvious need for training to prevent the violations described above. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Class they represent request relief as outlined below.

70

# FOURTH CLAIM FOR RELIEF

## DEPRIVATION OF FEDERAL CIVIL RIGHTS
## UNDER 42 U.S.C. § 1983

## EIGHTH AMENDMENT

## SUFFICIENT, NON-CONTAMINATED, FOOD NECESSARY TO SUSTAIN HEALTH

275.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.  Per the Court Order Dkt. 49, Plaintiffs specifically refer to: 6.1, 6.1.1.1, 21, 48-54, 55-90, 93-95.

276.      This fourth claim is asserted against Defendants Alameda County Sheriff's Office, Alameda County, Defendants Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan, Detentions and Corrections Captain Derrick C. Hesselein, Detentions and Corrections Captain Luckett-Fahima, DEFENDANT ARAMARK, and, and Does 25 through 50 and  Roes 1-25.

277.     At all relevant times herein, the named defendants herein were responsible for providing for the food needs of plaintiffs and class members.  Said defendants subjected Plaintiff and the members of the Plaintiff class they represent, to inadequate, and insufficient food in that the food provided was insufficient in quantity, frequently contaminated and spoilt, prepared in unsanitary conditions, served on unclean trays, overcooked, often inedible, and of such poor quality as unable to sustain health.    These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendments.

278.     By their policies and practices and the inconsistent implementation and oversight of same, Defendants subject Plaintiffs and the Prisoner Class they represent, to a substantial risk of serious harm from the provision of inedible, tainted and spoilt food and expose Plaintiffs and the Class and Subclass to significant risk of harm from exposure to inedible, contaminated,

71

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

insufficient and unhealthy food.  These policies and practices have been, and continue to be, implemented by Defendants ALAMEDA COUNTY, SHERIFF, AHERN and ARAMARK and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

279.    The policies, practices and customs described above are the official policies, practices and customs of Defendants ALAMEDA COUNTY, SHERIFF, AHERN and ARAMARK and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the Eighth Amendment.  The policies, practices and customs described above include Defendant COUNTY OF ALAMEDA and ARAMARK's failure to train its staff in the face of an obvious need for training to prevent the violations described above. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Class they represent request relief as outlined below.

**FIFTH CLAIM FOR RELIEF**

**DEPRIVATION OF FEDERAL CIVIL RIGHTS
UNDER 42 U.S.C. § 1983**

**FOURTEENTH AMENDMENT**

**SUFFICIENT, UNSPOILT, FOOD NECESSARY TO SUSTAIN HEALTH**

206.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.  Per the Court Order Dkt. 49, Plaintiffs specifically refer to: 6.1, 6.1.1.1, 21, 48-54, 55-90, 93-95.

207.    This fifth cause of action is asserted against Defendant Alameda County Sheriff's Office, Alameda County, Defendants Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan, Detentions and Facility Captain Luckett-Fahima, DEFENDANT ARAMARK,  and Roes 1-25, Does 25 through 50,

72

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

208. At all relevant times herein, the named defendants herein were responsible for providing for the medical care of plaintiffs and class members. Said defendants subjected Plaintiff and the members of the Plaintiff class they represent, to a substantial risk of serious harm and injury from the harmful and inhumane effects of denial and delay of necessary and needed medical care and the inadequate medical care, when provided. These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment. By their policies and practices described above, said defendants imposed substantial hardship on pretrial plaintiffs and pretrial members of the plaintiff class, in relation to the ordinary incidents of incarcerated life, which is not justified by any penological interest, so as to create a liberty interest protected by due process.

209. By their policies and practices described above, Defendants subject Plaintiffs and the Class Members they represent, to a substantial risk of harm due to the denial and deprivation of necessary and healthy food and sustenance, and to the serious consequences of inadequate, insufficient, contaminated and spoilt foods. These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Class Members ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

210. The policies, practices and customs described above are the official policies, practices and customs of Defendants COUNTY OF ALAMEDA, SHERIFF AND WELL-PATH and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the FOURTEENTH Amendment. The policies, practices and customs described above include Defendant Alameda County Sheriff's Office, Alameda County, Defendants Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan, Detentions and Facility Captain Luckett-Fahima, and

73

DEFENDANT ARAMARK's failure to train its staff in the face of an obvious need for training to prevent the violations described above. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Class they represent request relief as outlined below.

## SIXTH CLAIM FOR RELIEF

### DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

### EIGHTH AMENDMENT

### ADEQUATE SANITATION

211. Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein. Per the Court Order Dkt. 49, Plaintiffs specifically refer to: 6.1, 6.1.3, 48-54, 113-132, 214-226.

212. This sixth claim is asserted against Defendants Alameda County Sheriff's Office, Alameda County, Defendants Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan, Detentions and Corrections Captain Derrick C. Hesselein, Detentions and Corrections Captain Luckett-Fahima, and, and Does 25 through 50. Defendant Deputy Ignot (sp) and Deputy Joe are sued in their individual capacity. The paragraphs Plaintiffs refer to regarding Deputy Ignont and Joe are paragraphs 214-226.

213. Defendant Ignot and Joe, acting or purporting to act in the performance of their official duties as a sheriff's deputy, wrongfully and unreasonably refused to summon medical aid, and instead forced plaintiff Gerran and members of the class to endure hours of sharing a cell with a prisoner detoxing, which included multiple bouts of vomiting, diarrhea, and other discharges of human bio-hazardous waste. This caused all the members of the cell to be exposed to and have to endure living with vomit and diarrhea.

214. At all relevant times herein, the named defendants herein were responsible for providing for the sanitation and hygiene needs of plaintiffs and class members. Said defendants

74

subjected Plaintiff and the members of the Plaintiff class they represent, to inadequate, and insufficient sanitation, inadequate and insufficient laundry and the inadequate and insufficient means to maintain the necessary personal sanitation in their cells and housing units, to prevent infections and communication of diseases, including covid-19 as described herein. These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendments.

215. By their policies and practices and the inconsistent implementation and oversight of same, Defendants subject Plaintiffs and the Prisoner Class they represent, to a substantial risk of serious harm from being forced to live in unclean, unsanitary cells, bathrooms, showers and housing units, and to be exposed to biohazards, communicable diseases, microbes, germs and other harmful organisms, and insufficient clean laundry to maintain personal hygiene. These policies and practices have been, and continue to be, implemented by Defendants ALAMEDA COUNTY, SHERIFF, AHERN and ARAMARK and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

216. The policies, practices and customs described above are the official policies, practices and customs of Defendants ALAMEDA COUNTY, SHERIFF, and AHERN and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the Eighth Amendment. The policies, practices and customs described above include Defendant COUNTY OF ALAMEDA and Defendant SHERIFF's failure to train its staff in the face of an obvious need for training to prevent the violations described above. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

75

WHEREFORE, Plaintiffs and the Class they represent request relief as outlined below.

## SEVENTH CLAIM FOR RELIEF

### DEPRIVATION OF FEDERAL CIVIL RIGHTS
### UNDER 42 U.S.C. § 1983

### FOURTEENTH AMENDMENT

### ADEQUATE SANITATION

217.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.  Per the Court Order Dkt. 49, Plaintiffs specifically refer to: 6.1, 6.1.3, 48-54, 113-132, 214-226.

218.   This seventh cause of action is asserted against Defendant Alameda County Sheriff's Office, Alameda County, Defendants Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan, Detentions and Facility Captain Luckett-Fahima, Does 25 through 50.  Defendant Deputy Ignot (sp) and Deputy Joe are sued in their individual capacity.  The paragraphs Plaintiffs refer to regarding Deputy Ignont and Joe are paragraphs 214-226.

219.   Defendant Ignot and Joe, acting or purporting to act in the performance of their official duties as a sheriff's deputy, wrongfully and unreasonably refused to summon medical aid, and instead forced plaintiff Gerran and members of the class to endure hours of sharing a cell with a prisoner detoxing, which included multiple bouts of vomiting, diarrhea, and other discharges of human bio-hazardous waste. This caused all the members of the cell to be exposed to and have to endure living with vomit and diarrhea.

220.     At all relevant times herein, the named defendants herein were responsible for providing for the sanitation and hygiene needs of plaintiffs and class members.  Said defendants subjected Plaintiff and the members of the Plaintiff class they represent, to a substantial risk of serious harm and injury from the harmful and inhumane effects of inadequate, and insufficient sanitation, and the means to maintain the necessary personal sanitation in their cells and housing units, to prevent infections and communication of diseases, transmission and contamination from micro-organisms, including covid-19  as described herein.   These policies and practices have

76

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

5    By their policies and practices described above, said defendants imposed substantial hardship on pretrial plaintiffs and pretrial members of the plaintiff class, in relation to the ordinary incidents of incarcerated life, which is not justified by any penological interest, so as to create a liberty interest protected by due process. By their policies and practices described above, Defendants subject Plaintiffs and the Class Members they represent, to a substantial risk of harm due to the inadequate, and insufficient sanitation, and the lack of means to maintain the necessary personal sanitation, and the sanitation of their cells and housing units, to prevent infections and communication of diseases, transmission and contamination from micro-organisms, including covid-19 as described herein. These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Class Members ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

221.    The policies, practices and customs described above are the official policies, practices and customs of Defendants COUNTY OF ALAMEDA, and SHERIFF and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the FOURTEENTH Amendment. The policies, practices and customs described above include Defendant Alameda County Sheriff's Office, Alameda County, Defendants Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan, Detentions and Facility Captain Luckett-Fahima's failure to train its staff in the face of an obvious need for training to prevent the violations described above. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Class they represent request relief as

outlined below.

