UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL GONZALEZ, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GREGORY J. AHERN, et al.,<br><br>　　　　Defendants. | Case No. 19-cv-07423-JSC<br><br>**ORDER RE: PRELIMINARY INJUNCTION**<br><br>Re: Dkt. Nos. 71, 92, 94 |

In this putative class action, Plaintiffs—current and former inmates of Santa Rita Jail ("the Jail")—bring numerous Section 1983 conditions of confinement claims against Alameda County, Wellpath Management, Inc. ("Wellpath"), and Aramark Correctional Services LLC ("Aramark"). Plaintiffs' motion for preliminary injunction seeking redress regarding the prison's allegedly inadequate and unsanitary food is now pending before the Court.[1] (Dkt. No. 71.)  Having considered the parties' briefs and having the benefit of oral argument on February 11, 2021, the Court DENIES Plaintiffs' motion for preliminary injunction.

## BACKGROUND

**A. Third Amended Complaint Allegations**[2]

Alameda County contracts with Aramark to provide food services at the Jail and other jail facilities. (Third Amended Complaint ("TAC"), Dkt. No. 89 at ¶ 55.)[3]  The kitchen at the Jail is staffed primarily by prisoners that work under the supervision of Aramark. (*Id.* at ¶ 60.)  In recent

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 8, 16, 17, 21, 22, 68..)
[2] Plaintiffs labeled their Third Amended Complaint as "Second Amended Complaint," but they previously filed a Second Amended Complaint on August 31, 2020. (*Compare* Dkt. No. 89 *with* Dkt. No. 50.)
[3] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

years, Alameda County and Aramark have overseen a prisoner food budget reduction of 25%—$1.65 million. (*Id.* at ¶ 56.) These budget reductions have had a devastating effect on the quality and quantity of food at the prison. (*Id.* at ¶ 57.) Additionally, kitchen workers are not consistently tested for communicable diseases prior to beginning work in the kitchen. (*Id.* at ¶ 60.) For example, Willie Dudley, a former kitchen worker, was not tested for tuberculosis until two months after starting work in the kitchen. (*Id.*)

### i. Poor Kitchen Sanitation and Food Contamination

Used food trays are collected and deposited in the kitchen where they attract a variety of animals and bugs. (*Id.* at ¶ 61, 64.) In addition, mice, rats, and birds eat food in the kitchen, leave droppings on food preparation surfaces, and have been found inside cooking pans. (*Id.* at ¶ 61–63.) The Jail food is served on plastic, reusable trays, but the tray washing system does not consistently or reliably remove old food or clean the food trays. (*Id.* at ¶ 66.) The cleaning process for used food trays requires that a worker dumps the trays in a large wash basin with soapy water where a pump circulates water that is intended to rinse the trays. (*Id.* at ¶ 68.) This soapy water is only changed once a day. (*Id.*) After the trays are removed from the soapy water, they are placed on a conveyor belt and run through a sanitization machine. (*Id.*) The sanitation process takes less than five minutes, and trays often still have food crusted to the bottom after being sanitized. (*Id.*) This is a longstanding problem that Defendants have failed to correct and is a result of Defendants' custom of storing used food trays on the floor overnight. (*Id.* at ¶ 69.)

Plaintiff Larry Gerrans was a federal pretrial detainee during his incarceration at the Jail, and other inmates told him to reject any food trays that had yellow or brown liquid—indicating rat urine—on top of the tray's plastic cover. (*Id.* at ¶ 77.) In late September or early October 2019, Gerrans noticed rat feces between two pieces of bread that he was served, and he immediately notified the housing unit deputy. (*Id.* at ¶ 78.) Upon Gerrans's request, the housing unit deputy turned on his body-worn camera and documented the presence of rat feces; also, Gerrans filed a formal grievance. (*Id.*) Gerrans later learned that the housing unit deputy destroyed the rat feces and never submitted his formal grievance. (*Id.*) There are numerous other instances where prisoners have found dead animals, foreign objects, or animal droppings in their food. (*Id.* at ¶¶ 80–83.)

### ii. Grievances regarding Food Issues

Plaintiffs and class members have notified sheriff's deputies and filed grievances because of the unsanitary food service conditions. (TAC at ¶¶ 70, 78, 82, 84, 85, 90.) As recently as August 14, 2020, class members filed a grievance because of dirty food service trays. (*Id.* at ¶ 70.) Plaintiffs allege that these grievances have been denied and Defendants have not changed their procedures or improved sanitation practices. (*Id.*)

Class members have struggled to use the Jail's grievance process to address these sanitation issues. (*Id.* at ¶¶ 84–86.) Housing unit deputies have told class members that food sanitation issues cannot be resolved by the grievance process because Aramark is responsible for food at the Jail, and housing unit deputies have refused to accept grievances, thrown away grievances, refused to turn on their body-worn cameras to document incidents, and destroyed evidence. (*Id.* at ¶ 84.) Class member Darnell Ellis describes an incident where he had difficulty obtaining a paper grievance form, and after obtaining and submitting the required paperwork, the housing unit deputies refused to process the grievance, assign it a number, and only processed it five days later due to his persistence. (*Id.* at ¶ 85.) After weeks, the Jail had still not responded to his grievance. (*Id.*)

In addition, Plaintiffs allege that Alameda County and Aramark were placed on notice of the rat infestation and food sanitation issues because the female prisoners at the Jail filed a lawsuit that mirrors many of their claims, *Mohrbacher, et al. v. Alameda County Sheriff's Office, et al.*, 3:18-00050JD (filed January 4, 2018). (*Id.* at ¶ 86.) On August 26, 2020, there was an inspection of the kitchen, but Plaintiffs say the prison officials purposefully steered inspectors away from the scullery and the kitchen sanitation procedures were not appropriately inspected. (*Id.* at ¶ 87.) The Defendants have failed to fix, correct, or take affirmative action to remedy the problem of animals in the kitchen. (*Id.* at ¶ 86.)

### B. Procedural Background

Plaintiffs initially filed this putative class action on November 12, 2019, but did not serve the defendants until after filing their amended complaint on May 7, 2020. (Dkt. Nos. 1, 12, 13, 15.) On the same day Plaintiffs filed their amended complaint, they filed a motion for a temporary restraining order that the Court subsequently denied. (Dkt. Nos. 12, 41.) While the motion for a temporary

restraining order was pending, the County Defendants, Wellpath, and Aramark each filed separate motions to dismiss which the Court granted in part and denied in part. (Dkt. Nos. 18, 41, 34, 49.) The Court denied the motion as to Defendants' exhaustion argument but found that Plaintiffs had failed to adequately allege their myriad constitutional claims challenging 20 separate conditions of confinement at the Jail. Plaintiffs were granted leave to amend (except with respect to their Fifth Amendment claim). Plaintiffs thereafter filed a second amended complaint repleading all of their conditions of confinement claims (except for the Fifth Amendment claim) and Defendants again moved to dismiss. (Dkt. Nos. 50, 51, 52.)

While the motion to dismiss was pending, Plaintiffs filed a motion for preliminary injunction against Alameda County and Aramark regarding the food issues at the Jail. (Dkt. No. 71.) Plaintiffs ask that the Court require Defendants to:

> (1) Implement and maintain a jail kitchen that is constructed, equipped and operated in a clean and sanitary manner and is free of animals, birds, rodents, insects and vermin;
>
> (2) All dishware and trays shall have residual food scrapped off, washed, rinsed and sanitized per California Code and no dishware and tray shall be reused unless said dishware and tray is free of food residue and has been washed, rinsed and sanitized;
>
> (3) Institute procedures and quality control processes to insure that all food served is edible including:
>   a. No spoiled food;
>   b. No food with foreign objects – particularly non-food objects;
>   c. No food which has been contaminated by animals, birds, rodents, insects and vermin; and,
>   d. All food is properly handled, refrigerated and heated, without excessive heating;
>
> (4) Quality controls are implemented to insure that trays meet portion size and has all items called for in the menu;
>
> (5) Food production adheres to menus; and,
>
> (6) Special diet needs are met.

(Dkt. No. 71 at 3.) The motion for preliminary injunction is now fully briefed and Alameda County has raised an objection to the Plaintiffs' reply. (Dkt. No. 90.)

Two days after the preliminary injunction motion was filed, the Court granted in part and denied in part the Defendants' motion to dismiss. (Dkt. No. 73.) As relevant here, the motion was denied as to the Plaintiffs' claims regarding the unsanitary and contaminated condition of the food,

but was granted as to complaints about the food's nutritional content with leave to amend. (*Id.*) Plaintiffs filed the now operative Third-Amended Complaint after the motion for a preliminary injunction was fully briefed. (Dkt. No. 89.) They did not plead any new food-related claims, including any claims about the food's nutritional content. *Compare* (Dkt No. 89 ¶¶ 71–76, 88–90) *with* (Dkt. No. 50 ¶¶ 71–76, 88–90) (same).

## LEGAL STANDARD

"On a motion for a preliminary injunction, plaintiffs must make a 'threshold showing' of four factors." *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 844-845 (9th Cir. 2020) (internal citation omitted).

> Plaintiffs must show that (1) they are likely to succeed on the merits, (2) they are likely to "suffer irreparable harm" without relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. When the government is a party, these last two factors merge.

*Id*. Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("[W]e hold that the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test."). The party seeking an injunction bears the burden of establishing these factors are satisfied. *See Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal quotation marks and citation omitted).

## DISCUSSION

### I. PLRA Exhaustion

As a threshold matter, the County argues that Plaintiffs have failed to exhaust their administrative remedies under the Prison Litigation Reform Act ("PLRA"). Under the PLRA, "[n]o action shall be brought with respect to prison conditions under . . . [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2018). "Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's

exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available." *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016) (internal citation and quotation marks omitted). A remedy is unavailable where: (1) the procedure "operates as a simple dead end" because the "relevant administrative procedure lacks authority to provide any relief" or "administrative officials have apparent authority, but decline ever to exercise it[;]" (2) the "administrative scheme [is] so opaque that . . . no reasonable prisoner can use them[;]" or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1859–60 (internal citations omitted).

Plaintiffs' TAC alleges that prisoners have attempted, but were thwarted, from exhausting their claims regarding the food sanitation issues, and provides specific examples where Defendants failed to accept grievances, respond to grievances, and properly document issues raised by prisoners. *See, e.g.*, (Dkt. No. 89 ¶¶ 84–85.) Further, as exhaustion is a non-jurisdictional affirmative defense, the County bears the burden of proving that there was an available remedy that was not exhausted. *See Rumbles v. Hill*, 182 F.3d 1064, 1067–68 (9th Cir. 1999), overruled on other grounds by *Booth v. Churner*, 532 U.S. 731, 731 (2001); *see also Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) ("[A] defendant must first prove that there was an available administrative remedy and that the prisoner did not exhaust that available remedy . . . Then, the burden shifts to the plaintiff, who must show that there is something particular in his case that made the existing and generally available administrative remedies effectively unavailable to him by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile . . . The ultimate burden of proof, however, remains with the defendants."). Defendants have not offered any evidence of additional administrative remedies; they merely assert: "Plaintiffs do not present adequate evidence to excuse them from exhaustion, and Defendants challenge the Petition on this basis as well." (Dkt. No. 80 at 5 n.1.) Given Plaintiffs' allegations that they attempted to exhaust, but were thwarted, and the County's failure to identify administrative remedies that the prisoners did not exhaust, the County has not met its burden of demonstrating that Plaintiffs' claims are barred for failure to exhaust under the PLRA.

## II. Preliminary Injunction

### 1. Likelihood of Success on the Merits

The first preliminary injunction factor is the most important—likely success on the merits. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). The rights of pretrial detainees arise under the Fourteenth Amendment's due process clause and the rights of convicted prisoners arise under the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 527–28 (1979); *see also Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1067–68 (9th Cir. 2016) ("Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under the Fourteenth Amendment's Due Process Clause.") Because 85% of Plaintiffs and class members are pretrial detainees, the Court evaluates their claim under the Fourteen Amendment's more stringent deliberate indifference standard. (Dkt. No. 89 at ¶ 11; Dkt. No. 73 at 6.) Under this standard, a pretrial detainee must demonstrate:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). With respect to the third element, "the plaintiff must 'prove more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.*

Plaintiffs' motion raises three primary concerns: inadequate kitchen cleanliness, contaminated food, and food that lacks sufficient nutritional value. The Court addresses these issues in turn.

#### a. Inadequate Kitchen Cleanliness

Plaintiffs' cleanliness issues are two-fold: (1) that there are pest and vermin issues, and (2) that there are insufficient cleaning procedures for the food trays.

##### i. Pests and Vermin

Plaintiffs allege that the Jail kitchen is insufficiently clean and houses numerous pests and

vermin whose droppings get in the food. An inmate kitchen worker reported that in November 2020 she witnessed rat droppings in another inmate's food tray in one instance and a cockroach in another inmate's food tray in another instance. (Dkt. No. 71-2, Anderson Decl. ¶ 4.) An inmate kitchen worker, also in November, 2020, saw a mouse jump out of a box of cookies. (Dkt. No. 71-3, Barajas Decl. ¶ 2, 3.) The same inmate also reported that at night there are birds living in the kitchen, flapping around. (*Id.* at ¶ 3.) An inmate kitchen worker saw rodents in the dry storage area in the kitchen. (Dkt. No. 71-4, Felder Decl. ¶ 3.) An inmate, in July 2020, found what appeared to be rat or mouse feces in his cup at lunch. (Dkt. No. 71-6, Mellion Decl. ¶ 2.) Plaintiffs' counsel subsequently had the pellets tested by a licensed Alameda County Vector Ecologist that confirmed the pellets were mouse fecal pellets. (Dkt. No. 71-14, Swartz Decl. ¶ 2.) On October 13, 2020, a pretrial detainee reported seeing rat feces and cockroaches in the kitchen. (Dkt. No. 71-9, Reeves Decl. ¶ 3.) She said that the Jail kitchen does not have a door; instead, there are plastic flaps hanging from the doorways (strip doors), but they do not go all the way to the floor—this contributes to the vermin infestation. (*Id.* at ¶ 10.) She has seen many rats in the kitchen, but no traps. (*Id.* at ¶ 5.) She reported seeing a rat jump out of a pot of chili, (*Id.* at ¶ 6), and found a rat inside a box of condiments. (*Id.* at ¶ 7.) She saw cockroaches falling from the ceiling and vents in the kitchen scullery. (*Id.* at ¶ 8.) She has also seen birds walking into the kitchen under the plastic flaps. (*Id.* at ¶ 10.) On October 22, 2020, she reported finding a mouse in the kitchen break room. (*Id.* at ¶ 11.) Four days later she accidentally ate a cockroach that was in her food tray. (*Id.* at ¶ 14.) On November 15, 2020 she saw pigeons flying around the kitchen, and bird feces on the walls and kitchen lights. (*Id.* at ¶ 15.)

Another inmate kitchen worker has seen mice, rats, and birds in many parts of the kitchen, and has seen cockroaches, rat feces, bird droppings, and rodent urine. (Dkt. No. 71-13, Taylor Decl. ¶ 5.) She saw the Aramark supervisor dust rat feces off trays, and has also seen the Aramark supervisor pull bugs out of food with her bare hands. (*Id.* at ¶ 10.) The inmate found rat feces in food before it was sealed onto the trays, (*Id.* at ¶ 13), and observed large bins filled with dirty trays sitting out overnight; these dirty trays provide easy access and ample food for the rats and birds that live in the kitchen. (*Id.* at ¶ 21.) An inmate worker reported finding a rat in the freezer and maggots in his beans. (*Id.* at ¶ 6.) Another inmate kitchen worker reported an Aramark supervisor

picked rat poop off of a food tray with her bare hand and threw it away. (Dkt. No. 71-17, Zamora Decl. ¶ 5.) He stated that there are rats, birds, and cockroaches on the food preparation line. (*Id.* at ¶ 8.) He also reported seeing rats at least three times a week and said that there are rats coming in and out of a fist sized hole in the sheetrock of the scullery. (*Id.* at ¶ 9, 11.) Another inmate kitchen worker reported birds roosting in the kitchen and seeing birds at least three times a week in the kitchen. (*Id.* at ¶ 12.) He also said bird feathers and bird feces are in the kitchen. (*Id.* at ¶ 12.)

There is no dispute that the County—not Aramark—is the party responsible for kitchen pest control. The County offers evidence that it has taken numerous steps to ensure that the kitchen remains free of vermin and outside animals. Since October 2019, it has contracted with McCauley Agricultural Pest Services to perform integrated pest management at the Jail five days a week. (Dkt. No. 80-3, Pittsenbarger Decl. at ¶ 7.) These services include inspecting traps and monitoring the perimeter of the kitchen, bakery, dry storeroom, and all associated closets and mechanical rooms. (*Id.* at ¶ 8.) McCauley logs how much pest activity is observed and notes every area where there is pest activity. (*Id.*) McCauley sprays the kitchen on a bi-weekly basis to control insects. (*Id.* at ¶ 9.) Within the kitchen, there are 30 multi-catch traps to snare rodents and insects. (*Id.* at ¶ 10.) Within the dry storage there are 10 snap-type single-catch traps along the pipe chases. (*Id.* at ¶ 10.) There are 20–30 glue board monitors, which catch all types of pests, in the oven control areas, closets, and sprinkler risers. (*Id.* at ¶ 10.) Also, the exterior perimeter of the facility has 40 rodent stations to stop rodents from entering the building, and those are checked multiple times a week. (*Id.* at ¶ 11.) According to McCauley, the traps outside the kitchen catch far more rodents than the traps inside the kitchen, and McCauley believes that their program is effective because they have not caught a rat inside the Jail for several months. (*Id.* at ¶ 13–14.) In addition, the Jail utilizes strip doors to prevent bird entry into the kitchen, and the Jail has utilized McCauley to install bird netting on the exterior of the facility that minimizes the birds' ability to perch around the facility. (*Id.* at ¶ 15.)

Stuart Barnes, the Sergeant responsible for oversight of the Jail kitchen, bakery, and food transport, attests there are vermin and pest traps throughout the kitchen and storage areas, and bulk food and ingredients are stored off of the ground. (Dkt. No. 80-2, Barnes Decl. ¶ 4, 12, 14); *see*

*also* (Dkt. No. 81-4, Weiss Decl. ¶¶ 14, 19) (corroborating the precautions mentioned by Sergeant Barnes).

In August 2020 the kitchen and bakery passed its Environmental Health Inspection. (Dkt. No. 80-1, Auyeung Decl. ¶ 8.) The main kitchen was inspected by Jane Auyeung, a Supervising Environmental Health Specialist with the Alameda County Department of Environmental Health. (*Id.* at ¶ 2.) Ms. Auyeung has worked as an Environmental health specialist and inspected retail food facilities for thirteen years. (*Id.* at ¶ 6.) One of her responsibilities is oversight of the team of Registered Environmental Health Specialists that monitors all retail food facilities within the County, except the City of Berkeley. (*Id.* at ¶ 3.) During the most recent inspection of the kitchen, she noted how well-run the kitchen facility was and how it compared favorably to other commercial facilities. (*Id.* at ¶ 9.) There were no issues related to vermin, and there was no evidence of any infestation of rats, mice, birds, or other pests. (*Id.* at ¶ 9.) All of the food was stored as required by the California Retail Food Code. (*Id.* at ¶ 9.) Ms. Auyeung also supervised the most recent inspection of the Jail's bakery. (*Id.* at ¶ 10.) There were mouse droppings found during that inspection, but they appeared to be old and there was no evidence of an active infestation of mice or any other vermin in the facility. (*Id.*) The County Department of Environmental Health verified that the Jail has a pest control service, and the facility was overall clean and well run—it passed inspection without further remedy required. (*Id.*)

Likewise, Joseph Martinez is the Jail Lead Cook Supervisor for Aramark and he specifically denies that an inmate kitchen worker told him she witnessed a mouse jump out of a box of cookies, that he giggled when told pigeons were flying around the kitchen, or that he threw away a bag of Sloppy Joe sauce with a cockroach in it. (Dkt. No. 81-2, Martinez Decl. ¶ 2–5.) Aramark's General Manager at the Jail, Robin Weiss, personally investigated the claim that there were maggots in the beans; she found these were not maggots, but instead the skins of the beans that separate from cooked navy beans. (Dkt. No. 81-4, Weiss Decl. ¶ 15.)

In light of the County's evidence, Plaintiffs have not shown a likelihood to succeed on the merits. While there clearly was a pest problem, at a minimum, under prong three of the deliberate indifference standard and on this record the Court cannot conclude that Defendants have not put sufficient measures in place. Indeed, in light of these measures, at oral argument Plaintiffs

10

confirmed that they have narrowed the preliminary injunctive relief they seek on this issue to construction of a solid door to the kitchen. They contend that California Retail Food Code § 114259 "require[s] replacing the hanging plastic sheets with a solid barrier outdoors to prevent the entry of vermin, rodents, and birds." (Dkt. No. 71-1, Memorandum of Points and Authorities at 16.) Not so. The Code requires that "[a] food facility shall at all times be constructed, equipped, maintained, and operated as to prevent the entrance and harborage of animals, birds, and vermin, including, but not limited to, rodents and insects." Cal. Retail Food Code § 114259 (2007). Given that the Jail kitchen passed inspection, and the record evidence, the Court cannot conclude that the Jail door violates state law.

### ii.     Food Tray Cleanliness

Plaintiffs further allege that food service trays are not clean, and there are insufficient workers in the scullery. All food trays are supposed to come wrapped in plastic wrap, and one of the inmate workers that distributes food trays reports that every day there are at least a few trays that have damaged plastic wrap or are not fully sealed. (Dkt. No. 71-10, Rivera Decl. ¶ 4.) He also reported that four to five times a week he finds leftover remnants from previous meals on his tray of food. (*Id.* at ¶ 3.) An inmate reported receiving dirty and stained food trays on multiple occasions due to food from previous meals being cooked into the trays. (Dkt. No. 71-4, Felder Decl. ¶ 2.) They also reported receiving dirty, cracked, and uncovered food tray as recently as September 2020. (*Id.*) Another inmate reported that when he receives a hard-plastic tray it usually comes with food caked on the sides and bottom. (Dkt. No. 71-7, Misch Decl. ¶ 13.) In September 2020, an inmate reported finding and accidentally ingesting sharp metal pieces in his oatmeal. (Dkt. No. 71-8, Paschal Decl. ¶ 2–4.) He subsequently stopped eating food served on trays, but recalls that around three times a week the plastic cover on his food tray was not sealed. (*Id.* at ¶ 6.) An inmate kitchen worker reported seeing three to four trays a day that are not sealed by their plastic covering. (Dkt. No. 71-9, Reeves Decl. ¶ 12.) Another class member reported that over half the time his food trays are contaminated with food from a previous meal. (Dkt. No. 71-12, Shackleford Decl. ¶ 6.) Another inmate reports that a third of the time, the plastic on his tray is not sealed. (Dkt. No. 71-10, Rivera Decl. ¶ 7.) An inmate kitchen worker reported seeing the Aramark supervisor pulling dirty trays out of the garbage and reusing them. (Dkt. No. 71-13,

11

Taylor Decl. ¶ 9.) She also said that there are inadequate workers and tools to clean trays in the scullery. (*Id.* at ¶ 22.) Another inmate reported receiving a tray with old, residual food burnt into it in November 2020. (Dkt. No. 71-15, Upshaw Decl. ¶ 5.)

In contrast to the pest issue, Aramark is the party responsible for cleanliness of the kitchen and trays. Aramark submits evidence that is has a comprehensive program in place to ensure kitchen cleanliness: dirty trays are initially placed in large bins; the trays are then placed on racks where they are hosed off; the trays are then placed in two large industrial agitating tubs with soapy water, the tubs are drained and refilled with fresh soapy water every couple of hours; the trays are then loaded into an industrial dishwasher where they are rinsed and then sanitized. (Dkt. No. 81-4, Weiss Decl. ¶ 20.) According to Aramark, any tray that is not clean is washed again, trays are inspected before they are sent down the line for meal assembly, and if a tray is not clean, it is placed in a bin and rewashed. (*Id.*) Aramark also asserts that there are four to twelve people working in the scullery at a time. (*Id.* at ¶ 21.)

These cleanliness procedures are corroborated by Sergeant Barnes—he reports inmate kitchen workers are trained to remove dirty trays from the line and place them in the scullery. (Dkt. No. 80-2, Barnes Decl. ¶ 8.) Likewise, deputies are instructed to report dirty trays to kitchen workers. (*Id.* at ¶ 10.) Sergeant Barnes reports that after trays are sealed they are inspected by inmate kitchen workers and Aramark employees, and there are several layers of inspection to check for improperly sealed trays. (*Id.* at ¶ 15.) He also investigated the report that an inmate had swallowed a sharp metal object, and he concluded that it was highly unlikely that razor blades were placed in an inmate's food. (*Id.* at ¶ 34–36.) (basing his determination on a number of factors, including the fact that there is no way for an inmate to know where the food was going to be delivered, there is no guarantee that an inmate will not receive contaminated food themselves, and inmates are monitored by deputies throughout their time in the kitchen). Additionally, the Jail kitchen provides food to other facilities in other counties, and Sergeant Barnes has not received reports from other facilities similar to those provided by Plaintiffs. (*Id.* at ¶ 37.)

Aramark also refutes the declarations provided by various inmates. Margarita Reyes is the Aramark Cook Supervisor for the Jail, and she has worked in the Jail kitchen for 21 years. (Dkt. No. 81-3, Reyes Decl. ¶ 1–2.) Ms. Reyes stated that she has never seen rat feces on the trays,

12

dusted rat feces off of a tray, pulled bugs out of the food, or pulled trays out of the garbage to be used on the meal assembly line.  (*Id.* at ¶ 3–7.)

During oral argument, Plaintiffs alleged that the cleaning procedures described by Sergeant Barnes and Robin Weiss are inconsistent.  They are not. Sergeant Barnes maintains: "The food trays go through a rigorous washing process wherein the uneaten food is thrown away and scraped from the trays before the trays are then washed in the scullery."  (Dkt. No. 80-2, Barnes Decl. ¶ 8.)  This description of the kitchen's cleaning process does not contradict the account offered by Robin Weiss.  (Dkt. No. 81-4, Weiss Decl. ¶ 20.)  Plaintiffs also argued that Sergeant Barnes does not have any personal knowledge of the kitchen.  Again, this assertion ignores the record.  Sergeant Barnes attests that he spends eight to ten hours a day in the food preparation areas, and he is responsible for oversight of the kitchen, bakery, and food transport at the Jail.  (Dkt. No. 80-2, Barnes Decl. ¶ 8.)  These responsibilities give Sergeant Barnes personal knowledge of what is happening in the Jail's food preparation areas.

As with the vermin/pest issue, given the state of record the Court does not find that Plaintiffs have shown a likelihood of success on the merits of their claim that Aramark's handling of food trays cleanliness is constitutionally deficient.

### b.  Food Contamination

Plaintiffs also allege that the kitchen regularly serves inmates contaminated food at the Jail.  (Dkt. No. 71-4, Felder Decl. ¶ 2); (Dkt. No. 71-13 Taylor Decl. ¶ 5); (Dkt. No. 71-17, Zamora Decl. ¶ 8–9, 12.)  They allege that the fruit and vegetables are so wilted that they are inedible.  (Dkt. No. 71-7, Misch Decl. ¶ 9); (Dkt. No. 71-10, Rivera Decl. ¶ 6); (Dkt. No. 71-6, Mellion Decl. ¶ 6.)  They report numerous instances where individuals have been served food that is laden with foreign objects or rat feces.  (Dkt. No. 71-8, Kajuan Decl. ¶ 2–3); (Dkt. No. 71-6, Mellion Decl. ¶ 2.)  Others attest that food is left in warming ovens for hours.  (Dkt. No. 71-16, Vargas Decl. ¶ 3.)  Contributing to the food contamination issues, and as discussed above, inmates contend that the food trays are frequently not sealed by their required plastic covering.  (Dkt. No. 71-17, Zamora Decl. ¶ 6.)

The County responds that it has instituted several policies and procedures to ensure that the food service meets all the required health and safety regulations.  In particular, Sergeant Barnes

reports that food is packaged and sealed onto clean food trays to prevent spoilage. (Dkt. No. 80-2, Barnes Decl. ¶ 14.) He attests that he has personally witnessed kitchen workers removing trays that did not seal properly and returning trays to the sealing machine. (*Id.* at ¶ 15.) The Jail requires that housing unit deputies unload the food service carts shortly after arriving in the housing units, and an alarm or the Jail's control center prevents food from sitting out for too long. (*Id.* at ¶ 19.) Trays must be offloaded quickly because the carts must return to the kitchen so that the next meal can be served. (*Id.* at ¶ 21.) The Jail makes extra meals available in case a prisoner complains that there is an issue with their food. (*Id.* at ¶ 23.) Sergeant Barnes is unaware of any instances where food was left in the warming ovens for an excessively long period of time, and if a housing unity deputy did this they would be subject to disciplinary action. (*Id.* at ¶ 32.)

Aramark likewise contends that it has a number of policies designed to prevent food contamination. Aramark has established procedures to ensure a sanitary kitchen and it requires that Aramark employees and inmate workers are trained on these procedures. (Dkt. No. 81 at 9.) Aramark attests that it complies with all of the requirements of the California Department of Public Health. (Dkt. No. 81-4, Weiss Decl. ¶ 9.) All Aramark managers have Serv Safe certifications.[4] (*Id.*) Meals are inspected for palatability and to ensure that no contamination has occurred both before and after the meals are placed on individual trays and sealed; trays that do not seal properly are returned to the sealing machine. (*Id.* at ¶ 11, 12.) Food or trays that fall on the floor are immediately discarded or washed. (*Id.* at ¶ 10.)

Given the procedures that Aramark and the County have put in place, Plaintiffs have not shown a likelihood of success on the merits of their claim that Defendants have been deliberately indifferent to their health and safety needs because of food contamination at the Jail.

### c. Food Lacking Nutritional Value

The Court granted Defendants' motion to dismiss Plaintiffs' claims of constitutional harm due to the inadequate nutritional value of the food, but granted Plaintiffs leave to amend "[t]o the extent that Plaintiffs can allege specific facts suggesting that the nutritional content of the food is

---

[4] "ServSafe is a food and beverage safety training and certificate program administered by the U.S. National Restaurant Association. The program is accredited by ANSI and the Conference for Food Protection." *ServSafe*, WIKIPEDIA (last updated Jan. 19, 2021), https://en.wikipedia.org/wiki/ServSafe.

constitutionally deficient." (Dkt. No. 73 at 15.) Plaintiffs did not amend their complaint to allege that the nutritional content of the prison's food was constitutionally deficient. *Compare* (Dkt No. 89 ¶¶ 71–76, 88–90) *with* (Dkt. No. 50 ¶¶ 71–76, 88–90) (same); *see* (Dkt. No. 89 ¶¶ 206–10.) Furthermore, at oral argument, Plaintiffs confirmed that they were no longer seeking a preliminary injunction on this ground.

\*\*\*

Given Defendants' evidence—which has not been tested through discovery—Plaintiffs have not satisfied all of the elements of the deliberate indifference test required by the Fourteenth Amendment on any of their claims; therefore, Plaintiffs have not shown a likelihood of success on the merits and have not raised "serious questions" about their success on the merits.

### EVIDENTIARY OBJECTIONS

In light of the Court's ruling, it overrules Defendants' objections to Plaintiffs' evidence. The Court notes however, that the inmate witness declarations are acceptable. Plaintiffs cannot be expected to obtain physically-signed declarations given restrictions in place due to the Covid-19 pandemic.

### REQUEST FOR EVIDENTIARY HEARING

Shortly after oral argument on the preliminary injunction motion, Plaintiffs filed a request for an evidentiary hearing. (Dkt. No. 94.) The Court agrees that resolution of the issues raised by the motion will require resolution of disputes of fact; however, such disputes cannot be adequately resolved without the benefit of discovery and testing of each party's evidence. Further, it may be a circumstance where consolidation of a preliminary injunction motion with a trial on the merits is required. *See* Fed. R. Civ. P.65(a)(2). As discussed at oral argument, written discovery can commence on claims that survived the motion to dismiss, as well as any agreed-to inspections of the premises.

### CONCLUSION

For the reasons explained above, the motions for a preliminary injunction and an evidentiary hearing are DENIED.

This Order disposes of Docket Nos. 71, 92, 94.

//

**IT IS SO ORDERED.**

Dated: March 1, 2021

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge