LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543
528 Grand Avenue
Oakland, CA 94610
Telephone: (510) 329-2140
Facsimile:  (510) 580-9410
Email: yhuang.law@gmail.com

DENNIS CUNNINGHAM, SBN 112910
115A Bartlett St.
San Francisco, CA 94110
Telephone: 415-285-8091
Facsimile:  415-285-8092
Email:  denniscunninghamlaw@gmail.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| **ALAMEDA COUNTY MALE PRISONERS** And Former Prisoners, DANIEL GONZALEZ, et al. on behalf of themselves and others similarly situated, <u>as a Class, and Subclass;</u> **ALAMEDA COUNTY FEMALE PRISONERS** And Former Prisoners, JACLYN MOHRBACHER, ERIN ELLIS, DOMINIQUE JACKSON, CHRISTINA ZEPEDA, ALEXIS WAH, AND KELSEY ERWIN, et al on behalf of themselves and others similarly situated,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>**ALAMEDA COUNTY SHERIFF'S OFFICE, ALAMEDA COUNTY,  Deputy Joe, Deputy Ignont (sp) Jane ROEs, Nos. 1 – 25;** | No. 3:19-cv-07423 JSC<br><br>**FOURTH AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF AND DAMAGES FOR VIOLATION OF CIVIL RIGHTS AND OTHER WRONGS**<br><br><br>**JURY TRIAL DEMANDED** |

1

**WELL-PATH MANAGEMENT, INC., a**
Delaware Corporation, (formerly known as
California Forensic Medical Group) a
corporation; its Employees and Sub-
Contractors, and Rick & Ruth ROEs
Nos.26-50;

**ARAMARK CORRECTIONAL
SERVICES, LLC**, a Delaware Limited
Liability Company; its Employees and Sub-
Contractors, and Rick & Ruth ROES Nos.
51-75.

Defendants.

## INTRODUCTION

The present case was filed on November 12, 2019, after male prisoners incarcerated at Alameda County's Santa Rita jail, went on a strike, and refused to work.  Their complaints centered around conditions of confinement and treatment by jail guards.

Mohrbacher et al v. Alameda County Sheriff's Office, et al. , Case No. 3:18-0500 JD, was filed on January 4, 2018, in which the plaintiffs were all women prisoners at Santa  Rita Jail on behalf of themselves individually and the class of women prisoners at Santa Rita Jail.  The issues raised pertained to women specific issues as well as conditions that affected all prisoners at Santa Rita Jail.

On February 5, 2021, the Court in Mohrbacher ordered that all issues in Mohrbacher, which affected both men and women were consolidated with the present case, *Gonzalez*, and that the Court in *Mohrbacher* would retain those issues which were unique to women.

## PRELIMINARY STATEMENT

1.   The Alameda County Santa Rita Jail is the largest county jail in the San Francisco Bay Area. Eighty-five percent or more of prisoners at Santa Rita Jail are pretrial detainees.  Defendants operate the jail on a for profit basis, which seeks to extract as much money from the prisoners themselves. Despite it's almost half a billion dollar publicly funded budget, no tax payer funds are used to fund inmate programs or activities.  Instead, the defendant Alameda County Sheriff's Office ("Sheriff") charges inmate high fees for phone calls, use of the jail tablets, and commissary to fund all inmate programs and activities.  In addition, the jail derives profits from inmate labor in food services. Because the jail has contracted with outside for-profit corporations, defendant Sheriff's contracts and policies and procedures have built in incentives to reduce costs of all services to inmates which

results in limited, reduced and therefore inadequate and insufficient basic services in the areas of food, health care, sanitation (which includes laundry, personal sanitation and grooming) and inmate activities.

2. In addition to the first basic policy which is a fiscal tightfisted, penny pinching control of prisoner services, resulting in limited and reduced prisoner services provided by the jail and the flourishing and emphasis by the jail of fee based prisoner services; the second basic policy as publicly articulated by Defendant GREGORY AHERN ("Ahern"), is that Santa Rita Jail's prisoners, including all pretrial prisoners, who are 85% of the prisoner population, are criminals, who have lied their entire lives, are not to be believed and despite the constitutional presumption of innocence, all prisoners, including pretrial detainees, are deserving of punishment and deprivations and should receive punishment and deprivations during their incarceration in Santa Rita Jail.  As a consequence of these two policies, Santa Rita Jail regularly takes actions to the detriment of Plaintiffs and the Class Plaintiffs represent, and to the benefit of defendant SHERIFF's financial gain.

3. This civil rights lawsuit arises out of the unlawful, unconstitutional and inhumane manner in which defendant ALAMEDA COUNTY SHERIFF'S OFFICE (hereinafter Defendant "SHERIFF"), its staff and employees and multiple for-profit contractors, operate Santa Rita Jail which incarcerates state and federal prisoners, in such a manner designed to inflict punishment and deprivations, promote jail staff conduct which focus on deprivation and punishment and at best, disregard the prisoners' needs and rights and at worst promote and execute routine violations of prisoners' constitutional and statutory rights.  Defendants operate this county jail as a carceral institution which has as its primary purpose, the lock down of prisoners.  Prisoners are treated as the inventory in defendants' business of incarceration, and not as sentient human beings.

4. Unable to tolerate these unsanitary and inhumane conditions, plaintiffs and other prisoners after failing to obtain a response through defendants' labyrinthine and difficult grievance process, then engaged in a multi-prong strike, including a hunger strike, a work strike, and a strike against participating in jail activities such as going to court, and then initiated this lawsuit.

5. This is a civil rights action in which the Plaintiffs, on behalf of themselves and a class of similarly situated individuals, seek relief for Defendants' violations of Plaintiffs' rights and privileges secured by the First, Eighth and Fourteenth Amendments of the United States Constitution, and Section 7, Article 1, of the California Constitution.  Regardless of whether a prisoner is pretrial or convicted, Defendant SHERIFF treats all prisoners to the same conditions of confinement, The

everyday conditions of confinement defendant Santa Rita County Jail and Defendant SHERIFF's policies which plaintiffs and class members seek to address and redress for are:

6.1. Jail Food which is regularly served prisoners that is:

a. inedible due to contamination by rodents, rodent feces, bird droppings; cockroaches and foreign objects such as razors and piece of metal;

b. inedible due to age, poor storage, spoilage, excessive cooking and baking;

c. insufficient in calories and nutritional value because the quantity served is less than that required by state regulations and defendants' own menus; and,

d. insufficient in calories and nutritional value due to substitutions instead of authorized items required and outlined in defendants' own menus.

e. inedible, spoiled and contaminated jail foods, causing prisoners are regular hunger and as a result, prisoners are forced to spend money to purchase supplemental food, usually snacks and junk food at the jail's expensive, for-profit commissary.

6.2    For Profit Operations – Commissary.  The Jail's commissary sales generate a significant profit with forty percent of the profit going to the defendant Sheriff.  Defendant Sheriff, in reports to the Alameda County Board of Supervisors have reported income in excess of one million dollars per year from commissary sales.  This profit incentivizes defendant SHERIFF to provide inadequate food to prisoners because inadequate jail food creates hunger and prisoners' hunger increases commissary sales, which increases defendant Sheriff's income.

6.3  Insufficient and Inadequate Sanitation for Jail .  The Jail's punitive and penny pinching policies results in insufficient and inadequate cleaning supplies  and tools to do effective and actual cleaning of prisoners' living areas,  in insufficient  and clean laundry, and results in restrictions and inability of prisoners to carry out appropriate and necessary personal hygiene.

6.4  No Laundry or Personal Sanitation Available in the OPHU.  While the jail claims to have a specialized housing unit, called the Out Patient Housing Unit,  ("OPHU") which has medical staff, to provide more medical care for patients with medical conditions, the OPHU is run without regard for the basic sanitation and health needs of medically ill prisoners.  There is no scheduled laundry exchange at the OPHU.  Prisoners are often left, for months, without the opportunity to have clean laundry.  There is no schedule for personal hygiene such as showers. Prisoners are limited use the tiny cell sink for  bathing.  Prisoners who are not able bodied, are

4

left to lay in their own urine and feces, with staff coming in periodically to simply hose down the prisoner and the room.

6.5   <u>Medical Care.</u>   The contract between defendant Alameda County and Alameda County Sheriff's Office and the for-profit medical provider, defendant Well-Path (formerly California Forensic Medical Provider "CFMG") provides financial incentives to limit the medical care provided to inmates at Santa Rita Jail.   As a result, medical care is delayed or denied.   What medical care provided is insufficient, inadequate, limited or in many cases inappropriate. Prisoners suffer for extended periods of time, months, in severe pain; the pain being so high that prisoners can't eat or sleep.   Even when attorneys for prisoners apply to the courts for court orders mandating medical care, defendants ignore such court orders.    And even when defendants provide pain medication, defendants will regularly and abruptly halt the pain medication, requiring prisoners to submit new requests, which require several days for defendants to respond during which the prisoners are again in severe pain, unable to eat or sleep.   Prisoners with medical conditions are not provided needed medical devices or accommodations to assist them with daily living needs such as walking, or accommodations such as an accessible bed, forcing individuals with mobility limitations to have to climb into upper bunk, causing falls and greater injuries.   Prisoners with medical conditions, such as pre-diabetes or infections, which can be treated through immediate proper care, are not provided these needed treatments, so that the condition progresses and becomes much more severe and difficult to treat.

6.5   <u>Enforced Idleness.</u>   Defendant Sheriff's punitive and penny pinching policies result in Plaintiffs and members of Plaintiff  Class being locked in their cells for excessive amounts of time, provided limited opportunities for exercise, constrained by jail policies which limit and hamper prisoners' ability to exercise, denied handicrafts or board games, provided little or no useful programming or educational opportunities, provided little or no access to books.   As a result of this daily and constant enforced idleness, prisoners, to reduce the suffering created by enforced idleness, are driven to spending money to purchase movies, music and entertainment on the jail's for-profit electronic tablets.

6.6   <u>First amendment retaliation.</u>   When the men prisoners organized to do a group demand and group statement, this exercise of free speech was suppressed and the men suffered retaliation.

5

7.     This civil rights class action lawsuit seeks to remedy these dangerous and unconstitutional conditions at the Alameda County Santa Rita Jail in Dublin, California.  Plaintiffs in the Jail bring this action on behalf of themselves and those similarly situated.

8.     Plaintiffs seek a declaration that Defendants' ongoing policies and practices violate their constitutional right, and further, such injunctive relief compelling Defendants to: 1) provide adequate, uncontaminated, edible food sufficient to sustain health; 2) provide constitutionally adequate sanitation in prisoner living areas, the kitchen and food preparation area, and the ability to maintain personal hygiene; 3) provide constitutionally adequate medical care including medical devices; and 4) end enforced idleness with sufficient activities, out of cell opportunity and ability to exercise.

9.     Plaintiffs seek damages for the individual plaintiffs named herein, subject to proof.

## JURISDICTION

10.     This action is brought pursuant to the First, Eighth, and Fourteenth Amendments to the United State Constitution, by way of the Civil Rights Acts, 42 U.S.C. §§1981, 1983 et seq. and 1988.

11.     Jurisdiction is conferred upon this Court by 28 U.S.C. §1331 (claims arising under the United States Constitution) and §1343 (claims brought to address deprivations, under color of state authority, of rights privileges, and immunities secured by the United States Constitution).

## VENUE AND INTRADISTRICT ASSIGNMENT

12.     The claims alleged herein arose in the County of Alameda, State of California. Therefore, venue and assignment, under 28 U.S.C. § 1391(b), lies in the United States District Court for the Northern District of California, San Francisco Division or Oakland Division.

JURY DEMAND

13.     Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

Plaintiffs

10.     Plaintiffs are all former or current prisoners incarcerated at the Santa Rita Jail.  Plaintiffs represent themselves individually, with regard to damages, and seek to represent a class of males imprisoned at the Santa Rita Jail at any time since November 12, 2017, two years prior to the date of filing of the Original Complaint in this action, and a sub-class of prisoners who became infected with covid-19 while incarcerated in Santa Rita Jail; and the class of females imprisoned at the Santa Rita Jail at any time since January 4, 2016, two years prior to the date of filing of the Original Complaint

filed in the Mohrbacher action, for conditions which jointly negatively impact men and women both. Eighty-five percent of plaintiffs and class members are pretrial detainees.  Plaintiffs  DANIEL GONZALEZ, ROCCI GARRETT, LAWRENCE GERRANS and MICHAEL LUCAS, MARTIN GALLARDO, SERGIO MORALES-SERVIN, SAUL ESPINOSA, DANIEL TORRES and ARTEMIO GONZALEZ,  are former inmates.  CEDRIC HENRY, TROY POWELL,  RANDY HARRIS, BRIAN CARTER, RANDY HARRIS, KEVIAN BYRD, ERIC WAGNER, MICHAEL LOCKHART, RANDY HARRIS, ERICA RIVERA, DAVID MISCH, ANGELO VALDEZ are current prisoners in Santa Rita Jail.  Of the current, newly added named plaintiffs,  SAUL ESPINOSA, CEDRIC HENRY, DANIEL TORRES, ARTEMIO GONZALEZ, represent the sub-class of prisoners who contracted covid-19, while in the custody at Santa Rita jail.  The women plaintiffs include:  ROSE PEREZ, TIKISHA UPSHAW, ANNETTE KOZLOWSKI , DENISE ROHRBACH, ALEXIS WAH, KELSEY ERWIN, CHRISTINA ZEPEDA, who were prisoners at the time Mohrbacher was file, and are now not in custody in Santa Rita Jail.   JACLYN MOHRBACHER, TIKISHA UPSHAW, FRANKIE PORCHER, MARIA MOORE, LEAH CONNER, JAZZMIN BARBOZA, LEANNA ZAMORA, ASTRID TAYLOR, GABRIELA DEFRANCO, are current prisoners incarcerated in Santa Rita Jail.

Alameda County Defendants

11.    Defendant ALAMEDA COUNTY SHERIFF'S OFFICE (hereinafter referred to as SHERIFF") is a "public entity" within the definition of Cal. Govt. Code § 811.2.

12.    Defendant ALAMEDA COUNTY is a county in the State of California.

13.    Defendants DEPUTY IGNONT (sp), DEPUTY JOE (sp), DEPUTY 'John Roe', and DEPUTY "Jane Roe were and are guards and deputies on duty at Santa Rita Jail with direct control over plaintiffs and class members.  Defendants DEPUTY IGNONT (sp), DEPUTY JOE (sp), DEPUTY 'John Roe', and DEPUTY "Jane Roe", are sued in their individual capacities.

14.    Each and every individual Defendant named herein was at all times relevant to this Complaint an officer or employee of the Alameda County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of Defendant SHERIFF and within the scope of their employment with ASCO.

The Private For Profit Contractor Defendants

15.    Defendant WELL-PATH MANAGEMENT, INC  (hereinafter referred to as "WELL-PATH") is an active, for-profit corporation incorporated in the State of Delaware with its principal place of

business in California, located at San Diego, California.   Previously, defendant WELL-PATH was defendant CALIFORNIA FORENSIC MEDICAL CORPORATION ("CFMG").   Defendant WELL-PATH and its predecessor defendant CFMG had entered into written contracts with defendant SHERIFF to provide and is currently engaged in providing general medical, dental, prenatal and opioid treatment services at Santa Rita Jail.  Defendants RICK and RUTH ROEs 1-50 are WELL-PATH employees who work at Santa Rita Jail.  At all times relevant to this Complaint, Defendants WELL-PATH and RICK and RUTH ROEs 1-25 were agents of the Alameda County Sheriff's Office, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of ASCO and within the scope of their agency with ASCO.

16.    Defendant ARAMARK CORRECTIONAL SERVICES LLC ("ARAMARK") is an active, foreign, for-profit Limited Liability Company registered in the State of Delaware and licensed to do business in the State of California.   Defendant ARAMARK entered into a written contract with defendant Sheriff to operate the kitchens at Santa Rita Jail to prepare food for Santa Rita prisoners, and for prisoners at least six other Bay Area county jails.  Defendants RICK and RUTH ROEs 51-100 are ARAMARK employees who work at Santa Rita Jail.  At all times relevant to this Complaint, Defendants ARAMARK and RICK and RUTH ROEs 26-50 were agents of the Defendant SHERIFF, acting under the color of law within the meaning of 42 U.S.C. § 1983, and acting pursuant to the authority of Defendant SHERIFF and within the scope of their agency with Defendant SHERIFF.

## CLASS ALLEGATIONS

17.    Pursuant to Rules 23(a), (b2) and (b)(3) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a Plaintiff class consisting of all  male prisoners incarcerated at Santa Rita Jail ("SRJ") from November 12, 2017 through to the present; all women prisoners incarcerated at Santa Rita Jail ("SRJ") from January 4, 2016; the subclass ("A") of prisoners who are pretrial  and the subclass ("B") of prisoners incarcerated at Santa Rita Jail ("SRJ") who contracted covid-19 while under the custody of defendants.   All such prisoners were denied access to food that is adequate to maintain health in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution, denied conditions of confinement that met the minimal requirements of the Eighth and Fourteenth Amendments to the U.S. Constitution; and all suffered from constitutionally inadequate medical care; and lastly were incarcerated under a policy of punishment which sought to enforce idleness with insufficient activities, out of cell opportunity and ability to exercise, enforced idleness and the

consequences of defendants and each of their profit primacy policy, and lacked constitutionally adequate medical care.

18.    The members of the class are so numerous as to render joinder impracticable.  In the Fourth Quarter of 2018, Santa Rita Jail had an average daily population of 2,573 prisoners, of which 85% or 2,175 were pretrial.   Approximately 2,239  or 87% of all prisoners are male.

19.    On May 5, 2020, due to the covid-19 pandemic, the population of Santa Rita Jail was reduced to 1,773.  On March 29, 2021, defendant SHERIFF reports that it has 2,226 prisoners.  On information and belief, Plaintiffs plead that ten percent of the prisoners are women.  The sub-class of prisoners who contracted covid-19 while in custody at Santa Rita Jail number over 569 prisoners.

20.    In addition, joinder is impracticable because, upon information and belief, many members of the class are not aware of the fact that their constitutional rights were violated and that they have the right to seek redress in court.  Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.  There is no appropriate avenue for the protection of the class members' constitutional rights other than a class action.

21.    The class members share a number of questions of law and fact in common, including, but not limited to:

22.    whether defendants SHERIFF and ARAMARK jointly established and implemented written policies and unwritten customs and practices specifically designed and intended to deny access to clean, unspoiled and sanitary food adequate to maintain health, and reduce necessary expenditures on food purchase, food preparation, food storage and the proper food handling and service, in order to reduce defendant's SHERIFF's costs to increase the profits of defendants SHERIFF and ARAMARK;

23.    whether the sanitation in prisoner housing, in holding cells, in the OPHU, in the jail kitchen,  is inadequate and unconstitutional and violations of prisoners eight and 14th amendment rights;

24.    whether defendants SHERIFF and WELL-PATH established and implemented policies specifically designed and intended to place the reduction of costs as the primary objective in the provision of medical care for Plaintiffs and class members which resulted in the detriment and injury of Plaintiffs and class members;

25.    whether this denial of medical care violated Plaintiffs and Class members rights under the 8th and 14th Amendment;

9

26.    whether the members of the class were denied access to food that is adequate to maintain health;

27.    whether defendant SHERIFF, pursuant to written policies established and adopted by defendants AHERN and SHERIFF to increase profits, implemented these policies in part by providing the low quality and limited quantity of food provided to prisoners, which then forces prisoners who can afford it, to purchase food from the commissary.  This has the double benefit to defendant SHERIFF of maintaining lower costs output for food and simultaneously increasing profits from sale of commissary items.  On information and belief, plaintiffs assert that defendant Ahern has sole approval authority over recent significant prices increases where simple, common food stuffs such as ramen return profit margins of 400% and the written contract with the commissary concessionaire provides that defendant Sheriff  40% of all profits earned.   Commissary prices were significantly raised in Fall, 2019 and again in Spring, 2020.

28.    whether defendant SHERIFF, as part of its objective to maximize profits from the prisoners to the jail, in concert with WELL-PATH policies and practices,  created practical barriers to medical care by requiring prisoners to request each and every medical service, by implementing procedural barriers for prisoners making the Jail required requests for medical assistance, including limiting the availability of medical request slips, or the ability to submit these slips electronically; and long delays in responses to submitted medical request slips; and punishment and retaliation by the jail for prisoners requesting medical attention, including emergency medical attention.  Inasmuch as discovery has not commenced, plaintiffs allege that some of these are written practices and that these some policies are implemented through custom and practice.

29.    whether defendant SHERIFF established and implemented policies in violation of the First, Eighth and Fourteenth Amendments, to intimidate and prevent plaintiffs and class members from filing grievances against wrongful and unlawful practices at SRJ;

30.    whether the members of the class were prevented by fear of retaliation from engaging in the right to file grievances against unlawful practices and from communicating medical needs and requesting medical attention at SRJ.

31.    whether at all times relevant to this Complaint Defendants SHERIFF, WELL-PATH and ARAMARK acted under color of State law;

32.    The Plaintiffs' claims are typical of those of the class.  Like the other members of the class, the Plaintiffs were victims of the Defendants' policy, practice, and/or custom of preventing access to:

appropriate and necessary health sustaining food; necessary sanitation including sufficient supplies provided with sufficient frequency for maintaining sanitation; access to medical care; and to be free of enforced idleness due to excessive confinement.

33.  The legal theories under which the Plaintiffs seek relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the Plaintiffs are typical of the harms suffered by the class members.

34.  The Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interests with members of the class, and will fairly and adequately protect the interests of the class. The Plaintiffs have all been subject to conditions of confinement that violate the First, Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution.

35.  The Plaintiffs are represented by experienced civil rights and class action counsel.  Plaintiffs' Counsel have the resources, expertise, and experience to prosecute this action.  Plaintiffs' Counsel know of no conflicts among members of the class or between the attorneys and members of the class.

36.  The Plaintiff class should be certified pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to class members, the interests of the Plaintiffs and potential class members are aligned, and a class action is superior to other available methods for fairly and efficiently adjudicating the case.

STATEMENT OF FACTS

37.  Santa Rita Jail was a newly constructed jail, which was completed in 1989, and designed with the concept of locking up prisoners.  Santa Rita Jail was not designed to provide prisoners with classes or programs, but primarily to keep prisoners, even those who are pretrial, locked in cells, with enforced idleness.

38.  Defendant SHERIFF, despite California State policy that the "dramatic spending in corrections" have resulted in worse or unchanged recidivism rates, and mandated that "California must reinvest its criminal justice resources to support community-based corrections programs and evidence-based practices that will achieve improved public safety returns on this state's substantial investment in its criminal justice system,"  Penal Code §17.5, and despite Defendant Alameda County Sheriff's Office's receipt of a significant portion of Alameda County's funding from the state for evidence based practices, through realignment funding, defendant SHERIFF has not changed its emphasis on its premier policy of enforced idleness and punishment and deprivation for all prisoners, including pretrial detainees.

## PROFITEERING: JAIL POLICY PLACING PROFIT OVER PEOPLE

39.    Since 2013,  Defendant AHEARN  has overseen an unprecedented increase in the salaries of defendant SHERIFF personnel at Santa Rita Jail.  Salaries and benefits at SRJ have increased by $12.44 million dollars since 2013.  As a result, being a jail guard at SRJ is one of – if not the most – remunerative jobs in the entire county that a high school graduate with no college education can get. A starting jail guards make approximately $100,000 per year in salary and benefits.  This is not counting overtime payments available.

40.    That $12.4 million-dollar salary increase, and the $1.7 million increase in overtime between 2013 and 2018 amounted to almost 50% of the Sheriff's office SRJ budget increases over that period. It is reported that in 2017, Defendant AHEARN received $632,332 in total compensation, then Detentions and Corrections Commander Houghtelling received $449,144.96 in total compensation and Defendant Captain Hesselein received $394,437.

41.    Over the same period, while remuneration for Sheriff's office deputies and personnel at SRJ increased substantially, the SRJ jail population for whom the Sheriff is responsible, declined by almost 30%.

42.    According to Defendant SHERIFF, the average daily population at SRJ was 3,431 prisoners in June 2013 and had fallen to 2,825 by June 2015.  On March 1, 2020, the Jail population was 2,597. On May 6, 2020, the population had declined to 1,746.   Thus, the population at SRJ has declined by about 30% at the same time that remuneration for Sheriff's office deputies and personnel at SRJ increased by over 18%.

43.    On March 20, 2020 defendant SHERIFF submitted a budget increase request to the Alameda County Board of Supervisors, of an additional $106 million to hire 456 new staff for the jail, which the Board of Supervisors for defendant Alameda County approved at the urging of defendant SHERIFF and defendant MADIGAN.

44.    Defendants Sheriff and AHERN continually imposed reductions in the prisoner food budget at SRJ.  From fiscal year 2013/2014 to 2017/2018, the food budget was reduced  in the amount of $1.65 million, which was a 25% reduction.

45.    The cost reductions instituted by Defendants ARAMARK, Sheriff and AHERN in the food budget contract had a devastating impact on the quantity and quality of food provided to prisoners at SRJ, creating a situation where the food served is high in white flour, starches and sugar to reach minimum caloric requirements, with little in the way of fresh fruits and vegetables.  Protein is

primarily soy powder.  Availability, frequency and variety of fresh fruits and vegetables diminished significantly, and portion size also diminished.

46.    During this period, SHERIFF entered into written contracts with private, for-profit companies to provide basic and necessary services to SRJ prisoners, including with Defendant Aramark for prisoner food services, and Defendant Well-Path for medical care.

FOR PROFIT COMMISSARY

47.    Defendant SHERIFF maintains additional for-profit operations at the jail for which prisoners must pay to make phone calls, have video visits with family members, purchase food and personal items through the commissary system, and music and movie entertainment on the jail tablets.

48.    The Santa Rita Jail Commissary sells pre-packaged foods such as chips, cookies and ramen, with a high profit margin.  From the Commissary, the Jail receives a 40% of the net sales with a guarantee of $500,000 per year through defendant Sheriff's written contract with Keefe Commissary Network.  Inmate can only purchase products through the jail commissary and vending machines.  Some commissary items have over a 400% mark-up.  Maruchan Ramen sells for $0.24, retail, on Amazon;  Defendant Sheriff charges the prisoners, $1.13 for the same ramen.   Assuming defendant Sheriff and its Vendor Keefe purchase wholesale, the profit margin to defendant Sheriff and the commissary vendor is even higher.  Per Sheriff Ahern's July 11, 2018  report to the Alameda County Board of Supervisors, defendant Sheriff earned $1,742,062 in 2017 from commissary sales.

49.    Commissary prices were raised in early Fall, 2019 and again during the covid-19 pandemic, in late Spring, 2020.  Per the written contract with Keefe, the commissary provider, Defendant Sheriff controls price increases.

50.    It is the policy and practice of Defendants Sheriff and County to maximize profits.  One means of maximizing profits is to create a demand amongst prisoners for commissary food.  The profit motive for the commissary creates an incentive for making the jail food insufficient, unpalatable with poor quality and small portions, and creates a disincentive to make any changes or improvements.  When jail food is inedible for a variety of the reasons stated herein,  prisoners are rendered hungry, which increases the demand for high priced jail commissary food items that returns a significant profit for Defendants Sheriff and County.

**DEFENDANT SHERIFF'S AND ARAMARK FAIL TO PROVIDE DECENT, SANITARY AND SUFFICIENT FOOD TO PRISONERS TO SUSTAIN HEALTH.**

13

51.    Edible, sanitary food, which supports health is a basic right under the Eighth Amendment of the United Stated Constitution and Article 1, Section 17 of the California Constitution.  And for the 85% of the prisoners in Santa Rita Jail, they are not to be punished under the Fourteenth Amendment of the United States Constitution and Article 1, Section 7(a) of the California Constitution.

52.    Defendant Sheriff's operation of the Santa Rita Jail kitchen and defendant ARAMARK's operation of the food preparation at Santa Rita Jail demonstrates deliberate indifference, in that these defendants' practices result in prisoners often receiving spoilt, contaminated, inedible and insufficient food in violation of the constitutional rights of all prisoners incarcerated at Santa  Rita Jail.

53.    There is no penological justification for defendants SHERIFF and ARAMARK's ongoing policies and practices of serving contaminated, spoilt, or insufficient food to prisoners.  Instead, defendants Sheriff and Aramark are motivated by a profit motive, to reduce as much possible the costs, including basic food costs, out of the Santa Rita Jail food services, and to create as much demand as possible for prisoners' commissary food purchases.

## SANTA RITA JAIL'S KITCHEN AND FOOD OPERATIONS

54.    Defendant SHERIFF contracts with defendant ARAMARK to prepare food for prisoners at Santa Rita Jail and prisoners at other adult jail facilities in Colusa, Solano, San Benito, San Joaquin, Amador and Lake counties, and a juvenile facility in San Joaquin County.  The food prepared for the other carceral facilities provides profits for both Defendants Sheriff and ARAMARK.  Food services at Santa Rita Jail prepares 16,000 meals a day with the free labor of prisoner workers who are not paid and receive food treats as incentives for working.  Defendant Aramark does little to no training. Most of the inmates learn on the job, or from other inmates.  Inmates are not given instruction on what standards or metrics should be used in their tasks, nor assistance in meeting any such standards or metrics.

### DEFENDANTS' OPERATION PERMIT VERMIN, RODENTS AND ANIMALS EASY ACCESS INTO THE JAIL KITCHEN, SUBJECTING PRISONERS TO  INFESTED AND UNSANITARY AND CONTAMINATED FOOD

55.    Defendants are deliberately indifferent to the substantial and obvious risk of harm caused by Defendants' policies and practices permitting vermin, mice, rats and birds to enter the Santa Rita Kitchen –with great ease—AND at will-- attracted by the warmth in winter, ample water, food and shelter.  There is no dispute that having vermin, mice, rats and birds in a kitchen and during food preparation is an unacceptable and unsanitary situation.  Title 15 of Calif. Code Regs has a number of regulations which set the standards for all jails in California, including Santa Rita Jail and defendant

14

Sheriff.  These provisions include §1245 which requires that Santa Rita Jail meet the standards set in California's Health and Safety Code §§113700 et seq., which is the Retail Food Code.

56.    The California  Retail Food Code § 113980 requires that "All food shall be manufactured, produced, prepared . . . stored . . . and served so as to be pure and free from . . . spoilage; . . . shall be protected from dirt, vermin, . . . droplet contamination, overhead leakage, or other environmental sources of contamination; shall otherwise be fully fit for human consumption."

57.    <u>Santa Rita Jail Kitchen</u>.  The jail has a large central, industrial kitchen.  All inmates at Santa Rita Jail are fed from this kitchen.  A cart system delivers the food from the kitchen to the housing units.   The carts travel in and out of the kitchen, so that there are large openings in the kitchen's exterior.  These exterior openings are partitioned off with strips of clear plastic sheeting that are not fastened along the sides nor the bottom.  The plastic sheeting does not reach the ground, and often the plastic sheeting is pulled over to the side, to permit the carts easy entry and exit.  The surrounding area next to Santa Rita Jail, and particularly the kitchen is undeveloped, wild lands of the east bay hills, in which animals including birds, mice and rats, live.  Because the kitchen is not fully enclosed, wild animals, including birds, rats and mice, have easy access into the kitchen, drawn by the warmth, water, and ample food.

58.    Birds, mice, rats and cockroaches live in the Santa Rita Jail kitchen, because the only separation between the kitchen and the exterior are hanging, loose sheets of plastic, inmate kitchen workers have seen birds walk under the plastic into the kitchen.  Food in the kitchen is kept in such a manner that provide the birds, rats and mice easy access.  Bread is kept in plastic bags in open plastic crates.  Rats climb over the bread and chew open packages.  The cake and bread trays, loaded with baked goods, are left out over-night, uncovered, and the birds feast.  Bird feces are left on the cakes and breads.  Birds also roost on lights and fixture, depositing feces on the  jail kitchen surfaces.

59.    Used food trays are collected and delivered to the kitchen, where they are stacked against one wall, and left in the open, available and accessible to mice and rats, again providing an easily accessible, bounty of food and therefore, continually attracts mice and rats.

60.    California Health and Safety Code Sections 113700 through 114437, called the California Retail Food Code govern commercial food  facilities, which includes Santa Rita Jail's kitchen.  Santa Rita Jail is required to comply with the California Retail Food Code.  Section 114259 requires that food facilities be constructed, equipped, maintained, as to prevent the entrance and harborage of animals, birds and vermin, including rodents and insects.  Cal. Health & Safety Code ¶ 11426

15

requires that food facilities be "fully enclosed" with permanent floors, walls and roof.   Defendants operate a kitchen in violation of the California Health and Safety Code because it is open to the exterior and not enclosed;  plastic sheets and strips are not a permanent wall, and the current jail kitchen construction freely allows rodents, birds and vermin to enter and occupy the kitchen.

61.    Instead of expending the funds necessary to enclose the kitchen with a permanent wall that is capable to keeping out rodents and birds, and therefore be in compliance California code, defendants have insisted on maintaining the plastic sheeting and strips.

62.    Prisoners have also notified sheriff deputies of rodent and vermin droppings and of bird excrement in their food.  And on occasion, boiled mice are found in the beans.  Prisoners have filed grievances on these issues.  These grievances are denied and these notifications have not caused either defendant SHERIFF, COUNTY nor Aramark to change its procedures, or improve their sanitation.

63.    Plaintiff Larry Gerrans, during his incarceration at Santa Rita Jail, was a federal pretrial detainee.   He was initially incarcerated in August of 2019.  When he arrived at SRJ, the other prisoners warned him that the food was frequently contaminated with rodents, rodent droppings and other forms of adulteration.  At his first meal he was instructed that he should never scrape the sides or the bottom of his tray because the Jail doesn't clean the trays well, and often there are uncleaned food leftovers from previous meals left stuck to the tray's bottom and sides.  He was also warned to always observe the color of any liquid on top of the plastic covering over the food tray, and to refuse any tray in which the liquid was yellow or brown, indicating rat urine.

64.    Sometime in late September, early October, 2019, after unwrapping his dinner tray, he opened the two slices of bread, and saw rat feces between the bread.  He immediately called the housing unit deputy, deputy Wong.  Deputy Wong turned on his body worn camera and recorded Larry Gerrans' request that he document the rat droppings between the bread on his dinner tray.  Larry Gerrans was concerned because he knew that rats carry the Hanta virus, which is passed through their feces, and Hanta virus can be deadly.  Larry Gerrans requested that Deputy Wong document and report this so that this issue could be fixed.  He also completed a Grievance Report No. 19-2431.  Plaintiff Gerrans later learned that the rat feces were destroyed by Deputy Wong and never submitted along with his grievance.

65.    Deputy Wong was harassed and ridiculed by fellow deputies for accepting the grievance, and the next time there was a problem with food, he refused to accept the grievance but brought a replacement food tray.

66.    Meals served in plaintiff Daniel Gonzalez's housing unit in 2019 contained a dead mouse in a sandwich bag, a dead mouse cooked with the beans and a razor in the beans.  As a result of these incidents, Daniel Gonzalez was fearful and refused to eat beans and hot cereal, and would only eat those foods that he could carefully examine, or which arrived sealed.

67.    In Fall, 2019, Chad Arrington, a class member had pieces of metal in his food, which he believed to be broken pieces of razors.  He accidentally swallowed a piece of the razor, creating a medical emergency.  Not only Chad Arrington but 6 other inmates have also found metal or pieces of razor in their meal trays and filed grievances.

68.    On January 22, 2020, class member Eric Rivera filed a grievance stating that he and two other inmates in his housing unit found rat droppings in their food tray.  In July, 2020, David Mellion, a class member, found rodent droppings in the drink cup that came with his meal. Alameda County Vector Control confirmed that these droppings are indeed "mouse fecal pellets".

69.    On June 15, 2020. Robert Manning, a class member along with multiple other class members saw a dead mouse on a food tray in their housing unit 31 West.

70.    On November 14, 2020, Joey Haines, a class member saw some black pellets in his dried cereal that appeared to be rodent feces.  When he showed his tray to the housing unit deputy, the housing unit deputy was casual about the situation, didn't take any action to notify the kitchen, and simply just offered Joey Haines a replacement tray.  Joey was concerned that rodent feces would infest other food as well, and that a replacement tray did not fix the problem.  Thereafter,  he mailed the feces and cereal to his family, to insure that there would be proof of this contamination.

71.    As a result of these regular and frequent incidents of contamination and unsanitary conditions with the jail food, prisoners refuse to eat the beans or cooked cereal, or foods that are not prepackaged; limiting themselves to prepackaged foods such as packaged carrots, cartons of milk, oranges or fresh fruit.  As a result, many of the prisoners regularly experience hunger or are forced to purchase commissary items.

 Portion Size Is Inconsistent And Insufficient.

72.    Even if the food is not spoilt and fit to eat, the food served is frequently insufficient in order to sustain health.  Defendant Aramark's often serves scanty or small portions and prisoners are left

hungry.  Contents of food trays are inconsistent and not in compliance with defendant Aramark's own menu plans.

73.   The kitchen prepares the meals by taking refrigerated tubes of pre-cooked food, and scooping the food onto food trays that have built in cups.  Other food, such as bread, is added.  This is done on a production line.  Although inmate workers are supposed to be supervised, defendant Aramark, as a cost savings measure, does not hire enough staff to properly supervise or train  inmate workers, particularly on the issue of portion size or insuring that all menu items are on every tray.  Loading food trays is driven by a production number, and the tray's size.  If the portion size does not fit the tray pocket, then the portion size is reduced.  Sometimes, prisoner workers just cram two items into one tray pocket, in order to keep the line moving.  In addition to irregular or under-sized portions, often menu items are missing from the trays.  Because of the lack of production controls, items are frequently missing, or random substitutions are made.

74.   Regularly, the portions of foods in the trays are significantly less than what is required;  less than what is indicated on defendant Aramark's menus, or required by California regulations.  For all of 2020, and perhaps longer, the fresh carrots in the kosher/halal die, instead being the required 3 ounces, as stated on the menu, consisted of a prepacked plastic bag of only 1.6 ounces of carrots (as stamped on the bag), so these inmates received, daily, 48% less than what was required.

75.   For the regular meal trays, the menu states should include a half-cup of carrots with the meal, but frequently and regularly there are only a spoonful or two of carrots, just enough to form a single layer on the bottom of one pocket on the tray, significantly less than one half-cup.

76.   Inmates suffer hunger daily because the jail food is insufficient because  the food trays have chronic food shortages.

Insufficient Food

77.   A number of regulations in Title 15 sets standards for jail food.  §1242 specifies that "Menus shall be planned to provide a variety of foods, thus preventing repetitive meals."

a.   §1241(c) specifies that "The daily requirement of fruits and vegetables shall be five servings. At least one serving shall be from each of the following three categories:

b.   §1241(c)(1) specifies that "One serving of a fresh fruit or vegetable per day, or seven (7) servings per week."

c.   §1241(c)(2) specifies that "One serving of a Vitamin C source containing 30 mg. or more per day or seven (7) servings per week."

d.      §1241(c)(3) specifies that "One serving of a Vitamin A source, fruit or vegetable, containing 200 micrograms Retional Equivalents (RE) or more per day, or seven servings per week."

78.   Class member David Misch has submitted in 2020 over 40 grievances on food issues, with the focus on food insufficiency due to food shortages.  Food insufficiency was daily.  David Misch documented a multitude of different food shortages, including only providing him half of his protein, or two-thirds of his breakfast cereal.  By calculation, over the course of 2020, defendant Aramark shorted David and all others who had the Kosher Diet with over 32 pounds of baby carrots due to serving 1.6 ounces rather than the required 3 ounces.  Because David Misch does not have the funds to purchase commissary food, he is completely reliant on jail food.  The insufficient jail foods due to spoilage, contamination, and shortage caused David Misch and others to be chronically hungry.  By the Winter 2020, David Misch was lethargic, and cold all the time.  In the last year, David Misch lost 45 pounds, attributed solely to insufficient food from food shortages and food spoliations.

Spoilage

79.   Even assuming that portions are sufficient, the food has to be edible.  Spoiled food is not edible; food overcooked to the point it cannot be chewed is not edible.  To get the food to the inmates, defendant Sheriff's policy and procedure is a multi-step chain.  Once a meal tray is loaded with food, it is sealed and then refrigerated.  Later, possibly days later, these food trays for Santa Rita Jail prisoners are loaded on top of each other into plastic crates called "buckhorns" and buckhorns are loaded onto the carts.  The carts deliver the buckhorns to housing units.  The carts are not refrigerated, nor do the cart doors close tightly.  They do not move smoothly.  Trays are jostled, and during transport, the plastic seal can and does frequently break.  The carts also frequently travel outdoors, and summer day time temperatures in Dublin can be in the high 90 degrees, Fahrenheit.  When the cart arrive at the housing unit, the housing unit deputy must move the cart into the housing unit and the food trays refrigerated.  The hot trays are then heated for two hours before being served.

80.   Due to the multiple steps from kitchen food to food tray, to refrigerator, to cart, to housing unit, to oven, and finally to the prisoner, there are frequent mishaps to the food.  The plastic seal to break, the food spoils, particularly milk in the summer, or is contaminated by rodents, or becomes completely dried out after 2 hours of reheating and rendering the food inedible.

81.   Astrid Taylor almost never has enough food to eat because by the time she receives her meal tray, the food is so overcooked that it is inedible.  For example, hard-boiled eggs, after being baked

for two hours are so dried out, the egg white is like rubber, and the only thing chewable is the egg yolk. Sometimes the texture protein that they use for "meat" is stuck so tightly to the tray, you can't even pry it off. It's like the overheating has glued the protein to the tray surface. Astrid also does not eat the lunch sandwiches because she witnessed a kitchen worker picking up slices of bologna which had fallen onto the floor, back up, and putting them into sandwiches. On the day in question, an employee of defendant Aramark was slicing bologna, and bologna was falling all over, on the table, and on the floor. Those slices of bologna which were on the floor were just picked up and used for sandwiches.

82. Leanna Zamora is a kitchen worker, and because of what she has observed, she never eats the jail food. Food is routinely improperly stored. Lots of food in the refrigerators are not properly sealed or uncovered. Left over items are not properly sealed but simply stuffed covered with a garbage bag. Leanna is generally hungry.

83. Jazzmin Barboza says that the seal on her trays are broken three to four times a week, leading to severe over cooking. When the seal is broken, most of the food in her tray is not edible. Tanya Simms said that she is on the gluten free diet, and the seal on her trays are broken almost every day, and very often the food seems spoilt because the texture is slimy. When the food is slimy she is afraid to eat it, and ends up going hungry.

84. Leah Conner is a kitchen worker and says that there are so many trays that it is not possible for her to wash all the trays in her shift, therefore, on a regular basis, there's food crusts left on the trays, and the kitchen uses those trays. There are plenty of roaches, and some areas, including the carts used to deliver the food, are never cleaned. There's mold in the bottom of the food carts. She has seen mice jump out of the cookie packs.

85. Gabriela deFranco is a pod worker. There are so many trays that come unwrapped or not fully sealed. She can't throw all of them out because there would not be enough trays, so they do triage and only throw out the worst trays. Recently, Gabriela found beans in her oatmeal, so her tray had not been adequately washed and she did not eat her meal, and was hungry instead.

86. Plaintiff Daniel Gonzalez reports on February 24, 2020 that "Today my breakfast was burnt completely into a hard patty. I've never seen oatmeal which last I checked was a liquid, burned so bad it turned into a solid patty."

87. David Misch reports that the textured protein on his trays frequently come as a solid rubbery disc, akin to a hockey puck. This textured protein is so tough, that kitchen workers state they cannot

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

dislodge this material from the trays without a tool to scrape the tray, that even using their fingernails does not work.

Poor Sanitation And Lack Of Cleanliness

87.    Food at Santa Rita Jail is served on plastic, reusable trays with pockets for holding different types of foods.  The Santa Rita Jail has a tray washing system that does not consistently or reliably remove old food and clean the food trays.  This is a chronic, long standing problem, but defendants ARAMARK and SHERIFF have failed and refused to change the manner and means of washing these trays.

88.    In Santa Rita Jail, used food trays are collected, placed back into the buckhorns and sent back to the kitchen in the robot carts.  Once the carts arrive, buckhorns with dirty trays are stacked along the walls and on the floors, overnight.  These trays are not rinsed.  By the time the next day's kitchen shift starts, this food has dried and hardened, particularly into the corners of the tray's indented pockets.

89.    Buckhorns have no lids.  Overnight, these trays, with left-over food provide a plentiful food source for rodents, cockroaches and other vermin.  As a result, the rodent and cockroach populations in the SRJ kitchen have thrived.

90.     The Aramark cleaning procedure is for these trays to be banged against the side of a garbage can and then dumped into a large, wash basin, approximately 100 to 150 gallons in size, which is filled with soapy water.  The banging does not dislodge all of the dried, crusted food.  To get rid of the dry crusted food, would require that each tray be scraped.  But because there are only 2 and infrequently 4 inmates working the scullery, there is insufficient workers to scrape each plate.  Neither defendant Aramark nor defendant County provide tools for scrapping each plate, so this step is usually omitted.

91.    The food encrusted trays are dumped into the large wash basin, which has a circulating pump which agitates the soapy water, and these trays swish around. The soapy water is infrequently changed, often only once a day.  A prisoner worker has a paddle to move these trays After a few minutes the prisoner worker takes a milk crate style plastic crate and scoops up these trays out of the wash basin and dumps these trays onto a counter.  A second worker then stacks these trays into a conveyor belt.  The trays are not rinsed.  These trays are then processed through a machine to sanitize the trays.  The sanitization process takes less than 5 minutes.  After this sanitization, the trays are then

provided to other kitchen workers to refill with new food for future meals.  Often the trays have left over food encrusted, and remaining on the bottom and sides of the tray' compartments.

92.    Because the trays are not rinsed and not dried after the soapy water bath, There is no rinsing and no drying, trays are sometimes wet  when new food is dished into the wet trays, so dry cereal, kool-aid packets, bread arrive wet and inedible, and corn tortillas taste of soap.

93.    Inmate workers have requested that the wash basin water be changed more frequently and that more soap be used in the wash water.  These requests were denied by defendant Aramark because "soap is expensive".

94.    Inmates know never to scrap the sides or bottom of the tray's pockets because one will run into old food stuck on the sides or bottom, that has gone through soap.  Therefore, even if inmates are driven by hunger to eat the jail food because they cannot afford commissary food, inmates are short changed portions and regularly experience hunger even if they do eat the jail food because a significant portion of the food served is contaminated by old, soapy food and therefore inedible.

95.    Since 2017, at least 135 grievances have been filed by inmates at Santa Rita Jail on food related issues.  Defendant Alameda County Sheriff's Office overwhelmingly denies these grievances.  Not a single grievance response indicates that the circumstances which give rise to these problems with food has been addressed.

96.    SRJ kitchen's lack of proper sanitation,  rodent infestation, and dirty trays are long standing problems, which were raised in the litigation Mohrbacher et al. v Alameda County Sheriff's Office, et al. 3:18-00050 JD, filed January 4, 2018.

97.    The issues stated herein regarding the food were raised in the Mohrbacher case.  Per Judge Donato's order, those issues common to women and men are consolidated herein.

98.    In the 3rd amended complaint of Mohrbacher, filed on 6/26/2018, the women pled in paragraphs 73 through 85 as follows:

    "Food Shortages and Dangerous Food Conditions at SRJ

    73. The kitchen at SRJ is staffed by inmate workers under the supervision of Defendant ARAMARK.  By 2016, inmates were no longer even consistently tested for communicable diseases before being permitted to work in the kitchen.

    74. Santa Rita's kitchen prepares food not just for prisoners in the jail, but also for other jails under the jurisdiction of ACSO.

22

75.  According to an inmate kitchen worker at SRJ, the kitchen at SRJ is filthy.   At least seven birds live in the kitchen and bird droppings fall all over counter surfaces, including food preparation surfaces.  Rats run across the kitchen floor and there are frequently rat droppings in the food.  When this is brought to the attention of a paid ARAMARK supervisor, paid supervisors brush the rat droppings off the food and instruct inmate kitchen workers to continue working.

76.  Food in the kitchen is kept such that rats access it.  Bread is kept in plastic bags in open plastic crates.  Rats climb over the bread and chew open packages.  When bread bags are chewed by rats, a few pieces are thrown away but the rest of the bread is served to prisoners.

77.  Sandwich meat, primarily bologna, often is spoiled, with raised white spots of unknown origin and type on it.  That spoiled meat is given to prisoners to eat.

78.  Cooked beans are not properly stored, and not labeled, so that old, leftover beans are frequently reheated and served, or combined with newer cooked beans.  As a result, the beans decompose, and frequently become slimy and start to bubble as part of its bacterial decomposition.  These decomposing spoilt beans are regularly served to prisoners.

79.  There is no soap in the kitchen bathroom, and no paper towels.  In every commercial kitchen, there is a sign saying it is the law that kitchen staff must wash their hands after using the bathroom.  Clean hands require soap and water.  Inmate kitchen workers have no way to clean their hands and their hands are not clean after they use the bathroom.  The kitchen bathroom is also very dirty.

80. Commercial kitchens normally have a daily clean-up crew which comes in and cleans all ovens, stoves, venthoods, floors, and other surfaces and equipment in the kitchen.  Commercial clean-up crews normally come in the early morning, before a commercial kitchen opens.  Inmate kitchen workers have never seen a clean-up crew at the SRJ kitchen.  It is clear, simply by looking at the SRJ kitchen, that it is never cleaned.

81.    The walk-in refrigerators in the SRJ kitchen are disorganized and filthy.  There is no cleaning schedule for the refrigerators, which are seldom if ever cleaned.  Water collects on the floor, indicating condensation due to frequent temperature variations above acceptable food safety levels.

82. Ingredients are not marked or dated when they are received into the kitchen so there is no way to track use-by dates of the inventory.  As a result, kitchen workers are unable to tell which

ingredients should be used first or to follow standard first-in, first-out inventory control to prevent spoilage.  As an inevitable result, ingredients frequently spoil.  Sandwich meats are frequently become green or purple.  Beans become slimy and bubble.  Meals prepared from these spoiled ingredients are given to inmates to eat.

85. "Podworkers report that there are regularly vermin and vermin feces in the food and food trays.  Plaintiff JOHNSTON reported that while serving meals, she saw both rodent feces in one person's food tray and another tray with limbs and a rodent fetus cooked into the beans and served.  Plaintiff JOHNSTON brought this to the attention of Deputies Farmanian and Pope, who were on duty.  One of Deputies Farmanian or Pope took a picture of the tray, treating it like it was a joke.  The tray was then served to an inmate with instructions to "eat around it."  Another time, when a prisoner showed one of the deputies evidence that a rodent had eaten part of her lunch, one of the deputies, Farmanian or Divine said, "Mice gotta eat too".  "  As a result, Plaintiff JOHNSTON refused to and was unable to eat any beans.  Since beans were regularly served, she often suffered hunger. "

Sanitation Problems (Pre-Covid)

99.  Defendants Sheriff and Ahern, instituted and enforce rules that require Prisoners to clean their cells and common areas.  Prisoners complain that it is impossible for the plaintiffs and class members to actually clean the bathrooms, or their cells, and must live in squalor and filth.  Santa Rita Jail's men minimum security housing consists of large cells with 28 to 30 men in each cell. Men are housed in bunk beds, and there are 6 cells in each housing unit.  In the minimum-security housing units, each cell has 2 toilets, one urinal and one shower, which all 30 prisoners share.  The jail does not provide soap in the bathrooms.  Pre-Covid, the jail only permitted access to cleaning supplies at most, once a week for 15 minutes.  Many times, cleaning supplies are denied for weeks.  In addition, the cleaning supplies on the minimum side is limited to one broom, one mop, a short handled toilet brush and one bottle of cleanser.  There is a mop bucket which is filled once with some cleanser and water and used for three housing PODS.  The broom and mops are the same set, used in all areas of the prisoners' cells, the bathrooms, the common areas, the sleeping areas, and the brooms and mops are never cleaned, the bacteria and filth from the bathrooms are actually just spread around, making everything coated with dangerous bacteria and dirt, rather than actually improving the cleanliness and the sanitation of prisoners' cells.  One of plaintiffs' complaints is that the prisoner bathrooms were

infested with swarms of small flies or biting gnats who are attracted by the filth.   The men have regularly requested better and more frequent access to cleaning supplies.

100.   There is no security justification in providing three PODs with one mop bucket of cleaning solution, for 6 showers, countless toilets and cells.  The only policy rationale for not permitting more than one mop bucket and for not providing a greater number of cleaning tools and cleaning supplies is defendants SHERIFF and Ahern's fiscal penny pinching.

101.   Furthermore, the jail has a policy of housing people who are detoxing from drugs with the general population in a housing unit rather than in a medical unit where these people receive care from medical staff.  People who are detoxing from drugs are very ill, vomiting or with severe loss of bowel control.  These people end up vomiting or losing bowel control on their beds, on the floors, all over the bathrooms.   Because getting a lower bunk often requires a medical slip, these prisoners who are detoxing are placed in the upper bunk and the vomit and feces gets on the person below.  In addition, these individuals are disoriented, weak, and when they have to vomit or have loose bowels, they have difficulty getting down in a hurry from the top bunk, leading to frequent falls and injuries.  Sometimes, these severely weakened and impaired individuals are unable to reach the bathroom and the resulting human bio-waste is over the floors and in the general cell living area.

102.   Because everyone is required to live together, the smell, biohazards, and filth negatively affects everyone.  Because prisoners have no access to cleaning supplies, this frequent situation contributes to the squalor, filth and unsanitary conditions prisoners are forced to live in.  Almost all of the minimum-security cells have someone at least once a week, who is detoxing, so this is a constant, chronic condition.

103.   Due to the policy of arresting indigent and homeless people, defendant SHERIFF regularly places these people into the cells with other prisoners, without affording these people an opportunity to shower and wash before being placed into housing.  Theoretically, there is a shower available at booking/intake.  However, the holding cells and the booking/intake facilities are routinely filthy, rendering the showers unavailable, and unusable, and certainly not suitable for assisting in cleaning people to avoid the spread of contagion.  This results in the spread of contagious bugs such as lice and scabies, staph infections, e-coli, pseudomonas, hepatitis, C-difficile, and even possibility the Aids virus.

104.   These problems are exacerbated by the jail's policy pre-covid of not providing soap for prisoners in the bathrooms.   Although there is a "free" toiletry kit given out to all newly booked

prisoners and for indigent prisoners, the products are of limited quantity, does not suds well, so that it is inadequate for maintaining personal hygiene beyond one or two uses.  Therefore, while the soap in the "free" kit is supposed to last a whole week, those who are reliant on the indigent kit do not have enough supplies to maintain personal cleanliness for an entire week.  In addition, although the "free" kit for indigent prisoners is supposed to be provided once a week, often is provided less frequently.  The inability of prisoners to maintain personal hygiene negatively impacts all of the prisoners who share the same cell with indigent prisoners.

105.  The problems extend beyond the housing unit cells and booking/intake.  Whenever people are booked, or go to and from the jail to court, they are held in the multi-purpose rooms, and various holding cells.   A recurring problem is unsanitary conditions in the bathrooms and the holding cells.  Due to the large number of people who transit through these rooms, these cells quickly become dirty, and filled with trash.  The multi-purpose room, holding cells and dress out rooms are rarely cleaned.  The bathrooms available are filthy with feces and biohazards all around.

106.  Prisoners do not have access to soap outside the housing unit cells because they are not permitted to carry this soap on their person.  Because the jail does not provide soap in any of the bathrooms available to prisoners, when prisoners are required to go to court or other parts of the jail, they have no means to wash their hands after using the bathroom.   While there is a policy on the books for Defendant SHERIFF's books permitting prisoners to bring a sanitary kit to court, whether a prisoner actually gets to bring a "sanitary kit" depends on the arbitrary whim of the deputies in charge at the various stations along the way.  Most prisoners do not chance bringing their soap with them because meeting up with the wrong deputy results in having that soap confiscated and therefore in having no soap at all.  As a result, prisoners going to court are not afforded the ability to clean their hands.

107.  On the maximum side, the prisoners do not even get a mop bucket.  Instead, all they receive for cleaning is a broom with no handle, just the bristles, and a squirt bottle of some cleaning solution.  No rags, no sponges, and no means to wipe is provided.  Prisoners on the maximum side have to use their own tee shirts, or one prisoner said, that he would watch the pod workers, and if one of them happened to leave a used rag around, he would take that used, dirty rag, to wipe down his cell and toilet.

108.  On the maximum side, each cell can hold at most 2 prisoners.  Each cell has a bunk bed, and a toilet and sink.  The showers are located in the common areas.  During POD time, the doors to the

cells are locked.  There is no toilet in the POD area, so anyone who has to use the bathroom is forced to go in the shower, or if they have a plastic bottle, urinate in a plastic bottle.  This creates an unsanitary situation for everyone.  The jail claims that cell doors can be opened once an hour for prisoners to use the bathroom.  However, the technicians routinely shut off the television when cell doors are open.  Those men who require to use the bathroom are then holding up access to news and programs for the entire pod, when they have to use the bathroom.  Therefore, to avoid conflict, which can lead to physical conflict, most men do not ask that the cell doors be opened, and use the showers or plastic bottles instead.  The jail, despite grievances, have refused to remedy this situation.  As a result, the POD showers are regularly are contaminated with urine and feces, are filthy and coated with biohazardous.

109.  Many prisoners have stated that they have caught various skin infections as a result of the dirty and unsanitary conditions in their cells.  Plaintiff Larry Gerrans, after the first time he volunteered to clean the bathroom in his dormitory type cell, developed a severe bacterial infection in his right foot, which caused the skin to become inflamed, puss and bleed.  The bacteria was a form of flesh eating bacterial so that despite anti-biotics and antiseptic betadine, the wounds did not heal.  The inflammation became so bad that Larry Gerrans had difficulty walking.  As Larry Gerrans foot infection developed, other prisoners shared with Larry their own infections and scars, and Larry saw that these type of staph infections and bacterial infections are common among prisoners at Santa Rita Jail.

110.  Darryl Geyer fell on the stairs of his Housing Unit, causing a deep gash on his knee.  As a result of his fall, fecal bacteria  entered his knee, causing a yearlong infection that multiple trips to the hospital for surgery to  open up his knee, to irrigate and clean out the infection, and to have it re-sutured.  The fecal bacteria most likely was transported from the bathroom to the stairs due to the use of the one mop, and one bucket of cleaning solution that is used for the entire housing unit, including the bathrooms.

Sanitation (During Covid)

111.  The covid-19 pandemic became a national health crisis in mid-march, 2020.  Over the next few months, Santa Rita Jail slowly made changes to the sanitation regime.  Previously, defendants Sheriff prohibited prisoners from possessing bar soap, asserting that bar soap was a weapon.  But with covid-19, the jail, in order to enable and encourage prisoners to wash their hands, began to distribute bar soap, and there have been no reports that bar soap has been a security issue.  The brand currently

being distributed is Bob Barker bar soap, which many of the inmates have difficulty using because it is harsh and drying on the skin.  The Center for Disease Control states that  with bar soap, "ensure that it does not irritate the skin and thereby discourage frequent hand washing."  And although the jail is now distributing bar soap, it still does not allow prisoners to purchase bar soap on the commissary.  It is also unknown whether defendants will permit prisoners continued access to bar soap after the covid-19 pandemic ends.  Bar soap was not and is not available for purchase in the commissary.

112.   Defendant Sheriff increased the sanitation schedule, so that the tools and supplies previously available are now available more often.  Cleaning supplies in the general population housing units became available more regularly, and in some housing units, for a period of time every day during POD time, cleaning supplies were available.  However, the sanitation procedures and the sanitation tools and supplies did not change. In the minimum section the supplies are still limited to only one mop and one mop bucket for three PODs, and so the Cells at the end of the rotation have no possibility of being cleaned.  In reality, only the first few cells, who can use the mop bucket with clean water and cleaning solution have any chance of actually achieving cleanliness.   For the maximum side, they still are not provided rags or paper towels and entire housing units share one bottle of spray cleaner.  These insufficient cleaning supplies and cleaning tools does not permit genuine cleaning.  And the issues with showers being contaminated with human waste and not being cleaned, has not changed or otherwise improved.

113.   During covid, Troy Powell, a plaintiff a on the maximum side, contracted a serious fungal infection on his hands, from the dirty shower in his housing unit when the expanded sanitation efforts were in place.

Lack Of Cell Sanitation And Laundry : Out Patient Housing

114.   Santa Rita Jail has one unit, called the Out Patient Housing Unit ("OPHU") which provides a somewhat higher level of medical supervision because the OPHU, while not an infirmary, is staffed by medically trained personnel, and defendant Well-path has offices in that area.

115.   The cells in the OPHU have a toilet, a sink and a bed, and nothing else.  There is no common area for out of cell exercise.  Inmates in the OPHU do not have designated schedules or routine for showers.  There is no schedule for laundry exchange.  There is no schedule for cell cleaning.  And on information and belief, plaintiffs allege that OPHU does not have regular cleaning supplies available for inmate use.  Therefore, when inmates are housed in the OPHU for any length of time, they are

locked up in cells 24 hours day without any regularly available access to showers or clean laundry, or means to clean their cells.

116.   During the one year when Darryl Geyer suffered from the bacterial infection in his knee, he spent multiple stints in the OPHU, sometimes for up to three months at a stretch.  During these periods of time, he did not get laundry exchange, not even once within a three month period, and had to hand wash all his underwear in his sink.  He would infrequently be provided access to the shower, sometimes only once every two or three weeks.  He was denied all exercise and denied all out of cell time, and never received an opportunity for yard time or to be outside.  He rarely had a phone, no books, and spent that entire time in the OPHU in enforced idleness.

117.   For the inmates at Santa Rita Jail, who contracted covid-19, and were housed in the OPHU, experienced the same treatment.  They would only be provided access to the shower upon repeated requests, and then only at most once a week.

118.   Class member Joey Lovato reported that while in the OPHU for covid-19, there was no regular laundry exchange.  If he asked for clean laundry, they would give him one clean t-shirt, or one set of boxers, and never clean outer wear.

119.   Class member Jatinder Sing reported that after he returned from the hospital, to the OPHU, he was not provided with a laundry exchange, or other clean laundry and not given access to a shower without repeated requests.

120.   While Darryl Geyer was in the  OPHU, there were two prisoners housed there long term who had serious mental illness or dementia.  These two men were unable to provide for their own toiletry, and regularly soiled themselves.  One of these inmates was next door to Darryl Geyer, and the smell of the urine and feces was over powering.  No one went in to assist these men with medical care or toileting.  Once a month, these men would be removed from the cell, taken to the shower and hosed off.  A team, dressed in hazmat outfits would come in and power wash the cell, and then these men would be returned to these cells for another round.  Darryl Geyer was extremely upset and distraught at having to live next door to the accumulation of feces and urine, and also extremely upset and distraught that no one provided care for these prisoners.

<u>Defendant Well-Path's Financial Incentives To Provide  Inadequate Medical Care</u>

121.   Defendant SHERIFF has a written contract with Defendant WELL-PATH to provide all health care services of any type needed by any prisoner at SRJ.  WELL-PATH's contract specifies a set price based on average daily prisoner population ("ADP").

29

122. A number of sections of Title 15 pertain to medical care in Santa Rita Jail. Among them is §1200 which requires "emergency and basic health care"; § 1206 which requires health screening, and a "written plan to provide care" for any prisoner at the time of booking who requests or needs medical, mental health care; and § 1210(b) which specifies that "[f]or each prisoner treated for health conditions for which additional treatment, special accommodations and/or a schedule of follow-up care is/are needed during the period of incarceration, responsible health care staff shall develop a written treatment plan."

123. The written contract is calculated based upon the daily average prisoner population and specifies that WELL-PATH itself is solely responsible for all costs incurred in connection with any health care services provided to prisoners inside and outside the jail. WELL-PATH is not entitled to and will not receive any reimbursement from SHERIFF for the cost of services provided to prisoners by hospitals or by any non-WELL-PATH personnel. And defendant WELL-PATH is also charged with reimbursing defendant SHERIFF for the required deputy escort and transportation charges if a prisoner requires out of facility care. The cost for all such services is borne solely by WELL-PATH.

124. SHERIFF's contract with WELL-PATH explicitly states that WELL-PATH will pay for any and all "inpatient hospitalization costs, emergency room visits, ambulance transportation expenses, outpatient surgeries, outpatient physician consultations, outside specialist fees, off-site diagnostic procedures." If a prisoner receives such medical services, WELL-PATH must pay the total cost of the medical care provided, "regardless of the level of cost incurred."

125. The contract specifies that WELL-PATH alone will determine "the necessity and appropriateness of inpatient hospital care and other outside medical services."

126. Incredibly, the contract also specifies that in the event a third-party payor such as an insurer pays for part or all of any medical service provided to a prisoner outside the walls of SRJ, WELL-PATH must turn over half of that third-party payment to the Sheriff's office. In other words, even if WELL-PATH is reimbursed for its costs for outside medical care provided to prisoners, the Sheriff's office takes half of the reimbursement even though it paid nothing for the outside medical care.

127. By requiring WELL-PATH to pay for any and all medical care provided outside of SRJ to any SRJ prisoner, and by limiting WELL-PATH's ability to recover any amount WELL-PATH pays for such care, SHERIFF's contract with WELL-PATH creates a financial incentive and imperative for WELL-PATH to refuse and withhold needed and appropriate outside medical services to all prisoners, including pregnant prisoners, when the needed and appropriate medical services consist of

"inpatient hospitalization costs . . . outpatient physician consultations, outside specialist[s, or] off-site diagnostic procedures," among other services.

128.  By specifying that WELL-PATH alone will determine "the necessity and appropriateness of inpatient hospital care and other outside medical services," SHERIFF's contract with WELL-PATH enables WELL-PATH to refuse and withhold needed and appropriate outside medical services to SRJ prisoners, including pregnant prisoners, when the needed and appropriate medical services consist of "inpatient hospitalization costs . . . outpatient physician consultations, outside specialist[s, or] off-site diagnostic procedures," among other services.

129.  "[O]utpatient physician consultations, outside specialist[s and] off-site diagnostic procedures" within the meaning of the WELL-PATH contract include any outside or off-site OBGYN services, including prenatal care, provided to pregnant SRJ prisoners.

<u>Defendant Well-Path's Pattern And Practice Of Providing Inadequate Medical Care</u>

130.  Not surprisingly, when for-profit companies, like Well-Path, are given financial incentives to provide inadequate medical care in jails, inadequate medical care results.  A detailed study of more than 500 jails in the United States conducted by Reuters concluded that jails with healthcare companies overseen by private companies incur higher death rates and provide a lower quality of medical care than jails with medical care handled by government agencies.  For example, from 2016-2018, jails with publicly managed care had an average of 12.8 inmate deaths per 10,000 inmates per year.  Jails using one of the five leading contractors, of which Wellpath is the largest, had 2.3 to 7.4 additional inmate deaths per 10,000 inmates.  The death rates were 18% to 58% higher, depending upon the company.  See https://www.reuters.com/investigates/special-report/usa-jails-privatization/

131.  The Sacramento Bee found that, over a 10-year period ending in 2014, people in custody at California county jails serviced by a private contractor died of suicide or drug overdose at a rate about 50 percent higher than at other county jails when adjusted for population. See https://www.sacbee.com/news/investigations/the-public-eye/article7249637.html.  That contractor later became part of Well-Path.

132.  Well-Path is the nation's largest for-profit provider of health care to correctional facilities. The company services more than 500 facilities in 34 states.  An exhaustive investigation of Well-Path and its business practices by CNN completed in 2019 revealed that "amid a focus on 'cost containment' and massive corporate growth, the company has provided substandard care that has led to death and other serious outcomes that could have been avoided."  CNN's heavily documented investigation

looked at complaints and problems at nearly 120 locations managed by Well-Path in 32 states. CNN's investigative team noted that "[a]cross the country, the same themes have been found: doctors and nurses have failed to diagnose and monitor life-threatening illnesses and chronic diseases.  [Well-Path] employees have denied urgent emergency room transfers.  They have failed to spot or treat serious psychiatric disorders and have allowed common infections and conditions to become fatal." See https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/

Defendant Well-Path's Unreasonable Delay Or Denial Of Medical Treatment

133.  In order to maintain its profit margin, Well-Path has a pattern and practice of providing inadequate medical care by denying or unreasonably delaying medical care, reducing or denying medication and refusing to provide medical devices.

134.  WELL-PATH has limited medical services on site.  It does not have an infirmary, it only operates an outpatient housing unit ("OPHU") in which there are minimal medical services, but closer proximity to the one medical staff on duty.

135.  As a result of the cost provisions of SHERIFF's contract with WELL-PATH, medical care provided to SRJ prisoners at SRJ is grossly inadequate.   Santa Rita Jail has the highest number of inmate death in the Bay Area, and has an even higher jail death rate than Los Angeles County, which has the largest jail system in the country.  See https://www.ktvu.com/news/a-look-at-the-45-inmates-who-have-died-at-santa-rita-jail-in-the-last-five-years

136.  In addition, Santa Rita Jail prisoners are regularly denied necessary and appropriate outside medical care by defendant WELL-PATH because the provision of such care comes directly out of WELL-PATH's bottom line profits. In addition, defendant Well-Path has taken steps to limit the provision and availability of medication as cost saving steps.

Denial of Asthma Inhalers

137.  Tikisha Upshaw was originally permitted to keep an inhaler on her person when she was initially incarcerated in 2017.   However, in 2019, defendant CFMG changed that policy, and required submission of a sick call slip on issues involving inhalers.  This in effect denied access to inhalers for individuals with asthma because sick call slips are not responded to immediately.  This action by defendant CFMG was a cost savings measure, reducing the number of asthma inhalers required.

138.  Between 2019 and Covid, prisoners who have asthma and require an inhaler, were required to share a single inhaler.  During pill call, those with asthma were required to line up, and would be

provided access in turn, to that single inhaler. Access to the inhaler was only available during pill call. Each prisoner had a small cardboard box to place over the mouth piece, but that single inhaler was shared between all prisoners. This was unhygienic and violates medical standards, requiring patients to share medication, particularly one that is placed in a mucus membrane.

139. Post-Covid. On information and belief, Plaintiffs allege that due to public protest, defendants has changed their process, providing each prisoner, a dedicated inhaler. However, access to asthma inhalers are still limited to pill call only. Asthma attacks are not timed to pill call. If asthma sufferers have breathing needs outside of this schedule, it was tough luck.   Prisoners have to push the emergency button and wait for a technician to respond. After the technician responds, a deputy has to be called. After the deputy responds, if the deputy can then summon a nurse. This is a lengthy and difficult process, and deters many prisoners from requesting inhalers, instead, many suffer from limited ability to breath.

140. Brandon Burns has asthma, and requested to have an inhaler for an asthma attack. He pressed the emergency button, and spoke with the technician. The technician never responded, and a nurse never came.

141. Jatinder Singh   Class member Jatinder Sing reported that he tested positive for covid-19, and suffers from asthma, and as a result of breathing problems had to be transported to the hospital. Afterwards, upon his return to the hospital, he was not provided with access to the inhaler, and despite the smoke which infiltrates into the cells due to the wildfires in California, he had an asthma attack and had to request emergency assistance. Only then was he provided access to an inhaler, and only during pill call.

142. Kajuan Paschal BKO362 (Grievance on Denied Inhaler): "On 4-1-20 I was seen by a Doctor due to my asthma problems. I asked if I could use my pump [inhaler] and was told no. I told my reason why which was because I was having a hard time breathing and have been short of breath. Which didn't change the Doctor's answer. She didn't even check my vital signs or even listen to my lungs/breathing."

143. Tommy Cunningham  and Tikisha Upshaw have asthma, but the jail refuses to supply them with an inhaler. The jail only says that they will bring an inhaler when they have an asthma attack, but there is considerable delay. The anxiety and panic of not being able to breath, and the unknown of how long the delay will be, exacerbates the stress of asthma attacks, and not being able to breath, making asthma attacks much worse.

144.  Jade Andersen, filed a grievance that during the wild fires in late summer of 2020, smoke was filling the cells and aggravating her asthma.  She requested her asthma inhaler and was denied.

145.  Jamila Longmire filed a grievance stating that she had four (4) asthma pumps when she was incarcerated at Santa Rita Jail, that the jail confiscated all of her asthma pumps, and will not provide her with access to one, when she needs it for her asthma.

Denial of Appropriate Accommodations,

Lower Bunks/Lower Floor

146.  The upper bunk of the bunk beds has no ladder, and the only way to access it is to clamber on the top of a slipper metal table  hoist one-self up.  To get a lower bunk, requires a medical slip, called a "chrono".  For people who are detoxing, getting off the upper bunk quickly is important, otherwise they end up vomiting or defecating on themselves in bed, or the floor, rather than making it to the bathroom.  While detoxing, these people are in a severely weakened and disoriented state, and getting off that top bunk is difficult.  Yet, these people are medically cleared to be in housing units, and never given a chrono for a lower bunk.

147.  For individuals with seizure disorders or other mobility issues, it is not just the lower bunk, but being housed in the lower tier, which does not require walking up a long flight of steps to reach the cell.   A prisoner has to obtain a medical order for a lower tier, or lower bunk, which is difficult to obtain.

148.  Randy Harris  is a pretrial detainee.  When he was incarcerated in Santa Rita Jail he had a seizure disorder.  He requested a medical order for housing him on the lower floor and lower bunk due to his seizure disorder.  But Defendant SHERIFF refused to house him on the lower floor and in a lower bunk.  On October 3, 2020, while walking on stairs, from the upper floor, Randy Harris had a seizure and fell down 11 steps.  He was left on the ground for over two hours before the ambulance came.  Randy Harris now cannot stand, not even in the shower, and is in constant pain.  Defendant Well-Path failed and refused to do an appropriate diagnosis.  Randy Harris' criminal defense attorney was forced to obtain a court order under Penal Code 4011.5, for a medical evaluation.  A defendant Well-Path doctor stated that Randy needs surgery, but has refused to order the surgery because Santa Rita Jail does not have the facility, nor does defendant Wellpath have the means for Randy to do an appropriate recovery from spinal surgery.   Neither defendant Wellpath nor Sheriff wanted to incur the costs of providing Randy Harris with the surgery and the care for recovery.  Randy's attorney has continued to press for appropriate medical care including surgery.  In the interim, following the

34

**PLAINTIFFS' FOURTH AMENDED COMPLAINT**
*Gonzalez, et al  v. Alameda County Sheriff's Office  United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC*

actions of Randy' Harris' attorney, defendant Wellpath has cut off Randy's pain medication.  His daily pain is at a level 9 out of 10.  Defendant Sheriff has proposed that Randy Harris waive his constitutional right to a trial, plead guilty, and have the state prison system provide him with his needed spinal surgery.  Plaintiffs allege on information and belief, that the cutting off of all of Randy Harris' medication is a way to punish and coerce him to plead guilty so that he would leave Santa Rita Jail and then the costs for Randy Harris's surgery and recovery would become the State's burden.  This resolution would save defendant Wellpath significant costs for the surgery, and save defendant Sheriff from having to provide appropriate facilities for Randy Harris' recovery .

149.  Darryl Geyer fell on steps inside the jail and cut and injured his knee.  He asked to be assigned a lower bunk, the housing unit deputy refused.  Stepping on the slippery metal table and attempting to push  himself up to the upper bunk,  Darryl Geyer fell again, and this time, split his knee completely open. There was no penological reason to deny Darryl a lower bunk, in light of his recent fall and knee injury, except to mete out punishment, and to make a prisoner's life difficult, in line with defendant AHERN's publicly stated policy.

Denial of Medical Care, Medication and Medical Devices

150.   After falling the second time, Darryl Geyer's  wound did not heal properly.  It became infected, and defendant Well-Point merely gave him some Neosporin, a topical ointment to apply.  Over the next four months, the infection spread and grew, and was visible as a red line following his veins, moving toward his groin.  At that point, Darryl Geyer requested that his defense attorney file a Penal Code 4011.5 petition, requesting a court order that he be provided outside medical care for this increasingly serious condition.

151.  It turned out that his knee was infected with fecal bacteria, most likely spread from the bathrooms into the housing unit, the stairs, and Darryl Geyer's bunk, by the unsanitized mops and the fact that housing units shared one mop bucket for cleaning all areas including the bathrooms.  The mops are never cleaned, and the soapy water mop bucket is filled once a day, and not changed, remaining the same soapy water for all cleaning on each day.

152.  Over the next 8 months, defendant Well-Path tried various oral and topical anti-biotics, and placed Darryl Geyer in the Out Patient Housing Unit, and even suggested to Darryl Geyer that he consent to having his knee removed.  Finally, after forcing Darryl Geyer to endure more than 8 months of daily, severe papain, defendant Well-Path finally transported Darryl to Highland Hospital where he had repeated surgeries on his knee.   It took multiple surgeries because the infection

became so extensive due to defendant Well-Path's delay and refusal to take the necessary, medical steps when the problem initially occurred.

143.   Plaintiff LARRY GERRANS arrived at Santa Rita Jail, with a number of medical conditions, including hypertension, for which he was under the care of a physician and prescribed daily medication.  This information was transmitted multiple times to both defendant SHERIFF, and WellPoint.  Defendant SHERIFF refused to accept or permit prisoner LARRY GERRANS to bring into jail, his own prescription medication.  For over 22 days, defendants failed to provide plaintiff with any of his needed, daily prescription medication, and Plaintiff GERRANS' blood pressure continued to rise during that time until Plaintiff Gerrans was started suffering from dangerous symptoms of hypertension.  Then defendant WELL-PATH provided plaintiff with some other medication, which had not been prescribed, and this medication made Plaintiff Gerrans very ill.  He developed a migraine, started seeing light tracers.  He became nauseous and began vomiting violently.  For three days afterwards these symptoms persisted,  and even after the migraine and vomiting ended, to this day, his eyesight has not return to his prior level.

154.   Defendant WELL-PATH, on a regular, and constant basis clears newly booked individuals with addiction issues and withdrawal issues, to be placed into general housing with other prisoner, and refuse to provide these newly booked individuals with medical treatment for their withdrawal.  When these prisoners become violently ill, vomiting, seizing, or uncontrollable diarrhea, defendant deputies Doe 1-25, refuse to summon medical assistance, refuse to remove these prisoners, telling the other prisoners in the housing unit, "This is your problem.  If you don't like it, don't come to jail."  Clearly, this statement, "If you don't like it, don't come to jail," is to let all prisoners know, including the 85% of pretrial detainees that the essence of Santa Rita Jail are deprivations and punishments.

155.   Kyle Murphy was incarcerated at Santa Rita Jail.  At the time of the incident, he was pretrial and in minimum security.  One day Kyle started having seizures.  Men in his cell pushed the emergency button.  Defendant Technician Kaiser was on duty, and said, "Don't hit the button" and then apparently turned the button off.   Men in Kyle's cell started yelling "man down", and soon all of the six cells started yelling "man down".  It took 30-40 minutes for a Sheriff deputy to appear.  After visually examining Kyle, the Sheriff Deputy left, and it took another 15 -20 minutes before a male medical staffer arrived.  The male medical staffer came, assessed the situation and gave Kyle a dose of Narcan.  That had no effect, so the male medical staffer then left to get oxygen.  This created further time delay.  The male medical staffer returned with an oxygen mask and can, and proceeded

to try and apply oxygen to Kyle.  The male medical staffer was not well trained and did not know how to use the oxygen tank and mask.  The mask apparently was cutting off all outside oxygen to Kyle, but oxygen was not flowing from the tank.  Kyle started to turn blue.  Men in the cell started getting upset, and many of them were screaming "he's dying".  After some time with Kyle turning blue, a female nurse appeared.  She took the oxygen tube and plugged it into the tank and then oxygen started to flow.  They had to carry Kyle out.  He was gone to the hospital for a week, and upon his return, neurological damage was obvious.  His eyes could no longer track in tandem, and one of his eyes wanders.

156.  BRIAN CARTER was incarcerated into Santa Rita Jail in February 2015. Around 2017, Brain started itching all over his body, all the time. He visited defendant Well-Path/CFMG repeatedly, but they kept telling Brian it was "in his head."  During these eight visits over many months, defendant Well-Path/CFMG, failed and refused to do any diagnostic testing.   Only after eight visits to defendant Well-Path/CFMG over many months did defendant Well-Path even offer to test Brian's blood for a diagnosis.

157.   When they finally did test Brian Carter's blood, around a year after the symptoms first started, they told Brian he had a "thyroid issue." They didn't tell him the name of the issue - in fact, they really didn't explain anything to Brian. As far as Brian remembers, they put him on Methimazole which he is still on.   Defendant Well-Path also gave him eye drops because his eyes were especially dry and itchy.  But despite the eye drops, Brandon's eye irritation worsened.

158.  For two years, he repeatedly made requests to see an eye doctor and get checked out at Highland and has filled out many sick call slips and asked doctors many times to be referred to an eye doctor. Brian Carter's has still not been seen by an ophthalmologist or any other specialist. Defendant Well-Path has refused to do any further diagnostic examinations, has refused to have Brian examined by an ophthalmologist, and the reason is that Defendant Well-Path does not have a staff ophthalmologist and providing a opthamological exam would be an additional out of pocket expense.

159.  The scariest symptom, started happening in December 2020 when Brian Carter's eyes rolled back into his head. His eyes had already started bulging. The incident was terrifying for Brian Carter's – he couldn't see anything; he says he kind of tried to adjust his eyes to move them back into place. It was almost like he had to pop them back in. His eyes became totally bloodshot red. His eyes felt like they had pieces of lint or some contaminants in them. The nurse came that same day to take Brian to the doctor and they cleaned out his eyes.

160. The doctor told him the eye incident occurred because he is eating too much salt, which is interacting badly with his medication. The doctor said that iodine is not compatible with the medication. Previously Brian was never told that he had to be so careful about the salt in his diet. And Brian has no control over the amount of salt in his diet, as his meal tray comes set. Prisoners are not provided with any extra salt. Brian also met with the dietician shortly after he heard this, who told him there is no thyroid diet, only a high blood pressure diet. But when Brian filled out a sick call slip to get his diet changed to the high blood pressure diet, Defendant Well-Path CFMG denied his request for a medical diet.

161. Brian experiences a fast heartbeat, dizziness, hands shaking, exhaustion, itching, eye irritation, bulging eyes, eye blurriness, and weight fluctuation, Brian came into SRJ at 200 pounds (he is 5'8") and about a year ago, he plummeted to 148 pounds. His weight fluctuates 50 pounds up and down. On an average day, his dizziness is at around a 6 or 7 out of ten. Many days, he feels so lacking in energy,  he can't do anything.

162. Brian Carter's condition has not been fully diagnosed.  His treatment by defendant CFMG/Well-path is not controlling his symptoms.  Defendant CFMG/Well-path has told him no information about his condition.  A CFMG/Well-path doctor tells him to eat less salt, but then defendant CFMG/Well-path denies his request for a high blood pressure medical  diet that is low in salt.  This situation has been going on now for 4 years.  And defendant Well-Path is providing no treatment plan and refuses to take him to Highland for evaluation and a better diagnosis.

163. MAURY BUTLER had a torn ACL at the time he was incarcerated in August 2018.  Out of custody, he managed the torn ACL with a knee brace, appropriate shoes and regular ibuprofen for the pain.  Once incarcerated in Santa Rita Jail, defendant Wellpath/CFMG prescribed Maury 800 mg twice a day of ibuprofen but did not provide him with shoes or a knee brace.  To manage his knee, Maury Butler also needed, and had a prescription for special shoes.  These shoes stabilize Maury's feet so he could walk.   But Defendant Sheriff continually refused to give Maury Butler these shoes. So, Maury Butler's family ended up having to buy these shoes, and handed the shoes to Maury Butler in court, in front of the judge, so that the judge himself could order Maury Butler to receive these shoes.

164. In mid-Feb of 2021, defendant Wellpath/CFMG cut off Maury's ibuprofen and prescribed a small amount of Tylenol, which did not abate the pain.  The pain was so severe that  Maury could barely walk. He is not able to go up/down stairs. Ultimately, defendant Wellpath added 400 mg of

ibuprofen twice a day, about half of his previous prescription.  Maury's pain is at about a 7 (out of 10) every day. And the defendants SHERIFF and Wellpath have not provided any additional medical care and have refused to provide any additional medical care.  On information and belief, plaintiffs plead that the cut in medication was a cost saving measure, and had no medical necessity, especially since defendant Wellpath/CFMG did not replace the cut in ibuprofen with something else, and made no arrangements for alternate medical care.  Defendant Wellpath/CFMG has refused to consider surgery, has not provided any physical therapy or any other medical care for Maury Butler's knee.

164.  Chad Arrington had received a food tray which had been contaminated with pieces of razor blades, and so Cha accidentally swallowed a razor.  Well-Path refused to give him an x-ray to confirm the metal, or take any other action.  Well-Path had insisted that an x-ray was not needed because anything Arrington had ingested out simply be defecated, and played down any concern that the razor could cause any injury or intestinal perforation.  Finally Chad Arrington's defense attorney filed a Penal Code 4011.5 petition with the court requiring Well-Path to do a medical examination, where the x -ray confirmed that Chad Arrington had in fact swallowed pieces of metal.

165.   Fred Beverly had an untreated, infected open sore on the bottom of his foot.  This situation had been ongoing for a good part of a year.  This was aggravated by the footwear at the jail, which is either a plastic flip flop or a plastic croc type shoe. Mr. Beverly requested more protective shoes, which Well-Path refused to authorize.  In addition, Well-Path failed to properly treat Mr. Beverly's open foot sore, only providing an over the counter topical salve and a band aid.  Mr. Beverly's public defender had to file a Penal Code 4011 petition to obtain a court order to have defendant Well-Path provide the appropriate medical care.

166.  Eric Rivera.  On February 1, 2020, class member Eric Rivera had a sewage overflow in his cell, causing him to fall and hit his head and lose consciousness.  He has suffered headaches ever since, has requested a diagnostic examination and appropriate medical treatment, and received none.

167.  Annette Kozlowski was diagnosed with cervical cancer, and yet for months, Santa Rita Jail refused to take her for necessary treatment.  Annette was also reminded that "if she was released" to make sure she took care of it immediately, hinting that the jail was hoping she would be released before the jail provided her with medical care.  She was finally required to have her defense attorney obtain a court order, which only made the medical staff angry, telling her "We hate court orders" and telling her that her cervical cancer was not a priority.

168.   Rosa Perez, had an ongoing issue with neck pain and a serious rash on her face.  She repeatedly requested medical care, only to not receive any.  When Rosa told medical she needed an appointment, medical told her to just push the emergency button if the rash on her face got too red.  Pushing the emergency button only brought irritation from the housing unit guard.

169.   Tracy Benedict had several infected abscesses on her legs, and after pushing the emergency button in her cell, the deputies placed into the isolation cell, as punishment for pushing the emergency button.  Tracy was pushing the emergency button because she felt she had a blood infection.  Seven days later, she was finally seen by the doctor, and she was immediately taken to Highland Hospital and the abcesses drained and cleaned.  The guards and technicians refusal to take her medical condition serious was life threatening.

170.   Maria Moore is a pretrial detainee.  When she was not feeling well in 2019 so she filled out a sick call slip and went to see the Santa Rita medical clinic.  The clinic told her she was pre-diabetic, at risk for diabetes and needed to watch what she ate.  The Clinic told her, her prescribed treatment was to switch to the Gluten Free diet, which is a low carbohydrate diet.   After her medical visit, Maria Moore kept putting in medical requests to be changed to the Gluten Free diet.   Defendant Well-Path never authorized a gluten free diet, not until a year later, when Maria Moore was actually diagnosed as having diabetes.  Only after her actual diabetes diagnosis did Defendant Well-Path authorize the gluten free diet.   Plaintiffs plead on information and belief, that Defendants Sheriff, Well-Path, and Aramark, work together to maintain prisoners on the regular diet, because the medical special diets require more handling, and the gluten free diet has a higher level of fresh fruits and vegetables than the regular diet, and so the gluten free diet is more expensive to provide.  Maria is highly frustrated that she was denied the opportunity to prevent the development of diabetes from eating her medically prescribed diet sooner rather than the high starch and sugar regular diet.

Lack Of Dental Care

171.   Dental care, due to the financial imperatives, is highly limited at SRJ.  There is limited dental care for filing of cavities.  If the tooth requires a root canal, Well-Path does not provide root canals, instead, always opting to pull the tooth, which results in bone loss, difficulty eating, greater vulnerability for remaining teeth, and possible infection.

172.   Christopher Bonds had a tooth problem, which Well-Path chose to remove, but did not provide adequate follow-up care, and his mouth became infected.  Mr. Bonds' attorney was required to file a

Penal Code 4011.5 petition after he developed an infection, to obtain a court order to have Well-path provide the necessary medical care to remedy the infection.

173.  Eric Wayne.  Eric Wayne suffered for months of pain with a hole in tooth, "I have submitted several of dental request forms and endured the tooth pain for five (5) months before finally receiving medical care.

174.  Daniel Gonzalez:  Plaintiff Daniel Gonzalez had a tooth pain and despite repeated medical requests, he did not receive any medical attention.  He was forced to endure the severe pain for weeks and weeks until the pain became unbearable and finally he was forced to tell the guard that he was contemplating suicide because the pain was intolerable. Not until then, did he finally receive dental care.

175.  Kevian Byrd.  During the summer of 2020, Kevian's mouth started forming a sore which became an abcess. When the pain started, Kevian immediately put in a sick call slip. But Kevian wasn't seen until two months afterwards.  And during those two months, Kevian was submitting sick call slips almost every day because the pain started getting so bad and his abscess was getting bigger every day. At its largest, the abcess reached the size of a jawbreaker candy. Towards the end of these two months of waiting, Kevian was in such severe pain (around 8 or 9 out of 10) that he could barely talk, he could not eat and could not sleep.

176.   When Kevian was finally taken to the dentist, the dentist did a procedure to squeeze the pus out of this abscess. The dentist didn't give Kevian any information and only partially number his mouth. The procedure was very painful.  Once it was done, the dentist put gauze in his mouth and sent Kevian back to his housing unit.   Kevian's mouth was in extreme pain for a few days, an 8 out of 10; and he couldn't talk.  Kevian received extra strength Tylenol and had his gauze changed out every day at sick call for two weeks.

177.  Shortly after this first dental appointment, the abcess started forming again in his mouth in the same spot, and the pain was getting increasingly bad. He put another sick call slip in immediately, but the same exact delay of care happened again.  Despite daily medical slips, he was not seen by a dentist for another two months.   Apparently, the first dentist had not taken the time or effort to performed a thorough cleaning of the abcess,  which resulted in reinfection and another two months of severe pain.

178.  Michael Lockhart – For eight months and continuing, Michael Lockhart has had severe dental pain, including two cracked teeth.  Despite multiple medical requests for dental care, he has not seen a dentist.  The pain is so unbearable, Michael is not able to eat, and not able to sleep.  As a result of this pain, Michael has been unable to attend court.  When the Court learned that Michael was not able to attend court due to his pain, the Court issued an order under Penal Code 4011.5, ordering that the jail provide Michael with the appropriate care, and report back on what actions the jail was taking.  As of the date of the filing of this amended complaint, Michael has still not received dental treatment.

179.  Frankie Porcher.  Starting in August 2020, Frankie had a cracked wisdom tooth. A quarter of the tooth fell out.   Frankie was in tremendous pain every day due to her broken tooth. She was on 600 mg of Tylenol 3 times a day, which wasn't effective and did not dampen the pain. Around late November or early December of 2020, Frankie was approved by Dental at the jail to have her tooth removed, but it took until January 6, 2021 for the jail to send her over to Highland Hospital to have the procedure done. At Highland, the dentist told her there wasn't enough room in her mouth for the tooth, which created the painful symptoms and the cracking. The dentist said this also caused the skin in her mouth to start growing over this tooth.   Frankie had not had any dental care in the year and a half prior to her wisdom tooth cracking.

COVID

180.   Timothy Thompson contracted covid-19 while in custody.  As a result of Covid-19 he developed issues with low oxygen saturation levels, had difficulty breathing and chest pain. Concurrently he developed swelling in his legs.  Despite repeated requests for medical care, he was merely held in an OPHU cell, and provided no medical care except that his vitals were monitored twice a day.  His attorney had to file a Penal Code 4011 petition to obtain a court order for Well-Path to provide necessary medical care.

181.  Cedric Henry.  Plaintiff Cedric Henry contracted Covid-19 while incarcerated at Santa Rita Jail.  When he first developed symptoms, the only remedy defendant Wellpath provided, was to tell him to "drink water".  When he was moved into the "medical quarantine" unit, Housing Unit 8, The cell they moved him into was filthy.   The jail had simply sprayed bleach all over the cell, but did not wipe anything down. The dirt was still on every surface. There was feces on the floor. They did not give him any towels or paper towels to wipe off the cell. Instead, they just handed him a new bedroll and locked him in.

182.  On April 6, 2020, defendant Well-path administered a nasal swab corona virus test, they did not give plaintiff Cedric Henry any information.  He was running a fever and shivering.  The cell, a concrete block was cold.  He requested an extra blanket, and the deputy in charge refused to give him an extra blanket because jail rules only allows for one.  He was having difficulty breathing, but no doctor and no nurse explained what was going on.  Plaintiff Cedric Henry thought he was going to die.  While he had difficulty breathing, no one examined his lungs, or administered a chest x-ray. The only thing defendant Well-Path did was to monitor his temperature and oxygen level.  To have his temperature taken, he had to kneel down and stick his forehead through the tray slot of his cell door.  To have his oxygen level monitored, he had to stick his finger through the tray slot of his cell door.

183.  On April 15, 2020, based upon their flawed metric, defendant Wellpath announced that Plaintiff Cedric Henry could be removed from medical isolation because he had no temperature.  Plaintiff Cedric Henry believed he was still sick and he still had difficulty breathing.  First, the deputy walked him to Housing Unit 23, and then parked him outdoors in a concrete yard for several hours. Apparently, Housing Unit 23 was not the plan. Then plaintiff Cedric  Henry was walked to Housing Unit Six and  placed in another outdoor concrete yard, where he sat for another two hours. When the deputy came back, plaintiff Cedric Henry explained that he still had symptoms of a bad cough and breathing problems, that he had tested positive, and that placing him with other inmates was potentially jeopardizing other people. In response to plaintiff Cedric Henry trying to prevent others from being endangered, defendant Sheriff punished Cedric Henry by placing him into solitary confinement, or what prisoners call "The Hole".

184.  Despite repeated requests and communications with Jail staff, Cedric Henry received no medical attention, and was not medically monitored until April 26, 2020, through the intervention of Cedric Henry's family member, who reported that Cedric had difficulty breathing and a terrible cough.  The only medication provided was Mucinex and cough drops.

185.  After a month of isolation, Cedric Henry was experiencing psychological distress and requested mental health support.  He does not receive appropriate mental health support or medical assistance. On June 6, 2020, Cedric Henry required an emergency response and continued to experience breathing distress and strong headaches that feel like "lightning" strikes.  The jail's response is to give him Tylenol.  This "take an aspirin and call me tomorrow" is a paltry, inadequate response to an ongoing, serious medical condition.

186.   Even today, more than eight months after first contracting covid-19, Cedric Henry has medical issues, including extreme fatigue and lack of energy.  He barely ever leaves his cell, and can't find the energy to do much.  He is depressed and frustrated, and often has difficulty breathing, and suffers from headaches, every day, all day.  The only medical attention he receives is Tylenol, twice a day.  And the jail only gives him a prescription for Tylenol for 7 days at a time.  He is not permitted to submit a medical request for more Tylenol until his 7 days are up, and then when he does submit a medical request for more Tylenol, there is a two day delay.  So, for two days out of every seven, is has to endure debilitating headaches.  Despite requests for mental health support, he has received none.

187.   Saul Espinosa, a class member, who suffers from arthritis and has difficulty with mobility and kneeling was moved into Housing Unit 8C on April 18, 2020 after testing positive for covid-19.  While in Housing Unit 8, he received no shower,  he had no soap,  he had none of his property and none of his commissary,  he did not receive any clean clothes or even one laundry exchange.  The only medical care he received required him to kneel down and stick his face through the tray slot of his cell door, and then the medical staff could take his temperature.  Because he had difficulty kneeling, he on multiple times told them he could not do so.  Defendant Wellpath did not hydrate Saul, although he had a persistent high heart rate.  Defendant Wellpath did not treat him for his muscle and bone pain, and made no effort to make any accommodations for his mobility issues and physical pain.  Defendant Wellpath provided and continues to provide inadequate care for plaintiff Saul Espinosa's chronic pain.

188.   Joey Lovato, a class member, reported that he was categorized as high risk for covid due to his diabetes.  Yet,  he was placed in housing units with other people and placed in a bunk right next to an air vent.  After eight (8) days sleeping under an air vent, he became sick, was moved to HU 8, tested for covid-19, and informed that he tested positive for covid-19.  When he was moved into HU 8A, the cell he was filthy.  The was food on the walls, toothpaste over the vent, and the toilet and sink had food, grease and garbage.   The toilet did not flush properly so the stuff in the toilet would not go down.  After being placed in the filthy cell, he pushed the button for cleaning supplies and was told that he had to wait until POD time to get cleaning supplies.  He had to spend the night in that dirty, smelly cell, and wait until the next day, before he was given any cleaning supplies.  Joey Lovato was in HU 8 for 7-8 days, and was allowed out of his cell only 3 times for half hour, 40 minutes to shower and get cleaning supplies.  The only laundry exchange he received was just a t-shirt, or a boxer, never

44

a complete set of clean clothing. After he was deemed recovered, but he was not retested and he was moved to HU 33, where people were not all orange tagged.  After arriving in HU 33, the jail started filling up the housing unit, moving prisoners in from a number of other housing units and filling up cells.  Then someone got sick, and the jail tested everyone in HU 33 for covid-19, and a lot of the prisoners in HU 33 tested positive for covid-19.

189.   The Defendants Sheriff and Wellpath state in their Covid-19 Outbreak Plan that they use either a "test-based strategy" for determining when Covid positive patients are recovered, or a Symptom-based strategy.  The Symptom-based strategy includes:

•      "At least 3 days (72 hours) have passed since recovery defined as resolution of fever without the use of fever-reducing medications and improvement in respiratory symptoms (e.g., cough, shortness of breath); and,

•      At least 10 days have passed since symptoms first appeared " Santa Rita Jail Covid-19 Outbreak Plan, 8/18/2020. P. 7

190. Most covid positive prisoners in Santa Rita Jail are monitored by the jail per the symptom based strategy.  Very few are retested.  On information and belief, plaintiffs allege that both defendants Sheriff and Well-path have not been vigorously testing for covid-19 because testing costs money and symptom method is free.   As a result of defendants paramount tight fisted, penny-pinching policy, said defendants opted for the symptom based strategy.  However, as a result of the symptom based strategy, these defendants have in fact caused covid-19 to be transmitted through the jail during the Spring, Summer and Fall of 2020.

191.       Daniel Torres, a plaintiff, stated that he arrived in Santa Rita Jail on June 18, 2020.  He was held in the quarantine pod, HU 25 for 2 weeks and then moved to HU 33.  He was told that he was a person at risk, and moved to HU 3, supposedly for his own protection.  While in HU3 he was told he caught COVID-19.  When he was moved into HU8, even if he did not have covid-19, he would have caught it in HU 8.  Daniel was placed in a cell with a cell mate who was very sick.  When Daniel complained, the housing guards retaliated against him.  Badge 2368 told him that Daniel would never get pod time while 2368 was on duty.  Daniel was held in HU 8 until 7/31, and then moved into HU 33W.  Daniel believes that he was still sick when he was moved, because although he had no fever, he was still sick and had many of the other symptoms of Covid-19.  And although Daniel Torres was not retested, the jail told him that he was recovered.  Once in HU 33, Daniel, who

is a barber, began cutting everybody's hair.  And almost immediately people in 33W started getting sick.

192.     In Mid-July, HU 22 developed a mass outbreak of covid-19 infections.  A prisoner, who had tested positive for covid-19, named Campos, was moved from HU 8 back to HU 22, without testing to be confirmed as covid-19 negative.  On the night that he was returned to HU 22, he "face planted", signaling a continuing serious medical condition and was removed by the jail.   Within a week of Campos' brief return to HU 22, men in HU 22 began developing covid-19 symptoms, and more than half of the prisoners in HU 22 tested positive for covid 19.  On information and belief, Plaintiffs allege that the men in HU 22 became infected with covid-19 from Campos, and that Campos was able to infect the men of HU 22 because of defendants SHERIFF,  and WELLPATH's joint policy and practice of declaring covid-19 positive prisoners as "recovered" when they are still symptomatic, and not re-testing these men before placing them back into general population.

<u>Enforced Idleness</u>

193.  All prisoners at Santa Rita Jail, no matter their legal status, face long hours of enforced idleness with few classes, little programming, 20-24 hours a day locked in their cell, and limited time outdoors.  Defendant Sheriff does not provide much in the way of activities which inmates can engage in.  Most housing units no longer have board games.  The commissary no longer sells handicraft kits.  Exercise is limited due to rules where inmates are not permitted to take off their outer wear and exercise only in a tee shirt.  Since laundry exchange is only once a week, most prisoners do not want to sweat into their only change of clothing they have.  But defendant SHERIFF, by enacting these restrictive rules, in effect curtails and limits prisoners' ability to exercise.

194. The jail justifies the denial of POD time and the lack of family visits by providing tablets to each prisoner.  The tablets are Wi-Fi connected and capable of phone calls, and accessing various applications, for news, movies and music.  A few of the applications are free, but most cost money.  Calls on the tablet are $7 for 25 minutes.  To hear music costs $150 a month, with an additional $10 charge if the prisoner wants to choose which songs to hear.  Pod casts cost $8.99 per month, $5.99 for 14 days, $3.99 per day.  Movies cost $3.99 for 180 minutes.  The problem is that tablets do not have reliable Wi-Fi access in cells and are only useful in the common area.  And pursuant to the current covid-19 lockdowns, most prisoners have greatly reduced common area access, so there is just limited hours that the tablets are available.

195.    Angelo Valdez, a class member reports that although, the tablet charge is $8.99, a prisoner can only use funds from his books in $5 increments, so to pay for $8.99 on the tablet, the prisoner has to use $10 of value from his books, and ultimately forfeit some of those funds.

196.   Angelo Valdez reports that although the tablet is technically available to prisoners only from 7 a.m. to 10 p.m., the battery on the tablets usually only last for 3-3.5 hours of continuous use.  So, while a prisoner may have paid for 30 days of music at the cost of $150 a month, the tablet is really only available for 3.5 hours per day since prisoners cannot recharge the battery and the guards do not permit prisoners to exchange tablets for fresh batteries.

197.    Angelo Valdez reports that the jail says that Wi-Fi is in the common area, which is where the jail says tablets should be used, but during pod time, if many people try to use the tablet simultaneously, all tablets crash with error messages "14004" and the user is kicked off the system. Apparently, there is insufficient band-width in the jail Wi-Fi system to support these tablets.   So, the programming is not accessible, and even when programming is paid for.  Furthermore, prisoners spend most of their day inside cells, with poor WIFI reception.  Class member Eric Wayne filed a grievance that prisoners are "kicked off the Wi-Fi network 20 times a day" .

198.    Furthermore, although prisoners are charged money and pay for "24 hours" of access, the clock keeps running even if when the tablets are taken away, or unavailable due to poor Wi-Fi connections, or some other technical issues.  Regardless, the clock keeps running.   So, defendants Sheriff, overcharge prisoners and then short change them at each turn in the curve.

199.   Having tablets provides defendants SHERIFF with the disincentive to provide additional programming, out of cell opportunities and exercise options, and outdoor recreation.  Locking down prisoners into their cells, with enforced idleness provides greater incentive to use the tablets and to spend money on the tablets, adding funding to the Sheriff's coffers.

Strike

200.  On or about October 17, 2019, Santa Rita Jail's Watch Commander, late in the afternoon, defendant Hesselein, entered the common area of Housing Unit 31.  Defendant Hesselein was in the company of other older, white, men and women, likewise dressed in business attire.

201.  At that time, the men in HU 31 had been on lockdown all day, and there had been no lunch, so the men had not had any food for almost 12 hours.  Their jail food regularly contained rodent feces, the laundry was not clean, the housing unit lacked cleaning supplies and the men lived in overall unsanitary conditions.  Sua sponte, the men started to yell, ""Stop feeding us rat shit." "Jail clothes stink" "The food sucks" "There's shit all over the place."

202.  Defendant Hesselein walked over and verbally confronted the prisoners, and yelled, "I'll shut this place down." "I'll make you guys' life hell."  and defendant Hesselein walked out.

203.  True to Defendant Hesselein's word, shortly thereafter, in retaliation for men having publicly verbalized grievances over the conditions at the jail; a squad of about a dozen sheriff deputies dressed in tactical outfits and armed with rifles and weapons stormed the housing unit.  One deputy stood on a table with a rifle pointing it at the prisoners and someone barked out an order, "Get down on the ground" and the prisoners were instructed to lay down, face down on the floor of their cell.

204.  Someone yelled out, "I'm not getting down on the ground, the ground is filthy", and as a result, no one in the cell laid down.   The sheriff deputies threatened to shoot the prisoners, and a tense standoff resulted.  Finally, the prisoners were instructed to put their hands over their heads, and then all prisoners were all walked out of their cells into the multi-purpose room.

205.  Once the prisoners were removed, the deputies, conducted a "raid" where everything in the cell was turned inside out and searched.  This raid was a show of force in retaliation for the men's earlier public statements, and intended to intimidate them from future public statements criticizing the jail. The deputies took the prisoners' personal belongings, food and other items and threw them all helter skelter into a pile in the center of the room.  Once tossed, many of which are opened, commissary items become inedible; handled, dumped, thrown on the ground, and mixed with all manner of things. This was another component of Defendant Hesselein's order, to make the prisoner's "life hell". There was no penological justification for this raid, the incident with Defendant Hesselein was not related to the contents inside the dormitory cell.  The justification for this show of force and power was a group punishment and a statement of intimidation, letting the prisoners know that the power of force was with Defendants, and any challenge would be met with a power of force, used if not directly against the bodies of the men, then against what little property they owned, to let the prisoners know that at any moment, defendant Sheriff, could stripe them, and that even if their bodies as a group, was not within their reach, defendant Sheriff could remove from them, everything else.

There certainly is no penological justification for taking prisoners food and dumping it on the floor in the middle of the room, thereby making the food inedible because it had been on the floor.

206.   The next day, October 18, 2019, the men were again placed on lock down, and the meal schedule was again chaotic.   When the afternoon meal finally arrived, late in the afternoon, the men of Housing Unit 31, spontaneously refused to leave their cells, and refused the meal, thereby engaging in a hunger strike.   The deputies, alarmed, called in officers, first a sergeant and then a lieutenant, who offered to discuss with the prisoners, their grievances, and asked the men to select a spokesperson.   They selected Lawrence Gerrans.

207.   The men of HU 31 then spent the next two hours writing down their grievances and giving them to Plaintiff Lawrence Gerrans.  LAWRENCE GERRANS was selected to collect everyone's comments and requests and write up what became, both the Strike Demands and the Strike Statement. The Strike Demands and Strike Statement was a statement by everyone in the housing unit, not just Lawrence Gerrans.   And the Strike Demands and Strike Statement was submitted on behalf of all the prisoners as a group grievance.   The Strike Demands are attached as Exhibit A, and the Strike Statement is attached as Exhibit B.

208.   That evening, around 10 p.m., the deputy Charondo placed into HU31, upper D, a young, white, emaciated man, who was in drug withdrawal.   Rather than placing this young man who was withdrawing in the OPHU to receive medical supervision, he was placed into general housing, forcing the prisoners to care for him.   Over the next 15 hours, this young man was in a continual state of diarrhea.   When Larry Gerrans reported this to Deputy Ignont and requested that this young man be placed in the OPHU,  Deputy Ignont (sp?) said, "He's your problem." "You guys take care of him".

209.   By six a.m., the next morning, the stink in the cell from this young man's diarrhea was like a green, disgusting fog coating the entire room.   The diarrhea had smeared all over the bed and all over his clothes.   The prisoners again rang the buzzer yelling "Sick man coming out".   Eddie took a sheet and wrapped it like a diaper around this young man and tried walking him out of the cell.   Deputy Joe brings Eddie back into the room and announces that "This is your fucking problem.   I don't care how many times he shit himself."   Then Deputy Joe orders the kid to stand up and move.   The kid doesn't move.   Deputy Joe walked over, and grabbed this kid by the hair and pulled him up by the hair onto a sitting position and yells into his face, "don't make me do this."   At this time, Lawrence Gerrans, afraid that this kid would not be able to tolerate any physical violence, and intervened.   "Whoa, whoa,

it doesn't need to be like this." Then Deputy Joe released the kid, whose head drops like a ball back onto the floor. Lawrence Gerrans said, "I'll take care of him", and requested a hazmat bag, and clean clothing, clean sheets and towel. Lawrence Gerrans said to Deputy Joe, "You seem like a nice guy, but doing this to this kid is indefensible." Deputy Joe responded, "Don't come to jail" and walked off.

210. Here clearly was an individual who very sick, who was not moving well, and unresponsive, and Deputy Joe, instead of taking this young prisoner to the OPHU or summoning medical help, states the common refrain "Don't come to jail". Clearly this is a reiteration of the standard policy at Santa Rita Jail, and of defendant Sheriff, that one primary motivating policy at Santa Rita Jail – regardless whether an individual is pretrial detainee – that all prisoners shall be subjected to deprivation and punishment. In this instance, not only was this kid being punished, but the entire cell was punished, being forced to endure the malodor of vomit and diarrhea, and having to take care of this very sick person.

211. The prisoners then took the kid back into the cell, showered him, and while he was showering had another episode of diarrhea.

212. Only after the 4th or 5th incident of diarrhea, and over 15 hours of all the men in the cell enduring this unsanitary, exposure to human feces, were the prisoners finally able to get defendant SHERIFF to remove this kid from the cell and place him under appropriate medical supervision.

213. That afternoon, another prisoner in HU 31, fell off the top bunk, landing on his head. Soon thereafter, this prisoner went into seizure, flapping like a fish. Men in the cell heard the crack, as his head hit the ground. They immediately hit the emergency button and requested medical response. The medical response was also slow in coming. The deputies were slow in responding.

214. The men in this cell concluded that this prisoner must have died, because if the kid was alive, they would have been hustling to get him to the hospital.

215. After being held for two hours extra in the kitchen, these men were moved into the small yard. By the time they got back to the cell, the kid was gone.

216. That evening, after prisoners returned to their cells, the mood was "Enough is enough", and there was a call for a vote. The majority and all the races and majority voted for a strike that would be a hunger strike, a work strike and a strike against participating in jail activities such as going to class or court.

Retaliation For Speaking Out And Criticizing Jail Conditions

217. The other prisoners appointed Larry Gerrans to be their spokesperson, to speak for everyone as a group. After Larry had written up the strike demands and handed them to the jail, and after Larry had written up the strike statement, Defendant Hesselein, in order to silence the group and prevent them from speaking out, had Larry Gerrans, a federal inmate, removed from Santa Rita Jail, and transferred to Marin County jail. The objective was to silence all protests. Defendant Hesselein also had Larry designated him as a prisoner who should be held in solitary confinement, so that when he was in Marin County Jail, he was not allowed to have any contact or communication with any other prisoner, and was unable to speak about what had happened in Santa Rita Jail. In Marin County Jail, LAWRENCE GERRANS was placed into solitary confinement.

218. By removing Larry Gerrans, defendant Hesselein clearly communicated to the prisoners that speaking out and criticizing jail conditions is not permitted, and would be subject to retaliation and punishment.

Prior Knowledge Of Jail Conditions: Conscious Disregard Of Harm To Prisoners

219. None of these complaints are new, or a surprise. Many of these exact same issues, as listed in the Strike Demands have been made by women prisoners in the Mohrbacher case, filed in January, 2018, now pending in this court. 3:18-cv-00050-JD. The fact that prisoners on the East Side of the jail, and prisoners on the West Side of the Jail, independently derived essentially the same complaints, describing the same problems, indicates these are jail-wide, system wide practices.

220. Many of the problems are ongoing, chronic, and the subject of numerous grievances over an expanded period of time. Defendants were well aware of the issues and have chosen to not address or fix the problem.

221. Prisoners at Santa Rita Jail, both individually, or through the group grievances have repeatedly informed Defendants of the chronic and ongoing problems and unconstitutional, inhumane and unsanitary conditions of confinement at Santa Rita Jail.

FIRST CLAIM FOR RELIEF

DEPRIVATION OF FEDERAL CIVIL RIGHTS

UNDER 42 U.S.C. § 1983

FOURTEENTH AMENDMENT

SUFFICIENT, UNSPOILT, FOOD NECESSARY TO SUSTAIN HEALTH

222.  Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

223.  This first cause of action is asserted against Defendant Alameda County Sheriff's Office, Alameda County, DEFENDANT ARAMARK,  and Roes 1-25, Does 25 through 50.

224.  Prisoners in county jail have a constitutional right to sufficient, unspoiled, edible food, necessary to sustain life.  By their policies and practices described above, Defendants subject Plaintiffs and the Prisoner Class they represent, to a substantial risk of harm due to the denial and deprivation of necessary and healthy food and sustenance, and to the serious consequences of inadequate, insufficient, contaminated and spoilt foods.  These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.  By their policies and practices described above, said defendants imposed substantial hardship on pretrial plaintiffs and pretrial members of the plaintiff class, in relation to the ordinary incidents of incarcerated life, which is not justified by any penological interest, so as to create a liberty interest protected by due process.

225.  The policies, practices and customs described above are the official policies,
 practices and customs of Defendants COUNTY OF ALAMEDA, SHERIFF and ARAMARK and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the FOURTEENTH Amendment.  The policies, practices and customs described above include  Defendant Alameda County Sheriff's Office, Alameda County, and DEFENDANT ARAMARK's  failure to train its staff in the face of an obvious need for training to prevent the violations described above.

226.  Defendants have been and are aware of all of the deprivations complained of  herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the  Prisoner Class they represent request relief as outlined below.

SECOND CLAIM FOR RELIEF

DEPRIVATION OF FEDERAL CIVIL RIGHTS

UNDER 42 U.S.C. § 1983

EIGHTH AMENDMENT

52

SUFFICIENT, NON-CONTAMINATED, FOOD NECESSARY  TO SUSTAIN HEALTH

227.  Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

228.  This second claim is asserted against Defendants Alameda County Sheriff's Office, Alameda County, and  Defendant  ARAMARK, and, and Does 25 through 50 and  Roes 1-25.

229.  At all relevant times herein, the named defendants herein were responsible for providing for the food needs of plaintiffs and class members.  Said defendants subjected Plaintiff and the members of the Plaintiff class they represent, to inadequate, and insufficient food in that the food provided was insufficient in quantity, frequently contaminated and spoilt, prepared in unsanitary conditions, served on unclean trays, overcooked, often inedible, and of such poor quality as unable to sustain health. These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendments.

230.  By their policies and practices and the inconsistent implementation and oversight of same, Defendants subject Plaintiffs and the Prisoner Class they represent, to a substantial risk of serious harm from the provision of inedible, tainted and spoilt food and expose Plaintiffs and the Class and Subclass to significant risk of harm from exposure to inedible, contaminated, insufficient and unhealthy food.  These policies and practices have been, and continue to be, implemented by Defendants ALAMEDA COUNTY, SHERIFF, and ARAMARK and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

231.  The policies, practices and customs described above are the official policies, practices and customs of Defendants ALAMEDA COUNTY, SHERIFF, and ARAMARK and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the Eighth Amendment.  The policies, practices and customs described above include Defendant COUNTY OF ALAMEDA and ARAMARK's failure to train its staff in the face of an obvious need for training to prevent the violations described above. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Class they represent request relief as outlined below.

THIRD CLAIM FOR RELIEF

DEPRIVATION OF FEDERAL CIVIL RIGHTS

UNDER 42 U.S.C. § 1983

FOURTEENTH AMENDMENT

MEDICAL SERVICES

232.  Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.  Per the Court Order Dkt. 49, Plaintiffs specifically refer to: 3-6, 47-49, 129-175, 178-182, 191-203.

233.  This first third Cause of Action is asserted against Defendants Alameda County Sheriff's Office, Alameda County, DEFENDANT Well-Path, and Does and Roes 1-25.

234.  Defendant Deputy Ignot (sp) and Deputy Joe are sued in their individual capacity.  The paragraphs Plaintiffs refer to regarding Deputy Ignont and Joe are paragraphs 214-226.

235.  Defendant Ignot and Joe, acting or purporting to act in the performance of their official duties as a sheriff's deputy, wrongfully and unreasonably refused to summon medical aid, and instead forced plaintiff Gerran and members of the class to have to provide medical care for which they had no training and no experience in providing.

236.  At all relevant times herein, the named defendants herein were responsible for providing for the medical care of plaintiffs and class members.  Said defendants subjected Plaintiff and the members of the Plaintiff class they represent, to a substantial risk of serious harm and injury from the harmful and inhumane effects of denial and delay of necessary and needed medical care and the inadequate medical care, when provided.    These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendments.

237.  By their policies and practices described above, said defendants imposed substantial hardship on pretrial plaintiffs and pretrial members of the plaintiff class, in relation to the ordinary incidents of incarcerated life, which is not justified by any penological interest, so as to  create a liberty interest protected by due process.  By their policies and practices described above,  Defendants subject Plaintiffs and the Class Members they represent, to a substantial risk of harm due to the denial and delay in necessary and appropriate medical care, and the inadequate care due to the serious health

consequences of exposure to covid-19.  These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Prisoner Class's ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

238.  The policies, practices and customs described above are the official policies, practices and customs of Defendants COUNTY OF ALAMEDA, SHERIFF AND WELL-PATH and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the FOURTEENTH Amendment.  The policies, practices and customs described above include Defendant COUNTY OF ALAMEDA's failure to train its staff in the face of an obvious need for training to prevent the violations described above.   Defendants have been and are aware of all of the deprivations complained of  herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Class they represent request relief as outlined below.

FOURTH CLAIM FOR RELIEF

DEPRIVATION OF FEDERAL CIVIL RIGHTS

UNDER 42 U.S.C. § 1983

EIGHTH AMENDMENT

MEDICAL SERVICES

239.  Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

240.  This fourth claim is asserted against Defendants Alameda County Sheriff's Office, Alameda County, and  DEFENDANT Well-Path, Does and Roes 1-25.  Defendant Deputy Ignot (sp) and Deputy Joe are sued in their individual capacity.  The paragraphs Plaintiffs refer to regarding Deputy Ignont and Joe are paragraphs 183-199

241.  Defendant Ignot and Joe, acting or purporting to act in the performance of their official duties as a sheriff's deputy, wrongfully and unreasonably refused to summon medical aid, and instead forced plaintiff Gerran and members of the class to have to provide medical care for which they had no training and no experience in providing.

242.  At all relevant times herein, the named defendants herein were responsible for providing for the medical care of plaintiffs and class members.  Said defendants subjected Plaintiffs and the members of the Plaintiff class they represent, to a substantial risk of serious harm and injury from the harmful

and inhumane effects of denial and delay of necessary and needed medical care and the inadequate medical care, when provided.    These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendments.

243.   By their policies and practices and the inconsistent implementation and oversight of same, Defendants subject Plaintiffs and the Prisoner Class they represent, to a substantial risk of serious harm from the provision of inadequate health care.  These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under, color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

244.   The policies, practices and customs described above are the official policies,

245.   practices and customs of Defendants COUNTY OF ALAMEDA, SHERIFF AND WELL-PATH and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the Eighth Amendment.  The policies, practices and customs described above include Defendant COUNTY OF ALAMEDA, SHERIFF AND WELL-PATH's failure to train its staff in the face of an obvious need for training to prevent the violations described above.

246.   Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

        WHEREFORE, Plaintiffs and the Class they represent request relief as outlined below.

FIFTH CLAIM FOR RELIEF

DEPRIVATION OF FEDERAL CIVIL RIGHTS

UNDER 42 U.S.C. § 1983

FOURTEENTH AMENDMENT

ADEQUATE SANITATION

247. Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

248. This fifth  cause of action is asserted against Defendant Alameda County Sheriff's Office, Alameda County, Deputies Ignont and Joe and Does 25 through 50.  Defendant Deputy Ignot (sp) and Deputy Joe are sued in their individual capacity.

249. Defendant Ignot and Joe, acting or purporting to act in the performance of their official duties as a sheriff's deputy, wrongfully and unreasonably refused to summon medical aid, and instead forced plaintiff Gerran and members of the class to endure hours of sharing a cell with a prisoner detoxing, which included multiple bouts of vomiting, diarrhea, and other discharges of human bio-hazardous waste. This caused all the members of the cell to be exposed to and have to endure living with human bio-hazards including vomit and diarrhea.

250. At all relevant times herein, the named defendants herein were responsible for providing for the sanitation and hygiene needs of plaintiffs and class members.  Said defendants subjected Plaintiff and the members of the Plaintiff class they represent, to a substantial risk of serious harm and injury from the harmful and inhumane effects of inadequate, and insufficient sanitation, and the means to maintain the necessary personal sanitation in their cells and housing units, to prevent infections and communication of diseases, transmission and contamination from micro-organisms, including covid-19  as described herein.    These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

251. By their policies and practices described above, said defendants imposed substantial hardship on pretrial plaintiffs and pretrial members of the plaintiff class, in relation to the ordinary incidents of incarcerated life, which is not justified by any penological interest, so as to  create a liberty interest protected by due process.  By their policies and practices described above,  Defendants subject

Plaintiffs and the Class Members they represent, to a substantial risk of harm due to the inadequate, and insufficient sanitation, and the lack of means to maintain the necessary personal sanitation, and the sanitation of their cells and housing units, to prevent infections and communication of diseases, transmission and contamination from micro-organisms, including covid-19  as described herein. These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Class Members ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

252.   The policies, practices and customs described above are the official policies, practices and customs of Defendants COUNTY OF ALAMEDA, and SHERIFF  and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the FOURTEENTH Amendment.  The policies, practices and customs described above include Defendant Alameda County Sheriff's Office's failure to train its staff in the face of an obvious need for training to prevent the violations described above.  Defendants have been and are aware of all of the deprivations complained of  herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Class they represent request relief as outlined below.

SIXTH CLAIM FOR RELIEF

DEPRIVATION OF FEDERAL CIVIL RIGHTS

UNDER 42 U.S.C. § 1983

EIGHTH AMENDMENT

ADEQUATE SANITATION

253.   Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

254.   This sixth claim is asserted against Defendants Alameda County Sheriff's Office, Alameda County, Deputies Ignont and Joe and Does 25 through 50.  Defendant Deputy Ignot (sp) and Deputy Joe are sued in their individual capacity.

255.   Defendant Ignot and Joe, acting or purporting to act in the performance of their official duties as a sheriff's deputy, wrongfully and unreasonably refused to summon medical aid, and instead forced plaintiff Gerran and members of the class to endure hours of sharing a cell with a

59

prisoner detoxing, which included multiple bouts of vomiting, diarrhea, and other discharges of human bio-hazardous waste. This caused all the members of the cell to be exposed to and have to endure living with human bio-hazards including vomit and diarrhea.

256.   At all relevant times herein, the named defendants herein were responsible for providing for the sanitation and hygiene needs of plaintiffs and class members.  Said defendants subjected Plaintiff and the members of the Plaintiff class they represent, to inadequate, and insufficient sanitation, inadequate and insufficient laundry and the inadequate and insufficient means to maintain the necessary personal sanitation in their cells and housing units, to prevent infections and communication of diseases, including covid-19  as described herein.   These policies and practices have been, and continue to be, implemented by said Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members' ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendments.

257.   By their policies and practices and the inconsistent implementation and oversight of same, Defendants subject Plaintiffs and the Prisoner Class they represent, to a substantial risk of serious harm from being forced to live in unclean, unsanitary cells, bathrooms, showers and housing units, and to be exposed to biohazards, communicable diseases, microbes, germs and other harmful organisms, and insufficient clean laundry to maintain personal hygiene. These policies and practices have been, and continue to be, implemented by Defendants ALAMEDA COUNTY, SHERIFF, and AHERN and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and Class Members ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

258.   The policies, practices and customs described above are the official policies, practices and customs of Defendants ALAMEDA COUNTY and SHERIFF are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the Eighth Amendment.  The policies, practices and customs described above include Defendant COUNTY OF ALAMEDA  and Defendant SHERIFF's failure to train its staff in the face of an obvious need for training to prevent the violations described above.  Defendants have been and are

aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Class they represent request relief as  outlined below.

SEVENTH CLAIM FOR RELIEF

DEPRIVATION OF FEDERAL CIVIL RIGHTS

UNDER 42 U.S.C. § 1983

FIRST AMENDMENT

259.  Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

260.  By their policies and practices described herein, Defendants Alameda County Sheriff's Office, , Alameda County, and Does 25-50 violated Plaintiffs and members of plaintiff class rights to free speech, under the first Amendment by retaliating and punishing Larry Gerrans, and all plaintiffs and members of Housing Unit 31 for voicing concerns and complaints regarding conditions of confinement at Santa Rita Jail; as herein described;  this retaliation often occurred as group punishment, punishing entire PODs or housing units for the statements of a few, in order to inflict greater pressure and punishment for speaking out;

261.  At all relevant times herein, defendant SHERIFF has the ultimate responsibility for operating the Santa Rita Jail.

262.  These policies and practices have been, and continue to be, implemented by Defendants and their agents, officials, employees and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of Plaintiffs' and the Class Members' ongoing deprivation of rights secured by the United States Constitution under the First Amendment.

263.  The policies, practices and customs described above are the official policies, practices and customs of Defendant SHERIFF and COUNTY OF ALAMEDA, and are the direct and proximate cause of the violations of Plaintiffs being subjected to known harms in violation of the First Amendment.  The policies, practices and customs described above include Defendants failure to train its staff in the face of an obvious need for training to prevent the violations described above.

264.  Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct or failed to maintain policies, customs, or practices when it was obviously that they were needed to prevent the violation

of Plaintiff Larry Gerrans', and inmates in HU 31 at the time of the Strike's First Amendment Rights granted pursuant to 42 U.S.C. § 1983, to voice complaints and file grievances regarding conditions of confinement at Santa Rita Jail.

265.   As a direct and proximate result of Defendants' actions and inactions, Plaintiff Larry Gerrans', and inmates in HU 31 at the time of the Strike's suffered injuries entitling them to receive compensatory damages against defendants SHERIFF, and County of Alameda.

WHEREFORE, plaintiffs pray for relief on behalf of themselves and class members as hereunder appears.

PRAYER FOR RELIEF

Plaintiffs and the class and subclasses they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants as alleged herein, unless Plaintiffs are granted the relief they request. Plaintiffs and Defendants have an actual controversy and opposing legal positions as to Defendants' violations of the constitutions and laws of the United States and the State of California. The need for relief is critical because the rights at issue are paramount under the constitutions and laws of the United States and the State of California.

WHEREFORE, Plaintiffs, on behalf of themselves, the proposed class and all others similarly situated, pray for judgment and the following specific relief against Defendants as follows:

1.     An order certifying that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2);

2.     A finding that the conditions, acts, omissions, policies, and practices described above are in violation of the rights of Plaintiffs and the class and subclass they represent under the Eighth and Fourteenth Amendments to the United States Constitution, Article I, Sections 7 and 17 of the California

WHEREFORE, Plaintiffs respectfully request the Court to:

1.     Certify the Class of prisoners at Santa Rita under Rule 23, F.R. Civ P., and also the following Subclasses:

1.     Prisoners who are pretrial;

2.     Prisoners who had or have contracted covid-19.

2.     Make findings of fact reflecting the general and specific failings and inadequacies of defendants' approaches to and practice in the care of all prisoners, the pattern and practice of defendants' non-feasance and maltreatment of prisoners, and defendants' violations of statutory, regulatory and constitutional requirements in dealing with prisoners.

3.     Making findings of fact that defendants SHERFF and ALAMEDA's actions prioritizing profit over providing sufficient, healthy, wholesome food to sustain health, sufficient cleaning supplies and tools to maintain sanitation, and necessary and timely medical care constitutes punishment of pretrial detainees;

4.     Make findings of fact that defendants SHERFF and ALAMEDA's actions creating enforced idleness motivated and prompted by their for profit activities constitutes punishment of pretrial detainees;

5.     Make findings of fact that the group retaliation of the inmates in HU 31and individual retaliation against Larry Gerrans constitutes a violation of the Constitutional Right to Free Speech.

A.     Prohibit defendants from:

1.     punishing or threatening to punish prisoners for exercising their right to free speech, particularly regarding problems in Santa Rita Jail;

2.     serving spoilt, over cooked or otherwise inedible food;

3.     serving food on food trays that are not sanitary and clean, and free from old food debris; And,

B. Affirmatively Order and direct defendants to:

4.     Provide medical treatment which addresses the medical need, consistent with the standard of good medical practice in the Bay Area

5.     Fully comply with all applicable state statutes and regulations, and develop a legitimate individual treatment plan for each detoxing prisoner, and carry it out completely!

6.     Fully comply with all applicable state statutes and regulations for a sufficient, healthy, balanced, nutritious diet which will sustain health;

7.     Develop, implement and maintain a systematic program for cell and personal sanitation throughout the jail, including the OPHU;

8.     Full compliance with California Retail Food Act including the installation of permanent walls and doors which will keep rodents, birds and vermin from entering the kitchen;

9.     Enter a preliminary and permanent injunction on behalf of the broad Class of prisoners which will counter and remedy the County defendants' broader unconstitutional practice(s) as complained of and to be shown further;

10.    Award damages according to proof for individual plaintiffs;

11.    Award costs and fees for this action, including attorneys' fees;

12.    Grant such other and further relief as this Court deems appropriate.

DATED: March 29, 2020          LAW OFFICE OF YOLANDA HUANG


 __/s/ Yolanda Huang_____

Yolanda Huang


DENNIS CUNNINGHAM


 _/s/ Dennis Cunningham_____

Counsel for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JURY TRIAL DEMAND

A JURY TRIAL IS DEMANDED on behalf of Plaintiffs.

DATED: March 29, 2021

LAW OFFICE OF YOLANDA HUANG

___/s/ Yolanda Huang_____

Yolanda Huang

DENNIS CUNNINGHAM

_/s/ Dennis Cunningham_____

Dennis Cunningham

Counsel for Plaintiffs

**PLAINTIFFS' FOURTH AMENDED COMPLAINT**
*Gonzalez, et al v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 3:19-cv-07423 JSC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

## Requests

* A copy of this document ___ nte Rite Administration after the Hunger Strike on October 18, 2019
* Lawrence Gerrans provided 1 Hour Video Testimony as well.

1.) Food - Improve Palletably. More Diversity. See List.
  (See List of Food requests)

2.) Costs of Commissary Too High - Meet Federal rates
  • Aramark Needs to lower costs or Find New Supplier.

3.) Cost of Telephone Too ~~Are~~ High - availability +
  Access is too low. We want our own Personal
  electronics with access to email, Texting + Phone
  as well as Internet for Netflix, etc.
  • Cost of communication + Access is Punitive + Usury.

4.) Clothing - 2 Sets of Blues
  4 Sets of Shirts, Underwear, Socks
  2 Pair Work out Shorts
  * exchange Availability Twice a week.

5.) Law Library - We Need Access (Federal Law)
  - Internet Access could be Solution.
  * This is Federal requirement for fed inmates

6.) Cell Cleaning - Twice a week.
  • Clean mops + Clean mop Water
  • Clean Brushes + Clean Towels
  • More Disinfects
  • Better Floor + Shower Cleaning Agents
  • Insecticides to Kill Blood Sucking gnats
  • Honor requests for Additional Supplies day Today

7.) Mail - More reliable + on-time delivery
  (especially Newspapers)
  - Faster Sending of ~~er~~ mail out

8.) <u>Bedding</u> - Exchange Blankets Monthly
   - Improve Mattresses - Too Thin, Too Old, Too Dirty
   - Provide Pillows For goodness sake !

9.) <u>Personal Disinfectants</u> - Triple Antibiotics, Bandaids
   * Add To Commissary
   * Make more easily
     available from Nurse
   - Athlete's Foot Spray
   - Hydrogen Peroxide / Disinfectants
   - Personal Sanitation Supplies
   - Barbicide for clippers

10.) <u>Family + Attorney Visits</u>
   - Not Subject To Lockdown Within 6 Hours of Visit.
   - Notification System for Video Visits
   - Allow Video Visits To commence in Lockdown
      - Tower Should be able to easily monitor.

11.) <u>Upgrade T.V.'s + Speakers</u> - Hard To See
                              - Hard To Hear

12.) <u>Stop Turning Phones Off</u> - Costing Attorney Fee's

13.) <u>Mandatory POD Times</u> - <u>Morning</u> / <u>Afternoon</u> / <u>Evening</u>
                              9 to 11      2 to 4      7 to 10

14.) <u>Mandatory Yard Access</u> - 4 Times a week
       irregular

15.) <u>Adhere To Title 15 minimum Standards</u>

16.) <u>Stop recording Personal + Legal Phone calls for</u>
    <u>Pre-Trial detainees</u>, Civil rights violation.
     • Can't mount defense. Perform investigations.

17.) <u>Mandatory Meal Times</u>
- Breakfast 5:30 Am To 7:30 Am
- Lunch 11:00 Am To 1:00 pm
- Dinner 5:00 pm To 7:00 pm

18.) Policy For Inmate Intake Sanitation
• Inmates must shower and They must clean Their Finger nails + Toe nails before receiving issuance of clothing and Assignment To Housing. We must control Bed Bugs, STAPH, infectious diseases due To Creek dwellers + Homeless indigents being co-mingled with General population

19.) Clean The Holding Tanks with Hot mops, Bleaching and disinfecting agents at least once a day! They are Filthy + Health Hazard

20.) Clean The multi-purpose rooms daily with Hot mops + disinfectents.

21.) Coordinating clothing + Bedding exchange immediately after Pod cleanings.

22.) Get Body Scanners + Stop The Strip Searches
• They are Not yielding Seizures
• They are uncomfortable + Demoralizing

23. Stop Shackling minimum security prisoners during Federal Transport. Unnecessary + Demoralizing.

24. Provide Signage + Intake paper relating mutual Terms + conditions of respect, conduct + Privileges between detainees + deputies

25. Assign Key Holders by ethnicity/Affiliation to maintain order + rules. Self police to reduce manpower burden on Deputies in minimum security environments.

26. Santa Rita Needs to evolve its systems + methods away from This Punitive Justice System and demoralizing, inhumane Treatment of Citizens and Drug addicts To a modernized System + method of Restorative JUSTICE! Right Now we Have Garbage IN + even worse Garbage going out! This does not make our communities any Safer! To The contrary, it makes Them Less Safe! we Need to Build people up, mAke Them Productive and restore Their Health and Vitality !

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

Cell Sanitation is at a crisis point. Detainees are only provided cleaning supplies once a week. The supplies provided are insufficient as is the time allotted to effectively clean their cells, sinks, showers, toilets and floors. Blood sucking gnats swarm the showers and cells. Detainees are contracting Lice, Bed Bugs, and flesh eating Staph infections from the MRSA virus.

The protocols for Sanitation are illogical. Detainees are only given one set of clothes for the week, to include one shower towel. This policy is in stark contrast to most other jails that provide four (4) sets or more of clothes per week.

New clothes are exchanged every Friday. Cell cleaning is scheduled every Saturday. Forcing citizen detainees to clean their cells, floors, bathrooms and showers in clean clothes and then sit in their now dirty clothes for the remaining six (6) days of the week. This is indignant and punitive treatment.

Homeless detainees are exchanged out of their filthy clothes and into clean jail issued clothes without being showered or sanitized. They are then sent to filthy holding cells to sit and lay down in vomit, urine, feces, semen, food and dirt stained

Floors until They are Transported To Their New Housing unit. They are Then introduced To a Dormitory cell SHared by as Many as 30 other detainees, Comprised of regular citizens serving Terms for Drunk Driving, Drug possession, Domestic Violence or awaiting Their court dates, etc. Upon arrival To The Dorm unit, Known as a 'POD', They are mandated to SHower in The singular SHower stall SHared by all Dorm mates. This spreads Lice, Bed Bugs, and infectious diseases like MRSA; Creating an obvious Health Hazard and public safety problem.

In The worst case detainees are exposed To Heroin addicts introduced To The Dorm without any medication. The Heroin addicts involuntarily defecate on Themselves, The Floors, Toilets and SHower creating an enormous Bio Hazard. RATHer Then caring For The Heroin addict in The Infirmary, The Detainees are made To Tend To The addict, clean up The addict and His messes, and suffer The indignity, smell and infectious disease risks associated with These intravenous drug users. The risk of exposure To Hepatitis, C-Difficil, Pseudomonis, E-coli and other infectious disease introduced To Their SHower and Living environment is an illogical risk To The detainees and public Health, in general.

The Jail is suffering continuous lockdowns due to insufficient resources, manpower, and apparent funding. Consequently, citizen detainees are being "locked down" in their cells in excess of 22 hours a day. Family and attorney visits are being cancelled due to lack of manpower to walk detainees to their visits. In many cases, families and attorneys who are traveling in excess of two (2) hours and/or flying in are being denied their visits upon arriving to the jail. They are given no notice and are having to return home. This is creating frustrations and costs that are unnecessary.

Detainees are being gouged by commissary prices, for personal food and supplies, that exceed 800% mark up over retail store prices. For example, a single pack of Top Ramen noodle soup costs thirteen cents ($.13) at Safeway. It's commissary price is one dollar and thirteen cents ($1.13).

Detainees are being gouged by excessive calling costs. The cost to place a call is twenty three cents ($.23) per minute with a 15 minute limit, and phones are limited. This is costly and punitive to detainees, their families, and lawyers. All calls are also recorded and monitored, precluding detainees from mounting their defense with counsel or speaking candidly or intimately to their

Loved ones.

For Federal Detainees The Jail is required To Have a Law Library. IT does Not! This precludes Federal Detainees From being able To mount Their Defense, creating a Liability For The Government, in That iT gives Those convicted an immediate appeal.

Detainees are being deprived of access To Personal electronics commonly available at other Jails. They are Suffering The ability To remain connected and engaged To Their Families, Jobs and The World, in general. For an, otherwise, innocent Detainee This exacerbates Their Personal and professional Hardship. Costing many Their relationships, Jobs and income and precludes Them From accessing The Legal resources and intelligence To defend Themselves. Detainees are requesting reinstatement of Their ability To call, Text, email and use The internet. To carry on Their Lives.

For more information on The Hunger Strike and/or if You suffered under The conditions at Santa Rita and wish To Bear witness please call The Law Offices of _____.