1
2
3
4
5          UNITED STATES DISTRICT COURT
6       NORTHERN DISTRICT OF CALIFORNIA
7

8   DANIEL GONZALEZ, et al.,         Case No.  19-cv-07423-JSC

9          Plaintiffs,

10      v.          **ORDER RE: PLAINTIFFS' SECOND MOTION FOR CLASS CERTIFICATION**

11   GREGORY J. AHERN, et al.,     Re: Dkt. No. 225

12         Defendants.

13

14     Plaintiffs, current and former inmates at Santa Rita Jail, bring conditions of confinement

15 claims against Alameda County, Wellpath Management, Inc., and Aramark Correctional Services,

16 LLC.  Plaintiffs' motion for class certification of an injunctive relief under Federal Rule of Civil

17 Procedure 23(b)(2) is now pending before the Court.  (Dkt. No. 225.[1])  Having considered the

18 parties' briefs, including the parties' supplemental submissions, and having had the benefit of oral

19 argument on February 23, 2023, Plaintiffs' motion for class certification is DENIED IN PART

20 and conditionally GRANTED IN PART.

21              **BACKGROUND**

22     Plaintiffs filed this action in November 2019 alleging they are subject to unlawful,

23 inhumane, and unconstitutional treatment at the Santa Rita Jail (Jail).   Over the following three

24 and a half years, Plaintiffs filed five amended complaints and Defendants moved to dismiss each

25 version of the complaint.  Plaintiffs also sought a preliminary injunction in February 2021 on their

26 inadequate and unsanitary food claims.  The Court denied the motion because Plaintiffs had not

27

28 [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

demonstrated a likelihood of success on the merits of their claims regarding inadequate kitchen cleanliness, contaminated food, and food that lacked sufficient nutritional value in light of Defendants' unrebutted evidence regarding the Jail's policies and practices.  (Dkt. No. 85.)

A little over a year later, Plaintiffs moved for class certification, which the Court denied without prejudice because Plaintiffs' motion failed to demonstrate class certification was appropriate as, among other things, Plaintiffs had not identified proper class representatives and had not conducted discovery in support of their claims.  (Dkt. No. 175.)  However, the Court granted Plaintiffs leave to file a fifth amended complaint to substitute new named plaintiffs as class representatives.  (Dkt. No. 179.) Plaintiffs thereafter filed the now operative Fifth Amended Complaint which identifies the following conditions of confinement as giving rise to their claims: (1) inadequate and unsanitary food; (2) insufficient and inadequate sanitation; (3) inadequate medical care; (4) enforced idleness; and (5) First Amendment retaliation.[2]  (Dkt. No. 180 at ¶ 6.)

On November 17, 2022, the Court granted in part and denied in part Defendants' motion to dismiss the Fifth Amended Complaint allowing Plaintiffs to proceed on the following claims:  (1) inadequate and unsanitary food as to the County and Aramark; (2) inadequate medical care as to the County and Wellpath; (3) inadequate sanitation as to the County as well as Plaintiff Gerrans' individual claim against Deputies Joe and Ignot; and (4) Plaintiff Gerrans' First Amendment claim as to the County.  (Dkt. No. 216.)

Plaintiffs then filed the pending second motion for class certification.  (Dkt. No. 225.) Because Plaintiffs offered new evidence on reply, the Court granted Defendants leave to file surreplies.  (Dkt. No. 241.)  Following the hearing on Plaintiffs' motion for class certification, the Court requested additional briefing from the County Defendants on Plaintiffs' inadequate sanitation claim and allowed Plaintiffs to submit a response to Defendants' supplemental submission.  (Dkt. Nos. 257; 262.)

//

//

---

[2] Plaintiffs do not plead a separate claim based on their allegations of "forced idleness."

United States District Court
Northern District of California

United States District Court
Northern District of California

### PROCEDURAL ISSUES WITH PLAINTIFFS' MOTION

As a threshold matter, the Court addresses the procedural deficiencies in Plaintiffs' motion for class certification.

First, Plaintiffs' proposed order seeks certification of "a Women Inmate Class and a Pregnant Women Inmate Sub-Class defined below, as to all claims and defenses at issue in the Complaint pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure," whereas the motion seeks certification of a class of "all adults who have been incarcerated anytime between November 19, 2017, and the final resolution of this lawsuit, in Santa Rita Jail." (*Compare* Dkt. No. 225-2 *with* Dkt. No. 225 at 2.)  The Court assumes the language in the proposed order is a cut-and-paste error; however, to the extent Plaintiffs seek certification of a class of "all inmates" which includes male and female inmates, Plaintiffs do not have a female class representative.  (Dkt. No. 225 at 2.)  Plaintiffs argue—without explanation or citation to any authority or evidence —that this argument is a "red herring that goes nowhere," but do not dispute that female inmates are housed in separate areas from male inmates.  (Dkt. No. 236 at 19.) Accordingly, the Court construes Plaintiffs' motion for class certification as seeking certification of a class of all male inmates.

Second, Plaintiffs' subclasses are defined by their legal claim. Plaintiffs seek certification of three subclasses described as: (1) "Insufficient Food Sub-Class: suffered injury due to insufficient or inedible food;" (2) "Deficient Sanitation Sub-Class, suffered injury due to insufficient or deficient sanitation;" and (3) "Deprivation of Medical Care Sub-Class, suffered injury due to denial of adequate or appropriate medical attention and services."  (Dkt. No. 225 at 2.)  As Plaintiffs seek certification of a Rule 23(b)(2) class seeking prospective injunctive relief, it is unclear why the subclasses are defined by their past injuries.  "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).  By defining the subclasses by their injuries, as opposed to

3

United States District Court
Northern District of California

1   exposure to the challenged policy and practice, the Court cannot identify what injunctive relief

2   would provide relief to the class as a whole.

3       Third, while this is Plaintiffs' second motion for class certification—the first having been

4   denied over a year ago without prejudice to Plaintiffs developing evidence in support of their

5   motion—Plaintiffs' motion for class certification is devoid of such evidence.  (Dkt. No. 175.)  The

6   motion is supported by a declaration from counsel which attaches six documents; three of the

7   attachments are orders in other cases that counsel contends support certification here.  (Dkt. No.

8   225-1 at ¶ 8.)  The other three documents are: (1) a letter from former Alameda County Sheriff

9   Ahern to the Alameda County Board of Supervisors recommending approval of a contract with

10  Aramark for the August 2015-July 2018 term (Dkt. No. 225-1 at 6); (2) excerpts from the 2021-

11  2022 Alameda County Grand Jury Report (*Id*. at 8); and (3) the Santa Rita County Jail Daily

12  COVID-19 update for December 5, 2022 (*Id*. at 48).  In support of their moving papers, Plaintiffs

13  did not submit any declarations from the named plaintiffs, proposed class representatives, or class

14  members.  Nor did Plaintiffs submit any documents reflecting Defendants' policies and practices

15  or the absence thereof.

16      Fourth, to the extent Plaintiffs proffer declarations and deposition testimony with their

17  reply briefs and supplemental submission, Plaintiffs simply attach the declarations, refer to

18  declarations submitted with their motion for a temporary restraining order nearly three years ago,

19  or declarations submitted with their motion for preliminary injunction over two years ago, all

20  without citation to *where* in the declarations the evidence can be found.[3]  (*See e.g*., Dkt. No. 234 at

21  6; Dkt. No. 236 at 8-9.)  Likewise, Plaintiffs submit deposition testimony from putative class

22  members in support of their inadequate medical care and sanitation subclasses, but do not provide

23  citations to *where* within the excerpts the testimony can be found; in many instances, the

24

---

25  [3] Rather than strike this late-filed evidence, the Court granted Defendants leave to file sur-replies.

26  (Dkt. No. 243.)  *See Townsend v. Monster Beverage Corp*., 303 F. Supp. 3d 1010, 1027 (C.D. Cal.
    2018) ("the district court may decline to consider new evidence or arguments raised in reply, and

27  generally should not consider the new evidence without giving the non-movant an opportunity to
    respond.") (internal citation and quotation marks omitted).

28

1    deposition testimony is electronically filed out of page order and without a cover page so it is

2    unclear to whom the deposition testimony belongs.  (*See, e.g*., Dkt. No. 232 at 3; Dkt. No. 234 at

3    6-7; Dkt. No. 239.)  It is not the task "of the district court, to scour the record in search of a

4    genuine issue of triable fact. We rely on the []moving party to identify with reasonable

5    particularity the evidence" in support of its motion.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.

6    1996).

7            Fifth, on reply, Plaintiffs filed two administrative motions to seal attaching over 300 pages

8    of grievances.  (Dkt. Nos. 233, 238.)  Plaintiffs' administrative motion to seal fails to comply with

9    Local Rule 79-5 as, among other things, there is no declaration in support of sealing and the

10   request for sealing itself is not narrowly tailored as it just seeks wholesale sealing of hundreds of

11   pages of documents.  Further, the grievances attached to the administrative motions are neither

12   discussed, summarized, or cited to with any particularity in any of Plaintiffs' briefs; instead,

13   Plaintiffs' reply brief just states they "submitted over 300 grievances" without any further

14   discussion.  (Dkt. No. 232 at 3.)  "It is absurdly difficult for a judge to perform a search,

15   unassisted by counsel, through the entire record, to look for [] evidence." *Carmen v. San*

16   *Francisco Unified Sch. Dist*., 237 F.3d 1026, 1030 (9th Cir. 2001). Indeed, "[i]f the ... court ...

17   searches the whole record, in practical effect, the court becomes the lawyer for the [moving party],

18   performing the lawyer's duty of setting forth specific facts [and evidence]." *Id*. at 1031.  Given

19   these issues, the Court STRIKES Plaintiffs' administrative motions to seal.  (Dkt. Nos. 233, 238.)

20           Finally, in connection with their reply, Plaintiffs filed evidentiary objections in a separate

21   pleading.  (Dkt. No. 234-1.)  This separate filing violates Civil Local Rule 7-3(c) which requires

22   that "[a]ny evidentiary and procedural objections to the motion ... be contained within the

23   [opposition] brief or memorandum." N.D. Cal. Civ. L.R. 7-3(a). "Courts in this district regularly

24   strike separately-filed evidentiary objections and responses for violating Local Rule 7-3." *Go*

25   *Daddy Operating Co., LLC v. Ghaznavi*, No. 17-CV-06545-PJH, 2018 WL 1091257, at *14 (N.D.

26   Cal. Feb. 28, 2018) (collecting cases re: same). The Court thus STRIKES Plaintiffs' separate

27   statement of evidentiary objections. (Dkt. No. 234-1.)

28

The issues raised in this action, if true, can have a serious impact on the health, safety, and well-being of the inmates at Santa Rita Jail.  But Plaintiffs' scattershot motion and the failure to submit evidence in an appropriate and comprehensible fashion has hampered the Court's ability to consider these issues.  Plaintiffs' retort that they need not offer evidence in support of their class certification motion is wrong.  A Rule 23(b)(2) class seeking injunctive relief requires "proof" that a systemic policy and practice—or lack thereof—gives rise to the claims.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 353 (2011).

### DISCUSSION

"Federal Rule of Civil Procedure 23 governs the maintenance of class actions in federal court." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017). To succeed on their motion for class certification, Plaintiffs must satisfy the threshold requirements of Federal Rule of Civil Procedure 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b). *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).  The Court may certify a class only where "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

At oral argument, Plaintiffs confirmed they are only seeking certification under Rule 23(b)(2), which requires "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360–61.

## A. Rule 23(a) Factors

### 1. Numerosity

A putative class satisfies the numerosity requirement "if the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Impracticability is not impossibility, and instead refers only to the "difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc*., 329 F.2d 909, 913–14 (9th Cir. 1964) (citation omitted). "While there is no fixed number that satisfies the numerosity requirement, as a general matter, a class greater than forty often satisfies the requirement, while one less than twenty-one does not." *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 526 (N.D. Cal. Nov. 27, 2012).   The numerosity requirement is satisfied here as Plaintiffs seek certification of a class of all male inmates and Plaintiffs indicate that as of December 5, 2022, the Jail population was 2,086.

### 2. Commonality

"[C]ommonality requires that the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'" *Mazza*, 666 F.3d at 588 (quoting *Dukes*, 564 U.S. at 350). "[P]laintiff[s] must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Id*. (cleaned up). While Plaintiffs are not required to prove the merits of their case at this juncture, for commonality purposes, they must nevertheless demonstrate the claims are capable of generalized proof for the classes to be certified. *See Dukes*, 564 U.S. at 355 (plaintiff must come forward with "significant proof" that his claims can be proved on a classwide basis); *Parsons v. Ryan*, 754 F.3d 657, 683 (9th Cir. 2014), ("utterly threadbare allegations that a group is exposed to illegal policies and practices" not enough to confer commonality).

In *Parsons*, the Ninth Circuit affirmed certification of a class of approximately 33,000 inmates in 10 correctional facilities in Arizona seeking injunctive relief based on systemic deficiencies in the Arizona Department of Corrections (ADC) health care system and isolation units. 754 F.3d at 662.  The court framed the commonality requirement as whether because of

7

"specified statewide ADC policies and practices that govern the overall conditions of health care services and confinement" all class members are allegedly exposed "to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent." *Id.* at 678.  In affirming the district court's class certification order the Ninth Circuit noted:

> The district court identified 10 statewide ADC policies and practices to which all members of the class are subjected, and seven statewide ADC policies and practices which affect all members of the subclass. These policies and practices are the 'glue' that holds together the putative class and the putative subclass; either each of the policies and practices is unlawful as to every inmate or it is not. That inquiry does not require us to determine the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination.

*Id.*  The plaintiffs satisfied their burden of establishing commonality by submitting "expert reports, the detailed allegations in the 74-page complaint, hundreds of internal ADC documents, and declarations by the named plaintiffs" demonstrating the existence of policies and practices that allegedly expose "all members of the putative class to a substantial risk of serious harm." *Id*. at 683.  Further, the policies and practices were "defined with sufficient precision and specificity; they involve particular and readily identifiable conduct on the part of the defendants." *Id*.

### 1.  Inadequate Medical Care and Inadequate Food Subclasses

Plaintiffs' motion for class certification falls far short of the level of a showing *Parsons* requires with respect to their inadequate medical care and inadequate/contaminated food subclasses.  Plaintiffs' general theory of liability for their inadequate medical care and inadequate/contaminated food claims is that the Jail operates on a for-profit model and has implemented financially-driven policies which incentivize third-party contractors Wellpath and Aramark to keep costs down and provide the least amount of services (medical or food) to inmates.  (Dkt. No. 180 at ¶¶ 25-28.)  However, Plaintiffs' briefs do not identify any a particular policies or practices (or the absence thereof) that give rise to Plaintiffs' constitutional claims.

At oral argument, the Court asked Plaintiffs to identify the particular systemic policies and practices at issue for each of their subclasses.  Below, the Court summarizes Plaintiffs' theories (as articulated at oral argument) and the evidence offered in support of these theories. While Plaintiffs

United States District Court
Northern District of California

8

1   have not identified particular declaration or deposition testimony supporting their claims, given

2   the gravity of the issues and allegations here, the Court has endeavored to review the record in its

3   entirety to identify, where possible, evidence supporting Plaintiffs' theories.

**a) Inadequate Medical Care Subclass**

5       At the hearing, Plaintiffs articulated their theory regarding the inadequate medical care

6   subclass as challenging the Jail's policy and practice of providing minimal care that does not

7   address inmates' medical needs, and long delays for serious and genuine medical needs.  Plaintiffs

8   do not dispute Wellpath's written policies, which detail the level and timeframe for providing care

9   (Dkt. No. 228-2) might be adequate, but instead maintain the practice at the Jail is not compliant

10  with the written policy.  Plaintiffs contend this theory is supported by the Grand Jury report which

11  found that 20 percent of all grievances concern medical care.  Plaintiffs' reply brief also relies

12  upon (1) the Fifth Amended Complaint's allegations (Dkt. No. 180 at ECF 8, 15, 43-44, 51-54);

13  and (2) deposition testimony from James Mallett, Rasheed Tucker, and Darryl Geyer (Dkt. Nos.

14  232-3—232-5).  Plaintiffs also state that they have submitted "over 300 grievances," but Plaintiffs

15  do not discuss the contents of the grievances at all, and instead, simply attach the grievances.

16  (Dkt. No. 232 at 3.)

17      The complaint allegations and deposition testimony detail varied issues inmates have

18  encountered attempting to obtain medical care.  For example, Mr. Mallett testified he developed a

19  wound on his left leg and when he was finally taken to medical, they said it was from shooting up

20  drugs and refused to take a blood sample or allow him to see a specialist.  (Dkt. No. 232-3 at

21  21:21-22, 28:5-29:3.)  After six months they finally swabbed and tested his wound and discovered

22  he had a staph infection, at which point he was finally given medications, but the infection had

23  already spread to his ear.  (*Id.* at 29:4-16.)  Mr. Tucker testified he arrived at the Jail with an injury

24  to his hand and had surgery scheduled with Highland Hospital, but he never received treatment

25  and now his hand has atrophied.  (Dkt. No. 232-4 at 26:19-27:20.)  He also had issues getting his

26  blood pressure medication when he arrived at the Jail and they discontinued his Seroquel and his

27  Ativan, which led him to harm himself.  (*Id.* at 93:2-21.)  Mr. Geyer testified that after his knee

28

United States District Court
Northern District of California

United States District Court
Northern District of California

got infected, he did not have access to clean bandages and the nurses did not always have time for wound care.  (Dkt. No. 232-5 at 25:12-27:14.)  Eventually, his public defender had to get a court order to have his knee wound treated.  (*Id*. at 37:20-38:18.)

### b)  Inadequate Food

At the hearing, Plaintiffs articulated their theory regarding the inadequate food subclass as challenging Aramark's failure to serve food that complies with its own policies; namely, its menu. In particular, Plaintiffs emphasized the declaration testimony from David Misch and Adanna Ibe that inmates are consistently shorted the amount of carrots called for under the menu.   (Dkt. No. 234-2 at ¶ 8; Dkt. No. 234-3 at ¶ 3.)  Aramark conceded that as a result of supply chain shortages, it was unable to obtain single bags of carrots that met the required weight; however, its General Manager for the Jail, Rick Huking, attested that in response to the shortages, Aramark implemented a policy that inmates should receive two or more bags of carrots sufficient to ensure the amount of carrots provided met the menu weight.  (Dkt. No. 247-2, Huking Decl. at ¶¶ 8-12.) At the hearing, Plaintiffs pointed to Mr. Misch's testimony regarding chronic food shortages beyond the carrots; however, Mr. Misch's declaration does not include any such testimony (*see* Dkt. No. 234-3) and while the Fifth Amended Complaint alleges he often experiences "shortage on portion size," there are no specifics regarding the nature, frequency, or type of shortages (*see* Dkt. No. 180 at ¶ 14.3.7).

While not discussed at the hearing, Plaintiffs' reply brief also contends that Aramark has a pattern and practice of providing food trays that are contaminated with foreign objects or spoiled food.  For this allegation, Plaintiffs rely upon the deposition testimony of James Mallett, Rasheed Tucker, and Darryl Geyer, as well as declarations offered in support of their motion for preliminary injunction two years ago describing issues with dirty trays, vermin, and unclean kitchens. (Dkt. No. 236-4—Dkt. No. 236-13.)   Mr. Mallett testified his food trays were often dirty, he once found a cockroach on the side of his food tray, he has been served moldy food, and on one occasion, he found a rock in his food.  (Dkt. No. 236-4 at 46:10-48:25; 94:5-24.)  Mr. Tucker testified his food was often overcooked, he was sometimes served spoiled food, and the

1    food trays were often dirty. (Dkt. No. 239-1 at 74:3-8, 76:1-25.)  Mr. Geyer testified he sometimes

2    received food that was "so foul it was almost inedible," sometimes he received dirty trays, there

3    was a brief period when there were weevils in his beans, and he once had moldy bread.  (Dkt. No.

4    239 at 96:7-98:24.[4])

5        **c)  Plaintiffs' Inadequate Medical Care and Inadequate Food Claims Lack Commonality**

6            Neither Plaintiffs' arguments with respect to inadequate medical care nor those regarding

7    inadequate food demonstrate that class members' claims are capable of generalized proof.  *See*

8    *Dukes*, 564 U.S. at 355 (plaintiff must come forward with "significant proof" his claims can be

9    proved on a class-wide basis).

10           *First*, Plaintiffs' anecdotal evidence fails to demonstrate "there are in fact common

11   questions of law or fact."  *Parsons*, 754 F.3d at 683 (cleaned up).  For the medical care claims,

12   Plaintiffs have not presented any cohesive theory regarding inadequate access to medical care—

13   Mr. Tucker had difficultly getting his medication when he arrived at the Jail, Mr. Mallet had issues

14   obtaining treatment for a staph infection, and Mr. Geyer testified to receiving inadequate wound

15   care.  Plaintiffs' reliance on 20 percent of the grievances at the Jail relating to medical care is not

16   evidence of a common policy or practice of denying or delaying care.  Plaintiffs did not describe,

17   summarize, or synthesize the grievances regarding medical care such that the Court could

18   conclude they represent common evidence of anything.  Further, Plaintiffs do not dispute Wellpath

19   has a policy establishing procedures and timeframes for provision of medical care, nor have

20   Plaintiffs offered expert testimony or other evidence demonstrating Wellpath does not adhere to

21   this policy.

22           Plaintiffs' inadequate food claim is similarly not supported by evidence of a *systemic*

23   policy or practice resulting in chronic food shortages.  Plaintiffs' theory is premised on declaration

24   testimony from *two* individuals regarding instances in which they were shorted in their ration of

25   carrots.  Mr. Ibe attests that "the amount of [carrot] I receive varies and is not the same."  (Dkt.

26

27   ────────────────

28   [4] The Court assumes that this is Mr. Geyer's testimony, however, it is not apparent from the
     electronically filed exhibit.

11

*United States District Court*
*Northern District of California*

No. 234-2 at ¶ 8.)  While Aramark's menu states "the vegetable portion is suppose[d] to be 3 ounces…the most I have received is only one bag of carrots and the largest bag is only 2.6 ounces." (*Id*.)  Mr. Misch, who receives a Kosher diet, attests the Kosher menu states his meals should have one half cup of carrots, but "[n]one of the packages that the carrots come in are four (4) ounces." (Dkt. No. 236-2 at ¶ 3.) However, Aramark has offered evidence the menu measurements are by volume not weight such that their serving sizes are accurate.  (Dkt. No.  247-2 at ¶¶ 2-5; Ex. A.)

Likewise, while Plaintiffs have offered anecdotal evidence regarding spoiled food and dirty or contaminated trays, Plaintiffs largely rely on the declarations they submitted with their motion for a preliminary injunction two years ago.  However, the Court denied Plaintiffs' motion for a preliminary injunction on these claims because the County had offered evidence it had put procedures in place to address the issues Plaintiffs raised.  (Dkt. No. 95 at 10-15.)  The Court noted discovery was required to test Defendants' evidence.  (*Id*. at 14-15.)   Although two years have passed, it does not appear Plaintiffs have obtained that evidence, or at least they did not proffer it in connection with this motion.  While the deposition testimony of Mr. Mallett, Mr. Tucker, and Mr. Geyer reflect occasions when they have received spoiled or contaminated food, Plaintiffs have not offered evidence supporting an inference that these are systemic issues or that they arose from a common policy.

***Second***, Plaintiffs have not identified any specific policies or practices—or lack thereof— that have given rise to the alleged constitutional violations.  Without "some glue holding the alleged reasons for all those [issues] together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer" to Plaintiffs' claims.  *Dukes*, 564 U.S. at 352; *see also Parsons*, 754 F.3d at 684 ("when inmates provide sufficient evidence of systemic and centralized policies or practices in a prison system that allegedly expose all inmates in that system to a substantial risk of serious future harm, Rule 23(a)(2) is satisfied."). That is, it is unclear what relief the Court could order that would address Plaintiffs' individualized issues with food and medical care.  Plaintiffs have not presented any expert testimony regarding Defendants'

existing policies and procedures opining as to how these policies and practices give rise to common issues for class members and how they can be remediated on a classwide basis.  For example, in *Parsons*, the court relied upon expert testimony that

> instead of following their formal procedures, ADC's prison facilities maintain 'a policy and practice of not providing adequate medical professional staffing,' 'a practice of not complying with [ADC's] requirement that health care records be reviewed within 12 hours of an inmate's arrival,' 'a practice and unwritten policy of delaying and/or denying prisoners access to necessary care for serious medical needs,' 'a practice and unwritten policy of not providing sufficient, trained staff to competently respond to emergencies,' a 'practice and unwritten policy of failing to supervise, manage and support medication distribution,' and a 'practice of keeping chaotic, inaccurate, and disorganized records throughout the state, [and that a]s a result of these statewide policies and practices… 'medical care delivery in [ADC] poses a substantial risk of serious harm to prisoners who require medical care.'

*Parsons*, 754 F.3d at 669.  No such expert testimony has been proffered here on Plaintiffs' inadequate medical care claim—or any other claim.

**_Third_**, the cases Plaintiffs rely on do not support Plaintiffs' contention that such evidence is not required at the class certification stage as they were either unopposed motions for class certification, or relied upon evidence, including expert reports and specific policies/practices which gave rise to the plaintiffs' claims.  *See, e.g.*, *Jewett v. California Forensic Med. Grp., Inc.*, No. 13-CV-0882 MCE ACP, 2017 WL 980446, at *7 (E.D. Cal. Mar. 13, 2017), report and recommendation adopted sub nom. *Jewett v. California Forensic Medical Group, Inc.*, No. 13-CV-0882 MCE ACP, 2017 WL 1356054 (E.D. Cal. Apr. 5, 2017) (unopposed motion for class certification supported by expert reports, internal documents, written discovery responses, and class member declarations); Dkt. No. 225-1 at 51 (attaching *San Bernardino County Jail Topete v. Cty of San Bernardino*, No. 5:16-cv-00355-VAP-DTB (C.D. Cal. January 27, 2017) (joint motion for class certification which identified particular policies or the lack thereof which gave rise to the constitutional claims)); Dkt. No. 225-1 at 66 (attaching *Chavez v. Cty of Santa Clara*, No. 1:15-cv-05277-RMI (N.D. Cal. September 20, 2016) (granting joint motion for class certification using proposed order without no analysis)); Dkt. No. 225-1 at 69 (attaching *Cole v. Cty of Santa Clara*, No. 5:16-cv-06594-LHK (N.D. Cal. February 6, 2018) (granting joint motion for class

United States District Court
Northern District of California

certification in a one-page order)).

District court cases granting certification of a Rule 23(b)(2) conditions of confinement class following *Dukes* generally rely on expert testimony regarding the policies and practices at-issue.  *See, e.g.*, *J.P. v. Sessions*, No. 18-06081 JAK SKX, 2019 WL 6723686, at *1 (C.D. Cal. Nov. 5, 2019) (granting class certification where plaintiffs identified systematic policies and practices; namely, the allegedly insufficient mental health and trauma services provided to detainees subject to the family separation policy, and plaintiffs' claims were supported by expert declarations regarding the risk of harm from the systemic policies and practices); *Gray v. Cnty. of Riverside*, No. CV 13-00444-VAP, 2014 WL 5304915, at *31 (C.D. Cal. Sept. 2, 2014) (granting class certification where plaintiffs provided expert testimony that "based on their review of the safety cell logs, grievances, records of court orders, and inmates' medical records" there were "several systemic deficiencies in Defendant's medical and mental health policies, including deviations from the County's written policies.").  Plaintiffs have not explained how their motion satisfies their Rule 23(a)(2) burden despite the absence of the expert evidence of class-wide policies.

***

In sum, Plaintiffs have failed to offer "significant proof" that their medical care and inadequate food claims are capable of generalized proof.  *See Dukes*, 564 U.S. at 355.

### 2.  Inadequate Sanitation Subclass

At the hearing, Plaintiffs articulated their theory regarding the inadequate sanitation subclass as challenging two systemic policies and practices within the Jail:

1)  The Jail's policy requiring inmates to maintain the sanitation of their own cells and common areas, but failing to have a policy or practice which provides inmates with adequate sanitation supplies, or a policy for addressing inmates housed with those who cannot functionally maintain their own sanitation because of mental health issues, which impacts sanitation for all inmates within that congregate housing area.

2)  The Jail's policy of not providing bathrooms in the common areas, and inmates' difficulties obtaining access to bathroom areas during POD or out-of-cell time.

In support of this theory, Plaintiffs cited to two of the Grand Jury report findings: "[s]afety and

14

1   sobering cells at Santa Rita Jail are not universally cleaned and sanitized after each use, indicating

2   a systemic issue with maintaining cleanliness standards"; and "[t]he level of cleanliness in

3   common areas and recreation yards at Santa Rita Jail is highly variable across housing units, with

4   jail staff disavowing responsibility for ensuring a minimal standard of hygiene in areas cleaned by

5   inmates."  (Dkt. No. 225-1 at 38-39.)

6           Because Plaintiffs' motion for class certification did not provide Defendants notice of the

7   exact nature of their theory, the Court gave the County Defendants the opportunity to file a

8   supplemental brief addressing the theory as articulated at oral argument.  (Dkt. No. 257.)  The

9   County Defendants submitted a supplemental brief, a request for judicial notice, and a declaration

10  from Lieutenant Phillip Corvello of the Jail's Compliance Management Unit. (Dkt. Nos. 258, 259,

11  260.[5])  Plaintiffs thereafter requested leave to file a sur-reply which the Court granted, and which

12  included declarations from six individuals, none of whom previously submitted declarations on the

13  sanitation issue and only one of whom (James Mallet) is identified as a class representative on the

14  inadequate sanitation subclass.  (Dkt. No. 225 at 2; Dkt. No. 263.)

15          As a threshold matter, the County Defendants' argument that Plaintiffs' inadequate

16  sanitation claim is barred by res judicata is unavailing.  Res judicata is an affirmative defense and

17  Defendants did not plead res judicata—claim or issue preclusion—in their Answer to the Fifth

18  Amended Complaint.  (Dkt. No. 220).  *See ASCII Corp. v. Softool Corp.*, 211 F.3d 1272 (9th Cir.

19  2000) ("Res judicata is an affirmative defense that can be waived.") (citing Fed. R. Civ. Pro. 8(c)).

20  Nor did the County Defendants argue in any of their many motions to dismiss that Plaintiffs'

21  claims are barred by claim or issue preclusion. (Dkt. Nos. 18, 36, 52, 103, 204.) Accordingly, the

22  Court declines to consider the argument raised for the first time in a supplemental brief opposing

23  Plaintiffs' motion for class certification.

24          As to the merits of Plaintiffs' inadequate sanitation claim, the County Defendants insist

25

26  [5]  The County Defendants' unopposed request for judicial notice of Alameda County Sheriff's
    Office, Detentions and Corrections, Policy and Procedure Sections 15.05, 15.02, 15.03, 10.05, and
27  10.03 (Dkt. No. 259, Exs. B-F) is GRANTED.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689
    (9th Cir. 2001) ("a court may not take judicial notice of a fact that is 'subject to reasonable
28  dispute.' Fed. R. Evid. 201(b).").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Jail policies and procedures ensure inmate sanitation.  In particular, ACSO Detention and

2    Corrections, Policy and Procedure sections 15.01, 15.02, and 15.03 require inmates to maintain the

3    cleanliness of their own cells.  (Dkt. Nos. 259-2—259-4.)   Further, Jail guidance states guards

4    "must continue to ensure inmates have access to cleaning and proper hygienic supplies," and "[i]f

5    a deputy notices an inmate's cell is disorderly and/or unsanitary, they should make an effort to

6    encourage the inmate to clean their cell."  (Dkt. No. 260-1 at 3.)  "If the inmate is unwilling to do

7    so, when the inmate is removed from their cell for other reason (i.e. external appointment, pod

8    time, etc) the cell should be cleaned by pod workers (or Crime Scene Cleaners if bio-hazard is

9    present)."  (*Id*.)  Defendants also insist the Consent Decree in *Babu, et al. v. County of Alameda, et*

10   *al*., Case No. 5:18-cv-07677-NC, requires the Jail to document that deputies are reminded "during

11   their daily housing unit inspections to work with the inmates in their charge to ensure good

12   hygiene and cleanliness."  (Dkt. No. 258 at 5.)  Defendants concede the common areas do not have

13   toilets, but emphasize Detention and Corrections Policy and Procedure section 10.05 "requires

14   housing unit deputies to ensure that inmates are able to enter/exit their cells at least once per hour

15   while they are out in the common areas."  (Dkt. No. 258 at 5-6 (citing Dkt. No. 259-5 at 4).)

16   Further, while not reflected in a written policy, "[d]eputies are trained to permit inmates to access

17   the restroom when they are outside of their assigned living areas upon request."  (Dkt. No. 260,

18   Corvello Dcel. at ¶ 14.)

19          Plaintiffs do not dispute the existence of these policies and practices. Instead, Plaintiffs

20   contend that the County Defendants' policy and practice of requiring inmates to be responsible for

21   sanitation of their own cells, but not providing inmates consistent access to adequate sanitation

22   supplies presents a substantial risk of serious harm to inmates.  Similarly, Plaintiffs insist the

23   County Defendants' policy and practice of not having a toilet in the common areas and leaving

24   access to the toilets during pod time up to the individual deputies results in inmates using the

25   showers as a toilet, and because cleaning the showers is also left to inmate workers and is not

26   performed consistently, this policy, too, presents a substantial risk of serious harm to inmates.

27   Plaintiffs offer evidence in the form of declarations and the Grand Jury Report that these systemic

28

1    policies and procedures result in inadequate sanitation for all inmates at the Jail.

2        For example, numerous class members testify they were not provided sanitation supplies

3    either on a consistent basis or when requested, and that the cleaning supplies they were provided

4    were insufficient—one bucket and mop to clean an entire housing pod, no disinfectant, a broom

5    with no handle.  (Dkt. No. 234-2, Ibe Decl. at ¶¶ 2-4; Dkt. No. 234-5, Mallet Depo. 23:1-21; Dkt.

6    No. 234-6, Tucker Depo. 17:13-21; 46:19-23; Dkt. No. 235, Geyer Depo. 30:22-25; 31:18-23;

7    42:22-43:18; Dkt. No. 30-8, Lewis Decl. at ¶ 3; Dkt. No. 30-10, Moore Decl. at ¶ 6; Dkt. No. 30-

8    11, Powell Decl. at ¶ 6; Dkt. No. 30-12, Redmond Decl. at ¶¶ 2-3; Dkt. No. 30-14, Upshaw Decl.

9    at ¶ 6; Dkt. No. 30-13, Robinson Decl. at ¶¶ 3-4.).)

10       While many of these declarations are nearly three years old, Plaintiffs' sur-reply includes

11   declarations attesting that the same conditions exist in the Jail today.  David Misch attests that in

12   February 2023, he was moved to Housing Unit 1C and placed in a cell that had previously housed

13   an individual who was mentally ill and "the cell was filthy beyond description.  There was food

14   and feces smeared over the walls, the bed, on the floor."  (Dkt. No.  263-1, Misch Decl. at ¶ 6.)

15   He was given a mop with a handle, a broom head, a bottle of disinfectant spray, and some towels

16   to clean the cell.  (*Id*. at ¶ 9.)  The next day, he was taken to the shower which was covered in

17   mold and algae.  (*Id*. at ¶ 11.)  He was refused cleaning supplies for the shower because he was

18   "not a pod worker" so he used a toilet brush and his personal shampoo to clean the shower walls.

19   (*Id*.)  Because of lack of a toilet in the common areas, Mr. Misch estimates 80% of inmates use the

20   shower as a toilet.  (*Id*. at ¶ 15.)  Like Mr. Misch, Mr. Robertson attests inmates use the shower as

21   a toilet during pod time because only some of the deputies will open the cell door to allow inmates

22   to use the toilets in the cell area.  (Dkt. No. 263-3, Robertson Decl. at ¶¶ 3-5.)

23       Tiara Arnold attests that "[n]ow that Covid is done, they're now like backsliding on the

24   supply of cleaning supply," and as of March 2023, they have not been offered cleaning supplies

25   for a week.  (Dkt. No. 263-2, Arnold Decl. at ¶ 1.)  Further, the pods which house inmates with

26   mental illness are "like walking into sewage" because of the feces.  (*Id*. at ¶ 3.)  She also attests

27   the Intake-Transfer-Release (ITR) holding cells which are used for transferring inmates to and

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  from court are filthy and not cleaned.  (*Id*. at ¶¶ 4-5.)  Reginald Robertson attests to similar issues

2  with the ITR cells and the multi-purpose rooms that houses inmates before they are move to the

3  ITR cells.  (Dkt. No. 263-3, Robertson Decl. at ¶¶ 8-9.)  Mr. Robertson, James Mallet, and Bryson

4  McIntyre also attest to inadequate cleaning supplies—a single mop, bucket, and toilet brush are

5  provided to clean an entire pod.  (Dkt. No. 263-3, Robertson Decl. at ¶ 2; Dkt. No. 263-4,

6  McIntyre Decl. at ¶ 2; Dkt. No. 263-2, Mallet Decl. at ¶¶ 3-4.)   Finally, like Mr. Misch, Matthew

7  Pierce was also placed in a cell covered in feces and not provided adequate cleaning supplies.

8  (Dkt. No. 263-5 at ¶¶ 1-2.)

9          These declarations are consistent with the Alameda County Grand Jury's finding that

10  "[s]afety and sobering cells at Santa Rita Jail are not universally cleaned and sanitized after each

11  use, indicating a systemic issue with maintaining cleanliness standards"; and "[t]he level of

12  cleanliness in common areas and recreation yards at Santa Rita Jail is highly variable across

13  housing units, with jail staff disavowing responsibility for ensuring a minimal standard of hygiene

14  in areas cleaned by inmates."  (Dkt. No. 225-1 at 38-39.)

15          In sum, Plaintiffs have alleged and offered evidence of two policies and practices which if

16  true present a substantial risk to the health and safety of all the inmates at the Jail.   First, the Jail's

17  policy and practice of requiring inmates alone to be responsible for sanitation of their living areas

18  (cells) and not providing consistent, adequate access to cleaning supplies.  Second, the Jail's

19  policy and practice of not having toilets in the common areas for use during pod time and leaving

20  access to the toilets to the discretion of individual deputies which results in inmates using the

21  showers as a toilet, and leaving responsibility for cleaning these showers to inmate workers.  If

22  true, these allegations demonstrate the Jail has "failed to meet its constitutional duty to provide

23  reasonably safe conditions to Plaintiffs." *Roman v. Wolf*, 977 F.3d 935, 943-44 (9th Cir. 2020)

24  (holding the district court did not err in granting preliminary injunctive relief or provisionally

25  certifying a class where plaintiffs offered evidence that among other issues "there was not enough

26  soap or hand sanitizer to go around, detainees were responsible for cleaning the facility with only

27  dirty towels and dirty water").

28

In contrast to Plaintiffs' allegations as to inadequate medical care and inadequate food, Plaintiffs' allegations regarding inadequate sanitation reflect systemic issues with lack of access to adequate cleaning supplies and sanitation within the cells, and a policy and practice regarding access to toilets during pod time which results in inmates using the showers to go to the bathroom—these policies and practices affect all class members in the same way.  That is, "[t]hese policies and practices are the 'glue' that holds together the [inadequate sanitation] subclass; either each of the policies and practices is unlawful as to every inmate or it is not. That inquiry does not require us to determine the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination."  *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014).

Accordingly, the Court finds that the commonality requirement has been met for the inadequate sanitation subclass which is defined in relation to the two policies and practices identified above.

### 3.  Typicality/Adequacy of Class Representatives

A class representative's claims or defenses must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). A class representative must also be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  A class representative is adequate where his "claim and the class claims are so interrelated that the interests of the Class Members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982).

Plaintiffs offer Darryl Geyer, James Mallett, Timothy Phillips, Eric Rivera, Rasheed Tucker, and Eric Wayne as class representatives on the inadequate sanitation subclass.  (Dkt. No. 225 at 2.)  Mr. Mallett, who is currently detained at the Jail, submitted a declaration describing the

same types of sanitation issues as the rest of the class.  (Dkt. No 263-6.)  His claims are thus

typical of the proposed inadequate sanitation subclass as he shares the same or similar injury from

the same course of conduct.  Further, no conflicts between Mr. Mallett and the other class

members are apparent such that he is an adequate class representative.

### 4. Adequacy of Representation

Rule 23(g)(1)(A) requires that courts consider the following factors in appointing class

counsel: "(i) the work counsel has done in identifying or investigating potential claims in the

action; (ii) counsel's experience in handling class actions, other complex litigation, and the types

of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the

resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Defendants contend that Ms. Huang is not adequate to represent the proposed class because of

"significant ethical concerns" related to her representation of a criminal defendant in 2010, and

because she has been "derelict in her duties" in this case.  (Dkt. No. 231 at 22.)

The Court does not find that ethical concerns preclude Ms. Huang from adequately

representing the class.  However, in light of the issues with this motion and Plaintiffs' prior

motion for class certification, the Court has serious concerns regarding Ms. Huang's ability as a

"single practitioner [to] effectively litigate an action that involves thousands of [detainees at Santa

Rita Jail]" and their constitutional claims.  *See Cullen v. New York State Civ. Serv. Comm'n*, 435

F. Supp. 546, 560 (E.D.N.Y. 1977) ("The point is that by granting class status, the court places the

attorney for the named parties in a position of public trust and responsibility, and in effect creates

an attorney-client relationship between the absentee members and the attorney.")  Federal Rule of

Civil Procedure 23(g)(1)(E) allows the court when appointing counsel to "make further orders in

connection with the appointment."  The Court thus conditions Ms. Huang's appointment as class

counsel on her obtaining qualified co-counsel to litigate this action with her.

## B.  Rule 23(b)(2) Factors

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief or corresponding

20

declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360. "These requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688 (citing *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2011)). "[B]y allegedly establishing systemic policies and practices that place every inmate in [the Jail] in peril, and by allegedly doing so with deliberate indifference to the resulting risk of serious harm to them, the [County] defendants have acted on grounds that apply generally to the proposed class and subclass, rendering certification under Rule 23(b)(2) appropriate." *Parsons*, 754 F.3d at 688–89.

## CONCLUSION

For the reasons discussed above, Plaintiffs' second motion for class certification is DENIED IN PART and conditionally GRANTED IN PART.   The motion is denied as to the inadequate medical care and inadequate food subclasses.  The motion is granted as to the inadequate sanitation subclass, but only on the condition that Ms. Huang obtain qualified co-counsel to appear in this action and litigate it with her.

The Court sets a status conference for June 29, 2023 at 1:30 p.m. via Zoom video.  A joint case management conference statement is due one week in advance and shall identify Ms. Huang's co-counsel, if any, as well as why the addition of co-counsel means counsel can adequately represent the class.

The previously established pretrial schedule otherwise remains in effect.  (Dkt. No. 224.)

The Court STRIKES Plaintiffs' administrative motions to seal (Dkt. Nos. 233, 238) and Plaintiffs separately filed evidentiary objections (Dkt. No. 234-1).

//

//

1     This Order disposes of Docket Nos. 225, 233, 238.

2     **IT IS SO ORDERED.**

3     Dated:  May 9, 2023

4

5     JACQUELINE SCOTT CORLEY
      United States Magistrate Judge