1

2

3

4                         UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7   DANIEL GONZALEZ, et al.,                    Case No.  3:19-cv-07423-JSC

8                 Plaintiffs,

9          v.                                   **ORDER RE: WELLPATH'S MOTION
                                                FOR SUMMARY JUDGMENT**
10  COUNTY OF ALAMEDA, et al.,                  Re: Dkt. No. 434

11               Defendants.

12

13         Plaintiffs, 12 current or former detainees at Santa Rita Jail, bring individual Section 1983

14  claims against Wellpath, the private entity contracted to provide medical care at the Jail.  Plaintiffs

15  do not bring claims against any individual medical provider regarding the medical care they

16  received while at the Jail; instead, Plaintiffs chose to bring their section 1983 claims against

17  Wellpath only, alleging it has a policy and practice of delaying and denying medical care to Jail

18  detainees.  Wellpath moves for summary judgment insisting Plaintiffs have failed to offer

19  evidence sufficient to support a finding Wellpath had a policy or practice which caused Plaintiffs'

20  alleged injuries. (Dkt. No. 434.[1])  Having considered the briefs and relevant legal authority, and

21  having had the benefit of oral argument on July 10, 2024, the Court GRANTS the motion for

22  summary judgment.  Plaintiffs have not identified evidence sufficient to support a finding a

23  Wellpath policy or practice caused their alleged injuries.

24                                    **BACKGROUND**

25         Plaintiffs filed this putative class action in November 2019 alleging they are subject to

26  unlawful, inhumane, and unconstitutional treatment at the Santa Rita Jail.  Plaintiffs named as

27  _____

28  [1] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
    ECF-generated page numbers at the top of the document.

United States District Court
Northern District of California

defendants Alameda County, who oversees the Jail; Wellpath, the third-party contractor who provides medical services at the Jail; and Aramark, the third-party contractor who provides food services at the Jail.  Plaintiffs alleged the Jail operated on a for-profit model and the County's contracts with Aramark and Wellpath created incentives to prioritize profits over providing constitutionally adequate food and medical care to detainees.

Over the following three and a half years, Plaintiffs filed five amended complaints and Defendants moved to dismiss each version. Plaintiffs also sought a preliminary injunction in February 2021 on their inadequate and unsanitary food claims. The Court denied the motion because Plaintiffs had not demonstrated a likelihood of success on the merits of their claims regarding inadequate kitchen cleanliness, contaminated food, and food that lacked sufficient nutritional value in light of Defendants' unrebutted evidence regarding the Jail's policies and practices.  (Dkt. No. 95.)  A little over a year later, Plaintiffs moved for class certification, which the Court denied without prejudice because Plaintiffs' motion failed to demonstrate class certification was appropriate as, among other things, Plaintiffs had not identified proper class representatives and had not conducted discovery in support of their claims. (Dkt. No. 175.)  The Court granted Plaintiffs leave to file an amended complaint to substitute new named plaintiffs as class representatives. (Dkt. No. 179.)

Plaintiffs thereafter filed the now operative Fifth Amended Complaint.  (Dkt. No. 180.)  On November 17, 2022, the Court granted in part and denied in part Defendants' motion to dismiss the Fifth Amended Complaint and allowed Plaintiffs to proceed on the following claims: (1) inadequate and unsanitary food as to the County and Aramark; (2) inadequate medical care as to the County and Wellpath; (3) inadequate sanitation as to the County as well as Plaintiff Gerrans' individual claim against Deputies Joe and Ignot; and (4) Plaintiff Gerrans' First Amendment claim as to the County. (Dkt. No. 216.)

Six months later, the Court denied in part and conditionally granted in part Plaintiffs' second motion for class certification. (Dkt. No. 264.)  The motion was denied as to the inadequate medical care and inadequate food subclasses because Plaintiffs had not offered evidence of a systemic policy or practice as to either claim.  (*Id*. at 11.)  The Court conditionally granted the

United States District Court
Northern District of California

United States District Court
Northern District of California

motion as to Plaintiffs' inadequate sanitation subclass on the condition Plaintiffs' counsel obtain qualified co-counsel. (*Id.* at 20.) Two months later, upon appearance of additional Plaintiffs' counsel, the Court granted certification of a Federal Rule of Civil Procedure 23(b)(2) class on Plaintiffs' inadequate sanitation claim. (Dkt. No. 312.)

On March 6, 2024, after the close of fact discovery and while expert discovery was underway, the parties attended a settlement conference with Magistrate Judge Beeler. (Dkt. No. 409.) At a further settlement conference on May 21, 2024, Plaintiffs reached a settlement of their claims with the County and Aramark. (Dkt. No. 440.) The parties are in the process of finalizing that settlement.

Wellpath is not a party to the settlement and has moved for summary judgment on the single claim for relief pled against it by the 12 remaining individual plaintiffs: Lawrence Gerrans, Darryl Geyer, Daniel Gonzalez, Randy Harris, Cedric Henry, James Mallett, David Misch, Timothy Phillips, Erica Rivera, Rasheed Tucker, Eric Wayne, and Tikisha Upshaw. (Dkt. No. 434.) Each alleges different instances of different types of inadequate medical care. In their opposition to Wellpath's motion for summary judgment, Plaintiffs rely on the allegations of the Fifth Amended Complaint as well as expert opinions concluding that on specific instances, each plaintiff received medical care that fell below the standard of care. (Dkt. No. 452 at 13-28.[2])

The following summary of each Plaintiff's' claim is taken from Plaintiffs' opposition:[3]

- **Plaintiff Lawrence Gerrans** alleges "due to the lack of sanitation at Santa Rita Jail, he suffered a serious fungal or bacterial infection in his right foot, so that even today, he has trouble walking." (Dkt. No. 180 at 8:3-5.) Plaintiffs contend the failure to culture the infection "fell below the standard of care." (Dkt. No. 452 at 14.) Plaintiffs also appear to contend failure to x-ray his knee for another injury also fell below the standard of care. (*Id.*)

- **Plaintiff Darryl Geyer** alleges he suffered a knee injury following a fall in April 2019. (Dkt. No. 180 at 13:23-14:27.) Plaintiffs contend while he was prescribed

---

[2] For many of the statements in Plaintiffs' brief regarding the specifics of the Plaintiffs' individual claims there are no citations to the record. Although five Plaintiffs (Gerrans, Geyer, Misch, Phillips, and Wayne) submitted declarations with Plaintiffs' opposition brief, Plaintiffs only cite to the declarations proffered by Plaintiffs Geyer and Misch and only as support for some of their factual claims. (Dkt. No. 452 at 15-16, 22.) Plaintiffs likewise only cite deposition testimony for three Plaintiffs (Henry, Phillips, Rivera), but only as support for some of their factual claims.
[3] Citations are either to the Fifth Amended Complaint (Dkt. No. 180) or Plaintiffs' brief (Dkt. No. 452).

antiotics, the wound was not properly treated because it was not cultured, imaged, or properly cleaned.  (Dkt. No. 452 at 13-16.)  Plaintiffs' experts contend Mr. Geyer's treatment fell below the standard of care.  (*Id.* at 15.)

- **Plaintiff Daniel Gonzalez** alleges he suffered a severe tooth ache while at the Jail.  (Dkt. No. 180 at 7:18-27.)  Plaintiffs' expert opines Mr. Gonzalez only had one encounter with a dentist during his incarceration and the other staff who interacted with him were not sufficiently knowledgeable.  (Dkt. No. 452 at 17.)

- **Plaintiff Randy Harris** suffered a grand mal seizure in October 2020 but was only provided Tylenol and various doses of NSAIDS.  (Dkt. No. 180 at 9:11-19.)  Although Mr. Harris continued to have seizures, he did not have a neurological consult for a year.  (Dkt. No. 452 at 18.)  Further, because Mr. Harris had a peptic ulcer, Plaintiffs' expert opines prescribing NSAIDs fell below the standard of care.  (*Id.*)

- **Plaintiff Cedric Henry** complained of repeated headaches after contracting COVID-19 in Jail and was only prescribed analgesics but was not provided a neurological workup.  (Dkt. No. 452 at 19.[4])

- **Plaintiff James Mallet** was housed in a "filthy cell" and developed a skin infection.  (Dkt. No. 180 at 12:10.)  While nurses cleaned and dressed the wound, it was not cultured until he developed a fever two weeks later.  (*Id.* at 12:7-28.)  When Mr. Mallet developed recurrent ear infections which were cultured and treated with a variety of antibiotics, he was not referred to an ear nose and throat specialist or an audiologist which Plaintiffs' expert indicates fell below the standard of care.  (Dkt. No. 452 at 20-21.)  Further, Mr. Mallet has persistent complaints of knee discomfort and while x-rays were performed, he did not receive advanced imaging.  (*Id.* at 21.)

- **Plaintiff David Misch** found himself experiencing "body shakes, lack of energy, and depression" after he arrived at the Jail.  (Dkt. No. 452 at 21.)  He requested an increase in the amount of food he received because he was chronically hungry and his anils were splitting, but Wellpath did not write him a prescription for Ensure and instead only prescribed multivitamins.[5]  (*Id.*)

- **Plaintiff Timothy Phillips** has asthma which was aggravated by "biohazards in the housing units to which he was assigned."  (Dkt. No. 452 at 22.)   Inmates are not allowed to hold their own inhalers so he has to wait for staff to provide it to him when he is having an asthma attack and during the COVID-19 pandemic inmates used shared inhalers.  (Dkt. No. 452 at 23.)

- **Plaintiff Eric Rivera** fell and hit his head but was disciplined for requesting pain medication.  (Dkt. No. 180 at 10:8-12.)  Another time when he fell, he was given Motrin but no x-rays.  (Dkt. No. 452 at 24.)  He continues to experience headaches, low back pain, and shoulder pain. (*Id.*)   Over a one-month period in June-July 2019, Mr. Rivera complained of severe tooth pain and did not see a dentist for over six weeks at which time he had to have his tooth extracted.  (*Id.* at 25.)

---

[4] These allegations are not in the Fifth Amended Complaint; it only alleges "Cedric Henry suffers from long haul covid." (Dkt. No. 180 at 8:22-24.)
[5] At oral argument, Plaintiffs argued Mr. Misch was also denied timely COVID testing.  While this claim might be in his declaration, it was neither alleged in the Fifth Amended Complaint nor made in Plaintiffs' opposition brief.

- **Plaintiff Rasheed Tucker** has a diagnosed mental health condition and was housed with detainees who had severe mental impairments which caused his mental health to deteriorate.  (Dkt. No. 180 at 13:10-18.)  Mr. Tucker arrived at the Jail with a gunshot wound to his hand, but it was not treated.  (*Id*. at 13:19-22.)  Mr. Tucker was also not referred for a full cardiac workup, although EKGs were performed and he was diagnosed with sinus bradycardia or slow heart rate with nonspecific ST-T wave changes.  (Dkt. No. 452 at 26:1-6.)

- **Plaintiff Eric Wayne** suffers from a chronic condition of blood clots in his left leg.  (Dkt. No. 180 at 11:20.)  He developed a fungal leg infection from bathing in "dirty showers." (*Id*. at 11:21.)  He was prescribed hydrocortisone cream and a salve, but the wound was not cultured.  (*Id*. at 11:24-27.)  His leg is now swollen and black, but he has not been taken for diagnostics or examined by a medical doctor.  (*Id*.)

- **Plaintiff Tikisha Upshaw** fell out of her top bunk and while she received an x-ray for her hands, she was only provided pain medication for persistent headaches and neck pain.  (Dkt. No. 180 at 11:2-15.)

## OBJECTIONS

The parties have each filed objections and motions to strike the other party's experts as well as objections to other evidence.  (Dkt. Nos. 427, 433, 435, 446, 459, 469 at 9-13, 471, and 472.)  For the most part, the objected-to evidence is not material to the Court's decision and it is thus unnecessary to resolve the parties' objections.  To the extent the Court does consider the objected-to evidence, the objections are addressed in context.

## DISCUSSION

"Summary judgment is proper where the movant shows, by citation to the record, that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021).  However, when, as here, the nonmoving party has the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)); *see also Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) (holding the *Celotex* "showing" can be made by "pointing out through argument—the absence of evidence to support plaintiff's claim")).  Once the moving party carries its initial burden, the adverse party must provide affidavits or other sources of evidence that "set forth specific facts showing that there is a genuine issue for trial." *Devereaux*, 263 F.3d at 1076 (citing Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 323–24; *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1107 (9th Cir. 2000)

1    (holding once the moving party carries its initial burden of production, "the nonmoving parties

2    were obligated to produce evidence in response")).

3        "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after

4    adequate time for discovery and upon motion, against a party who fails to make a showing

5    sufficient to establish the existence of an element essential to that party's case, and on which that

6    party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322 (explaining plaintiff's failure

7    to produce proof to establish elements of cause of action upon which he bears burden of proof at

8    trial warrants summary judgment).  The moving party can meet its burden "by 'showing'—that is,

9    pointing out to the district court—that there is an absence of evidence to support the nonmoving

10   party's case." *Id.* at 325.

11   **I.    SECTION 1983 CLAIM**

12       "To establish § 1983 liability, a plaintiff must show both (1) deprivation of a right secured

13   by the Constitution and laws of the United States, and (2) that the deprivation was committed by a

14   person acting under color of state law." *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143,

15   1149 (9th Cir. 2011).  Each Plaintiff brings a Section 1983 claim against Wellpath alleging

16   Wellpath "subjected Plaintiff … to a substantial risk of serious harm and injury from the harmful

17   and inhumane effects of denial and delay of necessary and needed medical care and the inadequate

18   medical care" in violation of the Fourteenth Amendment.  (Dkt. No. 180 at ¶ 236.[6])  Plaintiffs base

19   this claim on the theory Wellpath is financially incentivized to "refuse and withhold needed and

20   appropriate outside medical services to all prisoners, including pregnant prisoners, when the

21   needed and appropriate medical services consist of 'inpatient hospitalization costs . . . outpatient

22   physician consultations, outside specialist[s, or] off-site diagnostic procedures,' among other

23   services."  (Dkt. No. 180 at ¶ 127.)

24       **A.    Wellpath is Subject to Suit Under Section 1983**

25       Plaintiffs only bring a claim against Wellpath and not any individual medical provider.

26

27   ─────────────
     [6] Plaintiffs bring the same claim under the Eighth Amendment.  (Dkt. No. 180 at ¶ 242.)
28   However, Plaintiffs concede as pretrial detainees, they are only eligible to bring claims under the
     Fourteenth Amendment.  (Dkt. No. 452 at 11, n. 4.)

United States District Court
Northern District of California

While municipalities and other local government entities are subject to suit under Section 1983, Wellpath is a private entity. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (holding municipalities and other local government units could be sued for constitutional violations under section 1983). But a private entity can be held liable under section 1983 when "the conduct allegedly causing the deprivation of a federal right [was] fairly attributable to the State." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012).   There is no dispute Wellpath—as the entity providing medical care at the Jail—was performing a public function and thus can be sued as a public entity under Section 1983. *See Tsao*, 698 F.3d at 1140.

### B.   *Monell* Liability

A claim for municipal liability under Section 1983, known as a "*Monell*" claim, requires proof: (1) the plaintiff was deprived of a constitutional right; (2) the municipality had a policy; (3) this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) the policy is the moving force behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).  "A municipality may not [] be sued under a respondeat superior theory." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019).  Thus, to prevail on their claim against Wellpath under *Monell*, each Plaintiff must ultimately prove (1) a constitutional violation occurred; and (2) the violation was caused by a Wellpath policy. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1024 (9th Cir. 2008).

Plaintiffs' constitutional claim—that Wellpath was deliberately indifferent to their serious medical needs in violation of the Fourteenth Amendment—requires proof (i) Wellpath made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) Wellpath did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, Wellpath caused the plaintiff's injuries. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). The "mere lack of due care by a state official is not enough to show a constitutional violation"; instead, "[t]he plaintiff must prove more than negligence but less than subjective intent—

United States District Court
Northern District of California

7

something akin to reckless disregard." *Alexander v. Nguyen*, 78 F.4th 1140, 1145 (9th Cir. 2023) (internal citation omitted).

Wellpath moves for summary judgment on the grounds even assuming each Plaintiff on some occasion received deficient medical care causing injury, the record evidence is insufficient to support a finding a Wellpath policy caused the injury.

### 1.   Plaintiffs Bear the Burden to Demonstrate an Unconstitutional Policy, Custom or Practice Caused Their Injuries

To ultimately prevail on their *Monell* claim, Plaintiffs must demonstrate the violation of their constitutional rights was the result of "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton*, 915 F.3d at 602–03 (citing *Monell*, 436 U.S. at 693-95). So, regardless which theory is alleged, the plaintiff must show "the policy is the moving force behind the constitutional violation*." Dougherty*, 654 F.3d at 900-01; *see also City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985) ("At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."). Further, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Tuttle*, 471 U.S. at 823-24. Plaintiffs' *Monell* claim is predicated on the second theory of liability: "Wellpath has a de facto pattern and practice of providing delayed and substandard health care." (Dkt. No. 452 at 34.)

Wellpath contends Plaintiffs have failed to identify evidence sufficient to support a finding a Wellpath policy or practice caused, that is, was the moving force behind, any Plaintiff's alleged injuries. *See Celotex v. Catrett*, 477 U.S. 317, 322–323 (1986) ("a complete failure of proof concerning an essential element of the nonmoving party's case … renders all other facts immaterial"). Wellpath insists at most Plaintiffs offer evidence of individualized instances of alleged breaches of the standard of care, but that this evidence is insufficient to establish *Monell* liability. The Court agrees.

//

United States District Court
Northern District of California

2.      Dr. Waldman

Plaintiffs first argue the testimony of their expert, Dr. Sherwin Waldman, supports a finding Wellpath had a pattern and practice of providing constitutionally-deficient medical care. (Dkt. No. 452 at 7.)  Plaintiffs retained Dr. Waldman to opine as to "the medical care provided to the [Plaintiffs] during the time that they were incarcerated at the Santa Rita Jail in Dublin, California." (Dkt. No. 433-3 at 2.)  For purposes of this motion, the Court does not resolve Wellpath's objections to Dr. Waldman's testimony and instead assumes his testimony is admissible.

Dr. Waldman's testimony is insufficient to support a finding Wellpath had a pattern and practice of providing constitutionally deficient medical care.  He only offers "opinions as to whether an appropriate standard of medical care was met in each of the [Plaintiffs'] individual cases." (Dkt. No. 433-3 at 2.)  Assuming a reasonable trier of fact could find that the 12 plaintiffs at least once experienced some sort of constitutionally deficient medical care, their experiences are too different to support a finding of a practice of providing constitutionally deficient care.  As the previous description of their claims shows, *see infra* at pp. 3-5, some Plaintiffs experienced issues with dental care, others with mental health treatment, and still others with asthma, and so on.  Further, Plaintiffs offer no evidence as to the numbers of detainees Wellpath treated during the (undefined) period Wellpath was responsible for Plaintiffs' care.  Even if some pattern and practice could be found from such diverse circumstances, what percentage of detainees needing care received constitutionally deficient care?  What providers were responsible for the deficient care?  The record leaves these basic questions unanswered.

Further, Dr. Waldman's general conclusions do not support a finding that a Wellpath policy caused any Plaintiff to suffer a constitutional violation, that is, to be injured as a result of deliberate indifference to medical needs.  He opines "[t]here is poor access to advanced imaging particularly in cases of trauma and orthopedic issues. There is poor access and referral to outside medical specialists for consultation and further testing." (Dkt. No. 455 at 12.)  Further, "[w]hile dental care appears to be thorough and well documented there appears to be long waits to be seen while patients are in pain." (*Id.*)  Dr. Waldman also credits the Jail with having "an in-house

9

orthopedic program." (*Id*.)  Dr. Waldman concludes:

> Some of these issues involve direct medical care, others appear to be Wellpath administration issues.  After such consultations or advanced imaging is recommended it is unclear as to what is the process for approval.  Why are they infrequently ordered?  Why are they delayed?  Are these referrals reviewed by medical personnel?  Are there other administrative issues that play a role in these decisions?

(Dkt. No. 433-33 at 16.[7])  Dr. Waldman does not answer these questions nor does he opine—despite Plaintiffs' argument otherwise—that these delays and denials are because of a Wellpath policy or practice.  So, even accepting Dr. Waldman's conclusions that the care provided to Plaintiffs on particular occasions fell below the standard of care, he does not opine or offer any evidence this deficient care was *because of* a Wellpath policy or practice, let alone a policy or practice that amounts to deliberate indifference.  *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989) ("a municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'").

### 3.    Professor Feachem

Plaintiffs' expert Neelam Sekhri Feachem does not fill in the gap left by Dr. Waldman.  Professor Feachem is an Associate Professor at the Institute of Global Health Sciences located within the School of Medicine at the University of California, San Francisco who "focus[es] on global health systems and financing policy, with a particular emphasis on low income and vulnerable populations."  (Dkt. No. 433-2 at 2.[8])  Professor Feachem opines Wellpath's contract with the County has "[p]erverse contract incentives with lack of accountability and oversight by [the Alameda County Sheriff's Office]."  (Dkt. No. 433-2 at 6.)  For purposes of this motion, the Court does not resolve Wellpath's objections to Professor Feachem's testimony and instead assumes her testimony is admissible.

---

[7] Although Plaintiffs cite and rely on Dr. Waldman's opinions, they did not file a complete copy of his report (or even a copy of all the pages they cite) with their opposition.  While it is not the Court's task to "scour the record" in search of evidence to support Plaintiffs' claims, *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996), the Court has located the complete version of Dr. Waldman's report as it was attached to Wellpath's motion to exclude his testimony.  (Dkt. No. 433-33.)

[8] Plaintiffs again did not file a complete copy of Professor Feachem's report with their opposition brief, but it was attached to Wellpath's motion to exclude her testimony.  (*Compare* Dkt. No. 454 *with* Dkt. No. 433-2.)

United States District Court
Northern District of California

United States District Court
Northern District of California

Professor Feachem's opinion is two-fold.  First, she describes Wellpath as a for-profit healthcare provider who provides "low-quality health services across county jails in California and the U.S." (Dkt. No. 433-2 at 4.)    This opinion is based on Wellpath's ownership by the private equity firm H.I.G. Capital, the 1,000 federal lawsuits pending against it in federal courts throughout the country, and a letter sent to Wellpath and H.I.G. Capital by a group of U.S. Senators regarding concerns Wellpath was providing inadequate health care in prisons and jails across the United States.  (*Id*. at 4-5.)

Second, Professor Feachem opines Wellpath's contract with the Alameda County Sheriff's Office has "perverse contract incentives with lack of accountability and oversight by ASCO."  (*Id.* at 6.)  She describes it as a "global capitation contract" which is "not uncommon in the industry." (*Id*.)  She opines "inherent in this type of contract is an incentive for the provider to withhold services and deny access to referral outside of the Jail for conditions that require specialist care or hospitalization" because "Wellpath received a set fee to cover all healthcare services and must pay outside providers and hospitals for the costs of referrals.  All monies that Wellpath saves result in higher profits for private equity investors."  (*Id*.)

Assuming Professor Feachem's opinion is admissible, it does not supply the evidence missing from Dr. Waldman's opinion, that is, evidence that supports a finding any Plaintiff's deficient care was caused by a Wellpath policy or practice.  For example, what evidence supports a finding these "perverse incentives" led to the failure to culture and properly clean Mr. Gerrans and Mr. Geyer's wounds, or the delay in Mr. Gonzalez seeing a dentist, or the failure to x-ray Ms. Upshaw's neck?  Professor Feachem notably does not opine these perverse incentives are likely to cause the specific injuries complained of here and her testimony does not bridge the evidentiary gap to explain what economic incentive Wellpath would have to fail to culture wounds, fail to clean wounds, fail to x-ray injuries, or fail to prescribe Ensure.

Plaintiffs insist Professor Feacham need not have any knowledge regarding the factual basis for Plaintiffs' claims because she analyzed the contract and is uniquely qualified to do so as an expert in "healthcare financing and the impact of healthcare financing on the actual delivery of healthcare," and she reviewed "Wellpath's medical staff's qualifications, Wellpath's medical

staff's depositions, and Wellpath's medical staff's admitted lack of necessary knowledge for the effective delivery of medical care to Santa Rita inmates," and the Mazar's audit report.  (Dkt. No. 449 at 17.)   But this response discloses Plaintiffs' fundamental misunderstanding of their *Monell* burden.  Rather than sue individual Wellpath medical providers for deliberate indifference to medical needs, *see, e.g.*, *Alexander v. Nguyen*, 78 F.4th 1140, 1143 (9th Cir. 2023), each Plaintiff decided to plead a single *Monell* claim against Wellpath.  So, to survive summary judgment, Plaintiffs must prove not only that their injuries were caused by conduct that amounted to deliberate indifference to medical needs, but also that a Wellpath policy or practice caused that deliberately indifferent conduct.  Professor Feacham's opinion adds nothing to that analysis.  Her opinion Wellpath's contract with the County incentivizes Wellpath to provide less care because it is paid a flat rate per detainee does not support a finding of a *Monell* violation because she does not connect the contract to the care decisions made for any Plaintiff.  Professor Feachem testified:

> Q.· ·Would it also be true that it would be speculation on your part to testify that Wellpath or any of their providers withheld care to any of these plaintiffs who I just mentioned because of perverse contract incentives?
>
> \*\*\*
>
> A. ·I could not comment on those particular cases.
>
> Q.· Would you please help me understand why you could not comment on any of those cases?
>
> A.· ·Because I was not asked to review those medical records. ·
>
> Q.· ·Why would you need to look at those medical records · in order to come to a conclusion whether the treatment of those plaintiffs were withheld because of perverse contract incentive as you have defined that term?
>
> A.· ·Because each case is individual.· Where the contract applies to the population of inmates at Santa Rita Jail, each individual has been treated differently and for different conditions, and so I cannot comment whether care was withheld in those particular cases.

(Dkt. No. 433-4, Feachem Depo. at 16:14-17:10.)

Professor Feachem's opinions regarding the Wellpath medical director's lack of engagement with the administrative functions of her role managing the Jail's medical services also

do not support a finding some Wellpath policy or practice caused any Plaintiff to suffer a constitutional violation.  Professor Feachem's opinion Michael Durbin, the registered nurse serving as the Jail's Health Services Administrator, demonstrated a lack of experience and advanced healthcare management training, is also insufficient as there is a complete absence of evidence supporting a finding that this lack of experience caused any Plaintiff to suffer injuries from conduct that amounted to deliberate indifference to medical needs.

Professor Feachem's reliance on the quality assurance report prepared by Mazars, the third-party the County hired to audit Wellpath's compliance with its contract with the County, is likewise not probative of the *Monell* claim.[9]  While Plaintiffs and Professor Feachem argue the report "found several compliance issues," they do not tie those compliance issues to the claims in this action.  (Dkt. No. 452 at 10; *see also* Dkt. No. 454-1 (Prof. Feachem Supp. Report).)  Professor Feachem indicates the report "addresses four areas of quality of care: 1) Alerts and Problems, 2) Specialty and Ongoing Medical Care, 3) Patient Monitoring, and 4) Documentation." (Dkt. No. 454-1 at 4.)   Professor Feachem states the report "assesses 28 indicators across these four domains," but she does not identify the "indicators" and those referenced "Problems (after intake), Emergency Response Medication and MAR Reconciliation, Restraints (frequency of monitoring)," "Translation/Interpreter," "Suicide Watch," "Alerts (after intake)," "Alcohol/Benxodiazepine Withdrawal and Opiate/Opiiod Withdrawal," for example, do not appear to have anything to do with Plaintiffs' claims here.  (*Id*. at 4-6.)  That is, Professor Feachem does not opine the report measured the issues complained of here—failure to culture wounds, delays in care, refusals to refer to specialists, and refusals to order advanced imaging or testing.  (Dkt. No. 454-1 at 4-7.)  Nor have Plaintiffs offered evidence any of the compliance issues cited in the report were based on a Wellpath policy or practice generally or a Wellpath policy or practice to deny or delay care specifically based on cost.[10]

---

[9] The Court notes Wellpath's objection to the Mazars report under Federal Rule of Civil Procedure 37(c)(1), but does not rule on the objection given the Court's conclusion the audit is irrelevant to the questions before it.

[10] It is also unclear if the period of the audit, 2022-2023, overlaps with the timeframe of Plaintiffs' injuries.  Because Plaintiffs do not provide evidence of the dates of their alleged injuries, this cannot be verified although Wellpath argues the dates do not overlap.  (Dkt. No. 469 at 10.)

United States District Court
Northern District of California

1    So, even accepting Professor Feachem's conclusion that Wellpath is a for-profit health care

2    provider and its global capitation contract with the County creates perverse incentives to reduce

3    costs, Professor Feachem does not opine or offer any evidence these perverse incentives created a

4    Wellpath policy or practice which caused or even was likely to cause any Plaintiff injuries here.

5    *See Canton*, 489 U.S. at 389 ("a municipality can be liable under § 1983 only where its policies

6    are the 'moving force [behind] the constitutional violation.'").

### 4.    Plaintiffs' Other Experts

8    Plaintiffs also offer testimony from two medical experts: Dr. Carlos Franco-Pardes, an

9    infectious disease specialist, (Dkt. Nos. 454-4, 454-5); and Dr. Morton K. Rosenberg, a dentist

10   (Dkt. No. 454-7.)  Neither provide evidence of a Wellpath policy or practice which caused any

11   individual Plaintiff's injuries complained of here.  To be sure, both opine as to occasions on which

12   the level of care Plaintiffs received fell below the standard of care.  For example, Dr. Rosenberg

13   opined Plaintiff Daniel Gonzalez's dental care fell below the standard of care because his reports

14   of dental pain were not adequately addressed and he only saw a dentist once without adequate

15   diagnostic x-rays.  (Dkt. No. 454-7 at 2-3.) Dr. Franco-Paredes opined the care provided to Darryl

16   Geyer, James Mallet, Lawerence Gerrans, and Eric Wayne all fell below the standard of care

17   because their living conditions were unsanitary and their wounds were not properly cultured or

18   treated.  (Dkt. No. 454-4 at 2-7.)

19   But neither Dr. Franco-Paredes nor Dr. Rosenberg opined the treatment decisions which

20   caused Plaintiffs' injuries were made pursuant to a Wellpath policy or practice.  To the contrary,

21   Dr. Franco-Paredes testified nothing in Mr. Gerrans' medical records explained why his wound

22   was not cultured. (Dkt. No. 454-6, Franco-Paredes Depo. at 82:25-83:4.)  Nor did Dr. Franco-

23   Paredes see anything in Mr. Geyer's file that explained why the MRI that had been ordered was

24   not done.  (*Id*. at 70:1-5 ("Q: Have you seen any records where somebody at Wellpath evaluated a

25   request by Dr. Malitorise that an MRI be obtained for Mr. Geyer, and they failed to approve that

26   request? A: I don't see any of that.")

27   Thus, even accepting Dr. Franco-Paredes and Dr. Rosenberg conclusions that the care

28   provided to these Plaintiffs on these occasions fell below the standard of care, they do not opine or

United States District Court
Northern District of California

14

offer any evidence this deficient care was *because of* a Wellpath policy or practice, let alone a policy or practice that amounts to deliberate indifference.  *See Canton*, 489 U.S. at 389.

### 5.   The 2021-2022 Grand Jury Report

Plaintiffs also insist the 2021-2022 Alameda County Grand Jury Report's "scathing criticism of Wellpath's activities at the Santa Rita Jail" demonstrates a policy and practice of denying and delaying care.  (Dkt. No. 452 at 37.[11])  The actual report, however, does not support Plaintiffs' argument.  The report concludes in relevant part:

> The Grand Jury confirmed that demand for medical services exceeded available capacity, often causing long wait times for appointments. The Grand Jury also learned that appointment delays and cancellations (for instance, to attend a court hearing) contributed to issues with continuity of medication for some patients. The Grand Jury was unable to confirm the root cause of this imbalance between supply and demand and concludes that it warrants a coordinated review by Wellpath and Santa Rita leadership.
>
> Santa Rita recently initiated monthly, independent quality assessments of health care provided to detainees. The Grand Jury reviewed the resulting Monthly Quality Dashboard delivered in March 2022 and noted that it found examples of incomplete and inaccurate information in medical records as well as operational procedures that interfered with care delivery.
>
> Although reported quality levels were far below established standards, the Grand Jury was impressed with the rigor of the audit, the quality of the recommendations, and the jail commander's personal participation in the monthly review meeting. Obtaining accurate information on the scope and nature of operational issues is a critical first step in addressing the problem, and the Grand Jury believes that the introduction of this process will be useful in monitoring not only access to care but also the quality of care.
>
> The contract between Wellpath and ACSO includes requirements that Wellpath ensure minimum staffing by job function and maintain a low error rate across quality audits. The contract provides for monetary penalties for each understaffed shift and each occurrence of below-goal quality delivery. The Grand Jury understands that historically no penalties have been levied against Wellpath for understaffing or inadequate levels of quality. The Grand Jury believes these monetary penalties are an important tool to ensure that Wellpath delivers on its contractual obligations. The Grand Jury also encourages ACSO to actively pursue these penalties in each instance when contract requirements are not met.

---

[11] The Court notes Wellpath's objection to Plaintiffs' reliance on the Grand Jury report, but does not rule on the objection given the Court's conclusion the report is irrelevant to the issues presented here.

(Dkt. No. 453-5 at 6.)  The Report also notes the Jail's former medical director was terminated after Wellpath learned she had been using Jail prescription pads to self-prescribe medication.  (*Id.* at 6-7.)

The Report does not support a finding Wellpath has or had a policy or practice of delaying and denying medical care which caused any Plaintiff to be injured by conduct that amounted to deliberate indifference to medical needs.  Again, as a threshold matter, it says nothing about the care provided to Plaintiffs here and thus is not evidence Wellpath had a policy or practice which caused any Plaintiff's injuries.  Nor is it evidence Wellpath even has such a policy or practice.  First, the Report notes "the Grand Jury was unable to confirm the root cause of th[e] imbalance between supply and demand."  (*Id.* at 6.)  Second, there is no explanation or context for the statement "quality levels were far below established standards."  (*Id.*)  Finally, the Report notes Wellpath's contract with the County calls for specific staffing levels and monetary penalties if these levels are not met, but "historically no penalties have been levied against Wellpath for understaffing or inadequate levels of quality."  (*Id.*)  None of these findings support a finding of a Wellpath systemic custom or practice to deny or delay medical care to reduce costs, let alone a practice that caused any Plaintiff's injuries.  *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("[a]bsent a formal governmental policy, [plaintiff] must show a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity.'").

### 6.      Plaintiffs Challenge Individual Treatment Decisions

Finally, Plaintiffs have provided a chart which they contend is "inferential evidence" "that financial considerations have motivated Wellpath's policy and practice of denying or delaying needed medical or dental care."  (Dkt. No. 452 at 40.)  Drawing all inferences in Plaintiffs' favor, the chart illustrates particular situations when these plaintiffs were denied care, but this is insufficient to support a finding of a pattern or practice that led to the deliberate indifference to a plaintiff's medical needs.  *See Trevino*, 99 F.3d at 918.  A particular plaintiff's "individual experience simply does not provide the duration, frequency, and consistency necessary to prove a municipal custom of deliberate indifference under *Trevino*." *Ramirez v. Las Vegas Metro. Police Dep't*, 22 F. App'x 828, 831 (9th Cir. 2001).

16

First, the chart cites only two purported examples of "financial incentives to delay/deny care." (*Id.* (citing Ex. 24 at 37:7-38:21; Ex. 23 at 156:12-23).)  Exhibit 23 is a portion of Ms. Upshaw's deposition where she testified she was not sent for an X-ray after she fell from a top bunk because *she guessed* "it was cheaper for them to give me a finger splint." (Dkt. No. 455-6, Upshaw Depo. at 156:12-23.)  Exhibit 24 is a portion of Mr. Wayne's testimony regarding his need to obtain a court order to get special shoes because the Jail would not provide them. (Dkt. No. 455-8, Wayne Depo. at 37:13-38:22.)  Neither Ms. Upshaw's nor Mr. Wayne's testimony is evidence of a *Wellpath* policy or practice to deny or delay care based on a desire to reduce costs; indeed, their testimony provides no evidence as why they were not provided the X-ray or the shoes.

Second, to the extent the chart lists other categories such as "Delay & Denial: Diagnostic: Imaging & Lab Work," "Excessive delay: Dental Pain- Poor Quality Dental Work," and "Excessive Delay: Physical Pain," among others, Plaintiffs do not offer evidence that supports a finding these denials and delays were based on a *Wellpath* policy or practice, let alone a policy that amounted to or led to deliberate indifference to medical needs.  (Dkt. No. 452 at 40.)

Third, the only evidence Plaintiffs offer about a Wellpath physician stating they could not get approval to provide additional care are declarations from two Plaintiffs, Darryl Geyer and Eric Wayne, describing statements made by Jail medical personnel. (Dkt. Nos. 452-2 (Geyer Decl.); Dkt. No. 452-5 (Wayne Decl.).)  Mr. Geyer attests Dr. Molitorisz would ask him when he was getting out because there was no way she could "get approval for a comprehensive cleaning of your knee" and a charge nurse who worked with Dr. Molitorisz said "you'll get better care outside of here" and "I wouldn't want to be treated here myself." (Dkt. No. 452-2 at ¶¶ 3-4.)  Mr. Geyer also attests Jail staff removed the metal pieces from his knee brace and Dr. Molitorisz told him it was because they "have a policy with custody to remove the metal and plastic from your assistive devices so we don't have to house you in OPHU.  There's no way I can get approval to house you back here, just for a knee brace." (*Id.* at ¶¶ 16, 17.)

Wellpath objects to Mr. Geyer's statements as hearsay. (Dkt. No. 469 at 12.)  While Plaintiffs filed a response to Wellpath's objections, they did not address Wellpath's objections to

the Plaintiff declarations offered with their opposition brief.  (Dkt. Nos. 471, 472 (duplicate filing).)  Dr. Molitorisz's statement is an out of court statement offered for the truth of the matter asserted and thus hearsay.  *See* Fed. R. Evid. 801(c).  At oral argument, Plaintiffs argued the statement fell under the party opponent exception to the hearsay rule.[12]  However, Plaintiffs' oral proffer failed to demonstrate the exception—which requires a showing the statement "was made by a person whom the party authorized to make a statement on the subject" or "made by the party's agent or employee on a matter within the scope of that relationship and while it existed"— applies.  *See* Fed. R. Evid. 801(d)(2)(C), (D).   But, even if Plaintiffs showed the hearsay exception applies, the statements Mr. Geyer attests Dr. Molitorisz and the charge nurse made do not support an inference Wellpath has a policy or practice of denying care.  Dr. Molitorisz did not say she could not get approval for the cleaning because Wellpath would say it was too expensive, or otherwise explain why she believed she could not get approval.  While she did indicate Wellpath had a policy precluding detainees from having metal in their assistive devices, there is no suggestion this was because of cost as opposed to, for example, security concerns—or even that it was a Wellpath policy as opposed to a Jail policy.  Plaintiffs do not offer deposition testimony from Dr. Molitorisz or the charge nurse Mr. Geyer referenced.

The statement in Eric Wayne's declaration that Mr. Cooper, a physician's assistant at the Jail, "told me more than three times that he put in a request for me to be taken to Highland Hospital to see a dermatologist" is likewise inadmissible hearsay and Plaintiffs have not demonstrated an exception to hearsay rule applies.  (Dkt. No. 452-5 at ¶ 6.)  Even if Mr. Cooper's statement is not hearsay, his statement is not evidence of a Wellpath policy or practice to deny or delay care.  While Mr. Cooper was deposed, Plaintiffs do not offer evidence—nor does the Court's independent review identify—any testimony stating this or any other care decision was based on a Wellpath policy or practice to deny or delay care.  (Dkt. No. 455-3.)

Indeed, while Plaintiffs deposed Dr. Slabaugh (the orthopedist who treated many of the

---

[12] Plaintiffs also argued the exception for statements made for medical diagnosis applied; however, "Rule 803(4) applies only to statements made by the patient to the doctor, not the reverse." *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1316 (9th Cir. 1985).

United States District Court
Northern District of California

Plaintiffs), Plaintiffs do not offer evidence Dr. Slabaugh or any physician or nurse testified as to the basis for their treatment decisions or that Wellpath directed them to deny or delay care, to not order cultures, to not provide referrals to specialists, or to not order advanced imaging because of costs or any other reason.  Nor have Plaintiffs identified any evidence from Plaintiffs' medical records indicating cost was a factor in any of their treatment decisions.  And the evidence provided is to the contrary.  When Dr. Slabaugh was asked: "what kinds of criteria do you use determining whether an infection, such as an infection in a left knee, requires culturing?"  He responded:

> A.     It's, as I say, a clinical judgment.· So, it would depend on a multitude of factors.· The host. Immunological status.· The kind of history of how the infection resolved.· Whether it had previously been treated with any antibiotics.
>            So, it's a hard question.· I don't think There's a hard and fast answer.

(Dkt. No. 455-6, Slabaugh Depo. at 123:14-23.)

Finally, to the extent Plaintiffs' experts opine the care provided to these Plaintiffs on particular occasions fell below the standard of care, this is not the only relevant question.   To prevail on their *Monell* claim, each Plaintiff must prove both a constitutional violation occurred *and* the violation was caused by a Wellpath policy or custom.  *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1024 (9th Cir. 2008).  Plaintiffs' experts offer evidence of neither.   Deliberate indifference requires more than the lack of due care—negligence is not enough.  *See Alexander v. Nguyen*, 78 F.4th 1140, 1145 (9th Cir. 2023).  And, no expert opines the reason any Plaintiff's care fell below the standard of care was *because of* a Wellpath policy or practice.

Plaintiffs cannot meet their burden merely by relying on individual treatment decisions. Plaintiffs do not bring negligence claims or deliberate indifference claims against any of their individual medical providers, nor did they bring a negligence claim against Wellpath.  Instead, they only pled a *Monell* claim and *Monell* claims cannot be based on respondeat superior liability. *See Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.").  Municipalities can be held liable only when there is "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton*

19

United States District Court
Northern District of California

1  *v. Harris*, 489 U.S. 378, 385 (1989).

2  Plaintiffs' reliance on *Jennings v. Cnty. of Riverside*, No. 5:19-01523 JFW (ADS), 2023

3  WL 9379974 (C.D. Cal. Sept. 1, 2023), is misplaced.[13] The plaintiffs there argued the county had

4  "a policy to deny soft shoes to inmates even if an inmate complains of pain" and offered "various

5  prisoner grievances that support his argument that [such] a policy exists." *Id.* at *7.  In finding the

6  grievance created a dispute of fact as whether the policy existed, the court relied on grievances

7  reflecting "denials of several inmates' complaints of foot pain and requests for soft shoes as well

8  as "numerous grievance responses by medical staff note that the various grieving inmates 'do not

9  meet the criteria for [soft] shoes per jail *policy*.'" *Id.* at *8 (emphasis added) (the alleged policy

10  was to delay soft shoes to all non-diabetic inmates).

11  Plaintiffs offer no such evidence here.  They offer evidence of incidents when their care

12  was allegedly denied or delayed—different types of care, for different types of conditions, the

13  circumstances of each were unique.  But they do not offer evidence the denials or delays were

14  *because of* a Wellpath policy or practice.

15  \*\*\*

16  In sum, Plaintiffs have failed to proffer evidence sufficient to support a finding in their

17  favor on their individual *Monell* claim against Wellpath.  Despite the many years this case has

18  proceeded, and the considerable leeway the Court has given Plaintiffs, they have failed to identify

19  evidence sufficient to support a finding in any Plaintiff's favor on the *Monell* claim.  While the

20  evidence Plaintiffs have proffered might have created a dispute of fact as to whether the care they

21  were provided on particular occasions fell below the standard of care, that is not the claim they

22  brought.  Since they have failed to offer evidence that supports a finding a Wellpath custom or

23  policy or pattern and practice was the moving force behind any Plaintiff's challenged individual

24  treatment decisions, Wellpath's motion for summary judgment must be granted.

---

[13] Plaintiffs' reliance on *Davis v. Akabike*, No. 19 CV 01504 DAD JLT (PC), 2021 WL 4991649 (E.D. Cal. Oct. 27, 2021), report and recommendation adopted, 2021 WL 5760531 (E.D. Cal. Dec. 3, 2021), is likewise unavailing as it did not involve a *Monell* claim, but rather a deliberate indifference claim against the plaintiff's treating physician.

**CONCLUSION**

For the reasons stated above, Wellpath's motion for summary judgment is GRANTED. (Dkt. No. 434.)

Wellpath's administrative motion to seal is GRANTED. (Dkt. No. 439.)

The Court will enter judgment following dismissal of Plaintiffs' claims against the County and Aramark.

This Order disposes of Docket Nos. 427, 433, 434, 435, 439, and 473.

**IT IS SO ORDERED.**

Dated: July 12, 2024

JACQUELINE SCOTT CORLEY
United States District Judge