## EIGHTH CLAIM FOR RELIEF

### DEPRIVATION OF FEDERAL CIVIL RIGHTS
### UNDER 42 U.S.C. § 1983

### SIXTH AMENDMENT RIGHT TO COUNSEL

222.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.  Per the Court Order Dkt. 49, Plaintiffs specifically refer to: 4, 106-112, 134, 193-194.

223.     This Eighth claim is asserted against Defendants Alameda County Sheriff's Office, Alameda County, Defendants Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan, Detentions and Corrections Captain Derrick C. Hesselein, Detentions and Corrections Captain Luckett-Fahima, and, and Does 50-100.
At all relevant times herein, the named defendants herein were responsible for custody and control, of plaintiffs and class members.  Said defendants deprived Plaintiffs and the members of the Plaintiff class they represent, to the right to counsel, by canceling, preventing, and otherwise interfering with attorney client communication and visits.   These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendments.  These policies and practices have been, and continue to be, implemented by Defendants ALAMEDA COUNTY, SHERIFF, and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members ongoing deprivation of rights secured by the United States Constitution under the Sixth Amendment.

224.     The policies, practices and customs described above are the official policies, practices and customs of Defendants ALAMEDA COUNTY, and SHERIFF, , and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the Sixth Amendment.  The policies, practices and customs described above

78

include Defendants COUNTY OF ALAMEDA and SHERIFF'S failure to train its staff in the face of an obvious need for training to prevent the violations described above. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Class they represent request relief as outlined below.

## NINTH CLAIM FOR RELIEF

### DEPRIVATION OF FEDERAL CIVIL RIGHTS
### UNDER 42 U.S.C. § 1983

### FOURTEENTH AMENDMENT

### PUNISHMENT AND ACTIONS WITHOUT PENOLOGICAL JUSTIFICATION

206. Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein. Per the Court Order Dkt. 49, Plaintiffs specifically refer to: 3, 4, 6.2, 6.3, 47, 48-54, 91, 92, 99-105, 189-207, 214-226.

207. This seventh cause of action is asserted against Defendant Alameda County Sheriff's Office, Alameda County, Defendants Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan, Detentions and Facility Captain Luckett-Fahima, Does 25 through 50, DEFENDANT ARAMARK, and Roes 1-25.

208. At all relevant times herein, the named defendants herein were responsible for providing for the care and custody of pretrial plaintiffs and pretrial class members. Said defendants subjected Plaintiff and the members of the Plaintiff class they represent, to a punishment and other actions without penological justification including excessive lockdown and inadequate out of cell time; inadequate outdoor recreation; arbitrary rules preventing or making it difficult to actually exercise, lack of adequate programming, and all other manner of actions to enforce idleness with all of the physical and mental injuries created by enforced idleness. These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert

79

with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

209. By their policies and practices described above, said defendants imposed substantial hardship on pretrial plaintiffs and pretrial members of the plaintiff class, in relation to the ordinary incidents of incarcerated life, which is not justified by any penological interest, so as to create a liberty interest protected by due process. By their policies and practices described above, Defendants subject Plaintiffs and the Class Members they represent, to a substantial risk of harm due to the denial and deprivation of the ability to exercise and move, to normal human activities including productive activities, and to be forced to be locked in cells for excessive periods of time in enforced idleness. These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Class Members ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

210. The policies, practices and customs described above are the official policies, practices and customs of Defendants COUNTY OF ALAMEDA and SHERIFF and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the FOURTEENTH Amendment. The policies, practices and customs described above include Defendant Alameda County Sheriff's Office, Alameda County, Defendants Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan, and Detentions and Facility Captain Luckett-Fahima's , failure to train its staff in the face of an obvious need for training to prevent the violations described above. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Class they represent request relief as outlined below.

**TENTH CAUSE OF ACTION**

**Title VI – Civil Rights Action of 1964, Executive Order 13166**

**Plaintiff Against All Defendants**

211. Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein. Per the Court Order Dkt. 49, Plaintiffs specifically refer to: paragraph 171.

212. Title VI of the 1964 Civil Rights Act prohibits public entities from discriminating based upon national original, and the 2000's Executive Order 13166, which affirms Title VI's language access requirement and outlines additional requirements, including requiring Defendants to be responsible for taking "reasonable steps" to ensure that all prisoners, particularly those with "limited English proficiency" or "LEP" under their custody and care have "meaningful access" to the entirety of Defendants programs and activities. Defendants have failed to do so, particularly with regard to the provision of medical care, which in this time of the covid-19 pandemic is especially egregious when a significant number of class members who are LEP were placed in HU 8, which was used for medical quarantine, and there was a complete lack of language assistance to any prisoner who had limited English proficiency, and so that Plaintiff Artemio Gonzalez, and class members who were suffering from covid-19 did not medical information, were wholly unable to communicate to any of the medical staff, and as a result was unable to receive even modicum of the medical support available.

213. Defendants are legally responsible for all violations of Title VI of the 1964 Civil Rights Act committed by County staff and contractors who provide programs, services, and activities. Plaintiff Artemio Gonzalez and members of the LEP subclass are individuals with limited English proficiency as defined in Title VI of the 1964 civil Rights Act and Executive Order 13166 issued in 2000 and who are qualified to receive language assistance in order to participate in the programs, services, and activities offered by Defendants.

The programs, services, and activities that Defendants provide to prisoners include, but are not limited to, medical, mental health, and dental services, library, educational, vocational,

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

substance abuse treatment, parenting classes, and anger management classes, and discharge services, communicating with those outside the Jail by mail and telephone, exercising, entertainment, safety and security, the Jail's administrative, disciplinary, and classification proceedings. Defendants' programs, services, and activities are covered by Executive Order 13166.

214. As a result of Defendants' policy and practice of discriminating against individuals with limited English proficiency, failing to provide reasonable language to prisoners with LEP, Plaintiff Art Gonzalez s and the LEP Subclass, Plaintiff represents, do not have equal access to Jail activities, programs, and services, including medical services for which they are otherwise entitled and qualified for.

**ELEVENTH CLAIM FOR RELIEF**

**DEPRIVATION OF FEDERAL CIVIL RIGHTS
UNDER 42 U.S.C. § 1983**

**FOURTEENTH AMENDMENT**

**PROFITEERING RESULTING IN DEPRIVATION AND PUNISHMENT**

215. Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein. Per the Court Order Dkt. 49, Plaintiffs specifically refer to paragraphs 3, 6, 2, 47-54, 91-220, 113-132, 189-207.

216. This eleventh cause of action is asserted against Defendant Alameda County and Defendant Sheriff.

217. At all relevant times herein, the named defendants herein were responsible for custody and care of plaintiff Larry Gerrans and Artemio Gonzalez who were and are pretrial while in the custody and care of Santa Rita Jail and sub-class members who are also pretrial. Said defendants subjected Plaintiffs and the members of the Plaintiff sub-class they represent, to a substantial risk of serious harm and injury from the harmful and inhumane effects of Defendant Sheriff's profiteering, where the goal of profit making overrode Plaintiffs' and Class members' needs, nutrition requirements, sanitation needs, personal hygiene needs,

1    health and mental health needs.  These policies and practices have been, and continue to be,

2    implemented by said Defendants and their agents, officials, employees and all persons

3    acting in concert with them under color of state law, in their official capacities, and are the

4    proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by

5    the United States Constitution under the Fourteenth Amendment.

6    218.    By their policies and practices described above, said defendants imposed substantial

7    hardship on pretrial plaintiffs and pretrial members of the plaintiff class, in relation to the

8    ordinary incidents of incarcerated life, which is not justified by any penological interest, so

9    as to  create a liberty interest protected by due process.  By their policies and practices

10   described above,  Defendants subject Plaintiffs and the Class Members they represent, to a

11   substantial risk of harm due to the inadequate, and insufficient sanitation, and the lack of

12   means to maintain the necessary personal hygiene, the ability to maintain health through

13   decent and healthy foods, maintain physical health through out of cell activities and

14   exercise and maintain mental health through productive interaction and activities.  These

15   policies and practices of profiteering have been, and continue to be, implemented by

16   Defendants and their agents or employees in their official capacities, and are the proximate

17   cause of Plaintiffs' and the Class Members ongoing deprivation of rights secured by the

18   United States Constitution under the Fourteenth Amendment.

19   225.    The policies, practices and customs described above are the official policies,

20   practices and customs of Defendants COUNTY OF ALAMEDA, and SHERIFF  and are the

21   direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in

22   violation of the FOURTEENTH Amendment.  The policies, practices and customs described

23   above include  Defendant Alameda County Sheriff's Office, Alameda County, Defendants

24   Sheriff Gregory AHEARN, Detentions and Corrections Commander Thomas Madigan,

25   Detentions and Facility Captain Luckett-Fahima's failure to train its staff in the face of an

26   obvious need for training to prevent the violations described above. Defendants have been and

27   are aware of all of the deprivations complained of  herein, and have condoned or been

28   deliberately indifferent to such conduct.

83

**SECOND AMENDED COMPLAINT**

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

WHEREFORE, Plaintiffs and the Class they represent request relief as outlined below.

## PRAYER FOR RELIEF

Plaintiffs and the class and subclass they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants as alleged herein, unless Plaintiffs are granted the relief they request. Plaintiffs and Defendants have an actual controversy and opposing legal positions as to Defendants' violations of the constitutions and laws of the United States and the State of California. The need for relief is critical because the rights at issue are paramount under the constitutions and laws of the United States and the State of California.

WHEREFORE, Plaintiffs, on behalf of themselves, the proposed class and all others similarly situated, pray for judgment and the following specific relief against Defendants as follows:

1.     An order certifying that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2);

2.     A finding that the conditions, acts, omissions, policies, and practices described above are in violation of the rights of Plaintiffs and the class and subclass they represent under the Eighth and Fourteenth Amendments to the United States Constitution, Article I, Sections 7 and 17 of the California

**WHEREFORE**, Plaintiffs respectfully request the Court to:

1.     Certify the Class of male prisoners at Santa Rita under Rule 23, F.R. Civ P., and also the following Subclasses:

      1.   Prisoners who are pretrial;

      2.   Prisoners who have limited English proficiency; and,

      3.   Prisoners who had or have contracted covid-19.

SECOND AMENDED COMPLAINT

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

2.      Make findings of fact reflecting the general and specific failings and inadequacies of both groups of defendants' approaches to and practice in the care of male prisoners, the pattern and practice of defendants' non-feasance and maltreatment of male prisoners, and defendants' violations of statutory, regulatory and constitutional requirements in dealing with male prisoners.

3.      Making findings of fact that defendants profiteering constitutes punishment of pretrial detainees;

4.      Making findings of fact that Defendants have violated the 1964 Civil Rights Act and Executive Order 13166 by failing to provide adequate language support to those prisoners who have limited English proficiency; and

5.      Make findings of fact that lockdown and continued denial of out of cell time and denial of outdoor recreation constitutes punishment of pretrial detainees.

A.      **<u>Prohibit</u> defendants from**:

1.      punishing or threatening to punish prisoners for exercising their right to free speech, particularly regarding problems in Santa Rita Jail;

2.      coercing or pressuring prisoners to not file a grievance or to withdraw a grievance;

3.      requiring prisoner workers to do coroners' laundry;

4.      24-hour lockdowns without a justifiable exigent circumstance, not merely staff scheduling and ease;

5.      Profiteering off of prisoners;

6.      interfering with, preventing or cancel duly scheduled visits, whether video or in person;

**And**,

B. **Affirmatively <u>Order and direct</u> defendants to**:

7.      Provide medical treatment which addresses the medical need, consistent with the standard of good medical practice in the Bay Area

SECOND AMENDED COMPLAINT

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

8.     Fully comply with all applicable state statutes and regulations, and develop a legitimate individual treatment plan for each detoxing prisoner, *and carry it out completely*!

9.     Fully comply with all applicable state statutes and regulations for a sufficient, healthy, balanced, nutritious diet which includes daily fresh fruits and vegetables, approved by a doctor;

10.    Develop, implement and maintain a systematic program for sanitation throughout the jail, including housing units, holding cells, kitchen and all bathrooms.

11.    Immediately provide no less 12 to 16 hours out of cell time daily for all pretrial detainees with weekly outdoor exercise prescribed by state regulations;

12.    Stop the profiteering from phone calls, video calls and the commissary;

13.    Full compliance with state laws and regulations which promote prisoner welfare and well-being;

14.    Enter a preliminary and permanent injunction on behalf of the broad Class of male prisoners which will counter and remedy the County defendants' broader unconstitutional practice(s) as complained of and to be shown further;

15.    Award damages;

16.    Award costs and fees for this action, including attorneys' fees;

17.    Grant such other and further relief as this Court deems appropriate.

DATED: August 31, 2020          **LAW OFFICE OF YOLANDA HUANG**


___*/s/ Yolanda Huang*_____
Yolanda Huang

**DENNIS CUNNINGHAM**


_*/s/ Dennis Cunningham*_____
*Counsel for Plaintiffs*

SECOND AMENDED COMPLAINT

*Gonzalez v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

## JURY TRIAL DEMAND

A JURY TRIAL IS DEMANDED on behalf of Plaintiffs.

DATED: August 31, 2020

**LAW OFFICE OF YOLANDA HUANG**

__/s/ Yolanda Huang_____
Yolanda Huang

**DENNIS CUNNINGHAM**

_/s/ Dennis Cunningham_____
Dennis Cunningham

*Counsel for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

EXHIBIT A

21
22
23
24
25
26
27
28

<u>Requests</u>

* A Copy of This Document Sent to Rita
Administration after the
Hunger Strike on October 18, 2019
* Lawrence Gerrans provided 1 Hour
Video Testimony as well.

1.) <u>Food</u> — Improve Palatably. More Diversity. See List
       (See List of Food requests)

2.) <u>Costs of Commissary Too High</u> — Meet Federal (rates)
              • Aramark Needs To Lower Cost or Find New Supplier.

3.) <u>cost of Telephone</u> Too ~~are~~ High — availability +
    Access is Too Low. We Want our own Personal
    electronics with access to email, Texting + Phone
    as well as Internet for Netflix, etc.
       • Cost of Communication + Access is Punitive + Usury.

4.) <u>Clothing</u> — 2 Sets of Blues
                     4 Sets of Shirts, Underwear, Socks
                     2 Pair Work Out Shorts
                  * exchange Availability Twice a week.

5.) <u>Law Library</u> — We Need Access (Federal Law)
                  — Internet Access could be Solution.
                  * This is Federal requirement for fed inmates

6.) <u>Cell Cleaning</u> — Twice a week.
       • Clean maps + Clean map water
       • Clean Brushes + Clean Towels
       • More Disinfects
       • Better Floor + Shower Cleaning Agents
       • Insecticides To Kill Blood Sucking gnats
       • Honor requests for Additional Supplies day Today

7.) <u>Mail</u> — More reliable + on-time delivery
                (especially Newspapers)
              — Faster Sending of ~~e~~ mail out

8.) Bedding - Exchange Blankets Monthly
        - Improve Mattresses - Too Thin, Too Old, Too Dirty
        - Provide Pillows for goodness sake!

9.) Personal Disinfectants - Triple Antibiotics, Bandaids
    * Add To Commissary    Athlete's Foot Spray
    * Make more easily   - Hydrogen Peroxide / Disinfectants
      available from Nurse   Personal Sanitation Supplies
                          - Barbicide for Clippers

10.) Family + Attorney Visits
     - Not Subject To Lockdown Within 6 Hours of Visit.
     - Notification System for Video Visits -
     - Allow Video Visits To Commence in Lockdown
         - Tower Should be able to easily monitor.

11.) Upgrade T.V.'s + Speakers - Hard To See
                              - Hard To Hear

12.) Stop Turning Phones Off - Costing Attorney Fee's

13.) Mandatory Pod Times - Morning / Afternoon / Evening
                            9 To 11    2 To 4    7 To 10

14.) Mandatory Yard Access - 4 Times a Week
        irregular

15.) Adhere To Title 15 minimum Standards

16.) Stop recording Personal + Legal Phone calls for
     Pre-Trial detainees, Civil rights Violation.
       · Can't mount defense. Perform investigations.

17.) <u>Mandatory Meal Times</u>
- Breakfast  5:30 Am To 7:30 Am
- Lunch       11:00 Am To 1:00 pm
- Dinner      5:00 pm To 7:00 pm

18.) Policy For Inmate Intake Sanitation
   • Inmates must shower and They must clean
     Their Finger nails + Toe Nails before receiving
     issuance of clothing and Assignment To
     Housing. We must control Bed Bugs, STAPH,
     infectious diseases due To Creek dwellers +
     Homeless indigents being co-mingled with
     General population

19.) Clean The Holding TANks with Hot mops,
     Bleaching and disinfecting agents at least
     Once a day! They are FilTHy + HealTH Hazard

20.) Clean The multi-purpose rooms daily with
     Hot mops + disinfectants.

21.) Coordinating clothing + Bedding exchange
     immediately after Pod cleanings.

22.) Get Body Scanners + Stop The Strip Searches
   • They are Not Yielding Seizures
   • They are unconfortable + Demoralizing

23. Stop Shackling minimum security prisoners during Federal Transport. unnecessary + Demoralizing.

24. Provide Signage + Intake paper relating mutual Terms + conditions of respect, Conduct + Privileges between detainees + deputies

25. Assign Key Holders by ethnicity/Affiliation to Maintein order + rules. Self police To reduce Manpower burden on Deputies in minimum Security environments.

26. Senta Rita Needs To evolve its systems + methods away from This Punitive Justice system and demoralizing, inhumane Treatment of citizens and Drug addicts To a modernized system + method of Restorative JUSTICE! Right Now We Have Garbage IN + even worse Garbage going out! This does Not make our communities any Safer! To The contrary, it makes Them less Safe! We Need To Build people up, mAke Them Productive and restore Their Health and Vitality!

EXHIBIT B

Cell Sanitation is at a crisis point. Detainees are only provided cleaning supplies once a week. The supplies provided are insufficient as is the time allotted to effectively clean their cells, sinks, showers, toilets and floors. Blood sucking gnats swarm the showers and cells. Detainees are contracting lice, bed bugs, and flesh eating staph infections from the MRSA virus.

The protocols for sanitation are illogical. Detainees are only given one set of clothes for the week, to include one shower towel. This policy is in stark contrast to most other jails that provide four (4) sets or more of clothes per week.

New clothes are exchanged every Friday. Cell cleaning is scheduled every Saturday. Forcing citizen detainees to clean their cells, floors, bathrooms and showers in clean clothes and then sit in their now dirty clothes for the remaining six (6) days of the week. This is indignant and punitive treatment.

Homeless detainees are exchanged out of their filthy clothes and into clean jail issued clothes without being showered or sanitized. They are then sent to filthy holding cells to sit and lay down in vomit, urine, feces, semen, food and dirt stained

Floors until they are transported to their New Housing unit. They are then introduced to a Dormitory cell shared by as many as 30 other detainees, comprised of regular citizens serving terms for drunk driving, drug possession, domestic violence or awaiting their court dates, etc. Upon arrival to the Dorm unit, known as a 'POD', they are mandated to shower in the singular shower stall shared by all Dorm mates. This spreads Lice, Bed Bugs, and infectious diseases like MRSA; creating an obvious Health Hazard and public safety problem.

In the worst case detainees are exposed to Heroin addicts introduced to the Dorm without any medication. The Heroin addicts involuntarily defecate on themselves, the Floors, Toilets and shower creating an enormous Bio Hazard. Rather then caring for the Heroin addict in the Infirmary, the Detainees are made to tend to the addict, clean up the addict and his messes, and suffer the indignity, smell and infectious disease risks associated with these intravenous drug users. The risk of exposure to Hepatitis, C-Difficil, Pseudomonis, E-Coli and other infectious diseases introduced to their shower and Living environment is an illogical risk to the detainees and public Health, in general.

The Jail is suffering continuous lockdowns due to insufficient resources, manpower, and apparent funding. Consequently, citizen detainees are being "locked down" in their cells in excess of 22 hours a day. Family and attorney visits are being cancelled due to lack of manpower to walk detainees to their visits. In many cases, families and attorneys who are traveling in excess of two (2) hours and/or flying in are being denied their visits upon arriving to the jail. They are given no notice and are having to return home. This is creating frustrations and costs that are unnecessary.

Detainees are being gouged by commissary prices, for personal food and supplies, that exceed 800% mark up over retail store prices. For example, a single pack of Top Ramen noodle soup costs thirteen cents ($.13) at Safeway. It's commissary price is one dollar and thirteen cents ($1.13).

Detainees are being gouged by excessive calling costs. The cost to place a call is twenty three cents ($.23) per minute with a 15 minute limit, and phones are limited. This is costly and punitive to detainees, their families, and lawyers. All calls are also recorded and monitored, precluding detainees from mounting their defense with counsel or speaking candidly or intimately to their

Loved ones.

For Federal Detainees The Jail is required To have a Law Library. It does Not! This precludes Federal Detainees from being able To mount Their Defense, creating a Liability For The Government, in That it gives Those convicted an immediate appeal.

Detainees are being deprived of access To Personal electronics commonly available at other Jails. They are Suffering The ability To remain connected and engaged To Their Families, Jobs and The World, in general. For an, otherwise, innocent Detainee This exacerbates Their personal and professional Hardship. Costing many Their relationships, Jobs and income and precludes Them from accessing The Legal resources and intelligence To defend Themselves. Detainees are requesting reinstatement of Their ability To call, Text, email and use The internet. To carry on Their Lives.

For more information on The Hunger Strike and/or if you suffered under The conditions at Santa Rita and wish To Bear witness please call The Law Offices of _____.

EXHIBIT C

# GRIEVANCES

**TO:** **Alameda County Board of Supervisors**

> **District 1 – Scott Haggerty**
> **District 2 - Richard Valle, President**
> **District 3 – Wilma Chan**
> **District 4 – Nate Miley**
> **District 5 – Keith Carson, Vice-President**

**Alameda County Sheriff's Office**

> **Sheriff Gregory Ahern**
> **Assistant Sheriff D. Houghtelling**
> **Commander Tom Madigan**
> **Captain D. Hesselein**

**From: Inmates at Santa Rita Jail**

**Date:  March 17, 2020**

**Re:  Unbearable Conditions at Santa Rita Jail**

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail.  Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject.  We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure.  We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

The Alameda County Sheriff's Office provides no information or guidance on the grievance process. There is an inmate handbook, but most inmates do not receive an inmate handbook.  And the information in the handbook is very limited.  There is no posted information on grievances or the grievance process, and what information inmates have is through transmission from another inmate, or experience at another facility.  Blank grievances are difficult to obtain.  Sheriff deputies discourage and pressure inmates not to file grievances.  Even when grievances are submitted, the process is such that the jail itself often does not follow its own process, and a carbon copy of the grievance with a tracking number is not returned to the filing inmates.  Even when the filing inmate receives the pink carbon with a tracking number, the jail sometimes does not respond, or responds very belatedly.  We prisoners have difficulty learning what the Santa Rita grievance process is and even more difficulty correctly following the grievance process.

These practices make filing grievances so difficult, in order to raise our voices  and bring attention to the awful, difficult to endure conditions at Santa Rita Jail, we have no choice but to file a group grievance about the daily, long standing, unconstitutional and inhumane conditions of confinement we are subjected to.

Santa Rita needs to evolve its systems and methods away from this punitive and demoralizing jail system with inhumane treatment of citizens and drug addicts to a modernized system and methods of restorative justice! The jail needs to end its culture of cruelty.  The current system does not make our communities any safer! To the contrary, it makes them less secure! Inmates leaving the jail are not better for having been in jail.  We need to build people up, make them productive and restore their health and vitality.

**1. FOOD.** The food here is awful and unhealthy. The food served consists of small repetitive, flavorless portions, day in and day out. The food is high in starch and sugar, low in nutritional value, and fresh fruits are primarily oranges and vegetables are primarily carrot nibs. The carrots are often dry and old. Protein is processed soy powder. The "juice" is colored and flavored powder. The food is cooked until there is no texture and no flavor. Then the food is either served frozen, or served after having been in the oven for hours and hours and is dry and hard. Frequently the food served is spoiled and decaying. Milk is sour. We have found vermin in our food (rat and mice feces, and whole boiled mice in the beans). Since the kitchen workers strike, portions have been so small that many of us are left hungry afterwards. The times for meals is arbitrary and random. Some of us have gotten dinner after 10 pm at night. Some of us have had to wait 12 hours between meals. The trays the food is put into are frequently dirty with the left-over caked-on food from a prior meal stuck to the bottom and that day's meal just slopped on top.

**WE DEMAND:**
a.  regular meal times;
b.  standardized meal preparation - stop placing meals in the oven for hours so that the food becomes dried to a crisp, or meals are served half frozen;
c.  clean trays and better kitchen sanitation;
d.  better quality control – no vermin in our food, no rodent shit, mold or spoilt foods;
e.  greater variety of food;
f.  variations of cold cereals such as Honey Nut Cheerios, Frosted Flakes, Raisin Bran, Fruit Loops, Frosted Mini Wheats, Cinnamon Toast Crunch, etc. ;
g.  hard boiled eggs, waffles/pancakes with syrup, yogurt;
h.  fresh fruits like bananas, blueberries, pears, plums, peaches, melons, grapes, and not just apples and oranges;
i.  fresh salads like Cobb, Caesar, Chef, Asian, Garden, Seafood, BBQ, Santa Fe, and dark leafy greens;
j.  real juice not powdered flavoring to mix with water;
k.  real desserts like Jell-O, pudding, cheesecake, ice cream, pies, cakes,
l.  real meat (and not just soy protein twisted into the shape of a sausage) like chicken on a bone and a more extensive dinner entrée menu and lunch menu; and,
m.  Give us choice in what we eat and grant us the ability to prepare the meals.

**2. SAFE AND SANITARY FOOD.** We have found razors in our food. Inmate workers have to be reliable and trustworthy. Folks from the Protective Custody population have ample reason to tamper with the food of the mainliners or a way to seek revenge, Thus, we of the mainline population deem it to be unwise to eat food that could be spit in and/or poisoned or adulterated by the PC population.

**WE DEMAND**: The PC population be only allowed to prepare food for the peers of the PC population and mainliners only prepare food for the mainliners. Under no circumstances should the PC population have access to the food served to mainliners.

**3. GROUP PUNISHMENT.** On a daily and regular basis, the deputies threaten group punishment, meaning the entire inmate group is punished for the actions of a specific individual or a small group of individuals. The actions of a single individual will result in everyone losing privileges including pod time. A guard's anger and irritation at one individual will result in

everyone suffering. A guard's irritation and anger is easily triggered by asking a question, making a request, or any form of exercise of free speech. Any effort to stand up for oneself, or to stand up for another, even if it is a Constitutional right, or rights which exist under current jail policies and procedures, leads to a guard's anger and irrigation. Too many deputies treat all interactions with inmates as confrontations. So, to stifle inmates, guards punish the entire group with the goal that the group will then retaliate against the individual who tried to assert his rights. We inmates live under the constant fear and threat of retaliation, group punishment, assault, verbal and psychological abuse, neglect and more.

For example, due to HU 7's protest after Halloween about the PC population preparing the food, everyone is being punished by being forbidden to work out in boxers. We are told the new rule is that we have to exercise fully dressed. Since we are only given one set of clothing per week, that means everyone, including those new arrestees who were not even here during the protest is now forced to sweat in our clothes and then wear them for the rest of the week. There is no reason to insist that we exercise fully dressed. This is group punishment, and it is wrong.

**WE DEMAND** that group punishment end. More checks and balances need to be put in place. No deputy should punish someone just due to irritation and impatience. Deputies should stop threatening group punishment. Deputies should stop telling the group to attack or retaliate against individuals. The entire group should not suffer punishment for the action of an individual. Deputies found guilty of group punishment should be subject to discipline. Deputies need to be trained and to practice alternative dispute resolution.

**4. GRIEVANCE SYSTEM.** Blank grievances are hard to get. Even when we do get a blank grievance, the housing unit deputies pressure us to not file a grievance. Too often we are told that the issue is "not grievable". Complaints about the food are refused because Aramark is a separate company. We do not have adequate writing instruments to write a grievance, only stubby pencils and often broken pencil sharpeners. If we finally submit a written grievance, many times we do not get the return of the pink carbon copy with a tracking number. And if we do, the jail takes whatever time it chooses to respond, if there is a response at all. And generally, all grievances are denied.

The jail does not provide information on the grievance process, including the appeals process. Most of us have never been provided with an inmate handbook. There are no informational posters on the wall.

Moreover, the whole grievance process is completely bias, for its administered, investigated and reviewed by the very same agency and/or deputies an inmate likely has a grievance against. It's nearly impossible to receive a favorable or fair disposition.

The grievance process is broken. If the grievance process is for no purpose, and that there is no possibility of any real change, then say so, and everyone can stop pretending.

**WE DEMAND** genuine checks and balances. Either an outside agency be appointed to handle the grievances and inmates have an advocate, who inmates can ask for the welfare of inmates.

**5. SANITATION.** The parts of Santa Rita Jail that the inmates use are filthy. The jail makes inmates responsible for cleaning our cells but refuses to provide enough cleaning supplies,

cleaning tools and only on an irregular and infrequent basis. When supplies are provided, they are provided for too short a period of time. Some of us do not receive cleaning supplies for weeks on end. With 30 people in a cell, or a pod, that leads to inmates living in filth and squalor. Too often, homeless people off the street are simply placed into the housing units without having first had the opportunity to wash. New arrestees detoxing from drugs are simply placed into the cells and are often sick with diarrhea or vomiting, causing the cells to be filthy. As a result, disease, skin infections, and similar issues are common.

The holding cells, the multi-purpose rooms, the cells in ITR are also filthy. Holding cells and often the multi-purpose have feces, old moldy food, garbage, and they stink. Inmates are held in the multi-purpose room for long periods of time and there is no bathroom in the multi-purpose room. Inmates end up having to relieve themselves in garbage cans or in the corner. This is awful and wrong. These rooms need to be cleaned several times a day.

The "shower" in ITR is so filthy, that no one ever uses it, and no one can use it.

**WE DEMAND:** Inmates should have the ability to clean each and every cell which inmates live in and use, every day, including the multi-purpose room, dress-out cell, all holding cells, cells in ITR, PODS and housing units. Daily: Hot mop, pressure wash, bleach, pick up the garbage. Sufficient and good quality cleaning supplies and tools such as: mops, brooms, dust pans, toilet brushes, sponges, Clorox bleach, Lysol wipes, air fresheners, soap dispensers, paper towels, puncture-proof gloves, should be available at all times. Other jails including San Francisco and San Mateo have cleaning supplies always available so that inmates can clean their cells, their bathrooms and the common areas, every single day, whenever. All incoming inmates must shower and clean hands, fingernails and toe nails before receiving clothing and housing unit assignments. Jail needs to control bed bugs, lice, staph, and other infectious diseases. Stop arresting the homeless! And if they are arrested they must be clean before being placed in housing units.

**6. CLOTHING.** Santa Rita Jail is very cold and we are provided with inadequate clothing. We are cold! The only foot wear we are given are flimsy, used foam rubber flip flops, which are very slippery. You cannot run in them, you cannot exercise in them, you cannot play sports, and with the water on the bathroom floor, and most floors in the jail being slick, hard concrete floors, inmates regularly slip and fall with flip flops.

**WE DEMAND** We need adequate clothing, especially in the winter time. two (2) full sets of clothing weekly and a coat, sweater, thermals and a beanie to deal with the cold. We demand that the Sheriff's Office return rubber sole shoes to inmate population. (San Francisco allows inmates to have shoes with laces that tie.) The shoes need to be slip on or Velcro strap, or have shoelaces. They would reduce injury on the yard during recreational activities like basketball and keep one from slipping and falling on the majority of the smooth surfaces which we are forced to walk on. It would also assist with our physical exercise, for working out in flip flops is not an option. Moreover, because the cells and housing unit floors are so filthy, it is not an option to workout barefooted.

**7. PERSONAL HYGIENE.** Living in such close quarters with so many people, it is difficult to maintain personal hygiene, because the jail does not provide the means to maintain personal hygiene. All inmates have to purchase soap from the commissary, which is expensive, small in

quantity and of poor quality.  The commissary also does not provide the necessary products for Black hair.  Sanitation of the  hair clippers is not provided

**WE DEMAND:**  We demand daily access to personal disinfectants, quality hygiene products and equipment such as Whal/Andis/Oyster Brand Hair Clippers, trimmers, T-liners.

- Bar soap.  Other county jails provide – free – small bars of soap, which work better and are cheaper to use than the poor-quality liquid soaps Santa Rita force inmates to buy.
- Topical antibiotics, bandaids, athlete's foot spray
- Hydrogen peroxide/disinfectant
- Personal sanitation supplies
- Barbicide for hair clippers; Disinfectant sprays and sanitizer solutions for barber equipment
- Maintenance oils and cleaning brushes for the hair clippers;
- Hand sanitizer dispensers
- Gaskets/wet wipes/2-ply toilet paper
-

**8. MATTRESSES AND BEDDING.**  We sleep on  metal or concrete.  The mattresses are..too thin..too old..too dirty.  Many of us have developed back pain.  Back pain prevents us from being able to sleep, when we are able to sleep.  The poor-quality mattresses also leads to regular and constant conflict with inmates requesting and needing two mattresses.  A better-quality mattress would eliminate that issue.

**WE DEMAND:**  The same mattress as the ones in Fremont City jail whose mattress are more than 6 inches thick.  This is to reduce the need of inmates requiring double mattress and reduce inmates developing back problems. Exchange Blankets monthly.

**9. EXCESSIVE CHARGES AND POOR QUALITY CANTEEN.**  The jail gouges inmates, most of whom are very low income, many of whom are homeless.  Telephone costs and canteen costs at Santa Rita are higher than at San Francisco or San Mateo.  The sheriff just raised prices of the already high costs of the canteen.  And because the food served at Santa Rita Jail is so lousy, many inmates are forced to use their family's money to buy canteen in order to stay alive.  A package of ramen in the store that costs $0.20 costs $1.13 in the Santa Rita canteen.  Not only is the canteen outrageously high pricing and over-charging for dollar store items, the quality and selection is very poor.  The food selection is unhealthy.  It's vital for people to maintain family contact and the costs of the phone calls is a prohibitive barrier.

**WE DEMAND:**  Lower prices, and greater quality and selection of goods and products in the canteen, and lower costs for telephone calls.  Stop profiting off of poor inmates.  Prices at commissary should match the federal rates.  Telephone rates should be no more than the lower of San Mateo or San Francisco.

**9. EXCESSIVE LOCKUPS.**  Santa Rita Jail locks all inmates up, every day, some in overcrowded cells, others in tiny cells, for too many hours.  Some days, we are locked up all day, 24 hours.  Santa Rita Jail treats all inmates as objects to be warehoused and every inmate, including all pretrial inmates who are constitutionally presumed innocent, are punished by being excessively locked up in our cells, deprived of real exercise opportunities, deprived of outdoor exercise.  We all suffer from enforced idleness, lack of programs and services.  We're not

animals. Our movement is already very limited as is. Having a scheduled and regular out of cell time and access to the yard would give us a small a measure of normalcy and a way to plan and/or schedule a full functional day, and a small measure of humanity.

**WE DEMAND** full daily access to the day room and outdoor big yard for all inmates including maximum classification inmates. Inmates should be allowed access to the day room 10 hours a day. Inmates need access to sunlight, every day.

**10. ENFORCED IDLENESS.** Santa Rita Jail punishes all inmates, including all pretrial inmates not only by excessively locking us up in our cells, but by the lack of activities, lack of exercise opportunities, lack of outdoor exercise, lack of programs and services. This enforced idleness and warehousing of people creates mental stress, depression, and tension, which feeds conflict between inmates and between inmates and deputies. Furthermore, instead of being to use our time in jail productively to work on problems and make us more able and ready to be responsible citizens, we leave the jail homeless, impoverished, and mentally and physically debilitated.

The jail will say, that every housing unit has a television set. However, while that is true, Santa Rita operates in all ways to make it harsh and as difficult as possible for inmates. The television sets are mounted so that it is hard to see, and almost impossible to hear.

**WE DEMAND:** comprehensive "inmate services" department.

a. More educational programs, including career and skills classes not just barbering and baking;

b. Enough educational classes so that everyone who wants to take a class can do so, right now there are so few classes most inmates are excluded;

c. Legal Information & Access which respects our right to confidentiality:

   i. Free legal clinics with actual attorneys, paralegals and law school students, so we can understand our judicial system, ask questions and become more knowledgeable;

   ii. Law Library -   Where we can do our own research and gain access to legal materials.

   iii. Free legal assistance.  For example, in San Francisco, the county provides Prison Legal Services that will perform legal research, make copies, and assist inmates.  In addition, each inmate has the opportunity once every two weeks to directly engage in legal research and to personally make copies with the assistance of Prison Legal Services;

   iv. Assistance so we can try to resolve and solve issues with our families, including divorce, child custody, and notary services;

d. Incentive program so that inmates who take classes and engage in productive activities and develop good score ratings are housed with greater privileges and freedoms.  There are no incentive programs currently in Santa Rita Jail;

e. Recreational services hosted such as: music, board games, chess tournaments, physical fitness, competitions, sports events, trivia challenges, yoga, meditation, Tai Chi, Insanity,

Basketball teams, baseball teams, flag football teams, soccer teams, fencing, pool, table tennis, frisbee. More books and magazines. Movies, nature programs. Upgrade Television sets so you can see and hear.

f. Increased inmate services for indigent inmates including free weekly postage, five (5) free phone calls a month; writing and drawing materials including paper, pens, and coloring material. Assist inmates in expanding the inmate welfare fund by aiding inmates to seek out aid and sponsorship via charities, organizations and government funding. Indigent inmates should not be denied any liberties afforded inmates with money due to financial status. Nor should those liberties be subpar and/or mediocre. Teach inmates the basics of entrepreneurship including the development of a business plan, filing requirements, funding requirements and all things needed to establish a business.

**11. LACK OF JOB TRAINING.** Santa Rita Jail's lock-ups and enforced idleness makes people crazy. This is the source of tensions, conflicts, fights, arguments, depression, anxiety and suicidal ideation. The jail uses enforced idleness to intimidate, harass and threaten all inmates. This leads to a routine hostility between guards and inmates. Over time, Santa Rita Jail has progressively removed programs and potential productive activities so that inmates leaving Santa Rita Jail are worse off than when they arrived. The job training teaches out of date skills, and are sexist. Women receive parenting and baking. Men can take barbering. These existing job classes are inadequate for the current job market.

**WE DEMAND:** job training and job programs for inmates to participate in regardless of classification status; programs and services that give inmates real world skills and trade accreditation, accolades, certifications, experience and even jobs upon release. These programs and services should be based on hours and do not require lengthy wait periods for an inmate to be admitted. Inmates should be able to pick up where they left off if released from custody or recidivisms occurs. All work and study should be made transferable to apprenticeships and colleges. Examples of programs and services:

> Plumbing, HVAC, Landscaping, Computer Science, Carpentry, Automotive Mechanic, Gardening & Botany, Software Programming, Roofing, Masonry, Welding, Culinary Arts, Architecture, Accounting, Diesel Mechanic, Renewable Energy, etc.

**12. PUNISHMENT, PUNISHMENT, PUNISHMENT.** Santa Rita Jail is wholly focused on punishment and deprivation. There are no incentives for good conduct, no incentives for self-improvement, no means for improving the human relations between guards and inmates. This leads to increased hostility, tension, and fights.

**WE DEMAND** incentive programs so we can be rehabilitated. This can include good time credits, or some form of a "forgiveness initiative" for the participation and completion of these programs which allow offenders to withdraw their pleas to certain offenses and obtain certifications of rehabilitation and pardon/leniency. We're demanding to be given options to salvage our lives and utilize our time in custody constructively to reduce recidivisms and become productive members of society.

**13. DEHUMANIZING PRACTICES.** No other county jail strip searches inmates after each legal visit, each and every court hearing and after every work shift. This regular and frequent strip searching is dehumanizing.

**WE DEMAND** Adopt best practices. – Get Body Scanners (i.e. San Mateo)

**13. SLAVE LABOR.** Santa Rita Jail creates division and hierarchy with the way it structures work. Some inmates are POD workers, giving them power and control, and also the ability to profit from their work. Inmate workers are treated like dogs, and given "food treats" for working. Kitchen workers, over Halloween, went on strike. This is an example where people feel taken advantage of, and abused. It also leads to a situation where the jail is always trying to pressure inmates to "volunteer" and the quality and caliber of the work is poor, and the jail then is poorly run. This is demonstrated by the marked decline in the quality of the food since the strike. Portion size is now irregular. Time when meals arrive is irregular. The quality of food is much worse.

      **WE DEMAND** that work also be incentivized, either by providing all workers with payment and/or good time credits/and or discounts on the canteen, this would include all inmates who contribute to the jail, including cleaning inside the housing units. Give inmates valuable work experience and a sense of pride and responsibility that comes with honest work. Ultimately, this gives back to the community by encouraging inmates to actively engage in the daily activities of the jail and getting inmates prepared to return to the community and workforce as productive members in society. All inmates should have access to work!

**14. MAIL, VISITATION AND FAMILY CONTACT.** The jail treats family visits as a burden which it wished could be eliminated and has set up the visiting program to be limited, cramped, difficult and expensive. Many of us have had loved ones travel to the jail only to be told that visitation is "canceled". Or that the inmate "refused" the visit, when in truth the technician or the deputy did not want to bother with bringing that inmate to the visit, and falsely declare that the inmate "refused" a visit. Family love and family connection are really important for inmates to keep our humanity. Cards and letters and photos are really important. Yet, when the deputies "shake down" a cell, they routinely destroy or confiscate cards, letters and photos. Instead, the jail should be encouraging our family contacts and encouraging our connection to our community. Family connections and community connections assist in preventing recidivism.

We are not animals and even if we were…animals need to be loved too. We demand an end to being devoid, desensitized and dehumanized by the lack of human contact. It's not right that we, cannot embrace our family and loved ones especially since we are not convicted. For example, Kyle Puckett was a pretrial detainee and his case was eventually dismissed. The five years he was in custody in Santa Rita Jail, he never got to hug or hold his son. We demand that we're treated as it is deemed: "Innocent until proven guilty."

      **WE DEMAND a** more compassionate and intimate visitation service. Such a service would be sensitive to the needs and hardships of the inmate's family and inmate themselves. Services would include, but not be limited to: "Family Days" that would allow all participating inmates full contact with visitation with their family and loved ones regardless of classification, save for inmates in ad seg for disciplinary purposes. We seek conjugal visit privileges, transportation services for family and loved ones with hardships and/or disabilities, meaningful visits not just 15 minutes over the phone and outside food services for visiting families and inmates.

      Inmates should not be forced to "miss" video visits or in person visits due to technician and deputy failures:

- Stop placing prisoners in lockdown within 6 hours of visit
- notify prisoners they have upcoming video visits
- allow video visits to begin in lockdown
- Technicians should be set up so they are alerted to when video visits begin
- Technicians and deputies should be disciplined for declaring that inmates have "refused" visits when this is not true.

For blues – stop turning off the phones, promote family communication.

Allow prisoners easy access to call attorneys. Top recording legal phone calls. Implement the federal system to allow inmates email access.

Stop using mail as a means to manipulate inmates. Mail needs reliable and on-time delivery especially for newspapers and an expedited method of sending mail.

**15. DEPUTIES AND TECHNICIANS ABUSE OF POWER.** While the inmate guidelines say that disrespect for deputies can and often does result in discipline, there is no comparable requirement that deputies act with respect for inmates. A technician who yells "suck my dick", is not disciplined, and the inmates who complained are threatened. We inmates are often subject to being cursed at, ignored completely, answered with "smart" demoralizing remarks, etc. by technicians. They often disregard inmate requests, fail to open calls for inmate video visits, persuade stand-in deputies on how to run programs to punish and/or get even with inmates (i.e., split tier/one pod), limit inmate free time, cutting off phones or TV unnecessarily and all other manner of psychological warfare. When inmates push the medical emergency button, the technicians often, and regularly disregard us, until the entire housing unit has to scream "Man Down!" Technicians and deputies ignore medical emergencies, and take their time, walking to the cell when someone has a medical emergency. Technicians and deputies falsely claim that inmates "refuse" family visits or legal visits to avoid having to do the work.

 **WE DEMAND** that abuse of power, dereliction of duties, the display arrogance and verbal abuse, by technicians and deputies not be tolerated; that deputies and technicians also be held accountable. Respect must be given in order to be reciprocated. Inmates should have relief from this type of abuse. Provide signage and intake paper stating mutual terms and conditions of respect, standards of conduct and privileges and rights between detainees and deputies.

**16. COMMUNICATIONS WITH DEPUTIES AND JAIL STAFF.** Deputies and jail staff treat every question or request from an inmate at best as an imposition and annoyance, and at worst as an affront and challenge. There is no positive or healthy means for inmates to communicate or interact with jail staff.

 **WE DEMAND** an Inmate Council, which every California prison has, and which Santa Clara County has instituted, to promote self-regulation, better communication and conflict resolution between inmates and staff.

**17. JEWS & MUSLIMS** need equal ability to practice their religions including: prayer rugs, Rabbis and Imams to lead services and religious counseling.

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we <u>all</u> endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| Milt Martini | [signature] | A54-1415 |
| Mark Lew | [signature] | AMD 054 |
| Robert Chandler | R | ARS-353 |
| RANDAL CAIRES | Randal Cay | ALK 814 |
| Jason Aruley | [signature] | NMC575 |
| Robert Laubach | [signature] | BBX 788 |
| Jorge Martinez | for work | UMD 126 |
| Angel Fuentes | angel Fun | BKF02-G |
| Benjamin Nuno | Benjamin Nuno | UMC 229 |
| KYLE WATKINS | K Watk | BFL030 |
| Jaime Avina Barajas | Jaime Avina Barajas | BMK552 |
| David Haines | David Haines | BJF536 |
| Simon Robles | Simon Robles | BZU935 |
| [illegible] | [signature] | BBN062 |
| Terrance Rose | [signature] | UMC372 |
| Dejon DisBurke | Dejon Burk | AWC-786 |
| JASON W. Wells | Jason Well | AUE-356 |
| Anton O'poole | Conte Poole | BFA980 |
| Cauasy Brewer | [signature] | 510 761 |
| Derrick Simmons | [signature] | BIQ698 |
| HENRY | Squilla | UMC 388 |
| Freddy Walters | [signature] | BFW507 |
| Douglas Gladden | [signature] | BhfG95 |
| Oscar Madrigal | an | UMD042 |
| TRAMAYNE BAKER | [signature] | BAV746 |

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| Christopher Kemp | C Kemp | VPC428 |
| Michael Kelly | M Kelly | BKD710 |
| Jewn Toury | | UMN 134 |
| Raymond Carter | | BM1026 |
| Cameron Garrett | AVR22t5 | |
| Dominick Walker | | BBNU52 |
| Conway Brewer | | BLU-761 |
| Deon Dershveler | | AWC-750 |
| Brian Johnson | | BIJ732 |
| Fontana Hill | | ALVN874 |
| Edwin Lee | Edwin Lee | AUR 95 |
| Chris Andalis | | BED609 |
| Josue Cardenas | J.C. | BL5238 |
| Diondre Stewart | | BJL460 |
| Richard Reynoso | | RBX207 |
| Simon Robles | | BIU-935 |
| Darrell Hargrove | | UGK-900 |
| Carl Beierfield | Carl Bein | ULM 812 |
| Raven Gonzales | | BLW488 |
| Hernandez Luis | | BCH314 |
| Jimmie Jones | Jimmie Jones | ULY 525 |
| Lee Watkins | | BFL030 |
| De'Shana Allea | | Bm B633 |

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
| --- | --- | --- |
| Burt'E Gucci Rhodes | B.R | UMB960 |
| Ishmael Durmas | Ishmael Durmas | BBR440 |
| EDWARD ALLEN | Edward Allen | BKT309 |
| Rodrick Long | Rodrick Long | BGU718 |
| LEONARD JOHNSON | Leonard Johnson | RJF427 |
| Albert Williams | Albert Williams | AYY264 |
| Kevian BYRD | Kevian Byrd | BLE480 |
| Jose Rodriguez | Jose Rodriguez | BKG555 |
| Gregory Dawson | Gregory Dawson | BGF-431 |
| Anthony Lopez | | UML064 |
| Raydean Omar Lindsay | Raydean Lindsay | BKC-043 |
| Abdiel Guerrero | Abdiel Guerrero | BKK784 |
| GIANG, HUNG | 7cg | BGB188 |
| Ishdue G. Wilson | mk | BFX5&0 |
| MAURICE BIBBS | M | UGT817 |
| William Turner | | BCN-530 |
| Kelvin Banister | Mac B | BCX042 |
| Alonzo Thuongkhim | Alonzi Thuong | BNX721 |
| Richard Ramirez | RR | BM0806 |
| Danicholas Evans | Danicholas Evans | BME851 |
| Waiman Bloater | Waiman Bloater | BNB57 |
| Darkaun Barnett | Dawn Barnett | BJS-526 |
| Jayden McDaniels | JM | BMJ657 |

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| Bennie Walker | | BLN 974 |
| Rickey Jackson | | BLE087 |
| Elijah Henry | Elijah Henry | BLT848 |
| Pearl Mahone | | AYS 686 |
| Shedrick Henry | | AVA-752 |
| Antoine Felix | | BiA746 |
| Curtis Taylor | | BLE377 |
| Rashad Albert | | BJD809 |
| Errol Anderson | Errol Anderson | AYR629 |
| Vernell Cloy | V. Cloy | BJC971 |
| Donald Sims | | BHB383 |
| Nathaniel Dudley | | BMB814 |
| Andre Poole | | BGQ970 |
| Jerry Harbin | | BGH530 |
| Michael Pruitt | | BML639 |
| Siamak Montes de Oca | | BJQ128 |
| Orion Huche | | BJW748 |
| Dominick R. Wilson | | BLX785 |
| Maurice A Powell Jr | | UMC 431 |
| Hillard Webb | Hillard Webb | BMG321 |
| Andrew Peter | | BJC988 |
| Ezahna Evans | Ezahna Evans | ULZ822 |
| RANDALL E. SHUMPERT | | UMC341 |
| Mynyamani Stevenson | | Bmm664 |

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| Burl'E Gucci Rhodes | B.R | UMB960 |
| Ishmael Durmas | Ishmael Durmas | BBR440 |
| EDWARD ALLEN | Edward Alin | BKT309 |
| Predrick Long | Predrick Long | BGU718 |
| LEONARD JOHNSON | Leonard Johnson | AJE427 |
| Albert Williams | Albert Williams | AY4264 |
| Kevian BYRD | Kevian Byrd | BLE480 |
| Jose Rodriguez | Jose Rodriguez | BKG555 |
| Gregory Dawson | Gregory Dawson | BGF-431 |
| Anthony lopez | | UMC064 |
| Rayduan Omar Lindsay | Rayduan Lindsay | BKC-043 |
| Abdiel Guerrero | Abdiel Guerrero | BKK784 |
| GIANG, HUNG | Teg | BGB188 |
| Willie G. Wilson | | BFX5S0 |
| Maurice BIBBS | M.B | UU817 |
| William Turner | | BCN-530 |
| Kelvin Banister | Mac B | BCX042 |
| Alonzo Youngblood | Alonzo Youngblood | BVL4721 |
| Richard Ramirez | | BM0806 |
| DaNicholas Evans | DaNicholas Evans | BME851 |
| Wayman Blocker | Wayman Blocker | BLK57 |
| Davaun Barnett | Davaun Barnett | BJS-526 |
| Jaylen McDaniels | | BMI657 |

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| John W. Miller, Jr | John W. Miller Jr | AME-406 |
| Alex Fernandez | | BJW353 |
| Enrique Sandoval | | AXV-433 |
| Marcel Rutherford Chen | | BLQ811 |
| Demetrice Thompson | | BKM280 |
| Gibson | Keith H. | BGW-699 |
| Otis | Otis Wright | BLI068 |
| | | |
| Anthony Dennis | | BLA638 |
| Jimmie Foster | Jimmie Foster | BLS474 |
| LARANTE STADESVILLE | | RLK878 |
| Ray Webb | Ray Webb | UMD002 |
| Mike Miller | | AWX627 |
| Lance Green | | ULW571 |
| Jerome Slayter | Jerome Slayter | UMC576 |
| R.M Roderick Maggay | R-M | ULW183 |
| Luis Cardenas | Luis Cardenas | BMJ673 |
| Richard Myers | M. R. Myers | ULW862 |
| Tyler Dickens | | BMG516 |
| Andre Cook | Jim Cook | UMC206 |
| Daniel Chavez | Dn Chavez | UMA611 |
| Joel Garcia-Lopez | | BHY333 |
| John Blacknell | John Blacknell | BLR401 |

Cp2

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we _all_ endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| Re | | |
| Robert Redmond | Robert Redmond | ARK-059 |
| Jimmy Mullins | Mull | ULG-130 |
| JAMES Robinson | James Rob | BAH-726 |
| Manuel Salot | | BMD-440 |
| Jamar Maddox | J. Attin | BD-055 |
| Marcus Bryant | M.T. Bryant | ANY-557 |
| Sean Collins | | UMB-955 |
| Kali Ponder | Kali Po | DLB228 |

v - roa

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| GEORGE BLANK | _[signature]_ | BBLU446 |
| Donald Smith | _[signature]_ | BAO-879 |
| Daniel Lesley | _[signature]_ | BLG-058 |
| TERRELL MARTINEZ | _[signature]_ | AU2551 |
| Michael Pitre | _[signature]_ | AW6384 |
| Chris Moss | _[signature]_ | BTT-024 |
| John Lee | _[signature]_ | VMC493 |
| Aaron Burks | _[signature]_ | BEE574 |
| Jacobi Graines | Jacobi Graines | BMP-055 |
| Fard collins | _[signature]_ | BJL705 |
| Jermaine Godfrey | _[signature]_ | |
| Darryl Hickman | _[signature]_ | BFK463 |
| Alexander McGee | _[signature]_ | BGNS80 |
| ARTHUR JACKSON | _[signature]_ | BMC-167 |
| Dijon Newton | NR | BGV-814 |
| Treshawn George | _[signature]_ | BJZ559 |
| Dishawn Richman | Richman | BLR-010 |
| Marquice McClinton | _[signature]_ | BEI-497 |
| Jacorian Frazier | _[signature]_ | BGW-930 |
| Juan Rodriguez | _[signature]_ | BMC837 |
| _[illegible]_ | _[signature]_ | ALU772 |

E-pod

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| Djontay Shackelford | D. | BAV816 |
| Arthur Malcolm Crenshaw | Arthur Crenshaw | VMD-098 |
| Matthew Pierce | Matthew Pierce | BHI-608 |
| Larorn mcglothin | Larorn mcglothin | Bgp 265 |
| Keith Smith | Keith Smith | BDJ-538 |
| Julio Rodriguez | Julio Rodriguez | BFH425 |
| Juan martinez | | BKR568 |
| Omar A. Bonilla V. | | BIE 024 |
| ARMONTE PUGH | | BLF521 |
| Eduardo Vazquez | | BLL-157 |
| Julian Robinson | Julian Robinson | BAF955 |
| Alofa Muli | | BEV684 |
| Baysa Man | | VMD 118 |
| JORGE L. ALFARO | Jorge Alfaro | BDR777 |
| JASON HATHORN | Jason Hathorn | BER424 |
| DEARUN DUMAS | Dearun Dumas | ANH397 |
| Andre Martin | | BMG482 |
| Fanuaee L Ifopo | | BCQ661 |
| Dijon Holifield | Dijon Holifield | BG4853 |
| Alkehm Session | Alkehm Session | BLG672 |

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| DARRELL HARGROVE | Darell Harg | AGK-900 |
| Christopher Kemp | C. Kemp | 4AC-428 |
| DE'Shawn Franklin | Deshawn Franklin | BJH043 |
| HENRY FORD | Henry O Ford | BAC204 |
| Jametrius Taylor | | Bat908 |
| Troy Kelley | Troy Kelley | Aux4bc |
| Dejon Disburka | Dejon Disburka | Awc-756 |
| Eddie S. Obetton | | BFC-948 |
| Oontaye L. Turner | | BHT-504 |
| RaMayne BAKER | | BAV766 |
| DeAndre Torrence | DeAndre Torrence | ARA-725 |
| Charles Crane | | 745 |
| Douglas Gladden | D~ | Bhf-695 |
| JIMMIE JONES | Jimmie Jones | ULX525 |
| Brian Johnson | | BIJ732 |
| Vonderrick Vickers | | BBN052 |
| Jo'Vay HENDERSON | | PFN UMC928 |
| Gabriell Benitez | | BM0844 |
| Fontana Hill | | AW2N874 |
| WAHAB MOJADDIDI | Wahab | BCE-398 |
| Hector Mandron | | BLZ700 |
| Izayah Hayes | | BMJ074 |
| LINCONA MARTINEZ | Carlos | UMC474 |

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| Brenis F. Merida De Leon. | Brenis | BKB833 |
| Rodulio Alexo Garcia | | UMD109 |
| Carlos Alberto Limon | Carlos Limon | UMC248 |
| De'Shaun Allen | | BMB633 |
| Michael Seymour | M Seymour | AND531 |
| Cameron Garrett | Cameron Garrett | AYR225 |
| De'Shawn Franklin | Deshawn Franklin | BJH043 |
| CHRISTOPHER ANDRUS | | BED609 |
| Diondre Stewart | Diondre Stewart | BJL460 |
| Adelfo López A. | | UMC525 |
| RANDAL CAIRES | Randal Caires | ALK814 |

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| Vishal Ramkrishna | | 079. |
| Gerardo Diaz Hernandez | Gerardo Diaz Hernandez | BMA782 |
| Jorge Martinez | Jorge Martinez | VMD126 |
| Francisco | Heredia | UMC 346 |
| Derrick Simmons | | B10698 |
| Darrien Smith | | B5L893 |
| Carrieto Alex | | UMC 282 |
| Manuel Titonga | Manuel | UMC 386 |
| Brayan Lopez | | UMD 034 |
| Alan Osorio | | UMC 385 |
| Axel Ramos | | BMG645 |
| Luis Amonbo Lopez | | BMP861 |
| Martin Hernandez | Hernandez | UMC451 |
| Miguel Vazquez | | UAB 179 |
| Jaime Avina Burajas | Jaime Avina Burajas | BMK551 |
| Oscar Madrigal | | UMD042 |
| Luis Ortega | Luis Ortega | UMC-542 |
| Alejandro Alvarez | Alejandro Alvarez | UMD-103 |

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we _all_ endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| Daniel Gonzalez | Daniel Gonzalez | BEZ 543 |
| José Quezada | | UMC 544 |
| Nathaneal Avila | Nathan Avila | UMB879 |
| Benjamin Pearsall | BEN PEARSALL | UMC525 |
| David Price | David Price | ULY465 |
| Chad Sunderland | Chad | UMC 269 |
| Arnulfo Estrada | Arnulfo Estrada | UMD 031 |
| Alexander Mazaragos | Mazaragos | UMO.880 |
| Tu minh Do | TMD | BGC 969 |
| Billy Durflinger | Billy D | BGE 413 |
| Michael Swenk | Michael Swenk | UMB963 |
| Eddie Edwards | Eddie Edwards | BHE 230 |
| Roger Karlson | | UMC96 |
| Britt Dunn | Britt Dunn | UMB917 |
| Steven Wolverton | | AYX836 |
| Andrew Franklin | Andrew F | BJK919 |
| Marcus Felder | Marcus F | UJK034 |
| Josue Cardenas | J.C. | BLE238 |
| Wayne Smith | Wayne Smith | ATP484 |
| Adam Nelson | adam nel | BCW098 |
| Hassdulgah Nasir | | BIQ709 |
| John Long | John Long | AJN630 |
| Raven Gonzales | | BLW488 |

WE DO NOT [illegible] WITH [illegible] BODY SCANNERS
WE DO NOT WANT BODY SCANNERS AT ALL !!!

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
| --- | --- | --- |
| Robert Ruhitte | [signature] | UMC 549 |
| Christopher Jensen | [signature] | BFX 341 |
| Ryan Chandler | Ryan Chandler | UMD022 |
| Marus Smith | Man Smith | VLZ 152 |
| Erasto Campos | Erasto Campos | UMC477 |
| Bradley Grassexchi | [signature] | BJF681 |
| Talalelei Iopu | Talalelei [signature] | UMD065 |
| Raven Gonzales | Raven G | BLW488 |
| Matthew Shell | Matt Shell | BMN080 |
| Jose Wentworth | [signature] | GNC 415 |
| Luis Nunez | [signature] | UMC-207 |
| Vishal Kandeshwar | [signature] | UMC-C79 |
| Eric Dennis | Eric Dennis | AVU268 |
| STEVEN CASEY | [signature] | BHW638 |
| Leonidas Macadiago | [signature] | UMD015 |
| Terrel Luis | [signature] | UMD 015 |
| Damian Baleas | [signature] | UMD 032 |
| William Brown | William Brown | UY-814 |
| Immanuel Simmons | [signature] | 0106JSS47 |
| Sherard King | King | HK-605 |
| Deamous McKinley | Deamous McKinley | AVB-702 |
| MEHARY ETHIPES | [signature] | UFN 405 |
| Shane Crutty | [signature] | UMD091 |

We are all inmates under the custody of the Alameda County Sheriff's Office: Santa Rita Jail. Our ultimate goal is to improve the overall conditions unto which all inmates of this institution are subject. We therefore, as inmates, affirm our consensus that the issues we list in this grievance, are common to all of us, and are the most significant issues we all endure. We are filing a group grievance because of the difficulty with filing grievances within Santa Rita Jail.

| Name (please print) | Signature | PFN |
|---|---|---|
| Robert Morris | Robert Morris | LLW916 |
| DARREll Buckley | Darrell Buckley | AVL880 |
| Dontay Sawyers | Dontay Sawyers | BHH600 |
| Julius Beham | | BIIP-110 |
| Ernest Fobbs | | UMC417 |
| Gerald Paynes | | RLU430 |
| Carlo Serrano | | BKU828 |
| LAMAR JOHNSON | | UMC220 |
| Ron Christian | Ron Christ | RMP540 |
| Jemel Pettaway | | BIY352 |
| Roderick Briseo | Roderick Rivas | ULV587 |
| Justin Dorsey | | BLZ494 |
| Ed Morales | | AXTY00 |
| Shane / acc 11 | | BBI-474 |
| Samuel Lunes | | AUU922 |
| ABAYomi Brown | | RAE544 |
| Jeffrey Chavez | J.C | Big234 |
| GARY CROCKETT | | BLS223 |
| | | |
| | | |
| | | |
| | | |

# Sanitation Lawsuit 34 East

**Name:** Richard Garcia

**PFD:** BDZ-395

**Complaint:** Mice poop on our cake and food, our trays are always dirty from left over food. weevils in beans, cleaning supplys never come. Also, They threatend us with an extra 30 days loss of time if we do not work in kitchen.

**Name:** Angelo Tollardo

**PFD:** BFF-171 - 34 EAST - E1 - L

**Complaint:** lack of cleaning Supplies, Nats on our food, Food Tray are dirty, Rat Feces on food in the Kitchen. Everyone getting sick in the pod letting people work while there sick, I caught hives from landr[...]

**Name:** MIKE ROACH

**PFD:** BGJ-431

**Complaint:** PEOPLE COMING INTO JAIL KICKING FROM HEROIN ARE PLACED IN GENERAL POPULATION. IT IS COMMON KNOWLEDGE THOSE KICKING HAVE UNCONTROLABLE BOWEL MOVEMENTS. WHICH EXPOSE EVERYONE AND DEPUTY SHERIFF'S EXPECT FELLOW INMATES TO CLEAN THE PERSON UP.

**Name:** EDMUND LUIS

**PFD:** ULX 882

**Complaint:** WE DON'T GET CLEANING SUPPLIES FREQUENTLY ENOUGH, LEADING TO POOR AND FILTHY LIVING CONDITIONS. THERE ARE GNATS THROUGHOUT THE POD, WHICH ARE A HUGE NUISANCE. I HAVE SEEN MICE TWICE - ONCE IN THE LIVING AREAS AND OUT IN THE HALLWAY. WE ALSO GET IMPROPERLY CLASSIFIED INMATES WHO ARE PLACED IN OUR MIDST, WHO THEN CREATE A BIGGER MESS (POOR HYGIENE, BEING A PACK RAT, ETC.).

NAME: VINCENT JOHN BARRON / (559)313-9237
PFN: BMG-635 / APRIL 2019 - APRIL 2020
COMPLAINT: SPOILED FOOD, CLEANING SUPPLIES UNATTAINABLE
EXTREMELY IRREGULAR FEEDING TIMES
UNHEALTHY/UNSANITARY LIVING ENVIRONMENT

NAME: Peter Craig Ford / 510-314-2704 / 510-706-3871
PFN: AVB240 / April 2018 - ?
COMPLAINT: No mental treatment, pre-scheduled surgery for major hair
loss /Tinnitus canceled, Very unsanitary conditions caus
bad noro-virus and Strep throat, passed out and left
untreated. 45LB weight loss due to lack of treatment.

NAME: VINCENT MARTIN
PFN: ALT186
COMPLAINT: Infestation, flying insects and other vermints lack of
cleaning supplies never available miss classification screening
on inmates being housed.

NAME: MIGUEL RUBIO
PFN: BIL568
COMPLAINT:

NAME: Joshua Dalando Harris
PFN: BKC448
COMPLAINT:

ANDRe Jonzales BDQ758
UNACCEPABLe mealtimes AND
UNSAxlatary living cenditions

Name James Traylor
PFN BAF 220
complaint: Dirty trays.

Name sims Damian
PFN BBC 657
complaint: everything Dirty.

Emilio Escobar
Pfn: UMA 598
Complaint: Dirty traps

OSca correa
PFn: BSR 435
unsanitary living condition

CARlOS GARCIA
PFN BBC 193
DIRTY KITCHEN FOR YEARS lEVInb condITIONS

NAME: MICHAEL LARINA
  PFN: BMC401

NAME: Julio CESAR INOCENCIO H
  PFN: BLU727

Name: JESUS salazar
  PFN: BMJ150

NAME: Donald Lee Marler
  PFN: BLC996

Name: John Warren
  PFN: AUB712

Name: AKRAM HUSSAIN
  PFN: BMA501

NAME:
  PFN:

Name:
  PFN:

Name:
  PFN: